UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, | ) | |
| DRIFTLESS AREA LAND CONSERVANCY, | ) | |
| WISCONSIN WILDLIFE FEDERATION, and | ) | |
| DEFENDERS OF WILDLIFE | ) | |
| | ) | |
| Plaintiffs, | ) | NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| RURAL UTILITIES SERVICE, | ) | |
| CHRISTOPHER MCLEAN, Acting Administrator, Rural | ) | |
| Utilities Service, | ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, | ) | |
| CHARLES WOOLEY, Midwest Regional Director, and | ) | |
| SABRINA CHANDLER, Manager, Upper Mississippi River | ) | |
| National Wildlife and Fish Refuge, | ) | |
| | | |
| Defendants. | | |

---

## COMPLAINT

---

Plaintiffs NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE for their Complaint allege and state as follows:

## INTRODUCTION

1.      This is a civil action for declaratory and injunctive relief under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, for the Defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et

seq., and the National Wildlife Refuge System Improvement Act of 1997 ("National Refuge Act"),

16 U.S.C. §§ 668dd–668ee.

2.     This lawsuit involves the proposed controversial 101-mile Cardinal-Hickory Creek

("CHC") high-voltage transmission line with towers up to 20 stories high. The huge CHC

transmission line is proposed to run on a wide path from Dubuque County, Iowa, directly through

the protected Upper Mississippi River National Wildlife and Fish Refuge ("the Upper Mississippi

Refuge"), and then through southwest Wisconsin's scenic Driftless Area, the Military Ridge

Prairie Heritage Area, the Black Earth Creek Conservation Area, and other vital natural resources,

family farms, wetlands, parklands, and communities before ending at a substation in Middleton,

Wisconsin.

3.     If allowed to proceed, the CHC transmission line will have significant negative

impacts on the environment, on wildlife, on property values, on family farms and agriculture, on

the outdoor recreation and tourism industry, on protected public lands, and on private conservation

lands both near the Mississippi River and along its entire proposed length.

4.     This lawsuit challenges two categories of federal agency actions related to the CHC

transmission line that were unlawful and should be set aside under the APA as arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction,

authority, or limitations; without observance of procedure required by law; and unsupported by

substantial evidence. 5 U.S.C. § 706(2).

5.     First, Defendant Rural Utilities Service ("RUS"), which is part of the U.S.

Department of Agriculture ("USDA"), approved an environmental impact statement ("EIS") for

the CHC transmission line that did not comply with the requirements of NEPA, 42 U.S.C. § 4321

et seq. The EIS improperly defined the purpose and need too narrowly for the project and did not

fully and fairly evaluate a proper range of alternatives. The EIS did not "rigorously explore and objectively evaluate" all reasonable alternatives. The EIS did not fully and fairly analyze "all direct, indirect, and cumulative impacts" of the project, in light of "all past, present, and reasonably foreseeable future" transmission and other development projects in the area. Furthermore, the EIS did not adequately consider greenhouse gas emissions and potential climate impacts from the project and the fossil fuel-generated electricity that it would carry.

6.     Second, Defendant U.S. Fish and Wildlife Service ("USFWS") granted a right-of-way authorization for the CHC transmission line to cross the protected Upper Mississippi Refuge even though the project is not a "compatible use" of the Refuge under the National Refuge Act, 16 U.S.C. §§ 668dd–668ee.

## JURISDICTION AND VENUE

7.     This court has federal question jurisdiction under 28 U.S.C. § 1331 because this action presents a controversy under federal laws including NEPA, the National Refuge Act, and the APA, and has jurisdiction under 28 U.S.C. § 1346, because this is an action against the federal government. This court has authority to grant the requested relief under 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief).

8.      Almost all of the CHC transmission line is proposed to be built in the Western District of Wisconsin, and therefore this is "a judicial district in which … a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" within the meaning of 28 U.S.C. § 1391(e)(1).  There is also another related lawsuit involving the proposed CHC transmission line that is pending in the Western District of Wisconsin. Plaintiffs Driftless Area Land Conservancy and Wisconsin

Wildlife Federation also reside in this judicial district. Venue is therefore appropriate in this district under 28 U.S.C. § 1391.

9.      This action is timely under Title 41 of the FAST Act, 42 U.S.C. § 4370m-6(a)(1)(A) and under 28 U.S.C. § 2401.

## PARTIES

10.     Plaintiff National Wildlife Refuge Association ("NWRA") is a not-for-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, NWRA's mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. Friends of Pool 9 and Friends of the Refuge - Mississippi River Pools 7 & 8, two of the volunteer organizations which support the Upper Mississippi Refuge, are affiliates and supporters of the National Wildlife Refuge Association.

11.     NWRA has members who use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area and who will be injured in fact if the CHC transmission line is constructed.

12.     Plaintiff Driftless Area Land Conservancy ("DALC") is a not-for-profit land trust and conservation organization, headquartered in Dodgeville, Wisconsin, which is dedicated to protecting sensitive lands, vital conservation areas, scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. DALC and its members maintain and enhance the health, diversity, and beauty of Wisconsin's natural and agricultural landscape through permanent land protection and restoration, and other conservation, natural resources protection, and

preservation actions. DALC is a nationally certified land trust that was recognized as the Wisconsin Land Conservancy of the Year in 2017 by Gathering Waters, Wisconsin's Alliance for Land Trusts.

13.     Plaintiff DALC has many local members who live, work, play, and own real property near and in the proposed right-of-way for the proposed CHC transmission line, and who will be injured in fact if the CHC transmission line is constructed.

14.     Plaintiff DALC's members use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area.

15.     Plaintiff DALC also owns conservation easements throughout the Driftless Area, including an easement on the historic Thomas Stone Barn property west of Barneveld, Wisconsin. The proposed CHC right-of-way would cross DALC's easement, which covers property on both the north and south sides of the road, interfere with that easement, and impair its ecological, aesthetic, and cultural value.

16.     Construction of the CHC transmission line would frustrate DALC's mission of conserving natural and historical lands in the Driftless Area and, in particular, its mission to conserve the lands on which it holds conservation easements.

17.     Plaintiff Wisconsin Wildlife Federation ("WWF") is a not-for-profit conservation organization dedicated to protecting wildlife habitat, conservation lands and waters, and natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are WWF members. WWF's members use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area. The CHC transmission line will compromise the long-term sustainability of fish and wildlife populations, clean air, clean

water, and healthy forests and grasslands, and thereby injure the WWF members who live, work, and play near the proposed route of the CHC transmission line.

18.     Plaintiff Defenders of Wildlife ("Defenders") is a not-for-profit membership organization that is one of the nation's leading advocates for threatened and endangered species and wildlife conservation. Founded in 1947, Defenders is headquartered in Washington D.C.  and maintains six regional field offices throughout the country. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including National Wildlife Refuges. Defenders advocates for new approaches to wildlife conservation that will help keep species from becoming threatened and endangered, and Defenders employs education, litigation, research, and advocacy to defend wildlife and their habitat.

19.     Defenders has members who use and enjoy the Upper Mississippi Refuge and the extensive natural resources in Wisconsin's Driftless Area and who will be injured in fact if the CHC transmission line is constructed.

20.      Defendant Rural Utilities Service ("RUS") is part of the U.S. Department of Agriculture ("USDA"). The RUS operates its Electric Program, which provides loans and loan guarantees to finance the construction of electric distribution, transmission, and generation facilities, including system improvements, as well as demand-side management, energy conservation programs, and on-grid and off-grid renewable energy systems.

21.     Defendant Christopher McLean is the Acting Administrator for the RUS, and is sued in his official capacity.

22.     Defendant U.S. Fish and Wildlife Service ("USFWS") is a bureau of the U.S. Department of the Interior, and manages the National Wildlife Refuge System, including the Upper Mississippi Refuge.

23.     Defendant Charles Wooley is the Regional Director for USFWS for the Midwest Region, which includes the Upper Mississippi Refuge.  Defendant Wooley is sued in his official capacity.

24.     Defendant Sabrina Chandler is the Manager of the Upper Mississippi Refuge. Defendant Chandler is sued in her official capacity.

## GENERAL FACTS

25.     Three companies—American Transmission Company LLC ("ATC"), ITC Midwest LLC ("ITC"), and Dairyland Power Cooperative ("Dairyland") (collectively, "the Developers")—plan to construct, co-own, and operate the proposed CHC transmission line.

26.     The CHC transmission line was first proposed more than a decade ago as part of a "multi-value portfolio" of about 20 proposed new high-voltage transmission lines proposed by the Midcontinent Independent System Operator ("MISO") in the Upper Midwest region. The CHC transmission line is the last of those lines to seek federal and state agency approvals.

27.     The proposed CHC transmission line would begin at the "Hickory Creek" substation in Dubuque County, Iowa, then run across and through the Upper Mississippi Refuge, and then cut a wide swath through the scenic southwest Wisconsin Driftless Area's vital natural resources and communities, until reaching the "Cardinal" substation in Middleton, Wisconsin. The following map shows the proposed route:

[*remainder of page intentionally left blank*]



28.     The proposed route for the CHC transmission line would cut directly through the Upper Mississippi Refuge and cross the Mississippi River, where its towers will be almost 20 stories high, as shown in the following map:



29.     The Upper Mississippi Refuge was established in 1924 as a refuge and breeding place for migratory birds, as well as a refuge for other birds, wildlife, fish, and plants. 16 U.S.C. § 723.

9

30.     This National Wildlife Refuge encompasses one of the largest blocks of floodplain habitat in the lower 48 states.

31.     Bordered by steep wooded bluffs that rise 100 to 600 feet above the river valley, the Mississippi River corridor and this National Wildlife Refuge provide scenic beauty and productive fish and wildlife habitat unmatched in the heart of America.

32.     The Upper Mississippi Refuge covers over 240,000 acres and extends 261 river miles from its north end at the confluence of the Chippewa River in Wisconsin to its south end near Rock Island, Illinois.

33.     The Upper Mississippi Refuge is comprised of wooded islands, marshes, and backwaters in Wisconsin, Iowa, Minnesota and Illinois, and provides a haven for a plethora of unique fish, wildlife, and plants.

34.     The Upper Mississippi Refuge is designated as a Wetland of International Importance pursuant to the treaty established at the Ramsar Convention on Wetlands of International Importance. https://www.fws.gov/midwest/UpperMissRamsar.htm. The designation of an area as a Ramsar site "embodies the government's commitment to take the steps necessary to ensure that its ecological character is maintained." https://www.ramsar.org/about/wetlands-of-international-importance-ramsar-sites. Ramsar sites "are recognized as being of significant value not only for the country or the countries in which they are located, but for humanity as a whole." *Id*.

35.     The Upper Mississippi Refuge is also designated as a Globally Important Bird Area.

36.     The Upper Mississippi Refuge protects important habitat and stop-over grounds for migratory birds.

37.     The Upper Mississippi Refuge is located within the Mississippi Flyway, a major bird migration route used by more than 325 migratory bird species to travel from their breeding grounds in Canada and the northern United States to their wintering grounds along the Gulf of Mexico and in Central and South America.

38.     Tracking data and in-person observations have shown that the federally endangered whooping crane, the tallest of North America's birds and one of the rarest, visited the Upper Mississippi Refuge in 2014 and again in 2017, in the precise area through which the transmission line would be built.

39.     The whooping cranes that used the Upper Mississippi Refuge are part of the Eastern Migratory population, which is the result of a major reintroduction effort by the Whooping Crane Eastern Partnership, made up of state and federal agencies, nonprofits, universities, and others. In January 2021, the Whooping Crane Eastern Partnership estimated the Eastern Migratory Population at only 80 cranes. Power lines are a major contributing factor to whooping crane mortalities. For example, one study determined that 17% of deaths in the migratory Wisconsin population of whooping cranes were caused by collisions with power lines. http://www.aplic.org/uploads/files/15518/Reducing_Avian_Collisions_2012watermarkLR.pdf  at p. 33–34.

40.     The CHC transmission line would pass over an Essential Habitat Area for the federally endangered Higgins eye pearlymussel where it crosses the Mississippi River at Cassville, Wisconsin.

41.     Erosion from clearing and filling the wetlands in the Upper Mississippi Refuge is very likely to lead to sedimentation in the Mississippi River both at the river crossing and downriver.

42.     Mussels, including the Higgins eye pearlymussel, are very sensitive to sedimentation, which can reduce the efficiency of their filter feeding and even smother mussel beds. "Freshwater mussels are some of the most threatened animals in existence."[1]

43.     The Essential Habitat Area at Cassville has by far the greatest native mussel density of all the essential habitat areas for the Higgins eye pearlymussel.

44.     "Native freshwater mussels are a keystone species and are considered both ecosystem engineers, improving habitat for other species, and indicator species important in assessing the health of the ecosystem."[2] As filter-feeders, mussels filter out pollutants, silt, bacteria, and other impurities and improve water quality. Their shells provide a surface for algae and insect larvae to attach to, creating a place for fish to feed. Because mussels anchor themselves in place, they also help stabilize river bottoms. Mussels are also a food source for fish, aquatic birds, and even mammals like muskrats and otters.

45.     Once it crosses the Mississippi River, the CHC transmission line would then cut a wide swath through southwest Wisconsin's scenic Driftless Area, damaging vital natural resources and communities.

46.     Unlike much of the Midwest's landscape, the Driftless Area was not flattened by glaciers. The Driftless Area's scenic landscape includes hundreds of rolling hills with deep river valleys, and it contains many rare and unique woodland, prairie, and riparian habitats. The Driftless Area has more than 1,200 streams, including world-class trout fishing streams, more than 4,000 river miles, and a network of 600 spring-fed creeks that flow through porous limestone bedrock.

---

[1] https://www.iowadnr.gov/About-DNR/DNR-News-Releases/ArticleID/807/4-Cool-Facts-You-Should-Know-About-Mussels.
[2] https://www.usgs.gov/centers/nwhc/science/native-freshwater-mussel-health?qt-science_center_objects=0#qt-science_center_objects.

47.     The Driftless Area is recognized internationally as a region of vital conservation opportunity and concern.

48.     According to George Meyer, the Executive Director of Plaintiff WWF and the former Secretary of the Wisconsin Department of Natural Resources: "Over the last eighty years, conservatively, hundreds of thousands of dollars have been spent to restore and improve the streams of the Driftless Area such as Black Earth Creek. These restorations efforts were funded by federal, state and local governments, national, and state and local conservation groups, and these efforts included thousands upon thousands of donated volunteer hours."[3]

49.     The proposed CHC transmission line would run along and through the Military Ridge Prairie Heritage Area, which is the Wisconsin Department of Natural Resources' highest priority for landscape-scale grassland protection and management in Wisconsin.

50.     The Military Ridge Prairie Heritage Area provides habitat for 14 rare and declining species of grassland birds.[4]

51.     The Military Ridge Prairie Heritage Area is part of the larger 490,000-acre protected Southwest Wisconsin Grasslands and Stream Conservation Area macrosite established by the Wisconsin Department of Natural Resources.

52.     The proposed CHC transmission line would have significant adverse impacts to the land, water, ecological, economic, historical, aesthetic, tourism and outdoor recreation, and community resources along its entire route, both through the Upper Mississippi Refuge and throughout the Driftless Area.

---

[3] https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=370578 at 11.
[4] https://www.nature.org/en-us/get-involved/how-to-help/places-we-protect/priority-area-military-ridge-prairie-heritage-area/.

53.     The proposed high-voltage CHC transmission line would require the construction of huge transmission towers up to 20 stories high with a clear-cut right-of-way typically 150 feet wide. It will present a significant visual intrusion on scenic viewsheds along its entire route and for miles beyond, impairing tourism and property values.

54.     The CHC transmission line would have multiple direct, indirect, and cumulative impacts on the natural ecosystems, species, ecological relationships, and environmental quality of fish and wildlife habitats within and adjacent to the right-of-way.

55.     The CHC transmission line would significantly interfere with existing land use and development plans in the Driftless Area where communities and the local economies depend on the health and vitality of the landscape, and outdoor recreational and tourism activities.

56.     The CHC transmission line will adversely impact the rural and scenic character of the area, which is highly valued by both residents and tourists alike.

57.     The CHC transmission line would cut directly across the Mississippi Flyway, both within the Upper Mississippi Refuge and elsewhere in the Driftless Area.

58.     The CHC transmission line would increase the risk of bird strikes involving many bird species, including but not limited to bald eagles, whooping cranes, and migratory birds protected by the Migratory Bird Treaty Act of 1918, 16 U.S.C. §§703–712, which implemented the 1916 Migratory Bird Treaty or Convention between Canada and the United States.  Since 1918, the Migratory Bird Treaty Act has been expanded to implement treaties with Mexico (1936), Japan (1972), and Russia (1976).

59.     The protected Upper Mississippi Refuge is supposed to provide safe haven for migratory birds.

60.    The CHC transmission line and its right-of-way would increase the risk of invasive species establishment and propagation, including the introduction of invasive species into the Upper Mississippi Refuge.

61.    The CHC transmission line and its right-of-way would result in habitat fragmentation to the detriment of many wildlife species, especially declining grassland bird species and forest interior species. These negative impacts on habitat and wildlife would occur along the length of the route, including within the protected Upper Mississippi Refuge.

62.    The CHC transmission line would negatively impact agricultural lands and farming operations. For example, farmers would lose otherwise useable land area around the base of transmission towers located in fields because large farm equipment cannot maneuver close to the bases of the towers. Construction in croplands can cause soil mixing, rutting and soil compaction. Organic farms may be harmed by herbicide drift from right-of-way maintenance or through construction vehicles introducing foreign plant species or chemicals.

63.    The CHC transmission line would have significant adverse effects on wetlands, both directly through construction in or near the wetlands, and indirectly through runoff and the propagation of invasive species along the right-of-way. This would include harmful effects on wetlands within the Upper Mississippi Refuge, which has been designated as a Wetland of International Importance.

64.    The CHC transmission line is not needed to meet anticipated electricity demand or to ensure the reliable supply of electricity in Wisconsin or any other nearby state.

65.    Upgrading existing electricity transmission and distribution lines, enhanced power line monitoring and power electronics, solar energy generation and energy storage systems on the "grid edge," demand management, and energy efficiency programs would be able to meet any

transmission "need" alleged for the proposed CHC transmission, and do so at lower cost and with less environmental damage.

66.     The Developers would receive a 10.82% to 11.07% annual rate of return on their construction and financing costs for the proposed CHC transmission line.

67.     The Developers intend to charge utility ratepayers more than $2.2 billion over the 40-year expected life of the proposed CHC transmission line.

68.     Some of the negative environmental effects of the proposed CHC transmission line could also be avoided through alternative routes that do not cross the protected Upper Mississippi Refuge or the most vital conservation lands and other parts of southwest Wisconsin's scenic Driftless Area's natural resources.

69.     The U.S. Army Corps of Engineers ("Corps") also granted dredge-and-fill permits for the CHC transmission line project under section 404 of the Clean Water Act, 33 U.S.C. § 1344.

70.     On the Iowa side, the Rock Island District of the Corps found that the project was eligible for "Nationwide Permit 12" ("NWP 12"), a general permit for utility lines.

71.     On the Wisconsin side, the St. Paul District of the Corps determined that the project was eligible for the St. Paul District's "Utility Regional General Permit" ("URGP").

72.     The Corps renewed and readopted both NWP 12 and the URGP without the environmental impact statement required by NEPA, and without the consultation with the USFWS required by section 7 of the Endangered Species Act ("ESA").

73.     The Corps' decisions to use NWP 12 and the URGP do not meet the requirements of section 404 of the Clean Water Act, and therefore the permits the Corps granted for the CHC transmission line project are also invalid.

74.     Plaintiffs have sent a 60-day notice of intent to sue the Corps for violations of the ESA.  If the violations are not remedied within 60 days of the letter, Plaintiffs will file suit against the Corps seeking declaratory and injunctive relief for violations of NEPA, the ESA, and the CWA.

**COUNT ONE:**

**THE RURAL UTILITIES SERVICE'S ENVIRONMENTAL IMPACT STATEMENT FOR THE PROPOSED CHC HIGH-VOLTAGE TRANSMISSION LINE DOES NOT COMPLY WITH THE REQUIREMENTS OF THE NATIONAL ENVIRONMENTAL POLICY ACT**

75.     Plaintiffs reallege each of the allegations in paragraphs 1 to 74 above.

76.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[5]  NEPA seeks to protect the environment by ensuring that federal agencies "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

77.     NEPA requires agencies to take a "hard look" at the environmental consequences of their actions. For major federal actions with the potential for significant environmental impact, NEPA requires that the agencies first prepare an Environmental Impact Statement ("EIS").

78.     NEPA requires that an EIS must include a detailed discussion of: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of

---

[5] This complaint cites the 2019 version of the regulations, which were in place at the time the environmental review for the CHC line was completed.

resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

79.     The Council on Environmental Quality ("CEQ") rules governing environmental reviews emphasize that the alternatives analysis is the "heart of the environmental impact statement," 40 C.F.R. § 1502.14, and require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* paras. (a), (d).

80.     An EIS must contain a statement of "purpose and need," which is required to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.

81.     As explained in *Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986), "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Id.* at 638.

82.     "No decision is more important than delimiting what these 'reasonable alternatives' are. That choice, and the ensuing analysis, forms 'the heart of the environmental impact statement.'" *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997) (quoting 40 C.F.R. § 1502.14).

83.     In *Simmons*, the court concluded "that the U.S. Army Corps of Engineers defined an impermissibly narrow purpose for the contemplated project. The Corps therefore failed to examine the full range of reasonable alternatives and vitiated the EIS." 120 F.3d at 667.

84.     As explained in *Simmons,* "[a]n agency cannot restrict its analysis to those 'alternative means by which a particular applicant can reach *his* goals.' *Van Abbema*, 807 F.2d at 638 (emphasis added); *contra*, [*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198–99

(D.C. Cir. 1991)]. This is precisely what the Corps did in this case. The Corps has 'the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project.' *Busey*, 938 F.2d at 209 (Buckley, J., dissenting)." 120 F.3d at 669.

85.     The court in *Simmons* further explained, "What other alternatives exist we do not know, because the Corps has not looked. Perhaps the Corps is relying on a contract between Marion and the Water District for Marion to supply the Water District with water *if* it succeeds in damming Sugar Creek. But this condition depends on meeting environmental requirements, which, in turn, demand exploration of alternatives free of contractual arrangements. The public interest in the environment cannot be limited by private agreements." 120 F.3d at 670.

86.     An EIS must evaluate "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). "Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d).

87.     An EIS must analyze cumulative impacts, 40 C.F.R. § 1508.25, defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

88.      Once an EIS is completed, federal agencies must make a formal finding that it meets all of the requirements of NEPA in a document called a Record of Decision ("ROD").

89.     The CEQ rules specifically require that agency RODs approving final EISs "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative

selected have been adopted, and if not, why they were not.  A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation." 40 C.F.R. § 1505.2.

90.     NEPA requires that "[t]he information [in NEPA documents] must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

91.     Defendant RUS's regulations state:

> Applicants' proposals must, whenever practicable, avoid or minimize adverse environmental impacts; avoid or minimize conversion of wetlands or important farmlands . . . when practicable alternatives exist to meet development needs; [and] avoid unwarranted alterations or encroachment on floodplains when practicable alternatives exist to meet development needs…. The Agency shall not fund the proposal unless there is a demonstrated, significant need for the proposal and no practicable alternative exists to the proposed conversion of the above resources.

7 C.F.R. § 1970.4(a).

92.     One of the transmission line Developers—Dairyland Power Cooperative—has stated its plan to secure a loan from the Defendant RUS to finance part of the CHC transmission line.

93.     The Defendant RUS's environmental review rules concerning loans or financial assistance for an electrical transmission line require that an environmental impact statement be prepared under NEPA, 42 U.S.C. §§ 4321–4370h, before loans or financial assistance are provided.  7 C.F.R. pt. 1970.

94.     The proposed CHC transmission line requires permits from the Defendant USFWS under the National Refuge Act, 16 U.S.C. §§ 668dd–668ee, and from the Corps under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

95.     Those permit requirements constitute "major federal actions" triggering the requirement for environmental review under NEPA. 40 C.F.R. §§ 1502.3, 1508.18.

96.     Defendant RUS was designated as the lead agency to prepare the environmental impact statement, and Defendant USFWS, the Corps, and the U.S. Environmental Protection Agency ("USEPA") were cooperating agencies.

97.     Defendant RUS "is responsible for all environmental decisions and findings related to its actions" and must "independently evaluate" all environmental information submitted by applicants. 7 C.F.R. § 1970.5(a).

98.     For the proposed CHC transmission line, the Developers stated that a key element of the "purpose and need" of the project was to increase transfer capability between Iowa and Wisconsin.

99.     That constricted definition of the purpose and need limited the range of alternatives that were considered in the environmental review to be only high-voltage transmission lines running from Iowa to Wisconsin.

100.    The Defendant RUS adopted the Developers' statement of the purpose and need for its EIS and ROD, and defined the purpose and need to require that any alternative "[i]ncrease the transfer capability of the electrical system between Iowa and Wisconsin."

101.    In doing so, Defendant RUS precluded reasonable alternatives to the transmission line from being fully considered.

102.    Defendant USFWS adopted the Developers' definition of purpose and need for its reviews, authorizations, and other determinations.

103.    The EIS did not evaluate whether or to what extent any of the needs identified by the Developers actually existed.

104.   For example, the EIS did not conduct its own need analysis in light of flat electricity demand in central and southwest Wisconsin.

105.   The EIS rejected a "no action" alternative on the grounds that it would not meet the stated purpose and need.

106.   The Developers and Defendants RUS and USFWS did not make an assessment about what would likely actually happen if the proposed CHC transmission line project were not built, which is what a "no action" alternative is.

107.   The staff of the Public Service Commission of Wisconsin determined that if the proposed CHC transmission line was not built, targeted upgrades to the existing transmission system could achieve similar benefits.

108.   The EIS rejected "non-wires" alternatives, primarily on the grounds that they would not "increase the transfer capability of the electrical system between Iowa and Wisconsin," and that no single non-wires alternative would be sufficient.

109.   The EIS did not rigorously explore and objectively evaluate whether a package of non-wires alternatives would meet the general objectives of the CHC transmission line.

110.   The EIS did not adequately assess the cumulative impacts of the proposed CHC transmission line in combination with all past, present and reasonably foreseeable transmission lines and other development projects that would create harmful environmental impacts in the Driftless Area and nearby areas.

111.   Much of the analysis in the EIS's cumulative impacts section is vague and provides only generalities rather than acknowledgment of specific cumulative impacts.

112.   The geographic and temporal scopes of the cumulative impacts analysis are improperly narrow.

113.    For example, the cumulative aesthetics impacts analysis is limited to a 2-mile area around the proposed huge transmission line, the public health and safety cumulative impacts analysis is limited to a 300-foot area, and the cumulative impacts analysis for the Refuge is limited to Pool 11 of the Refuge.

114.    Pool 11 is the area of the Mississippi River between Lock and Dam 10 and Lock and Dam 11, which encompasses only about 32 miles of the Mississippi River, while the Upper Mississippi Refuge covers about 261 miles of the Mississippi River.

115.    The temporal scope of the future impacts analysis is 60 years, which is the estimated life of the transmission line. The EIS does not address the fact that even if the line is decommissioned in 60 years, habitat destruction and many other impacts will not disappear at that time.

116.    The EIS asserts that because past actions are now part of the "affected environment" described in other places in the EIS, it is appropriate to exclude all past actions from its cumulative impacts analysis.

117.    The EIS necessarily does not consider the cumulative impacts from past actions when it considers those past actions part of the baseline status quo.

118.    The Developers and the EIS rejected alternative routes that would not cross the Upper Mississippi Refuge or Wisconsin's Driftless Area.

119.    In early informal discussions involving the Developers, the Upper Mississippi Refuge manager advised the Developers that no new transmission line crossing of the protected National Wildlife and Fish Refuge would be considered unless the Developers could demonstrate that non-Refuge-crossing options were infeasible.

23

120.    The Developers completed an Alternative Crossings Analysis ("ACA"), which was released in April 2016.

121.    The Developers' ACA considered three crossings within the National Wildlife and Fish Refuge and four "non-refuge" crossings.

122.    These "non-refuge" crossings that the Developers identified were not actually located north or south of, or otherwise away from, the National Wildlife and Fish Refuge, but at existing "breaks" in the Upper Mississippi Refuge boundaries where locks and dams, bridges, or municipalities are located.

123.    The Developers' ACA rejected all of the non-refuge crossing routes as infeasible.

124.    Defendants RUS and USFWS did not consider alternative routes that would have run north or south of the protected Upper Mississippi Refuge.

125.    The EIS did not consider alternative routes that would not cut a wide swath through the scenic Southwest Wisconsin Driftless Area's vital natural resources.

126.    Defendant RUS began the NEPA process by publishing a notice of intent on October 18, 2016, to prepare an EIS, and to solicit public input on the appropriate scope of the EIS. The notice announced public scoping meetings, 81 Fed. Reg. 71,696 (Oct. 18, 2016), and RUS later provided an opportunity for the public to submit written comments.

127.    Plaintiff DALC submitted scoping comments on January 6, 2017.

128.    Plaintiff DALC submitted supplemental scoping comments: on May 10, 2017, suggesting that Defendant RUS defer its environmental review until after the Public Service Commission of Wisconsin determined the need for the CHC transmission line; on May 11, 2017, requesting evaluation of the CHC transmission line's impact on the Ice Age National Scenic Trail;

and on August 11, 2017, expressing concern that the scoping report RUS issued on May 17, 2017, did not commit RUS to evaluating "non-wires" alternatives to the CHC project.

129.    The USEPA submitted scoping comments on January 6, 2017, in which it stated that: "[T]he development of the study area and alternative crossing locations, focusing solely on existing crossing locations, is too narrow. The scoping materials exclude evaluation of new Mississippi River crossings that would occur outside the [Upper Mississippi River National Wildlife and Fish] Refuge…. [T]he use of an existing corridor in this project will likely adversely impact the Refuge."

130.    The USEPA then stated: "EPA recommends the Draft EIS present and evaluate one or more alternative(s) outside Refuge lands. The selection of only two Refuge alternatives carried forward for further evaluation leaves USDA and the Applicant vulnerable to permit denial by USFWS and an ultimate decision of no action by USDA. EPA believes one or more non-Refuge alternatives is needed in order to compare and contrast impacts that would occur within and outside of the Refuge."

131.    Defendant RUS published notice of its draft EIS on December 7, 2018. 83 Fed. Reg. 63,149.

132.    Defendant RUS allowed written comments on its draft EIS until April 1, 2019, and held public meetings.

133.    Plaintiffs DALC and WWF submitted written comments on April 1, 2019. The Plaintiffs' comments challenged the Defendants' draft EIS for having an impermissibly narrow Purpose and Need statement, for limiting the range of alternatives to only include consideration of high-voltage transmission lines running between eastern Iowa and southwestern Wisconsin, and

for precluding consideration of non-wires alternatives or routes that would have avoided running through the protected Upper Mississippi Refuge and the Driftless Area's scenic natural landscape.

134.     Plaintiffs DALC's and WWF's comments also challenged the Defendants' draft EIS for failing to evaluate reasonable alternatives in detail.

135.     Plaintiffs DALC's and WWF's comments also challenged the Defendants' failures to independently consider the issues instead of relying entirely on reports prepared by the Developers, which predetermined the outcome.

136.     Plaintiffs DALC's and WWF's comments also challenged and pointed to specific places and ways in which the Defendants' environmental impact analysis was inadequate, where the draft EIS inappropriately relied on undescribed or poorly described and unenforceable mitigation measures to reduce the environmental impacts, and the lack of meaningful analysis of greenhouse gas emissions and potential climate impacts in the draft EIS.

137.     Defendant RUS made minor changes in its final EIS, but did not adequately address issues the Plaintiffs DALC and WWF raised in their scoping comments and in their comments on the draft EIS.

138.     Defendant RUS published its final EIS on October 23, 2019. 84 Fed. Reg. 56,756.

139.     Plaintiffs DALC and WWF again submitted written comments on the final EIS on November 25, 2019.

140.     On January 16, 2020, Defendant RUS signed and issued its ROD concluding that the final EIS met NEPA's requirements, and identifying the Developers' preferred alternative route as the Defendant RUS's preferred route, even though the Defendant RUS acknowledged that this was not the environmentally preferable alternative.

141.     The ROD is attached and incorporated herein as Exhibit A.

142.    Defendant RUS selected a route for the proposed CHC transmission line that it acknowledged was more environmentally damaging than other routes considered.

143.    Defendant USFWS also signed the ROD.

144.    Defendants' conclusion in the ROD that the final EIS was "adequate" under NEPA was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706, and violates NEPA, 42 U.S.C. § 4321, et seq., for several reasons:

(a)  The final EIS erroneously adopts the Developers' impermissibly narrow statement of the Purpose and Need for the proposed CHC transmission line project, which improperly presumed that there was a "need" for the project and precluded the full consideration of reasonable alternatives;

(b)  The final EIS did not fully or fairly consider alternatives to the proposed high-voltage transmission line such as "non-wires" alternatives or upgrading existing transmission and distribution lines;

(c)  The final EIS did not consider alternative routes that would avoid the Upper Mississippi Refuge or the Southwest Wisconsin Driftless Area;

(d)  The final EIS did not adequately describe or analyze impacts of the proposed CHC transmission line, including impacts on birds and other wildlife, streams and wetlands, and other resources;

(e)  The final EIS did not evaluate conflicts between the CHC transmission line and local land use plans and policies;

(f)  The final EIS did not adequately describe or reasonably analyze cumulative impacts of the proposed CHC transmission line combined with all other transmission projects and other development projects in the past, present and reasonably foreseeable future;

(g)  The final EIS did not adequately analyze the additional greenhouse gas emissions and potential climate impacts attributable to the CHC transmission line's construction and fossil-fuel generated electricity it would carry; and

(h)   The final EIS relied on superficial and unenforceable descriptions of potential mitigation or remediation measures, assumed they would all be successful, and thereby understated the adverse environmental impacts of the proposed CHC transmission line.

145.    Defendants' ROD is a final agency action subject to judicial review under the APA.

## COUNT TWO:

### THE COMPATIBILITY DETERMINATION ISSUED BY THE DEFENDANT U.S. FISH & WILDLIFE SERVICE'S UPPER MISSISSIPPI RIVER NATIONAL WILDLIFE AND FISH REFUGE MANAGER AND THE RIGHT-OF-WAY PERMIT TO ALLOW THE CHC TRANSMISSION LINE TO CROSS THE REFUGE VIOLATE THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997

146.    Plaintiffs reallege the allegations contained in paragraphs 1 through 145 above.

147.    The protected Upper Mississippi River National Wildlife and Fish Refuge was created by a 1924 Act of Congress, 43 Stat. 650 (now codified at 16 U.S.C. § 721–731), which described this Refuge's purposes as follows:

(a) as a refuge and breeding place for migratory birds . . .(b) to such extent as the Secretary of the Interior may by regulations prescribe, as a refuge and breeding place for other wild birds, game animals, fur-bearing animals, and for the conservation of wild flowers and aquatic plants, and (c) to such extent as the Secretary of the Interior may by regulations prescribe as a refuge and breeding place for fish and other aquatic animal life.

16 U.S.C. § 723.

148.    The Upper Mississippi Refuge is located along the Mississippi Flyway, which is a critical migratory route that more than half of North America's migratory birds use as a rest stop between their nesting and wintering grounds.

149.    The Upper Mississippi Refuge was the first migratory bird refuge authorized and funded by Congress.

150.    The Upper Mississippi Refuge is one of the most-visited of the 567 National Wildlife Refuges in the United States. https://www.fws.gov/refuges/RefugeUpdate/MayJune_2015/most-visited.html and https://www.doi.gov/blog/celebrating-national-wildlife-refuges#:~:text=Today%2C%20there%20are%20567%20national,per%20year%20into%20local%20economies.

151.    The proposed huge high-voltage CHC transmission line would run directly through and across the Upper Mississippi Refuge from Iowa to Cassville, Wisconsin. At each end of the Mississippi River crossing, the Developers would place 20-story high transmission line towers. Additional 75-foot tall towers would be placed in this National Refuge within a 260-foot wide right of way.

152.    The Upper Mississippi Refuge is part of the National Wildlife Refuge System administered by Defendant USFWS, and is governed by the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§668dd–668ee ("National Refuge Act"), among other national wildlife refuge federal laws.

153.    The National Refuge Act clarified for the first time that the sole mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). The statute also lists 14 management prescriptions, including to "ensure that the biological integrity, diversity, and environmental health of the System are maintained." 16 U.S.C. § 668dd(a)(4)(B).

154.    Consistent with that mission, the National Refuge Act states that Defendant USFWS "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [USFWS] has determined that the use is a compatible use and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i).

155.    The National Refuge Act specifically prohibits the grant of easements for "purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof" unless USFWS has first "determine[d] that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B).

156.    The National Refuge Act provides that "[c]ompatibility determinations in existence on October 9, 1997, shall remain in effect until and unless modified," 16 U.S.C. § 668dd(d)(3)(A)(iv), but does not grandfather in existing incompatible uses anywhere.

157.    The National Refuge Act requires that existing incompatible uses be eliminated as soon as possible, obligating Defendant USFWS to "provide for the elimination or modification of any use as expeditiously as practicable after a determination is made that the use is not a compatible use." 16 U.S.C. § 668dd(d)(3)(B)(vi).

158.    The National Refuge Act requires Defendant USFWS to reevaluate existing uses whenever "conditions under which the use [was] permitted change significantly, or if there is significant new information regarding the effects of the use, but not less frequently than once every 10 years, to ensure that the use remains a compatible use…." 16 U.S.C. § 668dd(d)(3)(B)(vii).

159.    Uses such as existing transmission lines with easements extending more than 10 years are still to be reevaluated at least every 10 years by Defendant USFWS to "examine

30

compliance with the terms and conditions of the authorization, not examine the authorization itself." *Id.*

160.   The National Refuge Act defines "compatible use" as "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or purposes of the refuge." 16 U.S.C. § 668ee(1).

161.   "Sound professional judgment," in turn, is defined as a "finding, determination or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge System Improvement] Act and other applicable laws." 16 U.S.C. § 668ee(3).

162.   The Defendant USFWS's Compatibility Policy, 65 Fed. Reg. 62,484 (Oct. 18, 2000), which is incorporated into part 603 of the USFWS Manual, places the burden of proving compatibility on applicants, not on the National Wildlife Refuge manager to prove incompatibility. 603 FW § 2.11(B)(1).

163.   The Defendant USFWS's Compatibility Policy further states that "[i]f information available to the Refuge Manager is insufficient to document that a proposed use is compatible, then the Refuge Manager would be unable to make an affirmative finding of compatibility, and we must not authorize or permit the use." 65 Fed. Reg. at 62,490; 603 FW § 2.11(E).

164.   The National Refuge System regulations provide that proposed "economic" uses— uses that provide an economic benefit to an applicant—must meet a higher standard than uses that support wildlife-dependent recreation or wildlife conservation. "We may only authorize public or private economic use of the natural resources of any national wildlife refuge . . . where we

determine that the use *contributes to* the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1 (emphasis added).

165.    The Defendant USFWS Manual states unequivocally that "[i]t is the policy of the Service to discourage the types of uses embodied in right-of-way requests. On areas in the National Wildlife Refuge System (System) if a right-of-way cannot be certified as compatible with the purposes for which a unit was established, it cannot be granted without authorization by Congress." 340 FW § 3.3.

166.    The Defendant USFWS Manual at 603 FW § 2.11(C) flatly prohibits using "compensatory mitigation to make a proposed refuge use compatible."

167.    The only exception to that prohibition is for "maintenance" of existing rights-of-way, 603 FWS § 2.11(D), but the Manual defines right-of-way maintenance narrowly:

> Maintenance of an existing right-of-way includes minor expansion or minor realignment to meet safety standards. Examples of minor expansion or minor realignment include: expand the width of a road shoulder to reduce the angle of the slope; expand the area for viewing on-coming traffic at an intersection; and realign a curved section of a road to reduce the amount of curve in the road.

168.    Even in those narrow circumstances, the Manual provides at 603 FW § 2.11(D) that:

> We will not make a compatibility determination and will deny any request for maintenance of an existing right-of-way that will affect a unit of the National Wildlife Refuge System, unless (1) the design adopts appropriate measures to avoid resource impacts and includes provisions to ensure no net loss of habitat quantity and quality; (2) restored or replacement areas identified in the design are afforded permanent protection as part of the national wildlife refuge or wetland management district affected by the maintenance; and (3) all restoration work is completed by the applicant prior to any title transfer or recording of the easement, if applicable.

169.    A draft Compatibility Determination was included as an appendix to the final EIS.

170.    Plaintiffs NWRA, DALC, WWF and Defenders of Wildlife submitted comments on the draft Compatibility Determination. The comments explained that a new right-of-way for

the proposed huge high-voltage CHC transmission line was not compatible with the purposes of the Upper Mississippi Refuge.

171.    Because the proposed route for the new transmission line with up to 20-story high towers would not follow the route of the existing and much smaller power lines that cross the Upper Mississippi Refuge, there is no way that the new transmission line project could be characterized or excused as just a minor "maintenance" effort that is exempted from compliance with the protective administrative requirements in the Refuge Manual and the National Refuge Act.

172.    In a document dated December 19, 2019, Defendant Sabrina Chandler, the Manager of the Upper Mississippi Refuge, issued a final Compatibility Determination on the proposed CHC transmission line.

173.    On December 20, 2019, Defendant Charles Wooley, the USFWS Regional Director, concurred in the Compatibility Determination, which is attached and incorporated herein as Exhibit B.

174.    The Defendants' Compatibility Determination acknowledged that "acres of habitat previously unaffected by a right-of-way would be impacted by realignment of the right-of-way" and that a larger acreage of habitat would be affected. Exhibit B at 9–10.

175.    The Defendants' Compatibility Determination conceded that "[i]mpacts to visual quality and aesthetics on the Refuge would result from construction of transmission line structures," and that these structures "would create additional lines and forms within the viewshed and would be readily noticeable from Oak Road, the primary road which connects the Cassville Ferry to Iowa." Exhibit B at 10–11.

176.    The Defendants' Compatibility Determination conceded that these structures "will be significantly more visible to Refuge visitors," resulting in "[n]egative impacts to the visual qualities of the Refuge." Exhibit B at 11.

177.    The Defendants' Compatibility Determination stated that the Developers intended to "clear all woody vegetation from within the [new] 260-foot right of way," and that "[c]learing and maintenance suppression of woody vegetation by the Applicants within the right-of-way footprint would alter the forest succession patterns permanently." Exhibit B at 12.

178.    In particular, the Defendants' Compatibility Determination conceded that the proposed CHC transmission line would run through the "early successional forest community" or "'young' forest" that the Upper Mississippi Refuge had successfully established in the Turkey River bottoms, and that "[n]atural succession of trees planted by the Refuge in the proposed right-of-way would cease." Exhibit B at 12.

179.    The Defendants' Compatibility Determination characterized the additional impacts as supposedly "minor," but nonetheless recognized that the new right-of-way would "result[] in habitat gaps and forest fragmentation." Exhibit B at 12.

180.    The Defendants' Compatibility Determination also acknowledged that "[p]otential construction-related impacts from the project would include the loss, degradation, and/or fragmentation of breeding, rearing, foraging, and dispersal habitats; and increased noise/vibration levels." Exhibit B at 12–13.

181.    The Defendants' Compatibility Determination concluded that wildlife species would not necessarily be displaced permanently, because they could move to adjacent forest areas, but that "cleared forest areas that may provide habitat for forest-obligate species" could cause permanent displacement. Exhibit B at 13.

182.   Contrary to the prohibition in the USFWS Manual, the Defendants' Compatibility Determination expressly relies on compensatory mitigation to justify its conclusion.

183.   The Defendants' Compatibility Determination allows the proposed CHC transmission line crossing of the protected Upper Mississippi Refuge.

184.   The Defendants' rationale was that the CHC transmission line could be treated as a "minor realignment of an existing right-of-way to meet safety standards" and, in effect, grandfathered in because the Developers had stated their intent to take down existing low-voltage transmission lines on an existing smaller right-of-way, 1800 feet away from the proposed CHC right-of-way on the western end and more than a mile away on the eastern end.

185.   With respect to the existing right-of-way, the Defendants' Compatibility Determination stated hopes that, with restoration efforts, the "[h]abitat fragmentation caused by maintenance of the right-of-way to suppress woody vegetation would be reduced over the next 30 to 50 years as vegetation is reestablished and natural successional patterns are allowed to proceed." Exhibit B at 12.

186.   At no time was the existing right-of-way designated a "compatible use," as defined in the National Refuge Act.

187.   No agency has ever determined that the existing right-of-way does not "materially interfere with or detract from" the Upper Mississippi Refuge's purposes.

188.   The existing right-of-way through the Upper Mississippi Refuge is 150 feet wide.

189.   The proposed CHC transmission line right-of-way would be 260 feet wide within the Upper Mississippi Refuge.

190.   The existing low-voltage transmission lines are on narrow towers.

191.    The proposed CHC high-voltage transmission line towers would be much wider and, at the River crossing, close to 200 feet high.

192.    The existing low-voltage transmission lines carry up to 161 kilovolts.

193.    The proposed CHC high-voltage transmission lines would be double-circuited with each line capable of carrying 345 kilovolts.

194.    The proposed CHC high-voltage transmission lines and 20-story high towers are not a "minor expansion or minor realignment" of an existing right-of-way. 603 FW § 2.11(D).

195.    The approved new right-of-way for the proposed CHC high-voltage transmission lines is not necessary "to meet safety standards," such as straightening a curve or widening the shoulders on an existing road might be. 603 FW § 2.11(D).

196.    The proposed CHC transmission line and its new right-of-way through the Upper Mississippi Refuge is therefore either an incompatible "new use" of the Refuge, or a project that will "expand, renew, or extend" an existing incompatible use. In either case, the CHC transmission line crossing the Refuge is prohibited by the Refuge Act. 16 U.S.C. § 668dd(d)(3)(A)(i).

197.    On or about September 8, 2020, Defendant USFWS granted a right-of-way authorization for the CHC transmission line across the Upper Mississippi Refuge based on the December 2019 Compatibility Determination. That right-of-way authorization is attached and incorporated herein as Exhibit C. The issuance of the Compatibility Determination and the grant of a right-of-way are "final agency actions" within the meaning of the APA.

198.    Both the Defendants' Compatibility Determination and the right-of-way authorization violate the National Refuge Act, the Act's implementing regulations, and the Defendant USFWS's Manual, and are therefore "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. 5 U.S.C. § 706.

## REQUESTED RELIEF

WHEREFORE Plaintiffs respectfully request that this Court issue an Order granting the following relief:

1.      Declare that Defendant RUS's Record of Decision approving and making a finding of adequacy of the final EIS for the proposed CHC transmission line violated NEPA in multiple respects and, therefore, was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA;

2.      Declare that Defendants USFWS's and Sabrina Chandler's final Compatibility Determination and that Defendants USFWS's and Charles Wooley's right-of-way authorization for the proposed Cardinal-Hickory Creek transmission line violated the National Wildlife Refuge System Improvement Act of 1997, its implementing regulations, and the USFWS Manual, and, therefore, were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA;

3.      Vacate RUS Defendants' Record of Decision finding the final EIS to be adequate;

4.      Vacate the Compatibility Determination and right-of-way authorization made by the USFWS Defendants;

5.      Enjoin the USFWS Defendants from permitting or granting any easement or other authority to allow the proposed CHC transmission line and towers to run across or cut through the Upper Mississippi River National Wildlife and Fish Refuge;

6.      Enjoin Defendant RUS from providing any financial assistance, permits, or easements for the proposed CHC transmission line unless and until a final EIS is prepared and approved that fully complies with all NEPA requirements;

37

7. Award Plaintiffs' attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable laws; and

8. Grant such further relief as may be just, equitable and appropriate.

Dated: February 10, 2021

Respectfully submitted,

<div style="display:flex">

/s/ Howard A. Learner
Howard A. Learner
Scott Strand
Rachel L. Granneman
Ann Jaworski
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
SStrand@elpc.org
RGranneman@elpc.org
AJaworski@elpc.org

*Counsel for Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, Wisconsin Wildlife Federation, and Defenders of Wildlife*

/s/ Lindsay Paige Dubin
Lindsay Paige Dubin
*Pro Hac Vice Application Forthcoming*
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
T: (202) 772-3234
ldubin@defenders.org

*Counsel for Plaintiff Defenders of Wildlife*

/s/ Robert M. Morgan
Robert M. Morgan
*Pro Hace Vice Application Forthcoming*
National Wildlife Refuge Association
415 E. Cape Shores Dr.
Lewes, DE 19958-3109
T: (301) 466-8915
RMorgan@RefugeAssocation.org

*Counsel for Plaintiff National Wildlife Refuge Association*

</div>