# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RURAL UTILITIES SERVICE, CHRISTOPHER MCLEAN, Acting Administrator, Rural Utilities Service, UNITED STATES FISH AND WILDLIFE SERVICE, CHARLES WOOLEY, Midwest Regional Director, and SABRINA CHANDLER, Manager, Upper Mississippi River National Wildlife and Fish Refuge, UNITED STATES ARMY CORPS OF ENGINEERS, LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL STEVEN SATTINGER, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and COLONEL KARL JANSEN, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Nos. 21-cv-00096-wmc & 21-cv-00306-wmc, Consolidated. |
| Defendants, | ) ) | |
| and | ) ) | |
| AMERICAN TRANSMISSION COMPANY, LLC, DAIRYLAND POWER COOPERATIVE, & ITC MIDWEST LLC, | ) ) ) ) | |
| Intervenor-Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. v

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................................ 6

I.     Description and Current Status of the Proposed Cardinal-Hickory Creek High-Voltage
       Transmission Line .................................................................................................. 6

II.    Adverse Environmental Impacts of the Proposed CHC Transmission Line and High
       Towers ................................................................................................................. 10

III.   Impacts on Plaintiff Conservation Organizations and Their Members. .......................... 13

IV.    Procedural History ............................................................................................... 18

       A.   Environmental Review .................................................................................. 19

       B.   USFWS's Approval of a Right-of-Way Cutting Across and Through the Protected
            Upper Mississippi River National Wildlife and Fish Refuge ...................................... 21

       C.   U.S. Army Corps of Engineers' Use of Only "General" Permits ................................. 22

       D.   New Developments Following Plaintiffs' Filing of This Lawsuit ................................. 23

ARGUMENT .................................................................................................................. 24

I.     STANDARD OF REVIEW .................................................................................... 24

II.    PLAINTIFFS HAVE STANDING ......................................................................... 27

III.   THE ENVIRONMENTAL IMPACT STATEMENT FOR THE CHC TRANSMISSION
       LINE DID NOT MEET THE REQUIREMENTS OF THE NATIONAL
       ENVIRONMENTAL POLICY ACT (NEPA). ....................................................... 32

       A.   Requirements for Environmental Impact Statements under the National Environmental
            Policy Act and CEQ's Applicable Environmental Review Regulations ......................... 33

       B.   The Defendants' EIS Improperly Adopted the Transmission Companies' Unduly
            Constricting and Impermissibly Narrow Purpose and Need Statement, Contrary to
            NEPA's Requirements as the Seventh Circuit Held in *Simmons*. ............................. 34

       C.   The Defendants' EIS Did Not Rigorously Explore and Objectively Evaluate All
            Reasonable Alternatives as NEPA Requires. ....................................................... 41

       D.   The Defendants' EIS Did Not Adequately Consider Cumulative Impacts as NEPA
            Requires ...................................................................................................... 42

       E.   The EIS Failed to Adequately Analyze Climate Change Impacts as NEPA Requires. 50

IV.   CONVEYING A 260-FOOT-WIDE RIGHT-OF-WAY FOR THE CHC
TRANSMISSION LINE AND ITS TOWERS TO CUT THROUGH THE UPPER
MISSISSIPPI RIVER NATIONAL WILDLIFE AND FISH REFUGE VIOLATES THE
NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997. ......... 53

A.   The National Wildlife Refuge System Improvement Act of 1997 Adopted a Strict
Prohibition Against Any Uses of National Wildlife Refuges that Are Not
"Compatible" with the Refuge System's Wildlife Mission. As Defendants
Acknowledge, Projects like the CHC Transmission Line Do Not Meet the
"Compatibility" Standard. ............................................................................. 55

B.   The CHC Transmission Line Does Not Fit within any Recognized Exceptions to the
Refuge Act's Compatibility Requirement. .................................................... 59

1.   The CHC Transmission Line May Not Lawfully Be "Grandfathered in" as
"Maintenance" or a "Minor Realignment" of an Existing Transmission Line. ..... 60

2.   Defendant USFWS Cannot Avoid the Refuge Act's Specific Compatibility
Requirements by Using its General Land Exchange Authority. ............................ 64

V.   THE GENERAL PERMITS USED BY THE U.S. ARMY CORPS OF ENGINEERS TO
AUTHORIZE THE DISCHARGES NECESSARY TO BUILD THE CHC
TRANSMISSION LINE AND HIGH TOWERS VIOLATE THE CLEAN WATER
ACT, NEPA, AND THE ENDANGERED SPECIES ACT ............................................ 69

A.   Background: The Corps' General Permits for "Utility Lines." .................................... 70

B.   The Defendant Corps' Conclusion that Major Projects like the CHC Transmission Line
Will Have No More than "Minimal" Impacts on the Environment Is Contrary to CWA
section 404(e)(1) ......................................................................................... 74

1.   The Defendant Corps' Policy of Defining Each Individual Water Crossing as a
Separate "Project" to Avoid Individual Permitting Violates Section 404(e) of the
Clean Water Act. ...................................................................................... 75

2.   The Defendant Corps Cannot Lawfully Avoid Making the "Minimal Impact"
Analysis Section 404(e) Requires for General Permits by Simply Deferring Impact
"Analysis" to the Individual Project Stage. ............................................................ 76

3.   The Defendant Corps Cannot Lawfully Evade the "Minimal Impact" Requirement
Simply by Asserting that Compensatory Mitigation Will, in All Cases, Reduce
Negative Environmental Impacts Below the "Minimal" Threshold. ..................... 77

C.   Because the Defendant Corps' General Permits for "Utility Lines" Do Have
Significant Environmental Impacts, They Are Also Invalid Because They Were Not
Preceded by an Environmental Impact Statement as NEPA Requires and by
Programmatic Consultation with the USFWS as the Endangered Species Act Requires.
.................................................................................................................... 79

CONCLUSION..................................................................................................................... 83

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs,*
650 F.3d 652 (7th Cir. 2011)……………………………………………………..… 29

*American Rivers v. Fed. Energy Reg. Comm'n,*
895 F.3d 32 (D.C. Cir. 2018)………………………………………………..…….… 29

*Backcountry Against Dumps v. Chu,*
215 F. Supp. 3d 966 (S.D. Cal. 2015)…………………………………………………..36

*Center for Biological Diversity v. National Hwy. Traffic Safety Admin.,*
538 F.d 1172 (9th Cir. 2008)……………………………………………………….... 51

*Center for Biological Diversity v. U.S. Dept. of Interior,*
623 F.3d 633 (9th Cir. 2010)………………………………………………..……… 68

*Citizens Against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991)…………………………………………………………35

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,*
123 F.3d 1142 (9th Cir. 1997)…………………………………………………… 43

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982)……………………………………………………………………54

*Delaware Riverkeeper Network v. FERC,*
753 F.3d 1304 (D.C. Cir. 2014)……………………………………………………...43

*D. Ginsberg & Sons, Inc. v. Popkin,*
285 U.S. 204 (1932)……………………………………………………………………67

*Environmental Law & Policy Center v. U.S. Nuclear Regulatory Commission,*
470 F.3d 676 (7th Cir. 2006)……………………………………………………... 36

*Friends of Alaska National Wildlife Refuges v. Bernhardt,*
463 F.Supp.3d 1011 (D. Alaska 2020)………………………………………….. 66-67

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) …………………………………………………………………28

*Gunpowder Riverkeeper v. FERC,*
807 F.3d 267 (D.C. Cir. 2015) ……………………………………………………30

*Habitat Educ. Center, Inc. v. Bosworth (Habitat I),*
363 F. Supp. 2d 1070 (E.D. Wis. 2005)…………………………………………… 4, 26, 47

v

*Habitat Educ. Ctr., Inc. v. Bosworth (Habitat II),*
 363 F.Supp.2d 1090 (E.D. Wis. 2005)…………… ……………………………… *passim*

*Habitat Educ. Ctr., Inc. v. Bosworth (Habitat III),*
 381 F.Supp.2d 842 (E.D. Wis. 2005)……………………………………………... 4, 47

*High Country Conservation Advocates v. United States Forest Serv.,*
 52 F.Supp.3d 1174 (D. Colo. 2014)…………………………………………… 51

*Humane Soc. of the U.S. v. Hodel,*
 840 F.2d 45 (D.C. Cir. 1988)………………………………………………….. 30

*Hunger v. Leininger,*
 15 F.3d 664 (7th Cir. 1994)……………………………………………………… 25

*Hunt v. Washington State Apple Advert. Comm'n,*
 432 U.S. 333 (1977)……………………………………………………………… 28

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
 305 F.3d 957 (9th Cir. 2002)…………………………………………………... 47

*Indiana Forest All., Inc. v. U.S. Forest Serv.,*
 325 F.3d 851 (7th Cir. 2003)…………………………………………………… 28

*Indigenous Env't Network v. United States Dep't of State,*
 347 F.Supp.3d 561 (D. Mont. 2018)……………………………………………….. 44

*Indigenous Env't Network v. Trump,*
 __F.Supp.3d__, 2021 WL 2187286 (D. Mont. May 28, 2021)…………………………. 55

*Kentucky Riverkeeper, Inc. v. Rowlette,*
 714 F.3d 402 (6th Cir. 2013)…………………………………………………… 78

*Kleppe v. Sierra Club,*
 427 U.S. 390 (1976) ……………………………………………………………80

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ……………………………………………………………29

*Massachusetts v. Watt,*
 716 F.2d 946 (1st Cir. 1983)……………………………………………………31

*National Parks & Conservation Association v. Bureau of Land Management,*
 606 F.3d 1058 (9th Cir. 2010) ………………………………………………… 36

*Native Ecosystems Council v. Dombeck,*
 304 F.3d 886 (9th Cir. 2002)………………………………………………….. 47

*Natural Resources Defense Council v. Callaway,*
 392 F. Supp. 685 (D.D.C. 1975)……………………………………………… 72

*Natural Resources Defense Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988)……………………………………………………………48

*Natural Res. Def. Council v. U.S. Dep't of Energy,*
    362 F.Supp.3d 126 (S.D.N.Y. 2019)……………………………………………………... 55

*Navajo Nation v. Azar,*
    302 F.Supp.3d 429 (D.D.C. 2018) …………………………………………………… 25

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) …………………………………………………… 43, 49

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    508 U.S. 656 (1993) ………………………………………………………………………55

*Northern Plains Resource Council v. U.S. Army Corps of Engineers,*
    454 F.Supp. 3d 985 (D. Mont. 2020)…………………………………………… 81-82

*Ohio Valley Env't Coalition v. Bulen,*
    410 F.Supp. 2d 450 (S.D.W.Va. 2004)……………………………………..……… 76-77

*Ohio Valley Env't Coal. v. Bulen,*
    429 F.3d 493 (4th Cir. 2005)…………………………………………………….. 76

*Ohio Valley Env't Coalition v. Hurst,*
    604 F.Supp.2d 860 (S.D.W.Va. 2009) …………………………………………….. 78

*Orchard Hill Bldg. Co. v. United States Army Corps of Eng'rs,*
    893 F.3d 1017 (7th Cir. 2018) ……………………………………………………… 25

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012)………………………………………………………………… 67

*Richland/Wilkin Joint Powers Auth. v. U. S. Army Corps of Engineers,*
    826 F.3d 1030 (8th Cir. 2016)…………………………………………………… 31

*Sierra Club v. Bostick,*
    787 F.3d 1043 (10th Cir. 2015)………………………………………………... 77

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017)……………………………………………….. 50

*Sierra Club v. Mainella,*
    459 F.Supp.2d 76 (D.D.C. 2006)……………………………………………… 25

*Sierra Club v. Marsh,*
    872 F.2d 497 (1st Cir. 1989)……………………………………………………31

*Sierra Club v. Morton,*
    405 U.S. 727 (1972)…………………………………………………………… 28

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   399 F.Supp.2d 1335 (M.D. Fla. 2005)……………………………………………… 76

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   803 F.3d 31 (D.C. Cir. 2015)…………………………………………………….. 77

*Sierra Club v. U.S. Army Corps of Engineers,*
   645 F.3d 978 (8th Cir. 2011)…………………………………………………….. 31

*Simmons v. U.S. Army Corps of Engineers,*
   120 F.3d 664 (7th Cir. 1997)……………………………………………… *passim*

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   137 S. Ct. 2012 (2017)……………………………………………………………. 54

*United States v. Coal. for Buzzards Bay,*
   644 F.3d 26 (1st Cir. 2011) …………………………………………………….. 31

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021)……………………………………………………………… 27

*Van Abbema v. Fornell,*
   807 F.2d 633 (7th Cir. 1986) …………………………………………… 35, 37

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
   6 F.4th 1321 (D.C. Cir. 2021)……………………………………………… 50-51

*Warth v. Seldin,*
   422 U.S. 490 (1975)………………………………………………………………… 31

*Western Watersheds Project v. Kraayenbrink,*
   32 F.3d 472 (9th Cir. 2011)……………………………………………………… 82

*WildEarth Guardians v. Zinke,*
   368 F.Supp.3d 41 (D.D.C. 2019)……………………………………………… 51

*Zabel v. Tabb,*
   430 F.2d 199 (5th Cir. 1970)…………………………………………………….. 71

**Statutes**

5 U.S.C. §§ 701–706 ……………………………………………………………….25

5 U.S.C. § 706(2)(A) ……………………………………………………… 5, 25, 33

16 U.S.C. § 668dd ……………………………………………………… *passim*

16 U.S.C. § 668ee ……………………………………………………… 53, 47

16 U.S.C. §§ 668dd, 668ee (1994) …………………………………………….. 55

16 U.S.C. § 1536(a)(2)……………………………………………....… 5, 27, 80-81

16 U.S.C. §§ 3161–3173 …………………………………………….. 66

16 U.S.C. § 3165 ……………………………………………………. 66

16 U.S.C. § 3192(h)………………………………………………….. 66

30 U.S.C. §§ 21–54………………………………………………….. 68

33 U.S.C. § 403 ………………………………………………….. 18, 71

33 U.S.C. § 1251…………………………………………………….. 70

33 U.S.C. § 1311(a) ………………………………………………… 70

33 U.S.C. § 1342 …………………………………………………… 70

33 U.S.C. § 1344 …………………………………………………*passim*

33 U.S.C. § 1362(12)……………………………………………….70

42 U.S.C. § 4321 *et seq.* …………………………………….. 3, 19, 67

42 U.S.C. § 4332 ………………………………………………… 33, 80

43 U.S.C. § 1716(a)…………………………………………….. 69

**Rules**

7 C.F.R. § 1970.5(a) ……………………………………………… 34

33 C.F.R. § 323.2…………………………………………………….. 71

40 C.F.R. § 230.1(c)………………………………………………… 72

40 C.F.R. § 230.10(a)………………………………………………..72

40 C.F.R. § 1502.13 (2019)………………………………………33-34, 41

40 C.F.R. § 1502.14 (2019)……………………………………… *passim*

40 C.F.R. § 1508.7 (2019)……………………………………… *passim*

40 C.F.R. § 1508.18 (2019)……………………………………..… 80

40 C.F.R. § 1508.25 (2019)…………………………………… 34, 42, 80

40 C.F.R. § 1508.27 (2019)…………………………………….… 80

50 C.F.R. § 25.21………………………………………………… 60-61

50 C.F.R. § 26.41……………………………………………… 61, 63, 65

50 C.F.R. § 29.1……………………………………………………………………… 58

50 C.F.R. § 402.14. …………………………………………………………………...81

50 C.F.R. § 402.02…………………………………………………………………… 81

Fed. R. Civ. Pro. 56………………………………………………………………….... 24

Wis. Adm. Code § NR 40.02(46) …………………………………………………... 12, 30

**Other Authorities**

340 FW § 3.3………………………………………………………………………… 58

340 FW § 3.6(A)(3)…………………………………………………………………... 58

603 FW § 2.11 ………………………………………………………………….. *passim*

Cam Tredennick, *The National Wildlife System Improvement Act of 1997: Defining the National Wildlife Refuge System for the Twenty-First Century*, 12 Fordham Envt. L. J. 41 (2000)………53

CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997)…………………………………………………………………………………..46

CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (Jun. 24, 2005)…………………………………………………………………………………..44

Garrett Power, *The Fox in the Chicken Coop: The Regulatory Program of the U.S. Army Corps of Engineers,* 63 Va. L. Rev. 503 (1977)…………………………………………..………… 71

General Accounting Office, *National Wildlife Refuges: Continuing Problems with Incompatible Uses Call for Bold Action*, GAO/RCED-89-196 (Sept. 1989)……… …………………….. 56

H.R. Rep. 105-106 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 1798-5…………...……… 53, 56

Interagency Working Group on Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide—Interim Estimates under Executive Order 13990* (Feb. 2021)…………………………………………………….……………… 51

John C. Grothaus, *Questionable Authority: A Recent CEQ Guidance Memorandum*, 37 Envt. L. 885 (2007)…………………………………………………………………………..…… 44

Michael C. Blumm & D. Bernard Zaleha, *Federal Wetlands Protection Under the Clean Water Act: Regulatory Ambivalence, Intergovernmental Tension, and a Call for Reform,* 60 U.Colo. L. Rev. 695 (1989)………………………………………………………………….…… 72

Michael C. Blumm & Elisabeth Mering, *Vetoing Wetland Permits Under Section 404(c) of the Clean Water Act: A History of Inter-Federal Agency Controversy and Reform,* 33 UCLA J. Envt. L. & Pol'y 215 (2015)………………………………………………………...………71

Travis O. Brandon, *A Wall Impervious to Facts:  Seawalls, Living Shorelines, and the U.S. Army Corps of Engineers' Continuing Authorization of Hard Coastal Armoring in the Face of Sea Level Rise*, 93 Tulane L. Rev. 557 (2019)……………………………………………………… 70

Rural Utilities Service, *Dairyland Power Cooperative: CapX 2020 Hampton-Rochester-La Crosse Transmission Line Project*, 77 Fed. Reg. 41,369 (July 13, 2012)……………………… 45

Request to Reopen Docket No. 05-CE-146 (PSC REF #: 414396)……………………………… 1

Request to Reopen Docket No. 05-CE-146 (PSC REF#: 414398) ……………………………... 1

42 Fed. Reg. 37,144 (July 19, 1977)…………………………… …………………………… 73

U.S. Army Corps of Engineers, *Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1860 (Jan. 6, 2017) ………………………………………………………………………………73

U.S. Army Corps of Engineers*, Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 2744 (Jan. 13, 2021) ……………………………………………………………………… 73

U.S. Fish and Wildlife Service, *Final Compatibility Policy Pursuant to the National Wildlife Refuge System Improvement Act of 1997*, 65 Fed. Reg. 62,484 (Oct. 18, 2000)……………...… 57

U.S. Fish and Wildlife Service*, Interagency Cooperation—Endangered Species Act of 1973, as Amended; Incidental Take Statements*, 80 Fed. Reg. 26,832, 26,8353 (May 11, 2015) ……...… 81

## INTRODUCTION

This case involves challenges by Plaintiffs National Wildlife Refuge Association,

Driftless Area Land Conservancy, Wisconsin Wildlife Federation, and Defenders of Wildlife

("Conservation Groups") to several federal permits and authorizations granted by three

Defendant federal agencies for the proposed controversial Cardinal-Hickory Creek 345 kV high-

voltage transmission line ("the CHC transmission line"):

(1) The Rural Utilities Service's ("RUS") Record of Decision approving the

environmental impact statement prepared for the project;

(2) The U.S. Army Corps of Engineers' ("Corps") decision to use so-called "general"

permits to allow this massive transmission line and high towers to run through

protected rivers, streams, and wetlands under the Clean Water Act; and

(3) The U.S. Fish and Wildlife Service's ("USFWS") decisions to permit the massive

transmission line and high towers to run through the protected Upper Mississippi

River National Wildlife and Fish Refuge.[1]

This massive transmission line and up to 20-story-high towers would cut a wide swath for

about 101 miles from the Hickory Creek substation in Dubuque County, Iowa, and then

---

[1] The Public Service Commission of Wisconsin ("PSCW") granted a state "certificate of public convenience and necessity" ("CPCN") for the Cardinal-Hickory Creek transmission line in September 2019. The merits of that decision are currently on appeal before Judge Jacob Frost of the Dane County Circuit Court with regard to state law issues (Case No. 19-cv-3418), and before the U.S. District Court on federal law issues involving constitutional due process violations under 42 U.S.C. § 1983 (Western District of Wisconsin Case No. 19-cv-01007-wmc). The PSCW decision was tainted by improper *ex parte* communications and undisclosed conflicts of interest on the part of former PSCW Commissioner Michael Huebsch. On June 28, 2021, transmission companies ATC, ITC and Dairyland Power filed a request with the PSCW to rescind the CPCN approval because they admitted that at least two of their agents, as well as others, engaged in secret text messaging using the "Signal" encrypted system on a regular basis with former Commissioner Huebsch while the CPCN case with pending before the Commission. *See* Request to Reopen Docket No. 05-CE-146 (PSC REF #: 414396), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=414396; Request to Reopen Docket No. 05-CE-146 (PSC REF#: 414398), https://apps.psc.wi.gov/ERF/ERFview/viewdoc.aspx?docid=414398. The PSCW has declined to do so. Discovery on the PSCW's violations is ongoing in the Circuit Court proceedings, and a trial is set before Judge Frost on September 29 and 30, 2021.

supposedly through the Upper Mississippi River National Wildlife and Fish Refuge, and then through the scenic Wisconsin Driftless Area's landscape, family farms, protected conservation areas, rural communities, and vital natural resources, ending at the Cardinal substation in Middleton, Wisconsin. Statement of Proposed Facts ("SPF") at ¶ 1. Because the U.S. Fish & Wildlife Service has now withdrawn the right-of-way through the protected National Wildlife Refuge, however, there is no connection between the segment of the proposed transmission line in Iowa and the separate segment of the proposed transmission line in Wisconsin. These are two "transmission line segments to nowhere."

Although none of the federal approvals have yet been reviewed by this Court, the three transmission line developers—Intervenor-Defendants American Transmission Company ("ATC"), ITC Midwest, and Dairyland Power Cooperative (collectively, "Transmission Companies")—have already commenced construction on the Iowa side, and stated that they plan to commence construction of their proposed massive transmission line on the Wisconsin side in October, 2021. SPF at ¶¶ 155, 156. They have already cleared most of the right-of-way in the shorter Iowa segment to the ground, including over steep hills and through forested areas, and have begun construction. SPF at ¶ 155. The Transmission Companies argue that they aren't planning to do any work within the Upper Mississippi River National Wildlife and Fish Refuge until October 2022, SPF at ¶ 157, but they see no barrier to building the massive transmission line right up to the boundary of the protected National Wildlife Refuge on both sides.

They seek to do all of this construction causing extensive environmental damage *before* the Court can address the merits of Plaintiff Conservation Groups' lawsuit. To paraphrase the Queen of Hearts' misguided approach to the judicial system in Lewis Carroll's *Alice's Adventures in Wonderland*: "Construction first—verdict afterwards."

2

While they continue construction with its resulting environmental harms, the three Transmission Companies and the three Defendant federal agencies are also requesting that the Plaintiffs' lawsuit challenging the illegal permit approvals be stayed and put on indefinite hold. Case No. 21-cv-00096, Dkt. 49, 50, 54, 60. The Transmission Companies and the Defendants "cannot have it both ways."

The issues in the case are straightforward and purely legal. Plaintiffs contend that:

1. Defendant RUS's environmental impact statement ("EIS") for the proposed CHC transmission line repeatedly failed to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., and the Council on Environmental Quality's ("CEQ") applicable environmental review rules for several reasons, including: (a) impermissibly defining a "purpose and need" for this project so narrowly as "increas[ing] the transfer capability of the electrical system between Iowa and Wisconsin," SPF at ¶ 79, which precluded full and fair consideration of reasonable alternatives *other than* building a new transmission line across the Mississippi River, including alternatives that are less environmentally damaging and more cost-effective, *see Simmons v. U.S. Army Corps of Engineers,* 120 F.3d 664 (7th Cir. 1997); (b) failing to "rigorously explore and objectively evaluate all reasonable alternatives," including non-wires alternatives or "alternative transmission solutions," that are less environmentally damaging and more cost-effective (40 C.F.R. § 1502.14[2]); (c) failing to "rigorously explore and objectively evaluate" alternative transmission line routes that would avoid cutting a wide swath through the protected Upper Mississippi River National Wildlife and Fish Refuge and scenic Driftless Area landscape and

---

[2] Unless otherwise noted, all references to 40 C.F.R. parts 1500 to 1508 (the CEQ regulations implementing NEPA) are to the 2019 version of the regulations, which were controlling at the time the environmental review for the CHC line was completed.

vital natural resources (40 C.F.R. § 1502.14); (d) failing in any way to assess the cumulative environmental impacts of the proposed CHC transmission line—"the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" (40 C.F.R. § 1508.7)—together with all other transmission lines and development projects including, but not limited to, the recent past CapX2020 and Badger-Coulee high-voltage transmission lines, and reasonably foreseeable future high-voltage transmission lines built in or proposed for this geographic region, *see Habitat Educ. Center, Inc. v. Bosworth (Habitat I)*, 363 F. Supp. 2d 1070, 1078–83 (E.D. Wis. 2005); *Habitat Educ. Ctr., Inc. v. Bosworth (Habitat II)*, 363 F.Supp.2d 1090, 1098 (E.D. Wis. 2005); *Habitat Educ. Ctr., Inc. v. Bosworth (Habitat III)*, 381 F.Supp.2d 842 (E.D. Wis. 2005); and (e) failing to adequately analyze the climate change impacts of the construction and operation of the massive CHC transmission line, including fossil-fuel electricity generation supported by the line.

Consequently, all of the federal agency decisions related to this project are invalid because they have not been preceded by a lawful EIS.[3]

2. Defendants USFWS, Wooley, and Chandler violated the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd–668ee ("the Refuge Act") by conveying a right-of-way allowing the proposed huge CHC transmission line with 20-story high towers to run through the protected Upper Mississippi River National Wildlife and Fish Refuge. The Refuge Act flatly prohibits any private economic use of a National Wildlife Refuge that is not "compatible with" and does not "contribute to" the Refuge's wildlife conservation purposes. Whether the approval is structured as an easement grant, as originally done, or as a land

---

[3] Defendants try to minimize the federal role in this project, Case No. 21-cv-00096-wmc, Dkt. 50 at 4, but, suffice it to say, this massive transmission line cannot be built without federal permits, easements, and approvals.

exchange, as the Transmission Companies now propose, the consequences are the same, and both violate the Refuge Act.

3.   Defendants the Corps, Lieutenant General Spellmon, Colonel Sattinger, and Colonel Jansen illegally authorized the discharges of dredged and fill materials into "waters of the United States." Instead of completing an "individual" permit review, these Defendants chose to use the Corps' illegally authorized nationwide and regional "utility line" general permits for this massive high-voltage transmission line. Section 404(e) of the Clean Water Act, 33 U.S.C. § 1344(e), only allows general permits for projects and project categories that separately and cumulatively will have no more than "minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." General permits are inappropriate for the massive and environmentally destructive CHC transmission line. The general permits also violate NEPA, because they were not preceded by an environmental impact statement, and violate Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), because they were issued without the required programmatic consultation.

By granting permits or considering possible federal financial assistance for the CHC transmission line project without a legally compliant EIS, all Defendants have violated the National Environmental Policy Act in addition to the violations of the Clean Water Act, Endangered Species Act, and National Wildlife System Refuge Improvement Act as summarized above and explained in more detail below. Plaintiffs therefore request that this Court vacate the challenged federal approvals as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

**STATEMENT OF FACTS AND PROCEDURAL HISTORY[4]**

**I.      Description and Current Status of the Proposed Cardinal-Hickory Creek High-Voltage Transmission Line.**

The proposed Cardinal-Hickory Creek high-voltage transmission line is planned to run

for about 101 miles between Dubuque County, Iowa, and Middleton, Wisconsin. SPF at ¶ 1.



*Map from the Record of Decision on the NEPA Review, ROD007625*

The CHC transmission line towers will be about 195 feet high (*i.e.*, 20 stories high) on

either side of the Mississippi River crossing, and 150 to 175 feet high (*i.e.*, 17+ stories) along

most of the route. SPF at ¶¶ 1, 125. The towers will be built with two types of foundations: one

---

[4] This brief is accompanied by a Statement of Proposed Facts (SPF) as required by this Court's summary judgment procedures.

would require holes 3 to 6 feet in diameter and 20 to 30 feet deep, and the other would require holes 5 to 12 feet in diameter and 20 to 60 feet deep. SPF at ¶ 151.

The proposed CHC transmission line will have a 150-foot-wide cleared out right-of-way and a 260-foot-wide cleared out right-of-way in the Upper Mississippi Refuge. SPF at ¶¶ 2, 127. The right-of-way will be cleared of trees and vegetation to the ground before construction, and vegetation will need to be kept down through cutting and herbicides for the entire life of the transmission line. SPF at ¶¶ 147-149.

In Iowa, the proposed transmission line would begin at the Hickory Creek substation and run for a short segment through Iowa before cutting a swath through the Upper Mississippi River National Wildlife and Fish Refuge ("the Refuge") and crossing the Mississippi River to reach Cassville, Wisconsin. SPF at ¶ 108.



*Map from the Record of Decision on the NEPA Review, ROD007626*

The Upper Mississippi River National Wildlife and Fish Refuge covers over 240,000 acres and extends 261 river miles from its north end at the confluence of the Chippewa River in Wisconsin to its south end near Rock Island, Illinois. SPF at ¶ 109. The northern and southern boundaries of this protected National Wildlife Refuge roughly correspond to the northern and southern boundaries of the four-state Driftless Area. SPF at ¶ 110.

The Upper Mississippi River National Wildlife and Fish Refuge is designated as a Wetland of International Importance and a Globally Important Bird Area. SPF at ¶ 111. The Refuge is located within the Mississippi Flyway, a major north-south bird migration route used by up to 40% of North America's waterfowl. SPF at ¶ 112. The Refuge's wooded islands, marshes, and backwaters in Wisconsin, Iowa, Minnesota, and Illinois, provide a haven for a plethora of unique fish, wildlife, and plants. SPF at ¶ 113. The right-of-way through the Refuge includes both non-forested and forested wetlands. SPF at ¶ 126.

The Transmission Companies propose to build the massive CHC transmission line on a new right-of-way through the National Wildlife and Fish Refuge. SPF at ¶ 123. The Developers have agreed to remove an older 69 kV transmission line that crosses the Refuge, and to relocate a 161 kV line to the new CHC transmission line right-of-way. SPF at ¶¶ 121-122. The proposed route for the CHC transmission line would follow a different path than the existing lines, crossing the Mississippi River over a mile north of the existing transmission lines' crossing of the River. SPF at ¶ 123. The CHC transmission line would then cut a wide swath through the scenic Driftless Area landscape and communities in southwest Wisconsin on the way to ending at the Cardinal substation in Middleton, Wisconsin. SPF at ¶¶ 1, 139.

The Driftless Area, unlike much of the Midwest's landscape, was not flattened by glaciers, and contains rolling hills and deep river valleys. SPF at ¶ 140. It is a "truly unique landscape, rich in natural resources and well-known and appreciated for its natural scenic beauty." SPF at ¶ 141. It contains many rare and unique woodland, prairie, and riparian habitats. SPF at ¶ 140. The Driftless Area is home to numerous endangered and threatened species, includes many cold water trout streams and high quality wetlands, and contains several designated Important Bird Areas. SPF at ¶ 141. The proposed route for the CHC line would run along and through the Military Ridge Prairie Heritage Area, which is identified as a high priority for landscape-scale grassland protection and management by the Wisconsin Department of Natural Resources. SPF at ¶ 145. It would also pass near and through numerous other natural and recreation areas, including the Black Earth Creek Wildlife Area and the Southwest Wisconsin Grasslands and Stream Conservation Area. SPF at ¶ 146. With a "largely rural character," the region "has emerged as an incubator for innovative agricultural enterprises, a home to thriving local and organic food economies, and a destination for visitors who appreciate the area's scenic beauty, recreational opportunities, and attractive communities." SPF at ¶ 142. The Driftless Area has a robust tourism economy based on the region's natural and outdoor recreation resources. SPF at ¶ 143.

The Transmission Companies have already begun building the CHC transmission line. In Iowa, the Transmission Companies have cut down trees, cleared most of the right-of-way, and begun construction. SPF at ¶ 155. In Wisconsin, the Transmission Companies have stated that they plan to begin construction in October 2021. SPF at ¶ 156. The Transmission Companies state that they plan to begin construction of their massive high-voltage transmission line, with 195 foot high towers at the river crossing, through the Upper Mississippi River National Wildlife

and Fish Refuge in October 2022, SPF at ¶¶ 125, 157, after completing construction to the extent practicable up to the Refuge's borders on both sides. In combination, the adverse, damaging environmental impacts are huge, and "all reasonable alternatives" were not fully and fairly considered.

## II.   Adverse Environmental Impacts of the Proposed CHC Transmission Line and High Towers.

Preconstruction and construction work will cause significant damage to the environment, resulting in injury to Plaintiffs' members' use and enjoyment of the environment and causing direct harm to Plaintiffs' organizational interests. Preconstruction activities include clearing the full right-of-way of all vegetation. SPF ¶ at 147. Trees and plants in the right-of-way would be cleared with mowers, by hand, or by "sky trims, processors, or harvesters." SPF at ¶ 148. The right-of-way for the selected route for the proposed CHC transmission line covers 1,935 acres, including 352 acres of grasslands, 250 acres of forest lands, 17 acres of shrubland, and 76 acres of wetlands. SPF at ¶ 158. The selected route would cut through approximately 114 different wetlands. SPF at ¶ 159. The damaging impacts to wetlands "would include fill activities from transmission line structure construction, tree clearing within the ROW, and construction of access roads and staging areas." SPF at ¶ 160. These "wetland fill activities . . . are considered permanent impacts resulting in wetland loss." SPF at ¶ 160.

The Transmission Companies would build 14- to 20-foot-wide access roads and work platforms. SPF at ¶ 150. In hilly places in the Driftless Area with a steeper than 10% slope, the Transmission Companies would regrade structure sites and work areas to be level. SPF at ¶ 152. The Transmission Companies would also construct temporary staging areas, helicopter landing pads, offsite "laydown yards," and "conductor pulling/handling" sites. SPF at ¶ 153. The transmission line route includes 163 acres of access roads and 213 acres of laydown yards. SPF

at ¶ 154. Construction equipment needed to install the line will also compact soils, including in sensitive agricultural fields. SPF at ¶ 173.

All of these activities will have significant long-term impacts on the environment. Clearing out the right-of-way would destroy and fragment habitat and expose soil to wind and water erosion, which can lead to sedimentation of nearby waterways. SPF at ¶ 161. Silty farmland soils in the Driftless Area are particularly prone to erosion. SPF at ¶ 162. "The most common contaminant from construction activity is the movement of sediment by stormwater into nearby surface waters, due to ground disturbance." SPF at ¶ 163. The Defendants acknowledge that "[p]roject construction would affect both biological resources and vegetation communities, such as wetlands, forests, and bluffs, through land clearing, grading, erosion and sedimentation." SPF at ¶ 164.

Further, "[c]onstruction of the project would affect water resources (e.g., rivers, floodplains) through land clearing, grading, [and] filling . . . Water bodies and floodplains would lose some productivity in the short term from construction-related pollutants, sedimentation, and erosion." SPF at ¶ 164. The Defendants claim that best management practices will minimize runoff and sedimentation, but the environmental impact statement does not include any proof of the efficacy of these management practices. SPF at ¶ 165.

Clearing the right-of-way would also create a new pathway for invasive plants to spread. Clearing would "directly affect noxious weeds through soil and native vegetation disturbance." SPF at ¶ 166. Noxious and invasive vegetation can be spread through construction and maintenance activities and "can relatively quickly invade disturbed or fragmented areas" and "lead to changes in the vegetation communities." SPF at ¶ 167; *see* SPF at ¶ 28.

Many invasive species already exist in the area of the proposed transmission line, and therefore could easily be spread through construction and maintenance activities. SPF at ¶ 168. In 2017, there was fieldwork done for wetland delineations and vegetation mapping. Even though the fieldwork "*did not* include targeted surveys to identify all invasive species," there were still over two dozen invasive plant species recorded. SPF at ¶ 168 (emphasis added). Twenty-four of those species are categorized as "restricted" under Wis. Adm. Code § NR 40.02(46), which means each species "causes or has the potential to cause economic or environmental harm or harm to human health." SPF at ¶ 168. One species is categorized as "prohibited," which means it also has the potential to "caus[e] economic or environmental harm or harm to human health." SPF at ¶ 168.

Removing trees and plants near cold water trout streams will raise the stream temperatures because the waters will no longer be shaded. SPF at ¶ 169. Clearing the right-of-way would also impact aesthetics. "Potential impacts to visual quality and aesthetics in the analysis area would result from . . . the establishment of new or expanded ROW through forested areas." SPF at ¶ 170. In particular, the clearing of the right-of-way will have immediate, irreversible aesthetic impacts in the vicinity of the Upper Mississippi River National Wildlife and Fish Refuge, Nelson Dewey State Park, and the Military Ridge State Trail in Wisconsin. SPF at ¶ 171. The presence of, and noise caused by, humans and equipment during preconstruction activities are also likely to disrupt wildlife, including bald eagles. SPF at ¶ 172.

Many of the adverse environmental impacts will begin as soon as trees and plants cleared or foundations are excavated, and will continue for the life of the transmission line. Once the 17- to 20-story-high towers are constructed and the east-west high-voltage wires are strung, there

will be even more negative impacts, including the risk that birds, especially migratory birds using the north-south Mississippi Flyway, will fly into the line and be killed. SPF at ¶ 174.

The Defendants acknowledge in their environmental impact statement that these impacts will be irreversible: "anticipated potential irreversible" impacts include "destruction of wetlands and floodplains," "destruction of terrestrial and aquatic vegetation and wildlife habitat, including forested areas and bluffs," and "alteration to the viewshed by clearing land, cutting and filling, and constructing transmission line structures." SPF at ¶ 175–176.

## III.   Impacts on Plaintiff Conservation Organizations and Their Members.

Preconstruction and construction activities will harm Plaintiffs because their members use and enjoy private lands and waterways, the Upper Mississippi River National Wildlife and Fish Refuge, and other public recreation areas that would be imminently and irreparably harmed.

For example, Dena Kurt, who is a member of both the Driftless Area Land Conservancy ("DALC") and Wisconsin Wildlife Federation ("WWF"), is an avid outdoor sports enthusiast who regularly enjoys canoeing and cross-country skiing in the area of the Upper Mississippi River National Wildlife and Fish Refuge through which the Transmission Companies would build the CHC transmission line. SPF at ¶ 10. Preconstruction and construction activities would impair the experience of being in a natural setting and would irreparably harm the ecosystems and species that Ms. Kurt enjoys experiencing and viewing due to impacts like destruction and fragmentation of habitat, erosion, and sedimentation. SPF at ¶ 12. In particular, Ms. Kurt is concerned that clearing and maintenance of the ROW will lead to increased run-off of soil and pollutants into the Mississippi River, with resulting sedimentation and algal blooms. SPF at ¶ 13. Clean and clear water is important to Ms. Kurt's enjoyment of paddling, because it allows her to view aquatic life, such as fish and mussels, and have a more enjoyable recreational experience. SPF at ¶ 14. Ms. Kurt is especially interested in mussels, including the federally endangered

Higgins' eye pearlymussel, which lives in the Mississippi River at Cassville. SPF at ¶ 14. Sedimentation of mussel beds is considered a significant threat to the Higgins' eye pearlymussel. SPF at ¶ 15.

Dan Ashe is a member of the Board of Directors of the National Wildlife Refuge Association ("NWRA"). SPF at ¶ 64. Mr. Ashe served as the Director of the USFWS from June 2011 to January 2017, in addition to previously working in other roles at USFWS. SPF at ¶ 64. Mr. Ashe is concerned that allowing the massive transmission line and high towers through the Upper Mississippi River National Wildlife and Fish Refuge would set an unfortunate precedent for allowing additional transmission lines and rights-of-way through the protected Refuges. SPF at ¶ 65. In Mr. Ashe's professional opinion, allowing this new right-of-way through the Refuge would be precedent-setting because he is not aware of any similarly large new rights-of-way that have been allowed through the National Wildlife Refuges since the USFWS's compatibility regulations were adopted in 2000. SPF at ¶ 66.

Kerry Beheler, a member of WWF, worked as a Wildlife Health Specialist with the Wisconsin Department of Natural Resources from 1991 to 2004. SPF at ¶ 55. Her personal interests and hobbies include hiking, bird watching, upland game bird hunting, gardening, habitat restoration, environmental education, and wildlife advocacy. SPF at ¶ 55. She uses and enjoys the Upper Mississippi River National Wildlife Refuge, including the area near Cassville, Wisconsin where the proposed transmission line would cross, and cares deeply about the wildlife that lives there. SPF at ¶ 56. Vegetation clearing will destroy and fragment habitat, introduce barriers to movement, and disturb and drive away wildlife. SPF at ¶ 57. Dredge and fill in the Refuge wetlands will impair their ecological value, and will likely result in increased turbidity and sedimentation in the Mississippi River, including in the essential habitat area for the

federally endangered Higgins' eye pearlymussel. SPF at ¶ 58. The proposed construction of the CHC transmission line through the protected National Wildlife and Fish Refuge, including dredge and fill in wetlands, would significantly detract from Ms. Beheler's enjoyment of the area. SPF at ¶¶ 58, 59.

DALC board member Mark Mittelstadt is a professional forester who provides ecologically-based woodland management. SPF at ¶ 23. As a volunteer, he maintains a native prairie at the Deer Valley Golf Course, just outside of Barneveld, Wisconsin, which provides habitat for species including the federally-listed regal fritillary butterfly and state-listed bird and plant species. SPF at ¶ 24. The CHC transmission line would run along the north edge of the Deer Valley Golf Course, about a quarter mile from the prairie. SPF at ¶ 25.

Mr. Mittelstadt has actively managed this native prairie for 20 years, and he spends about 200 hours each year on the prairie. SPF at ¶ 24. Equipment used to clear and maintain the transmission line right-of-way, however, may introduce invasive plant species, which can then rapidly spread throughout the prairie. SPF at ¶ 26. Invasive plants are difficult to combat and, in some cases, such as poison parsnip, can even be harmful to humans. SPF at ¶ 26. Mr. Mittelstadt is also concerned about invasive species spreading to the prairie at the Thomas Historic Stone Barn property, a protected conservation area, which is directly adjacent to the golf course, and on which DALC holds a conservation easement. SPF at ¶ 28.

Mr. Mittelstadt is also concerned that preconstruction and construction activity may disturb a pair of bald eagles that nests along Highway 18 / US 151. SPF at ¶ 29.  Mr. Mittelstadt drives past the eagle nest regularly and often observes the nest and the eagles. SPF at ¶ 29. In addition, Mr. Mittelstadt's use of the Cassville ferry service would be less enjoyable if the CHC

transmission line is constructed over the ferry's route between Cassville, Wisconsin and the landing in the Upper Mississippi River National Wildlife and Fish Refuge. SPF at ¶ 30.

Brian Durtschi, another DALC member, owns over 80 acres on the east side of Mount Horeb—a property with great scenic and recreational value with farmland, woods, Schlapbach Creek, and wetlands. SPF at ¶ 16-17. Wildlife including deer, turkey, other birds, and small mammals use the Schlapbach Creek and surrounding wetlands and wooded areas. SPF at ¶ 18. Mr. Durtschi enjoys seeing wildlife on his property, and also allows friends to use his property for hunting. SPF at ¶ 18. The planned route for the CHC transmission line would cut across his property through cropland, wooded areas, across Schlapbach Creek and its wetlands, and then continue over the Military Ridge State Trail. SPF at ¶ 19. Construction activities on Mr. Durtschi's property will include clearcutting a large swath of wooded area, destroying wildlife habitat and clearing plants around Schlapbach Creek and its wetlands. SPF at ¶ 20. Ground-clearing and bulldozing activities will likely cause significant erosion and sedimentation of the creek and its wetlands, especially due to the steep topography found on the property. SPF at ¶ 21. Moving heavy machinery through agricultural fields may cause irreversible soil compaction. SPF at ¶ 20.

Debora Morton is a DALC member who regularly visits, uses, and enjoys several recreation areas that would be damaged or affected by the CHC transmission line, including the Upper Mississippi River National Wildlife and Fish Refuge, Nelson Dewey State Park, Wyalusing State Park, and Pikes Peak State Park. SPF at ¶ 32. Ms. Morton camps, hikes, birdwatches, and enjoys the Mississippi River views in these protected public conservation and recreational areas. SPF at ¶ 32. Her use and enjoyment of these areas would be diminished if the CHC line is constructed. SPF at ¶ 33.

16

Jean Luecke is a member of Defenders of Wildlife who enjoys recreational activities along the Mississippi River and in the area of the National Wildlife and Fish Refuge, including boating and going on river cruises. SPF at ¶ 34. Her use and enjoyment of the area would be diminished if the massive CHC transmission line and high towers are built and detract from the scenic beauty of the area and negatively impact wildlife. SPF at ¶ 35.

Todd Paddock is an NWRA member who lives two months out of the year in Winona, Minnesota. SPF at ¶ 36. When he is in Winona, he spends a great deal of time in the Upper Mississippi River National Wildlife and Fish Refuge, where he fishes, boats, walks, birdwatches, picnics, swims, and cycles, among other activities. SPF at ¶ 37. He also enjoys observing wildlife while fishing, hunting, or walking with friends. SPF at ¶ 38. Mr. Paddock has volunteered for the Refuge's Winona District Friends group, has introduced many others to the Refuge, and has sought to advocate for the Upper Mississippi River National Wildlife and Fish Refuge and the National Wildlife Refuge System more generally. SPF at ¶ 39. Mr. Paddock's enjoyment of the Refuge will be diminished if the CHC transmission line is built and negatively impacts wildlife populations and detracts from the aesthetics of the area. SPF at ¶ 40.

Mary Kritz is a DALC member who enjoys visiting the Mississippi River in the area of the Refuge and Nelson Dewey State Park. SPF at ¶ 41. She also enjoys visiting and learning about Native American burial mounds in the area. SPF at ¶ 42. If built, the CHC transmission line would diminish her enjoyment of the natural areas near the Mississippi River and of burial mounds. SPF at ¶ 43.

Susan Anderson is a DALC member who, along with family members, owns a 280-acre property that is along the approved route of the proposed CHC transmission line. SPF at ¶ 44. She uses the property as a weekend home. SPF at ¶ 45. If built as an expansion and replacement

of a much smaller transmission line across the property, the massive CHC transmission line would diminish her enjoyment of the property. SPF at ¶ 46. It would be visible from the houses, and she is worried that the transmission line and high towers would negatively impact the bald eagles she enjoys watching on the property. SPF at ¶ 47. She is also concerned that construction of the transmission line would increase erosion and run-off on her property, and that it may disturb Native American mounds on the property. SPF at ¶ 48. Construction of the line would also require clearing out the trees in an area of her property that is being used for sustainable timber harvests. SPF at ¶ 49.

## IV.   Procedural History

The proposed CHC transmission line project has required a number of state and federal permits and approvals. On the federal side, which is the subject of this litigation, the proposed CHC transmission line has required:

(1) Permits from the Corps to cross navigable waters, including the Mississippi River under Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403;

(2) Permits from the Corps under Section 404(e) of the Clean Water Act, 33 U.S.C. § 1344(e), to discharge dredged and fill materials into "waters of the United States," including the 114 protected wetlands along the entire route;

(3) Because the proposed massive transmission line and high towers would cross a protected National Wildlife and Fish Refuge, the CHC transmission line also requires a formal determination by the Refuge manager that the project would be "compatible" with and "contribute to" the Refuge's wildlife protection and preservation purposes (a "Compatibility Determination") under the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. § 668dd.

(4) The USFWS must also approve conveying a right-of-way for the transmission line across the protected National Wildlife and Fish Refuge and must grant a special use permit.

(5) Because federal permits are required and one of the Transmission Companies intends to seek a federal loan for the project, an environmental impact statement ("EIS") is required under NEPA, 42 U.S.C. §§ 4321 *et seq*. NEPA requires that major federal actions, including granting permits or financial assistance to projects that might have a significant impact on the environment, must be preceded by an EIS that "rigorously explores and objectively evaluates all reasonable alternatives," among other NEPA requirements. 40 C.F.R. § 1502.14.

**A.  Environmental Review.**

In this case, Defendant RUS, part of the U.S. Department of Agriculture, instead of one of the environmental agencies, took the lead responsibility for preparing the EIS, apparently because one of the Transmission Companies had expressed interest in an RUS loan.[5] SPF at ¶¶ 3-4. Defendants USFWS and the Corps, along with the U.S. Environmental Protection Agency (EPA), participated as cooperating agencies. SPF at ¶¶ 6, 7.

RUS invited public comments on the proper scope of the EIS in 2017 and then issued a draft EIS on December 7, 2018. SPF at ¶¶ 67–68. Plaintiffs Driftless Area Land Conservancy ("DALC") and Wisconsin Wildlife Federation ("WWF") submitted extensive written comments on the proper scope of the EIS and then submitted extensive written comments on the draft EIS. SPF at ¶¶ 70, 71. DALC and WWF urged RUS and the cooperating agencies to both: (1) fully and fairly rigorously explore and objectively evaluate reasonable "non-wires" alternatives—

---

[5] Dairyland states that it intends to seek funding from the Rural Utilities Service in 2022 or 2023. SPF at ¶ 5.

including distributed solar energy plus energy storage, energy efficiency, demand response and local transmission line upgrades and improvements, and other "alternative transmission solutions" in southwest Wisconsin—that could create transmission system benefits at a lower cost and with less adverse environmental impacts; and (2) fully and fairly rigorously explore and objectively evaluate reasonable alternative routes that would avoid cutting a wide swath through the protected Upper Mississippi River National Wildlife and Fish Refuge and the scenic Driftless Area landscape, family farms, rural communities and vital natural resources. SPF at ¶ 72.

During the scoping process, the U.S. EPA also raised concerns about the proposed route running through the protected Upper Mississippi River National Wildlife and Fish Refuge. The U.S. EPA recommended that alternative routes be fully considered. SPF at ¶ 69.

DALC and WWF also specifically raised concerns by explaining that the "purpose and need" statement in the EIS was written so impermissibly narrowly that it precluded full and fair consideration of reasonable alternatives other than a huge high-voltage transmission line running on essentially the proposed route between the Hickory substation near Dubuque, Iowa, then through the Upper Mississippi River National Wildlife and Fish Refuge, and then through the scenic Driftless Area landscape and vital natural resources to the Cardinal substation in Middleton, Wisconsin. SPF at ¶ 73. DALC and WWF also explained that the EIS must analyze the cumulative impacts of the CHC transmission line, along with all past, present, and reasonably foreseeable future high-voltage transmission lines projects and other electricity infrastructure in the relevant geographic area. SPF at ¶ 74.

Defendant RUS did not make significant changes in response to comments, and published the final EIS on October 23, 2019. SPF at ¶ 75. On January 16, 2020, Defendants

RUS, USFWS, and the Corps issued a Record of Decision (ROD) approving the final EIS. SPF at ¶¶ 76–77.

**B.  USFWS's Approval of a Right-of-Way Cutting Across and Through the Protected Upper Mississippi River National Wildlife and Fish Refuge.**

The proposed CHC transmission line is massive: a 345-kV high-voltage transmission line with 20-story high towers on either side of the Mississippi River. SPF at ¶ 125. To accommodate much wider H-style transmission towers, the proposed right-of-way would be 260 feet wide through the Refuge, 110 feet wider than the right-of-way for the rest of the line. SPF at ¶ 127.

From the beginning of the process, the USFWS's Upper Mississippi River National Wildlife and Fish Refuge managers advised the Transmission Companies to find non-Refuge river crossing alternatives because a new huge high-voltage transmission line and high towers could not meet the Refuge Act's prohibition against uses that were not "compatible with" the Refuge's wildlife conservation purposes. As noted above, the U.S. EPA also urged that alternative routes be considered that would avoid running through the protected Upper Mississippi River National Wildlife and Fish Refuge. SPF at ¶ 69.

In 2012, Tim Yager, Assistant Refuge Manager, wrote in an email that he had discussions with ATC, one of the Transmission Companies, that "focused on the use of existing rights-of-way and or avoidance of the Refuge as the only compatible alternatives for crossing the Refuge." SPF at ¶ 114. The "Cooperating Agency Kickoff Meeting Notes" from the Defendant federal agencies' September 21, 2016, meeting focused on the EIS for the proposed CHC transmission line, state: "The USFWS would prefer the transmission line not to cross the Refuge; therefore, it is important to identify the River Crossing Analysis as such since it involves alternatives not crossing the Refuge (i.e., City of Dubuque)." SPF at ¶ 115.

On December 19, 2019, however, Defendant Sabrina Chandler, the Manager of the Upper Mississippi River National Wildlife and Fish Refuge, issued a document called a "Compatibility Determination." SPF at ¶ 116. This document did *not* find that the CHC transmission line, towers, and 260-foot clear-cut right-of-way are compatible with the Refuge's wildlife purpose, but instead concluded that the massive transmission line could be grandfathered in as "a minor realignment of an existing right-of-way to meet safety standards" because the Transmission Companies had agreed to take down two older, smaller, low-voltage transmission lines that crossed the Refuge and the Mississippi River about a mile downstream and to revegetate their narrower right-of-way. SPF at ¶¶ 117-119, 122. The USFWS Regional Director concurred with the determination the day after it was issued. SPF at ¶ 116. On or about September 8, 2020, USFWS granted a right-of-way authorization and special use permit, based on the "Compatibility Determination," for the CHC transmission line to cross the Upper Mississippi River National Wildlife and Fish Refuge. SPF at ¶ 120. Only after the Plaintiffs filed their lawsuit and just a week before these cross-motions for summary judgments and accompanying briefs were due to be filed, the Defendants notified Plaintiffs and this Court that the USFWS's authorization and permit were changing, however, as explained in Section D below.

**C.  U.S. Army Corps of Engineers' Use of Only "General" Permits.**

The Transmission Companies did not seek, and therefore the Corps did not conduct, the analysis required to issue an "individual" permit for the CHC transmission line under Section 404 of the Clean Water Act, 33 U.S.C. § 1344. Instead, the Corps District Engineers in Rock Island and St. Paul "verified" that the project came within their definition of a "utility line," and relied only on so-called "general" permits: "Nationwide Permit 12" in Iowa for the Rock Island District and the St. Paul District's "Utility Regional General Permit" in Wisconsin. SPF at ¶ 78.

22

The Corps had most recently reauthorized Nationwide Permit 12 in 2017, and the St. Paul's Utility Regional General Permit had been readopted in 2018. SPF at ¶¶ 185–186. Neither general permit was preceded by an EIS or a programmatic consultation with USFWS under Section 7 of the Endangered Species Act. SPF at ¶¶ 187–191.

### D.  New Developments Following Plaintiffs' Filing of This Lawsuit.

Plaintiffs filed their Complaint challenging the Defendants' flawed "Compatibility Determination" and NEPA review on February 10, 2021. Case No. 21-cv-00096, Dkt. 1. Plaintiffs filed a separate Complaint on May 5, 2021 challenging the Corps' permitting decisions, and the two cases were consolidated. Case No. 21-cv-00306, Dkt. 1, 22; Case No. 21-cv-00096, Dkt. 48. After Plaintiffs filed the Complaints in these consolidated cases, the Transmission Companies first submitted a modified application to Defendant USFWS seeking approval for the CHC transmission line, towers, and 260-foot right-of-way to enter the protected National Wildlife and Fish Refuge at a slightly different location, apparently to avoid burial mounds. SPF at ¶ 132.

In June, 2021, Defendant RUS issued a draft Environmental Assessment ("EA") examining the impacts of the Transmission Companies' requested route modifications. SPF at ¶ 133. The EA concluded that the route modifications do not result in significant changed circumstances or new impacts, meaning that RUS does not intend to prepare a full EIS. SPF at ¶ 134. The EA states that USFWS may, "[i]f determined appropriate," issue an "amended" Compatibility Determination for the modified route through the Refuge, but the USFWS has not committed to doing so. SPF at ¶ 135. The EA also states that Defendant USFWS "would need to issue an amended [ROW] permit" and that the "Special Use Permit may need to be amended." SPF at ¶ 135.

In July 2021, the Transmission Companies proposed to USFWS that their right-of-way across the National Wildlife and Fish Refuge be converted from an easement grant to a land exchange, which they claimed would somehow not be subject to the Refuge Act's compatibility requirements. SPF at ¶ 136. No land exchange has since been approved or completed. SPF at ¶ 137. Defendants have moved to stay this litigation until after the land exchange option is fully evaluated, and that motion is currently pending before the Court. Case No. 21-cv-00096, Dkt. 49, 50, 54, 60.[6]

On August 27, 2021, shortly before the cross-motions for summary judgment and briefs were due to be filed on September 3, 2021, the Defendant USFWS informed the Plaintiffs and this Court that it was reversing course, withdrawing its previous "Compatibility Determination" and right-of-way permit in order to pursue the land exchange. SPF at ¶ 138. USFWS stated that it had discovered a flaw in its review of the existing transmission line easement documents during the Service's issuance of the "Compatibility Determination," and that the proposed land exchange would obviate those problems as well. SPF at ¶ 138.

## ARGUMENT

### I.   STANDARD OF REVIEW

This matter comes before the Court on cross motions for summary judgment, which is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). Judicial review of federal agency actions

---

[6] The Transmission Companies also say that they do not intend to rely on the verifications that Nationwide Permit 12 applies to the portion of the line running through the Refuge, but someday will apply for verifications under the renumbered Nationwide Permit 57 or maybe seek an individual permit for that section. SPF at ¶ 194. Earlier this year, the Corps divided NWP 12 into three—one for oil and hazardous liquid pipelines, one for electric transmission lines (NWP 57), and one for water or other similar lines. *See infra* note 33. There are no substantive differences. There is also no indication that the Transmission Companies intend to stop "relying on" the Utility Regional General Permit in Wisconsin.

under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, however, is conducted

on the basis of the administrative record compiled in the agency proceedings, and will, in

virtually every case, be resolved "as a matter of law." As the Seventh Circuit has explained:

> When a party moves for summary judgment in such a judicial-review proceeding, he does not implicitly reserve a right to a trial if the motion is denied; there is no right to a trial in a review proceeding, as contrasted with an original proceeding. The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.

*Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir. 1994). "In an Administrative Procedure Act

Case, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA

standard of review.'" *Navajo Nation v. Azar,* 302 F.Supp.3d 429, 435 (D.D.C. 2018) (*quoting*

*Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006)).

Under the APA standard of review, courts are obligated to "hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not accordance with law." 5 U.S.C. § 706(2). Although a reviewing court

may not simply "substitute its judgment for that of the agency…[t]hat does not mean the review

is toothless." *Orchard Hill Bldg. Co. v. United States Army Corps of Eng'rs,* 893 F.3d 1017,

1024 (7th Cir. 2018) (internal quotation marks and citations omitted). "The Supreme Court has

instructed that the 'APA requires meaningful review,'" and the court "should not attempt itself to

make up for . . . deficiencies in an agency's reasoning, nor supply a reasoned basis for the

agency's action that the agency itself has not given." *Id.* (internal quotation marks and citations

omitted). Moreover, questions of law are for courts to decide. Reviewing courts owe no

deference to agency interpretations of the law, except under limited circumstances that do not

apply to this case. *See generally Kisor v. Wilkie,* 139 S. Ct. 2400 (2019).

In this case, the Court should grant summary judgment for Plaintiffs on all claims because the uncontested facts in the record establish that:

1.      Defendant Rural Utilities Service's environmental impact statement for the proposed CHC transmission line violates NEPA's requirements and the Council on Environmental Quality's applicable environmental review rules for multiple reasons: (a) impermissibly defining the "purpose and need" for this project so overly narrowly that it predetermined the outcome and precluded full and fair consideration of reasonable alternatives that are less environmentally damaging and more cost-effective, *see Simmons,* 120 F.3d 664; (b) failing to "rigorously explore and objectively evaluate all reasonable alternatives," including non-wires alternatives, that are less environmentally damaging and more cost-effective (40 C.F.R. § 1502.14); (c) failing to "rigorously explore and objectively evaluate" alternative transmission line routes that would avoid running through the protected Upper Mississippi River National Wildlife and Fish Refuge (40 C.F.R. § 1502.14); (d) failing in any way to assess the cumulative environmental impacts of the proposed CHC transmission line—"the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" (40 C.F.R. § 1508.7)—together with all other transmission lines and development projects including, but not limited to, the recent past CapX2020 and Badger-Coulee high-voltage transmission lines, and reasonably foreseeable future high-voltage transmission lines built in or proposed for this geographic region, *see, e.g., Habitat I*, 363 F. Supp. 2d at 1078–83; and (e) failing to adequately analyze the climate change impacts of the construction and operation of the CHC transmission line, including the fossil-fuel electricity generation that it will carry.

2.      Defendants USFWS, Wooley, and Chandler violated the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd-668ee ("the Refuge Act") by conveying a

right-of-way allowing the massive CHC transmission line with 20-story high towers to run through the protected Upper Mississippi River National Wildlife and Fish Refuge. The Refuge Act flatly prohibits any private economic use of a National Wildlife Refuge that is not "compatible with" and does not "contribute to" the Refuge's conservation purposes. Whether the approval is structured as an easement grant, as originally approved by USFWS, or as a land exchange, as the Transmission Companies now propose, the consequences are the same, and both violate the Refuge Act.

3.   The Defendant Corps illegally authorized the discharges of dredged and fill materials into "waters of the United States." Instead of completing an "individual" permit review, the Corps chose to use its illegally authorized nationwide and regional "utility line" general permits for this massive high-voltage transmission line. Section 404(e) of the Clean Water Act, 33 U.S.C. § 1344(e) only allows general permits for projects and project categories that separately and cumulatively will have no more than "minimal" adverse effects on the environment. The general permits also violate NEPA, because they were not preceded by an environmental impact statement, and violate Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), because they were issued without the required programmatic consultation. The Corps abused its discretion by applying these invalid permits to the CHC transmission line project.

## II.    PLAINTIFFS HAVE STANDING

In order to establish Article III standing, Plaintiffs must demonstrate (1) an injury in-fact, (2) that is fairly traceable to the challenged conduct, and (3) seek a remedy that is likely to prevent or redress the injury. *Uzuegbunam v. Preczewski,* 141 S. Ct. 792, 797 (2021). An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs' members in this case would have standing to sue in their own right because, as explained in the Statement of Facts and Procedural History, above, they will suffer imminent, irreparable injury caused by the CHC transmission line's construction and preconstruction activities. As the ten member declarations included with this brief[7] demonstrate, Plaintiffs' members include people who own property that would be taken to build the line, and whose use and enjoyment of their property and their property's economic value will be impacted by the line's construction. SPF at ¶¶ 18, 16–22, 44–49. Plaintiffs also have members who use and enjoy the Upper Mississippi River National Wildlife and Fish Refuge and natural areas in the Driftless Area along the line's route, and their enjoyment of those areas would be diminished by the transmission line and 17- to 20-story-high towers. SPF at ¶¶ 9–49, 54-59, 61, 63. This diminished enjoyment constitutes an injury sufficient to establish standing. *Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 855 n.4 (7th Cir. 2003) (finding that allegations that plaintiff's members used a National Forest "for hiking, camping and birding are sufficient to establish standing" to bring a suit under NEPA and National Forest Management Act). The Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Plaintiffs' members also enjoy viewing native animal and plant species that would be harmed by construction of the line. SPF at ¶ 11-14, 18-20, 24-29, 35, 40, 45, 55-

---

[7] See attached Declarations of Dena Kurt, Brian Durtschi, Daniel Ashe, Debora Morton, Jean Luecke, Kerry Beheler, Mary M. Kritz, Mark Mittelstadt, Susan Anderson, and Todd Paddington.

59. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–563 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.").

Because construction of the line has already begun on the Iowa side and is planned to begin in Wisconsin in October 2021, SPF at ¶¶ 155, 156, these concrete and particularized harms are not speculative, but are imminent injuries in fact. *Friends of the Earth, Inc.*, 528 U.S. at 181–84; *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011). These imminent injuries in fact are fairly traceable to the Defendants' conduct because the line cannot be built through the protected Upper Mississippi River National Wildlife and Fish Refuge and through Wisconsin's scenic Driftless Area landscape without Defendant USFWS's approvals. The transmission line cannot be built without valid Clean Water Act Section 404 permits issue by the Corps. This transmission line also cannot receive any federal funding, federal permits, or other federal approvals unless the environmental impact statement complies with all NEPA requirements.

A favorable decision from this court would redress Plaintiffs' members' injuries. *First*, if the Defendant RUS's Record of Decision approving the legally flawed EIS is vacated and remanded, the federal agencies would have to redo the EIS process in compliance with NEPA. Caselaw is clear that remanding for an agency to redo a NEPA analysis in compliance with the law provides redress for injuries stemming from environmental harms because, even though there is no guarantee the agency would come to a different decision on the merits, an agency *could* decide differently after completing a proper NEPA analysis. *Defenders of Wildlife*, 504 U.S. at 572 n.7; *American Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d 32, 42 (D.C. Cir. 2018) (finding the redressability prong of standing met because "[r]equiring the Commission to prepare

29

an Environmental Impact Statement might cause the Commission to gather more information that could improve the conditions in the license and the conditions of the Coosa River").

*Second*, if the USFWS decision granting a right-of-way permit through the Refuge is vacated and remanded, then the Transmission Companies would not construct the line through the Refuge.

*Third,* if the Plaintiffs prevail on their claims against the Corps, the agency would have to issue new, valid individual Clean Water Act Section 404 permits before the project could be built. That would require a much more thorough review of whether the project's adverse environmental impacts will be more than "minimal," whether the project could result in "significant degradation" of water resources, and whether the project is genuinely in the public interest.

Plaintiffs seek to protect interests that are germane to their organizational purposes. Germaneness requires only "mere pertinence between litigation subject and organizational purpose." *Humane Soc. of the U.S. v. Hodel,* 840 F.2d 45, 58–60 (D.C. Cir. 1988) (organization granted standing to challenge increase in hunting in National Wildlife Refuges); *see also Gunpowder Riverkeeper v. FERC,* 807 F.3d 267, 272 (D.C. Cir. 2015) (environmental organization's allegations of NEPA violations were germane to its purpose of preserving river watershed). Plaintiffs easily meet that legal test. Plaintiff National Wildlife Refuge Association is a not-for-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System. SPF at ¶ 62. Plaintiff Driftless Area Land Conservancy is a land trust and conservation organization that seeks to protect scenic landscapes, historic properties, and natural resources in Wisconsin's Driftless Area. SPF at ¶ 8. Plaintiff Wisconsin Wildlife Federation is dedicated to protecting wildlife habitat, conservation lands and waters, and

natural resources throughout the State of Wisconsin on behalf of the hunters, anglers, trappers, and other individuals who are its members. SPF at ¶ 53. Plaintiff Defenders of Wildlife is dedicated to conserving species and the habitat upon which they depend. SPF at ¶ 60.

The relief requested by Plaintiffs will apply across the board, benefiting each individual member without requiring their individual participation. *Hunt,* 432 U.S. at 343; *see also Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Plaintiffs therefore meet all of the requirements for associational standing.

The Plaintiffs have also suffered and continue to suffer their own procedural injury[8] because of the Defendants' violations of NEPA. Courts have recognized that "the failure to comply with NEPA's requirements causes harm itself." *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 995 (8th Cir. 2011); *Richland/Wilkin Joint Powers Auth. v. U. S. Army Corps of Engineers*, 826 F.3d 1030, 1037 (8th Cir. 2016). *See also, United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011) ("It follows inexorably that 'when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.'") (quoting *Massachusetts v. Watt,* 716 F.2d 946, 952 (1st Cir. 1983)).

Construction of the CHC transmission line would also irreparably harm the direct interests of Driftless Area Land Conservancy, which owns a conservation easement on the historic Thomas Stone Barn property located on Highway 18 / US 151 west of Barneveld, Wisconsin. SPF at ¶ 50. That easement, among other things, protects "scenic vistas." SPF at ¶

---

[8] While some courts have described this as a "procedural" injury, others have instead acknowledged the same injury, but characterized it differently: "[T]he harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).

51. The CHC transmission line would be built along that highway, and the easement includes property on both the north and south sides of the highway. SPF at ¶ 50. Construction of the transmission line would interfere with this conservation easement, and irreparably impair its ecological, aesthetic, scenic, and cultural value. SPF at ¶ 52. Even if the transmission line were re-routed to be within the adjacent highway right-of-way rather than directly across the easement, it would still negatively affect the conservation easement. SPF at ¶ 52.

Construction of the proposed CHC transmission line will therefore cause injuries-in-fact both to the Plaintiff organizations directly and to their members, and vacating the federal approvals in this case will give Plaintiffs meaningful relief. All Article III standing requirements have been met.

## III. THE ENVIRONMENTAL IMPACT STATEMENT FOR THE CHC TRANSMISSION LINE DID NOT MEET THE REQUIREMENTS OF THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA).

The Environmental Impact Statement violates NEPA's requirements in numerous ways: (1) the EIS's unduly constricted purpose and need statement is impermissibly narrow and predetermines the outcome, *see Simmons,* 120 F.3d 664; (2) the EIS fails to "rigorously explore and objectively evaluate all reasonable alternatives," including non-wires alternatives, to the proposed transmission line (40 CFR § 1502.14[9]); (3) the EIS fails to "rigorously explore and objectively evaluate all reasonable alternatives," including alternative routes that would avoid cutting a wide swath across the Upper Mississippi River National Wildlife and Fish Refuge and scenic Driftless Area landscape and vital natural resources (40 CFR § 1502.14); (4) the EIS fails to assess the cumulative environmental impacts of the proposed CHC transmission line—"the

---

[9] Unless otherwise noted, all references to 40 C.F.R. parts 1500 to 1508 (the CEQ regulations implementing NEPA) are to the 2019 version of the regulations, which were controlling at the time the environmental review for the CHC line was completed.

incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"—together with all other transmission lines and development projects (40 C.F.R. § 1508.7); and (5) the Defendants' EIS fails to adequately analyze climate change impacts. Because of these failures, the Defendants' Record of Decision finding that the EIS complied with NEPA was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A. Requirements for Environmental Impact Statements under the National Environmental Policy Act and CEQ's Applicable Environmental Review Regulations.

The National Environmental Policy Act ("NEPA") is our nation's foundational environmental law. NEPA requires that "all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on" the proposed action's "environmental impact." 42 U.S.C. § 4332. An agency's EIS must include discussion of environmental impacts, unavoidable adverse effects, alternatives to the proposed action, the relationship between short-term uses of the environment and long-term productivity, and any irreversible and irretrievable commitments of resources. 42 U.S.C. § 4332.

The Council on Environmental Quality ("CEQ") has issued comprehensive regulations that govern environmental reviews by all federal agencies. An EIS must contain a statement of "purpose and need," which is required to "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. CEQ's regulations emphasize that the alternatives analysis is the "heart of the environmental impact statement," and requires agencies to "[r]igorously explore and objectively

evaluate all reasonable alternatives," including a "no action" alternative. 40 C.F.R. § 1502.14.

An EIS must "[d]evote substantial treatment to each alternative considered in detail including the

proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R.

§ 1502.14(b).

An EIS must also analyze cumulative impacts in relation to the proposed project and the

relevant geographical area. 40 C.F.R. § 1508.25. Cumulative impacts are "the impact on the

environment which results from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

Federal) or person undertakes such other actions." *Id.* § 1508.7.

RUS's own environmental review regulations also state that RUS "is responsible for all

environmental decisions and findings related to its actions" and must "independently evaluate"

all environmental information submitted by applicants. 7 C.F.R. § 1970.5(a).

**B. The Defendants' EIS Improperly Adopted the Transmission Companies' Unduly Constricting and Impermissibly Narrow Purpose and Need Statement, Contrary to NEPA's Requirements as the Seventh Circuit Held in *Simmons*.**

RUS erred as a matter of law from the outset by accepting the impermissibly and unduly

constricting and narrow "purpose and need statement" urged by the Transmission Companies for

what should be an independent NEPA environmental analysis. SPF at ¶ 80. The CEQ rules

require that every environmental impact statement "briefly specify the underlying purpose and

need to which the agency is responding in proposing the alternatives including the proposed

action." 40 C.F.R. §1502.13. The purpose and need statement frames the problem that needs to

be solved and therefore defines the range of reasonable possible alternatives that must be

"rigorously explore[d] and objectively evaluate[d]." 40 C.F.R. § 1502.14. An unreasonably

narrow purpose and need statement constricts the range of alternatives analyzed, and undermines the agencies' ability to conduct an EIS that meets NEPA's requirements.

As the Seventh Circuit has explained:

> When a federal agency prepares an Environmental Impact Statement (EIS), it must consider "all reasonable alternatives" in depth. 40 C.F.R. § 1502.14. No decision is more important than delimiting what these "reasonable alternatives" are. That choice, and the ensuing analysis, forms "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. To make that decision, the first thing an agency must define is the project's purpose. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C.Cir.1991). The broader the purpose, the wider the range of alternatives; and vice versa. The "purpose" of a project is a slippery concept, susceptible of no hard-and-fast definition. One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing "reasonable alternatives" out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy the Act.

*Simmons*, 120 F.3d at 666.

The agency cannot in this way skew the analysis and results, and predetermine the outcome. In *Simmons*, as in this case, the federal agency simply accepted the project proponents' stated project purpose, which was to supply water for the City of Marion, Illinois and a nearby Water District from a single source. The court held that this impermissibly narrowed the scope of alternatives to the new lake that the project proponent wished to create by damming a creek. *Id.* at 667. The court recognized that the fact that the City of Marion and the Water District had a common problem—a need for water—in no way required a solution that would provide both with water from a single source. *Id.* The Corps' rejection of alternatives on the grounds that they would supply Marion and the Water District from separate sources was therefore arbitrary and capricious. *Id. See also Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) ("[T]he evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to

accomplish the *general* goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals.") (emphasis in original).

Other courts have similarly held. *See, e.g., National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058, 1072 (9th Cir. 2010) (an agency may not "adopt[] private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives"). In fact, in a somewhat factually analogous case, a district court in the Ninth Circuit held that the Department of Energy violated NEPA in its EIS for a new transmission line that would carry power from a wind farm in Mexico into the United States. *Backcountry Against Dumps v. Chu*, 215 F. Supp. 3d 966, 979 (S.D. Cal. 2015)*, modified on reconsideration sub nom. Backcountry Against Dumps v. United States Dep't of Energy*, No. 3:12-CV-03062-L-JLB, 2017 WL 2988273 (S.D. Cal. Jan. 30, 2017). The court explained that "the purpose and need statement is too narrowly drawn and focused almost exclusively on private interests." *Id.* at 978. That overly narrow purpose and need was then used to foreclose the consideration of an alternative of building distributed generation—solar panels in urban areas— instead of the new transmission line. *Id.* at 978.

The Seventh Circuit continues to follow the approach set out in *Simmons*. In *Environmental Law & Policy Center v. U.S. Nuclear Regulatory Commission*, 470 F.3d 676, 683 (7th Cir. 2006), the Seventh Circuit cited to *Simmons*:

> We have held that blindly adopting the applicant's goals is "a losing proposition" because it does not allow for the full consideration of alternatives required by NEPA. [*Simmons*, 120 F.3d] at 669. NEPA requires an agency to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" and to look at the general goal of the project rather than only those alternatives by which a particular applicant can reach its own specific goals. *Id.*

While the Seventh Circuit upheld the Nuclear Regulatory Commission's decision to use the same *purpose* as proposed by the private applicant, that *purpose*—baseload energy generation—was

much broader than the applicant's *goal* of building a new nuclear plant. Notably, the purpose was "was broad enough to permit consideration of a host of energy generating alternatives." *Id.* at 684.

And while the court excused the Commission's failure to carefully consider energy efficiency as an alternative, this was based on facts not found in the current case. First, the court explained that the private applicant "was in no position to implement such measures." *Id.* at 684. In contrast, ATC, one of the Transmission Companies proposing the CHC transmission line, is already itself pursuing non-wires alternatives. ATC's online blog describes a planned battery storage project that "is less expensive than an alternative to rebuild a transmission line in the area" and "would increase area transmission reliability and operational flexibility." SPF at ¶ 88.

Second, the court in *Environmental Law & Policy Center* explained that energy efficiency would in fact be considered later as part of the upcoming "need for power" analysis, which under Commission regulations, could be postponed until a later licensing proceeding. 470 F.3d at 684. So, the broader alternatives analysis would be done in the next, second phase of the EIS and permit (licensing) approval process.

Not so in the present CHC transmission line case. The Defendant federal agencies' EIS and Record of Decision is the first and only NEPA environmental review process. There is no next, second evaluation or proceeding—all NEPA requirements must already be met.

As in *Simmons*, "[w]e are confronted here with an example of this defining-away of alternatives." 120 F.3d at 666. As in *Simmons*, Plaintiffs contend that the RUS and "[t]he Corps rigged the environmental impact statement on the question of purpose…". *Id.* at 669. As in *Simmons*:

> An agency cannot restrict its analysis to those "alternative means by which a
> particular applicant can reach *his* goals." *Van Abbema*, 807 F.2d at 638 (emphasis

37

added); *contra*, *Busey*, 938 F.2d at 198–99. This is precisely what the Corps did in this case. The Corps has "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Busey*, 938 F.2d at 209 (Buckley, J., dissenting). And that is exactly what the Corps has not shown in its wholesale acceptance of Marion's definition of purpose.

*Id.* at 669.

Finally, as in *Simmons*: "If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives. … [T]he Army Corps of Engineers executed an end-run around NEPA's core requirement. By focusing on the single-source idea, the Corps never looked at an entire category of reasonable alternatives and thereby ruined its environmental impact statement." *Id*. at 670.

Here, Defendants RUS and the other cooperating federal agencies (the Corps and USFWS) likewise adopted the Transmission Companies' desired, self-limiting purpose and need. SPF at ¶ 80. The Defendant federal agencies thus predetermined the outcome and unduly constricted the range of reasonable alternatives that they must independently consider. The EIS's purpose and need statement includes six elements:

- Address reliability issues on the regional bulk transmission system and ensure a stable and continuous supply of electricity is available to be delivered where it is needed even when facilities (e.g., transmission lines or generation resources) are out of service;

- Alleviate congestion that occurs in certain parts of the transmission system and thereby remove constraints that limit the delivery of power from where it is generated to where it is needed to satisfy end-user demand;

- Expand the access of the transmission system to additional resources, including 1) lower-cost generation from a larger and more competitive market that would reduce the overall cost of delivering electricity, and 2) renewable energy generation needed to meet state renewable portfolio standards and support the nation's changing electricity mix;

- Increase the transfer capability of the electrical system between Iowa and Wisconsin;

38

- Reduce the losses in transferring power and increase the efficiency of the transmission system and thereby allow electricity to be moved across the grid and delivered to end-users more cost-effectively; and

- Respond to public policy objectives aimed at enhancing the nation's transmission system and to support the changing generation mix by gaining access to additional resources such as renewable energy or natural gas-fired generation facilities.

SPF at ¶ 81. These purposes, especially the fourth "purpose," are improperly narrow and constricting. Only new "bulk power" high-voltage transmission lines between Iowa and Wisconsin, can meet that so-called purpose and need.

Indeed, "[i]ncreas[ing] the transfer capability of the electrical system between Iowa and Wisconsin" by means of a massive high-voltage transmission line is a *specific way* to meet the other elements of the purpose and need statement. It is a "means" rather than an "end," and is simply a description of the exact project that the CHC transmission line developers want to build. Some of the other elements of the purpose and need statement, to the extent they are true needs,[10] can be equally and better addressed with non-wires alternatives.

There are many other solutions and technologies that can offer the same benefits to the transmission system as building a massive new line (and can do it with less environmental damage, and likely cheaper and faster). SPF at ¶ 85. These include upgrading existing lines, employing high tech power management, deploying distributed solar energy and other renewable energy generation nearer to where it's needed, and using well-known and ubiquitous energy efficiency and demand management strategies approaches, if needed, to hold down peak demand that can stress the grid. SPF at ¶ 85. RUS did not fully and fairly consider non-wires alternatives because they did not serve the constricting purpose to increase the overall transfer capacity

---

[10] Plaintiffs do not concede that they are.

between Iowa and Wisconsin, which skewed and predetermined the outcome of a massive high-voltage transmission line.

In a chart comparing non-wires alternatives, RUS indicated that of renewable generation, energy storage, energy efficiency, and demand response, none could increase the Iowa-Wisconsin transfer capacity. SPF at ¶ 82. The final EIS actually acknowledges just a few pages later that energy storage "could increase electricity transfer capability," but claims it would not be technically feasible to deploy battery storage at a level that would meet the project needs. SPF at ¶ 83. Because one element of the purpose and need was defined as increasing transfer capacity between Iowa and Wisconsin, RUS also did not consider the option of building a new transmission line on a route that avoids cutting through the heart of the Refuge and the Driftless Area (such as the route for the proposed SOO Green Line transmission line[11]). SPF at ¶ 89, 90, 91. Instead, RUS looked only at minor tweaks to the route proposed by the Transmission Companies.

Put simply, RUS rejected non-wires alternatives and other alternative transmission solutions because they were not a new high-voltage transmission line, as a result of the impermissibly narrow and constricting purpose and need statement adopted by the Defendants at the outset at the behest of the Transmission Companies. The circumscribed purpose and need also precluded consideration of other routing options that would avoid the Upper Mississippi River National Wildlife and Fish Refuge and the scenic Driftless Area landscape and vital natural resources. For the reasons explained above, the Defendants unduly narrow and

---

[11] Plaintiffs DALC and WWF specifically commented on the Draft EIS that the agencies should consider other route options, such as those proposed for the SOO Green Renewable Rail project, an underground transmission line primarily utilizing existing railroad rights-of-way, which would run from Mason City, Iowa to just outside Chicago. Plaintiffs noted that even if the specific SOO Green project was not built, this and similar proposals show that there are alternative corridors and routes for moving power from west to east that would avoid significant adverse environmental impacts on the special scenic Driftless Area landscape and unique natural resources. SPF at ¶ 91.

constricted analysis is arbitrary and capricious and violates NEPA. *Simmons*, 120 F.3d 664; 40 C.F.R. §§1502.13, 1502.14.

### C. The Defendants' EIS Did Not Rigorously Explore and Objectively Evaluate All Reasonable Alternatives as NEPA Requires.

The Defendants' constricted consideration of alternatives in the EIS violates NEPA in two ways. First, because of the impermissibly constricted purpose and need statement, the range of alternatives considered is improperly narrow. Second, to the extent RUS considered non-wires alternatives and alternative transmission solutions at all—options for improving the grid system, such as by increasing distributed local renewable energy generation, energy storage technologies, energy efficiency and demand response, efficiency upgrades to and new power line technologies for the existing transmission and distribution lines—RUS compounded its error by considering only individual measures in isolation, rather than considering realistic "packages" of these solutions. SPF at ¶ 84. The Defendants' final EIS is therefore impermissibly skewed and does not rigorously explore and objectively evaluate these alternatives and solutions that can realistically achieve the project's broader purpose and perceived need.

Many non-wires options work best in combination, such as solar with battery storage. SPF at ¶ 87. In testimony submitted in the Public Service Commission of Wisconsin's proceeding on state approvals for the CHC transmission line, engineer and solar and energy storage expert Kerinia Cusick explained, "The Applicants failed to evaluate proven, non-wires based solutions such as power electronics, energy storage, solar, and load control, and energy efficiency and demand response approaches in effective combinations to augment the performance of the existing transmission infrastructure, thereby potentially meeting the transmission need more effectively and efficiently." SPF at ¶ 86.

The Defendant RUS's failure to rigorously explore and objectively evaluate reasonable packages of non-wires options and alternatives combining non-wires options with local system upgrades set up their strawperson alternatives to fail when it comes to fully and fairly considering "all reasonable alternatives," which is the heart of the NEPA environmental review process. Combinations of non-wires alternatives can take pressure off existing transmission capacity, and thereby address reliability, congestion, and access concerns just as well as or better than old-fashioned "big wires" projects. SPF at ¶ 85. RUS refused to consider any such combinations. SPF at ¶ 84.

In *Simmons,* the Seventh Circuit found that "[b]y focusing on the single-source idea, the Corps never looked at an entire category of reasonable alternatives and thereby ruined its environmental impact statement." *Simmons,* 120 F.3d at 670. Here, RUS has similarly "ruined" its environmental impact statement by limiting itself to alternatives that increase the transfer capacity between Iowa and Wisconsin through the construction of the massive high-voltage transmission line proposed by the private Transmission Companies.

### D. The Defendants' EIS Did Not Adequately Consider Cumulative Impacts as NEPA Requires.

Defendant RUS also violated NEPA by failing to adequately consider the cumulative impacts of this line in combination with other transmission lines and other large infrastructure projects like highways that put additive pressures on the same ecosystems, watersheds, and species. 40 C.F.R. §§ 1508.25(a)(2), (c)(3). CEQ's Regulations explain that:

> *Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis in original); *see generally Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1319 (D.C. Cir. 2014).

NEPA's "hard look" requirement extends to cumulative impacts, and analyses fall short of that requirement if they include so little "detail and quantification . . . such that an objective reviewer cannot be confident that the agency took the hard look at environmental consequences that NEPA requires." *Habitat II*, 363 F. Supp. 2d at 1101; *see also Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998) ("To 'consider' cumulative effects, some quantified or detailed information is required.").

The RUS's approach to cumulative impacts in this case is fatally flawed from the beginning because the EIS completely fails to consider or discuss cumulative effects from the CHC transmission line in combination with past actions and already-built projects in the region, without even getting to "present, and reasonably foreseeable future actions." The EIS ducks this analysis altogether by arguing that:

> The cumulative effects of past actions are accounted for in the description of the affected environment presented for each resource in Chapter 3; therefore, no past projects are included in the cumulative action scenario.

SPF at ¶ 92.

Describing the current setting for the proposed CHC high-voltage transmission line is in no way a legally adequate substitute for examining the cumulative impacts from this new massive transmission line in combination with "past" projects. *Delaware Riverkeeper Network*, 753 F.3d at 1319, explicitly requires consideration of not only ongoing and future actions, but also past actions that impact the same area, and the "overall impact that can be expected if the individual impacts are allowed to accumulate." In *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997), the court found that an EIS was insufficient when

it "describe[d] past projects in the area with generalities insufficient to permit adequate review of their cumulative impact."

Nothing in the Bush Administration's *Guidance on the Consideration of Past Actions in Cumulative Impacts Analysis* (June 24, 2005),[12] suggests that federal agencies may completely dispense with consideration of past actions when assessing cumulative impacts, merely by reciting magic words that a description of current conditions includes the current aggregative effects of past actions. That Guidance is of course not binding, nor is it entitled to any deference.[13] It was a response to decisions suggesting that environmental review for Forest Service timber cuts needed to include a catalog and analysis of all previous cuts in a national forest. Here, the issue is whether an environmental review for a high-voltage transmission line can ignore the impacts of two specific past projects of the same kind in the same geographic area, with no attempt to assess how the three projects together might affect the region's aesthetics, wildlife habitat, resiliency, and recreational uses. *See, e.g. Indigenous Env't Network v. United States Dep't of State*, 347 F.Supp.3d 561 (D. Mont. 2018) (requiring EIS for KeystoneXL pipeline to include analysis of cumulative impacts with earlier Alberta Clipper pipeline project).

In fact, even in its "description of the affected environment," the Defendant RUS's EIS fails to *even acknowledge* several other major high-voltage transmission line projects in the same area. SPF at ¶ 93. The Badger-Coulee high-voltage transmission line also cuts through the Driftless Area and connects to the Cardinal substation in Middleton, Wisconsin. SPF at ¶ 94. In the "affected environment" discussion, the EIS only references the Badger-Coulee transmission

---

[12] CEQ, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (Jun. 24, 2005), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-PastActsCumulEffects.pdf.
[13] John C. Grothaus, *Questionable Authority: A Recent CEQ Guidance Memorandum*, 37 Envt. L. 885 (2007).

line when providing photographs of it as an example of what the CHC transmission line would look like. SPF at ¶ 93. The Badger-Coulee line and the Cardinal-Hickory Creek were both part of the same "portfolio" of transmission lines. SPF at ¶ 95. The CapX2020 Hampton-Rochester-La Crosse line passes through Minnesota, crosses the Mississippi River and then proceeds to a substation in La Crosse County, Wisconsin.[14]

These huge transmission lines include west-to-east segments running perpendicular to the south-to-north ecologically-vital Mississippi Flyway for migratory birds, thereby creating a collision risk. SPF at ¶ 112. The EIS nowhere considers how the combination of these huge transmission line projects and other large development projects in the same geographical area would affect wildlife, including migratory birds that would have to now avoid multiple high-voltage transmission lines and towers. SPF at ¶ 92-93. Nor does the EIS consider how tourism in the region, or in the Upper Mississippi River National Wildlife and Fish Refuge specifically, would be affected by these large transmission lines in combination. SPF at ¶ 92-93.

The EIS's cumulative impacts analysis for "current" and "future" projects is also insufficient. First, the geographic scope of the analysis is drawn too narrowly.

The RUS's EIS in the present case sets out a "cumulative impact spatial boundary" for each "affected resource." SPF at ¶ 96. For example, the analysis of cumulative impacts on wildlife is limited to projects and actions within "the Savanna and Coulee Sections of the Driftless Area Ecoregion bounded to the north by where the Turkey and Wisconsin Rivers join the Mississippi River." SPF at ¶ 97. The Turkey River joins the Mississippi River on the Iowa side about half of a mile to the west of where the transmission line would cross the Mississippi River and the Refuge. SPF at ¶ 98. This a nonsensical "northern" boundary because it is

---

[14] Rural Utilities Service, *Dairyland Power Cooperative: CapX 2020 Hampton-Rochester-La Crosse Transmission Line Project*, 77 Fed. Reg. 41,369 (July 13, 2012).

essentially due west from the river crossing and because it creates an absurdly limited analysis area for wildlife on the Iowa side of the Mississippi River. The EIS itself acknowledges that:

> Owing to its location in the heart of the Mississippi Flyway, many species of bird migrate through or occupy habitat within the Refuge. This includes species dependent on wetland and open water habitat such as the wood duck, mallard, blue-winged teal, American wigeon, gadwall, northern pintail, greenwinged teal, canvasback, lesser scaup, common goldeneye, ringed-necked duck, bufflehead, ruddy duck, merganser, belted kingfisher, Canada goose, and Tundra swan.

SPF at ¶ 99. Because these, and many other, species migrate, they can suffer harmful cumulative impacts from projects and actions all along their migration route. CEQ's guidance on cumulative impacts[15] provides that for "[m]igratory wildlife," "[p]ossible [g]eographic [a]reas for [a]nalysis" would include "[b]reeding grounds, migration route, wintering areas, or total range of affected population units." The Defendant RUS's EIS addresses cumulative wildlife impacts in about one page. SPF at ¶ 100. The EIS does not even acknowledge the special issue of cumulative impacts on migratory species. SPF at ¶ 100.

The northern boundary for wildlife cumulative impacts on the Wisconsin side—"where the … Wisconsin Rivers join the Mississippi River"—fares no better. SPF at ¶ 97. The Wisconsin River joins the Mississippi River at Wyalusing State Park, which is further south than the Cardinal substation in Middleton. SPF at ¶ 102. In other words, the scope for cumulative impacts for wildlife (and the same scope is used for trees, plants, and wetlands) does not even include the entire CHC transmission line route. Even if the EIS's description of the geographical area for its cumulative impacts analysis area was a mistake—even though that description of the geographic scope for wildlife and vegetation is repeated in multiple places in the cumulative impacts section, SPF at ¶ 97—and the RUS somehow meant to actually consider cumulative

---

[15] CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf.

impacts beyond that area, the agency's failure to clearly disclose the considered area, and why it chose such area, would violate NEPA.

"[T]he choice of analysis scale [for the cumulative impacts analysis] must represent a reasoned decision and cannot be arbitrary." *Habitat II*, 363 F. Supp. 2d at 1097 (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir. 2002). An agency must therefore "provide support for its choice of analysis area." *Id.* (quoting *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 902 (9th Cir. 2002)). An agency should consider whether an affected species also uses habitat outside of the project area. *Id.*

The circumstances in the three *Habitat Education Center* cases are analogous to the present CHC transmission line case when it comes to the federal agency's failure to fully and fairly consider cumulative impacts. *Habitat I*, 363 F. Supp. 2d at 1078–83; *Habitat II*, 363 F.Supp.2d 1090; *Habitat III*, 381 F.Supp.2d 842. In each of these three cases, the U.S. Forest Service approved timber sales allowing thousands of acres of logging in the same geographical area of the Chequamegon-Nicolet National Forest in Northern Wisconsin. Each of the federal agency's separate environmental impact statements, however, looked at that one timber sale's impacts on threatened red-shouldered hawks, northern goshawks and pine marten in isolation and failed to look at the cumulative impacts of the three "past, present, and reasonably foreseeable future actions" in combination in destroying the wildlife's needed habitat to survive.

The district court (Judge Adelman) accordingly ruled in favor of the plaintiffs and reversed the Forest Service's timber sale approvals in each of these cases because of the lack of "sufficiency of the cumulative impacts analysis," and "REMANDED to the Forest Service for proceedings consistent with this opinion." In addition, the district court "ENJOINED" each of

the three separate timber sale projects "until such time as the EIS complies with NEPA." *E.g.,* 363 F. Supp. 2d at 1089.

Similarly, in *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988), the court held that an agency violated NEPA when it failed to adequately consider "the effect of simultaneous *inter*-regional development on migratory species" (emphasis in original). The court explained that "merely announc[ing] that migratory species may be exposed to risks of oil spills and other 'impacts' throughout their routes" was not sufficient because "[t]hese perfunctory references do not constitute analysis useful to a decisionmaker." *Id.* at 299.

In *Habitat II*, 363 F. Supp. 2d at 1097–98, the record did not make clear what geographic area the agency used when considering cumulative impacts for the goshawk, red-shouldered hawk, and American marten. The district court found that the U.S. Forest Service's cumulative impacts analysis violated NEPA in part because the agency "should have disclosed in the EIS how it chose such area and by failing to do so it violated the requirements of NEPA." *Id.* at 1098. Similarly, the agencies here not only used a flawed geographic scope, but failed to explain why they chose that scope. SPF at ¶ 103.

Second, even for the projects and actions that the EIS *does* address in the cumulative impacts discussion, the EIS essentially just lists other projects and actions and states that there would be cumulative impacts, *without engaging in any meaningful analysis* of what those cumulative impacts would be. For example, the cumulative impacts analysis for wildlife does little more than list other infrastructure projects in the area and acknowledge that the projects will cumulatively destroy, degrade, and fragment habitat. SPF at ¶ 100. This mere cataloging of projects is not sufficient.

In *Habitat II*, 363 F. Supp. 2d at 1100–02, the agency considered cumulative impacts on specific species, yet even that discussion "provide[d] too little detail to demonstrate that the Forest Service took a hard look at the cumulative effects of past, present, and reasonably foreseeable future logging projects on red-shouldered hawk and goshawk." The EIS did not elaborate on how much habitat for these species exists or "make clear how the [proposed] project and other activities will affect such habitat." *Id.* at 1101. The EIS acknowledged "that logging, road construction, road improvement, and other human activities will impact goshawk and red-shouldered hawk and their habitat, [but] the analysis provides no specific information concerning such impacts." *Id.*

The analysis in the RUS's EIS in this case is even less detailed than the Forest Service's too-limited analysis that was reversed in *Habitat II*. The EIS here devotes only about one page to all wildlife cumulative impacts, and does not even mention any specific species. It makes general statements like the following:

> Any projects that remove, degrade, or fragment habitat—such as transportation improvement projects, new energy development, and new or rebuilt transmission lines—would contribute to the cumulative adverse impacts that may occur by converting undeveloped areas to developed areas, changing forested and shrubland land cover types to grassland, and loss of area to structure and ancillary facilities.

SPF at ¶ 101. This "analysis" is much too general to provide any meaningful information. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1378–79 (finding that cumulative impacts analysis was inadequate when it provided "some information in regard to the cumulative effects of all proposed timber sales on old growth habitat, but the analysis provided was very general"). The RUS's "analysis" of cumulative adverse impacts of this massive CHC transmission line in combination with other huge transmission lines and other "past, present, and reasonably foreseeable future actions" in the relevant geographical area is so thin and insufficient as to be

arbitrary and capricious, an abuse of discretion, and contrary to law, and, therefore, should be reversed on this ground alone.

### E.  The EIS Failed to Adequately Analyze Climate Change Impacts as NEPA Requires.

Finally, the EIS's analysis of potential greenhouse gas emissions is wholly inadequate. Instead of making a reasonable analysis or estimate of how much electricity from fossil-fuel (coal and gas) generating plants the proposed line would carry, Defendants provided carbon emission estimates *if* the transmission line carried 100% coal-fired power—12.3 million metric tons of carbon dioxide per year—or 100% wind power—0.272 million metric tons of carbon dioxide per year—and told policymakers and the public that it would be somewhere in between. SPF at ¶ 177. That does not meet NEPA's requirements. Federal agencies may not simply throw up their hands, and say there is no accepted way of making these estimates. Even when information is incomplete or unavailable, the rules require agencies to explain how significant the impact might be, what evidence is available, and how others have been making those estimates. 40 C.F.R. § 1502.21(c); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017).

At the hearings before the Public Service Commission of Wisconsin, Citizens Utility Board expert Mary Neal confirmed by use of her power system modeling that the Transmission Companies "greatly overstated" the "highly speculative" wind generation-related benefits, and explained that the CHC transmission line would actually increase coal-generated electricity. SPF at ¶ 178. Yet nowhere in the EIS is there an estimate or even a reasonable range of estimates about what the climate impact would actually be. Consequently, the EIS does not "provide the information necessary for the public and agency decisionmakers to understand the degree to

which the [federal action] at issue would contribute to [climate change] impacts." *WildEarth Guardians v. Zinke,* 368 F.Supp.3d 41, 51 (D.D.C. 2019).

That gap in the analysis is compounded by RUS's refusal to use the social cost of carbon to monetize climate impacts.[16] RUS argues that it is not required to monetize impacts to any resource, SPF at ¶ 179, but it does monetize such claimed benefits such as "positive effects to employment and income" or alleged energy costs savings. SPF at ¶ 180. Federal courts have found agency analyses supporting regulations to be inadequate when they monetize benefits of an action but not costs. *Center for Biological Diversity v. National Hwy. Traffic Safety Admin.,* 538 F.3d 1172, 1199–1203 (9th Cir. 2008). Another federal court concluded that NEPA required "a 'hard look' at whether this tool [the social cost of carbon], however imprecise it might be, would contribute to a more informed assessment of the impacts than if it were simply ignored." *High Country Conservation Advocates v. United States Forest Serv.,* 52 F.Supp.3d 1174, 1193 (D. Colo. 2014). Most recently, the D.C. Circuit remanded an EIS from the Federal Energy Regulatory Commission that refused to use the social cost of carbon analysis to assess the monetary impact of a set of natural gas pipelines and terminals. *Vecinos,* 6 F.4th at 1329. RUS should have included an estimate of the social cost of the additional carbon emissions that will result from the CHC transmission line, or provided a reasoned explanation for why it could not be done. *WildEarth Guardians,* 368 F.Supp. 3d at 74–75 & n. 30.

*** 

For all of these reasons, the EIS fell short of NEPA's requirements, and the Defendants' findings in their Record of Decision approving the EIS are therefore arbitrary and capricious, an

---

[16] *See* Interagency Working Group on Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide—Interim Estimates under Executive Order 13990* (Feb. 2021), https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf?source=email.

abuse of discretion and contrary to law under the Administrative Procedure Act and, therefore, should be reversed and remanded. None of the federal agency actions at issue in this litigation were adequately informed by the insufficient EIS. Nor did members of the public get the analysis they needed to make their own informed judgment.

The Defendant agencies impermissibly skewed the "purpose and need" statement to preordain the Transmission Companies' desired result. The Defendants did not "rigorously explore and objectively evaluate all reasonable alternatives," and they proceeded without a thorough understanding of whether and to what extent reasonable "non-wires" alternatives and alternative transmission solutions might be available and how they might be better alternatives. The Defendants did not "rigorously explore and objectively evaluate all reasonable alternatives" as to transmission line routes that could avoid cutting through the protected Upper Mississippi River National Wildlife and Fish Refuge and the scenic Driftless Area landscape and could be reasonable, available and preferable. The Defendants likewise failed to fully and fairly consider the cumulative impacts and environmental damages an additional massive high-voltage transmission line and high towers in this geographic region in combination with the other "past, present, and reasonably foreseeable future" transmission lines and other major development projects. Finally, the Defendants did not fully and fairly consider adverse climate change impacts in any meaningful manner. Each of these failures separately and together violate NEPA and the APA. Consequently, the Defendant agencies' permit approvals, which are underpinned by the flawed EIS, themselves are invalid, and must be vacated until a legally sufficient EIS is conducted and finalized in compliance with NEPA's requirements.

## IV.   CONVEYING A 260-FOOT-WIDE RIGHT-OF-WAY FOR THE CHC TRANSMISSION LINE AND ITS TOWERS TO CUT THROUGH THE UPPER MISSISSIPPI RIVER NATIONAL WILDLIFE AND FISH REFUGE VIOLATES THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997.

The National Wildlife Refuge System, which includes the Upper Mississippi River National Wildlife and Fish Refuge, is governed by the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-668ee (the "Refuge Act").[17] The Refuge Act flatly prohibits uses of Refuges that are not "compatible" with the wildlife purposes of the individual Refuge and the Refuge System's overall mission. *Id.* § 668dd(d)(3)(A)(i). The statute also defines "compatible" narrowly, with consideration of non-biological factors expressly prohibited. *Id.* § 668ee(1)–(3).

Defendant USFWS has not determined that the construction of the CHC transmission line is "compatible" with the Upper Mississippi River National Wildlife and Fish Refuge's wildlife purposes. Why not? Because it cannot reasonably come close to satisfying that statutory standard. Instead, USFWS argues that the CHC transmission line somehow falls outside the Refuge Act's compatibility requirement: (1) because it can be "grandfathered in" as "maintenance" of an existing transmission line right-of-way; and most recently, (2) because the right-of-way conveyance can be restructured as a land exchange rather than an easement grant, and that will avoid all of the Refuge Act's specific prohibitions.

Neither of those claims has any merit. The new massive CHC high-voltage 345-kV transmission line and 20-story high towers on a new right-of-way cutting a wide swath through

---

[17] For a review of the Refuge Act and its rationale, *see generally* Cam Tredennick, *The National Wildlife System Improvement Act of 1997: Defining the National Wildlife Refuge System for the Twenty-First Century*, 12 Fordham Envt. L. J. 41 (2000). As noted in the Committee Report for the Refuge Act, the National Wildlife Refuge System is a "system of Federal lands acquired and managed for the conservation of fish, wildlife, plants, and their habitat." H.R. Rep. 105-106, 1 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 1798-5, 1798-5.

the protected National Wildlife and Fish Refuge is plainly *not* "maintenance," nor can it reasonably be characterized as a "minor expansion" or "realignment" for safety purposes. The right-of-way for the CHC transmission line is brand new, it follows a new route, it is nearly twice as wide as the existing transmission line right-of-way and will carry twice the voltage, and the transmission towers will be much larger and taller. SPF at ¶¶ 121, 122, 123, 124, 126, 127. Nor can repackaging this direct violation of the Refuge Act's statutory requirements into a contrived land exchange, in which presumably the Transmission Companies would get fee simple title to the same right-of-way, be permissible. That obvious attempted circumvention of the Refuge Act's specific requirements is legally impermissible. Courts must look at the entire statute, and therefore cannot read USFWS's more general land exchange authority to trump the specific requirements governing which National Wildlife Refuge uses may be allowed and which are prohibited.

Defendants likely will contend that, by withdrawing their previous "Compatibility Determination" and special use permit in favor of a land exchange, they have rendered the Refuge Act issues moot. It remains "well settled," however, that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc.*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Voluntary cessation of a challenged practice rarely moots a federal case, and does so only when it is "absolutely clear that the allegedly wrongful behavior could not be reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189.

The party urging mootness bears the "heavy burden" of showing that it will not "revert to" its prior policy. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 n.

1 (2017). Here, not only can the government revert to its previous illegal act—allowing the CHC transmission line across the protected National Wildlife and Fish Refuge—but it has already indicated its intention to do exactly that. SPF at ¶ 137. *See generally Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993) (amendment of challenged ordinance does not moot case because new ordinance "disadvantage[d] [plaintiffs] in the same fundamental way"); *Indigenous Env't Network v. Trump*, __F.Supp.3d__, 2021 WL 2187286, at *4 (D. Mont. May 28, 2021) (Biden revocation of KeystoneXL pipeline permit did not moot challenge because subsequent President could re-issue it); *Natural Res. Def. Council v. U.S. Dep't of Energy*, 362 F.Supp.3d 126, 142 (S.D.N.Y. 2019) (Department of Energy's adoption of "more tailored approach" to achieve the same result did not moot case).

**A. The National Wildlife Refuge System Improvement Act of 1997 Adopted a Strict Prohibition Against Any Uses of National Wildlife Refuges that Are Not "Compatible" with the Refuge System's Wildlife Mission. As Defendants Acknowledge, Projects like the CHC Transmission Line Do Not Meet the "Compatibility" Standard.**

The Refuge Act was a thoroughgoing revision of the previous National Wildlife Refuge System Administration Act of 1966, 16 U.S.C. §§ 668dd, 668ee (1994) (amended 1997). Prior to 1966, Defendant USFWS managed National Wildlife Refuges under a hodgepodge of specific laws governing individual refuges. The 1966 Act created the National Wildlife Refuge System, but it still left discretion to USFWS and individual Refuge managers on whether to allow non-wildlife-related uses on these public lands. Refuge managers were not supposed to allow anything other than "compatible uses," but neither the term "compatible" nor the missions of the Refuge System were defined in the statute.

The result was that, by the 1990s, USFWS had allowed almost half of the National Wildlife Refuges in the U.S. to be crossed by "right-of-way projects" like transmission lines and pipelines, and had allowed many other private economic uses that were not compatible with wildlife purposes, often because of external political or economic pressure. *See* General Accounting Office, *National Wildlife Refuges: Continuing Problems with Incompatible Uses Call for Bold Action*, GAO/RCED-89-196 at 3, 17 tbl. 2.1 (Sept. 1989), https://www.gao.gov/assets/rced-89-196.pdf. As the GAO reported:

> Based on our discussions with FWS officials, consideration of nonbiological factors has also played an important role in the approval of rights-of-way across refuges. As one FWS official told us, when rights-of-way applications are considered, the strongest biological reasons for disapproving the use can be overcome by the weakest economic rationale.

*Id.* at 26.

Congress responded by passing the 1997 Refuge Act,[18] which, for the first time, expressly declared that the *sole* mission of the Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

Consistent with that mission, the Refuge Act flatly prohibited USFWS from "initiat[ing] or permit[ting] a new use of a refuge, or expand[ing], renew[ing], or extend[ing] an existing use of a refuge, unless [USFWS] has determined that the use is a compatible use and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i). Indeed, reflecting the concern about the proliferation of "right-of-way projects" in the GAO report, the Refuge Act

---

[18] In explaining the need for the legislation, the Committee Report for the 1997 amendments states that several reports "concluded that the lack of an overall mission and management procedures had allowed numerous incompatible uses to be tolerated on wildlife refuges." H.R. Rep. 105-106, 3 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 1798-5, 1798-7.

specifically provides that USFWS may not "permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, powerlines, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof" unless USFWS "determines that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B).

The Refuge Act defines "compatible use" narrowly as "a wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1). "Sound professional judgment" is defined specifically and narrowly, to prohibit consideration of economic or nonbiological factors. 16 U.S.C. § 668ee(3). It means a "finding, determination, or decision that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3).

USFWS rules and policies further bolster the presumption against finding new or expanded refuge uses "compatible." Defendant USFWS's *Final Compatibility Policy Pursuant to the National Wildlife Refuge System Improvement Act of 1997*, 65 Fed. Reg. 62,484 (Oct. 18, 2000), incorporated into part 603 of the USFWS Manual, places the burden of proving compatibility on applicants. 65 Fed. Reg. at 62,489, 603 FW § 2.11(B)(1).[19] Moreover, the rules provide that proposed private "economic" uses (like the CHC transmission line) are allowable

---

[19] USFWS includes applicable rules and policies in the USFWS "Service Manual," https://www.fws.gov/policy/manuals/. This brief will cite the Manual as "FW," with the part number first and the specific section second.

only if "the use *contributes to* the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1 (emphasis added).

Defendants have long recognized that "right-of-way projects" like the massive CHC transmission line are not "compatible" with wildlife purposes. The USFWS Manual states that "[i]t is the policy of the Service to discourage the type of uses embodied in right-of-way requests. On areas in the National Wildlife Refuge System (System), if a right-of-way cannot be certified as compatible with the purposes for which a unit was established, it cannot be granted without authorization by Congress." 340 FW § 3.3. The Manual goes on to emphasize that, in right-of-way cases, "[a] determination of compatibility with the purposes for which a unit of the System was established must mean consideration only of wildlife values or project values, not of any broader social or economic concerns." *Id.* § 3.6(A)(3).

When the Defendant USFWS previously rejected a similar high-voltage transmission line proposal to cross the Upper Mississippi Refuge at Black River Bottoms near where the Black River flows into the Mississippi River, the Refuge managers found that expanding an expired right-of-way "to accommodate a new 345 kV line would not contribute to the purposes of the Refuge or the Refuge System. In fact, expansion of the expired right-of-way would detract from the Refuge purpose and Refuge goals." SPF at ¶ 104. Specifically, the Refuge managers found that the proposed transmission line would:

- increase the risk of negative interactions between invasive plants and adjacent forested/grassland habitats;

- greatly increase the risk of bird strikes, especially for migrant species which may be unfamiliar with the presence of power lines;

58

- impact wildlife-dependent recreational opportunities due to reduced habitat quality which directly impacts wildlife species upon which recreation is based;

- compromise the scenic qualities of the Black River bottoms because of the presence of a much larger right-of-way; and

- impair the quality of the visitor experience and likely reduce the public's opportunity to experience wildlife.

SPF at ¶ 105. USFWS also stated its concern about the precedent that allowing the use would create, recognizing that permitting this transmission line use would likely lead to recurring requests for similar activities that will be difficult to manage in the future. SPF at ¶ 106.[20]

The concerns that led USFWS to reject the Black River Bottoms transmission line crossing apply with like force to the CHC high-voltage transmission line as well, and are reflected in the final EIS. SPF at ¶ 107. To its credit, Defendant USFWS has never backed off from its stated position that projects like the proposed CHC high-voltage transmission line do not meet the Refuge Act's compatibility requirement. Therefore, the sole question is whether there is a legitimate and legally permissibly way under the Refuge Act to get around the "compatibility" requirement and still be consistent with Congress' statutory language and intent. The answer is that there is not.

B. **The CHC Transmission Line Does Not Fit within any Recognized Exceptions to the Refuge Act's Compatibility Requirement.**

As explained above, Defendant USFWS has not found, and could not legally find, that the CHC transmission line right-of-way blasting through the protected National Wildlife and

---

[20] The Upper Mississippi Refuge managers did issue a favorable "compatibility determination" to allow a transmission line to be built on an existing right-of-way near an operational coal-fired power plant near Alma, Wisconsin. It is highly questionable whether that decision complied with the Refuge Act, but it appears no one sought judicial review.

Fish Refuge is compatible with or would contribute to the Refuge's wildlife and other conservation purposes. Instead, Defendants' position appears to be that either: (1) the massive CHC transmission line could be "grandfathered in" as "maintenance" or a "minor realignment" of a smaller existing transmission line the Transmission Companies have agreed to remove; or (2) the transaction could be restructured as a land exchange, in which the Transmission Companies would get fee simple title to the right-of-way and the Refuge would receive compensation in the form of land, thereby taking the same physical right-of-way land and water out of the Refuge with a magical swipe of pen and making the violations of the Refuge Act's requirements disappear. Neither of these arguments has any merit. The first is not a reasonable or sensible reading of clear statutory language. The second is a bit of contrived legal legerdemain that would effectively nullify the language and very purpose of the Refuge Act.

1.  *The CHC Transmission Line May Not Lawfully Be "Grandfathered in" as*
    *"Maintenance" or a "Minor Realignment" of an Existing Transmission Line.*

Recognizing that the CHC transmission line's crossing of the Refuge could not lawfully or fairly be described as a "compatible use" under the Refuge Act, Defendant USFWS decided to characterize this massive new development project as "maintenance" of an existing transmission line, a "minor realignment of an existing right-of way to meet safety standards," thus requiring the Transmission Companies to show only that they had complied with the terms and conditions of the existing easement under 50 C.F.R. § 25.21(h), 603 FW § 2.11(H)(3). SPF at ¶ 117–120. The Transmission Companies had agreed that, if they got their new wide right-of-way, they would take down an existing smaller low-voltage transmission line about a mile away and relocate another one to the new route and then revegetate and restore the old right-of-way. SPF at ¶¶ 121–123. The argument is that those promised actions would compensate for the losses the protected National Wildlife and Fish Refuge would suffer from the CHC transmission line

crossing, and might even provide a net benefit to the Refuge and the surrounding area in the long run. SPF at ¶¶ 128–130.

The Upper Mississippi River National Wildlife and Fish Refuge was established and created by Congressional statute. That has permanence. The Refuge's protections and durability should not be subject to the whims of a particular federal administration or "let's make a deal" horse-trading with politically-connected and powerful private Transmission Companies and other developers.

This is precisely the kind of deal the Refuge Act was designed to prohibit. The Refuge Act is clear that incompatible uses in existence when the law became effective would not be "grandfathered in." To that point, Congress in the Refuge Act specifically directs USFWS to "provide for the elimination or modification of any use as expeditiously as practicable after a determination is made that the use is not a compatible use." 16 U.S.C. § 668dd(d)(3)(B)(vi); *see also* 50 C.F.R. § 26.41(d). Consistent with that goal, the Refuge Act also provides that all existing uses other than wildlife-dependent recreational uses were to be reevaluated for compatibility whenever there are changed conditions or there is new information, or at least every ten years. 16 U.S.C. § 668dd(d)(3)(B)(vii); 50 C.F.R. § 25.21(f), (g).

The only exception was *existing* rights-of-way authorized for more than 10 years, *id.* § 25.21(h), which the 1997 statute did not allow Defendant USFWS to immediately terminate. That exception, however, gives no authority to USFWS to allow any *new* rights-of-way that are not compatible, or even to permit the expansion or extension of existing rights-of-way. Like a "nonconforming use" provision in a zoning ordinance, the USFWS rules allow for "maintenance" of existing rights-of-way, defined to include "minor expansion or minor realignment to meet safety standards," and nothing more. 50 C.F.R. § 26.41(c), 603 FW §

61

2.11(D). The USFWS Manual then says "[e]xamples of minor expansion or realignment include: expand the width of a road shoulder to reduce the angle of the slope, expand the area for viewing on-coming traffic at an intersection, and realign a curved section of a road to reduce the amount of curve in the road." 603 FW § 2.11(D).

The proposed new massive CHC 345-kV high-voltage transmission line with its 195-foot towers and 260-foot wide right-of-way through the Refuge, SPF at ¶¶ 125, 127, is entirely different from expanding the width of a road shoulder. Defendant USFWS's determination that the massive transmission line is "a minor realignment of an existing right-of-way to meet safety standards," SPF at ¶ 117, is indefensible. The CHC transmission line is not "minor," in any sense of the word, and its purpose is not to meet any stated safety standards.

The new right-of-way will be up to six thousand feet away from the existing smaller transmission lines. SPF at ¶ 123. The CHC right-of-way will be 260 feet wide instead of 150 feet wide. SPF at ¶ 127. The transmission line towers closest to the Mississippi River will be 195 feet high. SPF at ¶ 125. The proposed CHC transmission line is a *new* or, at best, significantly *expanded* use, the authorization for which should have been fully reviewed by Defendant USFWS for compatibility with both the Refuge's congressionally-defined purpose and the Refuge System's mission.

The Transmission Companies' offer to provide land and restoration work to compensate for the extensive damage caused by the CHC transmission line construction and operation is legally and practically insufficient and does not make any difference. Defendant USFWS's rule expressly prohibits a practice that had become common in the pre-1997 period[21]—applicants offering "compensatory mitigation" in order to obtain a "compatibility" finding that might not

---

[21] *See generally,* Robert Fischman, *The National Wildlife Refuge System and the Hallmarks of Modern Organic Legislation*, 29 Ecology L.Q. 457 (2002).

otherwise be available. The USFWS rules adopted in 2000 flatly forbid using "compensatory mitigation to make a proposed use compatible." 50 C.F.R. § 26.41(b), (c), 603 FW §§ 2.11 (C), (D). The result of allowing these arrangements before 1997 had been a continuing proliferation of non-compatible uses throughout the National Wildlife Refuge System, precisely what the Refuge Act and Defendant USFWS's own 2000 rules were intended to reverse.

If this Court determines that the new CHC transmission line cannot be fairly characterized as "maintenance" or a "minor realignment," then it must find that the proposed crossing of the Upper Mississippi National Wildlife and Fish Refuge violates the Refuge Act. The compatibility provisions in the statute, as written, do not contain any other exceptions. Even if the massive CHC transmission line followed the same right-of-way as the existing smaller low-voltage transmission lines, it would still be a much wider right-of-way (SPF at ¶ 127) and carry more than twice the voltage. SPF at ¶ 121, 124. It would be exactly the kind of "expansion" of an existing use that the statute prohibits.

The USFWS rules do require that any *approved* use of the Refuge creates "no net loss of habitat quantity and quality." 50 C.F.R. § 26.41(c). That requirement, however, applies only *after* a use has already been found to be compatible. There is nothing in the statute or rules that gives Refuge managers the discretion to transform noncompatible economic uses into "compatible" uses if private developers offer to provide enough money, land, or restoration work to persuade the Refuge manager that, on balance, there will be "no net loss of habitat quantity and quality." *Id.* Simply put, the arbitrary horse-trading violates the statutes that Congress has written and enacted, and the Defendant USFWS's own rules.

Therefore, whether or not the Transmission Companies are "replacing the acreage required for the realigned right-of-way with an acreage of equal value which will be afforded

63

permanent protection as part of the Refuge," SPF at ¶ 128, goes only to the issue of whether they have met this separate legal obligation; it in no way affects the question of whether the massive transmission line and high towers use is itself compatible with the purposes for which the Refuge was established and with the Refuge System mission. It is not. For a "new" or "expanded" use, the offer to donate land is precisely the kind of "compensatory mitigation" the USFWS's rules say cannot be used to make an otherwise-incompatible project compatible.

2. *Defendant USFWS Cannot Avoid the Refuge Act's Specific Compatibility Requirements by Using its General Land Exchange Authority.*

In July 2021, the Transmission Companies submitted a new proposal to try to circumvent the compatibility requirements of the Refuge Act. SPF at ¶ 136. Their new idea is to convert the legally improper easement and special use permit to cross the Refuge into a land exchange under 16 U.S.C. § 668dd(b)(3). Although Plaintiffs have not been informed of many details, it appears that the proposal is for USFWS (and presumably the Corps, which owns some of the land in question) to transfer fee title of the land for essentially the same right-of-way to the Transmission Companies, and in exchange, the developers would give the government a 30-acre parcel on the other side of the Mississippi River about two miles away. The theory is that, after a land exchange, the very same right-of-way that the CHC transmission line would run through with the very same harmful environmental and wildlife impacts would no longer be "in" the Refuge, and therefore no longer be subject to the statutory prohibition against uses of Refuge land that are incompatible with the Refuge's wildlife purposes. Case No. 21-cv-00096, Dkt. 50 at 2, 10 (Transmission Companies' Memorandum in Support of Expedited Motion to Stay).

Contrary to what Defendants suggest, it is not nearly that easy to circumvent the Refuge Act's requirements, nor should it be through such legerdemain. The Refuge Act allows USFWS to use land exchanges to deed away federal lands if and only if those lands are "suitable for

disposition." 16 U.S.C. § 668dd(b)(3)(A). There is no such showing here, nor could such a showing reasonably be made.

"Suitable for disposition" of course must be defined in light of the Refuge Act's mission, text, and structure as a whole. The very purpose of the Refuge Act was to foreclose and limit private economic uses within the boundaries of protected National Wildlife Refuges, unless found to contribute to wildlife conservation purposes. Land exchanges that, for example, eliminate private inholdings and incompatible uses might be consistent with the Act's purposes.[22] Land exchanges like the one being proposed by the Transmission Companies, however, that add incompatible uses—here in a very big way—and are designed to get around the Refuge Act's specific substantive and procedural requirements, are unlawful and inconsistent with USFWS policy. Indeed, in "plan[ning] and direct[ing] the continued growth of the System" the USFWS must do so "in a manner that is designed to *accomplish the mission of the System*...." 16 U.S.C. § 668dd(a)(4)(C) (emphasis added).

Before the Refuge Act was adopted in 1997, it was not uncommon for Refuge managers to occasionally allow incompatible uses such as roads, pipelines, and powerlines to cross Refuges in exchange for land donations.[23] The rule *against* using such compensatory mitigation to make proposed uses artificially compatible, 50 C.F.R. § 26.41(b), was adopted precisely to stop that practice. The Transmission Companies' proposal would mark the return of the types of questionable practices that prompted Congress to enact the Refuge Act in the first place. If allowed, this would signal to private development interests who wish to dig copper mines, drill

---

[22] The Upper Mississippi Refuge's Comprehensive Conservation Plan (CCP), for example, contemplates exchanging Refuge lands that are intermingled with state wildlife management areas to "provide consistent management and regulations and reduce confusion by visitors." SPF at ¶ 131. Contrary to the Transmission Companies' suggestion, the CCP does not embrace the use of land exchanges whenever it would "benefit" the Refuge.

[23] See *supra* note 21.

fracking wells, run tar sands pipelines, or construct high-voltage transmission lines through protected National Wildlife Refuges that they can engage in those activities by making an offer of land (or money to acquire land) that a Refuge manager is willing to accept, and all the substantive and procedural impediments in the law would drop away.

The U.S. District Court in Alaska recently rejected the idea that general land exchange authority can allow developers and USFWS to avoid the specific requirements of public lands statutes. In *Friends of Alaska National Wildlife Refuges v. Bernhardt,* 463 F.Supp.3d 1011 (D. Alaska 2020), the USFWS had agreed to exchange land in the Izembek National Wildlife Refuge in order to allow a road to be built through the Refuge between King Cove and Cold Bay, Alaska.[24]

The Izembek Refuge is governed by the Alaska National Interest Lands Conservation Act (ANILCA), which, like the Refuge Act, has a provision on land exchanges. ANILCA § 1302(h), 16 U.S.C. § 3192(h). At the same time, however, Title XI of ANILCA has specific substantive and procedural requirements for transportation and utility right-of-way projects across "conservation system units." ANILCA, subchap. IV, 16 U.S.C. §§ 3161–3173. One of those requirements is that transportation or utility projects must be "compatible with the purposes for which the unit was established," and there must not be an "economically feasible and prudent alternative route." 16 U.S.C. § 3165.

As in this case, USFWS made no attempt to argue that the proposed road was "compatible with" the Izembek Refuge's purposes. Nor did USFWS follow the procedures outlined in Title XI. USFWS argued, however, that it did not need to follow Title XI because,

---

[24] The *Friends* decision was appealed to the Ninth Circuit. The Secretary of the Interior is reconsidering the Izembek land exchange, however, and may well return to the Department's previous position against the land exchange from the Obama Administration. That would likely moot the appeal.

once the proposed land exchange was completed, the lands would no longer be federal conservation lands and therefore would no longer be covered by Title XI or ANILCA.

Upon judicial review, the district court agreed with the plaintiff conservation groups that USFWS could not "nullify the protections Congress established when adopting Title XI by enabling land exchanges to circumvent its procedures." *Friends of Alaska National Wildlife Refuges*, 463 F.Supp.3d at 1025. Using the "well established canon of statutory interpretation," the court found that "the more specific procedural mandates of Title XI govern over the general authority provided in [the land exchange section]" because that "avoids the superfluity of the specific provision from being swallowed by the general one, giving effect to every clause of the statute." *Id.* (*quoting RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012)) (internal quotation marks and alterations omitted) (specific controls the general, and "commonplace statutory construction" applies when two provisions are both parts of the same statutory scheme).

As the United States Supreme Court has long recognized, allowing a specific provision to be swallowed by a more general one "violat[es] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *RadLAX*, 566 U.S. at 645 (*quoting D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Similarly here, using the general land exchange provision to somehow trump the Refuge Act's substantive compatibility requirements, and its procedural requirements for compatibility determinations, cannot be reconciled with these fundamental rules of statutory interpretation. That approach is impermissible as a matter of law and violates Defendant USFWS's statutory obligations.

Even if this proposed land exchange met the requirements of the Refuge Act—which is not the case here—implementing it would also violate NEPA, 42 U.S.C. § 4321 *et seq.,* because

it must be preceded by substantial additional environmental review. Under the right-of-way easements and permits currently in place or under consideration for the CHC project, the Transmission Companies must comply with those easements' and permits' terms, including periodic review of compliance with easement conditions, and the easements would have a limited time duration. Granting fee title, on the other hand, would exempt the Transmission Companies from those requirements, and that, alone, could have substantial adverse environmental impacts.

The Ninth Circuit confronted this question in *Center for Biological Diversity v. U.S. Dept. of Interior,* 623 F.3d 633 (9th Cir. 2010). There, the Bureau of Land Management ("BLM") approved a land exchange with Asarco, a mining company, so that it could expand its copper mining operations near Ray, Arizona.[25] BLM and Asarco argued to the court that the environmental consequences of the land exchange alternative and the "no action" alternative would be the same because Asarco had valid mining claims and would use the land for mining in either case.

The Ninth Circuit rejected that argument. The Court noted that, if the land remained public, Asarco must submit Mining Plans of Operation to BLM under the Mining Law of 1872, 30 U.S.C. §§ 21–54, which would require Asarco to provide a significant amount of information and go through many appropriate processes, all of which they could avoid if they held the land in fee. Without that comparison of alternatives in the environmental impact statement, BLM could not have taken the "hard look" required by NEPA. 623 F.3d at 646. Likewise, without that comparison in its Record of Decision, BLM's consideration of whether the proposed land

---

[25] The BLM derived its authority to approve of the land exchange under the Federal Land Policy and Management Act, a statute whose mission differs from the mission of the Refuge System to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration" of wildlife. 16 U.S.C. § 668dd(a)(2).

exchange would serve the "public interest" under the Federal Land Policy and Management Act, 43 U.S.C. § 1716(a), was also "arbitrary and capricious" under the Administrative Procedure Act. 623 F.3d at 647.

If Defendant USFWS intends to pursue the Transmission Companies' proposed land exchange offer in this case without making the same comparison, the result will be the same: the Defendant agency's action will be contrary to both NEPA's requirements and the "suitable for disposition" requirement of the Refuge Act. The specific compatibility requirements of the Refuge Act cannot be evaded by Defendant USFWS using the more general land exchange provision.

## V.   THE GENERAL PERMITS USED BY THE U.S. ARMY CORPS OF ENGINEERS TO AUTHORIZE THE DISCHARGES NECESSARY TO BUILD THE CHC TRANSMISSION LINE AND HIGH TOWERS VIOLATE THE CLEAN WATER ACT, NEPA, AND THE ENDANGERED SPECIES ACT.

The massive CHC transmission line involves hundreds of crossings of rivers, streams, and wetlands protected by the Clean Water Act. SPF at ¶ 181. This transmission line cannot be built on its proposed route without federal permits from Defendant U.S. Army Corps of Engineers. The Corps, however, decided not to do a project-specific analysis of whether the CHC transmission line or the "discharges" along its route met the Clean Water Act's requirements through the "individual" permit process, but instead used so-called "general" permits that the Corps says apply to all "utility lines," no matter their size or scope. SPF at ¶ 78.

Plaintiffs contend that this approach and the general permits themselves violate three separate federal laws: (1) the Clean Water Act, because transmission lines like the CHC project involve discharges that have more than "minimal" separate and cumulative adverse environmental effects; (2) the National Environmental Policy Act, because these general permits are major federal actions with significant potential environmental impacts but were not preceded

69

by an environmental impact statement; and (3) the Endangered Species Act, because those permits may affect listed species and critical habitat, but were not preceded by "programmatic" consultation with the Defendant U.S. Fish & Wildlife Service. The Corps should be directed to vacate the application of those general permits to the CHC project, and to instead do an "individual" permit review to determine whether the transmission line and the discharges involved in the project meet the requirements of the Clean Water Act and the rules.

**A.  Background: The Corps' General Permits for "Utility Lines."**

The purpose of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. To accomplish that purpose, the CWA broadly prohibits "the discharge of any pollutant by any person." *Id.* § 1311(a), and prohibits "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

The primary exception to that broad prohibition is the National Pollutant Discharge Elimination System ("NPDES") permit program, which is administered by the U.S. Environmental Protection Agency ("EPA") under Section 402 of the CWA. *Id.* § 1342. Concerned, however, that the NPDES permit requirements could prevent work needed to maintain navigation in the waters of the United States, Congress added Section 404 of the CWA,[26] which grants the Corps, not the EPA, the authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344. "Dredged material" is material excavated from U.S. waters, and "fill material" is material "placed in waters of the United States where the material has the effect of: (i) Replacing any

---

[26] Travis O. Brandon, *A Wall Impervious to Facts:  Seawalls, Living Shorelines, and the U.S. Army Corps of Engineers' Continuing Authorization of Hard Coastal Armoring in the Face of Sea Level Rise*, 93 Tulane L. Rev. 557, 564 (2019).

portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(c), (e)(1).

The Corps had long had authority to regulate obstructions to navigation under Section 10 of the Rivers and Harbors Act of 1899 ("RHA"): any construction, fill, or excavation with the potential to obstruct navigable waters has long required a permit from the Corps. 33 U.S.C. § 403. The purpose of the RHA was "to protect harbor areas from the congestion caused by random unplanned construction of wharves and piers."[27] And, for most of the twentieth century, the Corps and the courts interpreted the RHA to allow denial of "Section 10 permits" only on grounds that the proposed project would interfere with commerce or navigation.[28]

By 1970, however, courts had started to find that the Corps could consider, or was even required to consider, conservation factors as well as navigation in RHA permitting.[29] Consequently, when passing the Clean Water Act in 1972, Congress decided to leave the responsibility for regulating dredging and filling activities with the Corps. There was significant opposition to taking that authority from the EPA, on the grounds that "the Corps' mission was not to protect the environment but to promote navigation."[30] The compromise was to leave the jurisdiction with the Corps, but to include section 404(b)(1) of the CWA to subject the Corps' exercise of permitting authority to binding EPA regulation. 33 U.S.C. § 1344(b)(1).

The EPA's "404(b)(1) Guidelines" place very serious limits and restrictions on the Corps' permitting authority. The Guidelines prohibit the issuance of any dredge or fill permit "unless it can be demonstrated that such a discharge will not have an unacceptable adverse

---

[27] Garrett Power, *The Fox in the Chicken Coop:  The Regulatory Program of the U.S. Army Corps of Engineers,* 63 Va. L. Rev. 503, 506 (1977).

[28] *See generally* Michael C. Blumm & Elisabeth Mering, *Vetoing Wetland Permits Under Section 404(c) of the Clean Water Act: A History of Inter-Federal Agency Controversy and Reform,* 33 UCLA J. Envt. L. & Pol'y 215, 227–28 (2015), and cases cited.

[29] *See, e.g., Zabel v. Tabb,* 430 F.2d 199, 214 (5th Cir. 1970); Blumm & Mering at 227–28.

[30] Blumm & Mering at 228–29 (quoting Sen. Muskie, chief sponsor of the CWA).

71

impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c). The Guidelines also prohibit the grant of Section 404 permits if there are less environmentally damaging "practicable alternatives" to the proposed discharges, and they require compensatory mitigation for unavoidable adverse effects. 40 C.F.R. § 230.10(a).

In the Section 404 permitting program's early days, the Corps adopted a very narrow view that its responsibility extended only to "traditionally navigable" waters, but that view was rejected in *Natural Resources Defense Council v. Callaway,* 392 F. Supp. 685, 686 (D.D.C. 1975). Faced with an unwanted and, in its view, unmanageable expansion of its regulatory responsibility to include all "waters of the United States," including wetlands,[31] the Corps responded by beginning to issue so-called "general" permits. General permits are "off-the-shelf," "one-size-fits-all" permits that apply to broad categories of activities. Their purpose is to avoid subjecting each new application to the more extensive, project-specific "individual" permitting process. Typically, unlike the case with "individual" permits, the Defendant Corps' general permits do not involve public notice or opportunity for comment on a project; often, they do not require any delineation of jurisdictional waters; in many cases, they do not even require that the Corps be notified. SPF at ¶ 182.

Congress authorized the Corps to use general permits in the 1977 amendments to the Clean Water Act, but only under very limited circumstances. Under what is now Section 404(e) of the CWA, the activities in any general permit category must be "similar in nature," they must

---

[31] The Corps responded to the *Callaway* decision by issuing a press release declaring that, because of the court's decision, permits would now be required for "the rancher who wants to enlarge his stock pond, or the farmer who wants to deepen an irrigation ditch or plow a field, or the mountaineer who wants to protect his land against stream erosion." Michael C. Blumm & D. Bernard Zaleha, *Federal Wetlands Protection Under the Clean Water Act: Regulatory Ambivalence, Intergovernmental Tension, and a Call for Reform,* 60 U.Colo. L. Rev. 695, 705 n. 56 (1989).

"cause only minimal adverse environmental effects when performed separately," and they must "have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Consistent with those restrictions, many of the Corps' general permits involve the kind of minor discharges one would expect—smaller-scale piers and docks, beach creation and maintenance, and wildlife ponds. SPF at ¶ 183. But, by their terms, some of the Corps' general permits today cover projects that can be massive in scale.

The Corps' "utility line" general permits are such an example. Nationwide Permit 12 (NWP 12), which the Corps' Rock Island district used in this case, and the Utility Regional General Permit ("Utility RGP") the St. Paul District used, authorize discharges associated with the construction, maintenance, repair, and removal of utility lines and associated facilities, including oil and gas pipelines, electric transmission and collection lines, telephone, cable TV and internet cables, and so on, if they do not cause the loss of more than one-half acre of waters of the United States per waterway crossing.[32] SPF at ¶ 184.

NWP 12 was first adopted in 1977, and then reissued every five years since.[33] The 2017 version is the one the Corps' Rock Island District used for the Iowa portion of the CHC transmission line. The current version of the St. Paul District's Utility RGP, which was used to authorize discharges on the Wisconsin portion of the CHC transmission line, was made effective on February 21, 2018. SPF at ¶ 185. Neither of those reauthorizations was preceded by the

---

[32] Earlier this year, the Corps divided NWP 12 into three separate nationwide permits: NWP 12 for oil and gas pipelines, NWP 57 for electric utility lines, and NWP 58 for water lines and other similar substances. U.S. Army Corps of Engineers, *Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 2,744 (Jan. 13, 2021). Even if the Corps were to shift the CHC project over to NWP 57, however, the CWA, NEPA, and Endangered Species Act issues will remain exactly the same. The 2021 proposals still extend to projects with more than minimal adverse environmental impacts, and they were still not preceded by environmental impact statements or programmatic consultation with USFWS.

[33] 42 Fed. Reg. 37,144 (July 19, 1977). The version used in this case was adopted in 2017. U.S. Army Corps of Engineers, *Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1860 (Jan. 6, 2017) (also in Administrative Record at NWP000001–NWP000150).

preparation of an EIS under NEPA[34]; indeed, it appears that an EIS has never been prepared for any version of NWP 12 or the Utility RGP. Likewise, neither of those reauthorizations were preceded by programmatic consultation with USFWS under Section 7 of the Endangered Species Act. SPF at ¶ 190, 191. The Defendant Corps' apparent position is that the utility line projects covered by NWP 12 and the Utility RGP have no more than "minimal" adverse environmental impacts in virtually all cases, either individually or cumulatively, and so the general permits comply with section 404(e) of the CWA. Likewise, again because the impacts are supposedly so minimal, the Corps has never carried out programmatic environmental impact statements or programmatic endangered species consultations for those general permits.  SPF at ¶ 187-191. That flawed approach is under challenge nationally.

**B. The Defendant Corps' Conclusion that Major Projects like the CHC Transmission Line Will Have No More than "Minimal" Impacts on the Environment Is Contrary to CWA section 404(e)(1).**

 It of course defies common sense to conclude that the potential adverse environmental impacts of the massive CHC high-voltage transmission line project will be no more than "minimal." Yet the Defendant Corps still takes the "minimal impact" position and refused to do individual permitting.

How does the Corps justify this counterintuitive conclusion? There are three basic Corps arguments. First, the Corps defines "project" narrowly to minimize the agency's jurisdiction and responsibility. Second, the Corps claims it can defer review of potential environmental impacts and possible conditions to the project stage and still use general permits. And third, the Corps argues that "compensatory mitigation" can and will always bring adverse environmental impacts below the "minimal" threshold. None of those arguments have merit.

---

[34] The Corps instead relied on a less rigorous analysis under NEPA called an Environmental Assessment, which is used by agencies to determine whether or not an EIS is required. SPF at ¶ 187.

1. *The Defendant Corps' Policy of Defining Each Individual Water Crossing as a Separate "Project" to Avoid Individual Permitting Violates Section 404(e) of the Clean Water Act.*

The Defendant Corps' first argument is that large projects like the CHC transmission line are not single projects at all, but rather a series of discrete projects at each individual river, stream, or wetland crossing. "[E]ach crossing of a water body at a separate and distant location" is a "single and complete project." SPF at ¶ 191, 192. In other words, the argument is that the Corps does not regulate pipelines or transmission lines *per se*; it only regulates discharges of dredged or fill material at discrete disposal sites, and, with proper precautions, those discharges will not have more than a minimal impact. This is the same contention, of course, that allows the Corps to get around its own "half-acre" requirement—that, if a project will result in more than a half-acre of protected waters or wetlands being converted, then a more extensive individual permit is required. SPF at ¶ 184.

Under the Corps' interpretation, then, there is no limit to the number of times its "utility line" general permits can be applied to an individual project like the CHC transmission line, nor is there any limit to the number of acres of protected waterbodies and wetlands a project like the CHC transmission line can damage before triggering an individual permit requirement. That result flies in the face of the very real limits Congress imposed on the Corps' general permitting authority in Section 404(e), 33 U.S.C. § 1344(e).

In particular, the requirement that a category of actions covered by a general permit have no more than minimal *cumulative* adverse environmental impacts gets read right out of the statute. General permits like NWP 12 and St. Paul's Utility RGP cover thousands of discharges, SPF at ¶ 182 (Corps estimate at time of 2017 NWP issuance that the permits would authorize over 60,000 activities per year), and the cumulative impact of those discharges cannot fairly be

characterized as only "minimal." Even under the Corps' definition, then, the statutory

requirements of minimal impacts simply cannot be met.

> 2.  *The Defendant Corps Cannot Lawfully Avoid Making the "Minimal Impact" Analysis Section 404(e) Requires for General Permits by Simply Deferring Impact "Analysis" to the Individual Project Stage.*

The Corps' response is that, despite its clear language, Section 404(e) does *not* require

the agency to assess whether impacts will be "minimal" before it issues general permits. Instead,

the Corps argues, it can defer consideration of cumulative impacts to the project stage, and, if it

concludes that a particular project's cumulative impacts will be minimal, then verifying that an

applicant can use a general permit for that project is lawful under Section 404(e).

In *Ohio Valley Environmental. Coalition v. Bulen,* 410 F.Supp. 2d 450 (S.D. W.Va.

2004), *aff'd in part, vacated in part,* 429 F.3d 493 (4th Cir. 2005), the court concluded that

Section 404(e) unambiguously required the Corps to determine minimal impacts before, not

after, issuance of a general permit. As the court reasoned, "[i]f the Corps cannot define a

category of activities that will have minimal effects, absent individual review of each activity,

the activities are inappropriate for general permitting." 410 F.Supp. 2d at 465.

> The issuance of a [general] permit . . . functions as a guarantee *ab initio* that every instance of the permitted activity will meet the minimal impact standard. Congress intended for a potential discharger whose project fits into one of those categories to begin discharging with no further involvement from the Corps, no uncertainty, and no red tape.

410 F.Supp. 2d at 465–66 (citing colloquy between Sens. Muskie and Nunn in legislative

history); *see also Sierra Club v. U.S. Army Corps of Eng'rs,* 399 F.Supp.2d 1335, 1345–47

(M.D. Fla. 2005), *vacated in part,* 464 F.Supp.2d 1171 (M.D. Fla. 2006).

Other courts have disagreed, including the Fourth Circuit in the *Ohio Valley* case, which

deferred to the Corps' proffered interpretation under *Chevron.* In large part, the Fourth Circuit's

explanation for finding the interpretation reasonable was that it would be difficult for the Corps

to predict the environmental impact of activities not yet identified. 429 F.3d at 501–02. The

problem with that reasoning, however, is that if the Corps cannot confidently predict that a

category of activities will *not* have more than a minimal impact in different circumstances at the

time it is considering a general permit, it should conclude that a general permit is *not* appropriate.

Under section 404(e), it is a *precondition* for a general permit that the category of activities will

indeed not have more than minimal impacts. If the Corps cannot draw conclusions about impacts

until the individual project stage, then those projects should go through individual permitting.

With all due respect to the Fourth Circuit, the district court in *Ohio Valley* has the better side of

this argument.[35] The Corps cannot evade the requirement that it assess whether general permits

will have no more than a minimal adverse environmental impact by just deferring any analysis of

environmental impacts to the individual project stage.

> 3.   *The Defendant Corps Cannot Lawfully Evade the "Minimal Impact" Requirement Simply by Asserting that Compensatory Mitigation Will, in All Cases, Reduce Negative Environmental Impacts Below the "Minimal" Threshold.*

The Corps' third principal argument for why it can conclude that projects like the CHC

transmission line will have no more than "minimal" adverse environmental impacts is that there

is always some way to provide "compensatory mitigation" to make up for any environmental

damage and adverse impacts. In other words, if it turns out that discharges of dredged or fill

material from a project like the massive CHC transmission line *do* have significant adverse

environmental impacts, then the Corps can always ask the applicant to purchase wetland banking

credits or take some other kind of mitigation measure to offset that impact. That "compensatory

---

[35] To our knowledge, the Seventh Circuit has not confronted this question. Tenth Circuit and D.C. Circuit panels have followed the Fourth Circuit. *Sierra Club v. Bostick,* 787 F.3d 1043, 1061 (10th Cir. 2015); *Sierra Club v. U.S. Army Corps of Eng'rs,* 803 F.3d 31, 39 (D.C. Cir. 2015).

mitigation" will, in the Corps' view, bring the impact back under the "no more than minimal" threshold. SPF at ¶ 188.

That argument swallows the "minimal impact" rule whole, because it assumes without knowing or requiring documentation that compensatory mitigation will always be possible and successful. That is not a legitimate assumption. As the Sixth Circuit recognized:

> Under the CWA, the issuance of a nationwide permit hinges on the reviewing agency's finding that a proposal has only a "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1); *see also* 40 C.F.R. § 230.7(a)(3). In making this finding, the relevant CWA regulations require an agency to (i) "set forth in writing an evaluation of the potential . . . cumulative impacts of the category of activities to be regulated" by the proposal, 40 C.F.R. § 230.7(b) and (ii) provide "*documented information* supporting each factual determination [required by § 230.11]," *id.* § 230.7(b)(1) (emphasis added), including a determination of cumulative impacts, *d.* § 230.11(g).

*Kentucky Riverkeeper, Inc. v. Rowlette,* 714 F.3d 402, 412 (6th Cir. 2013). The Court acknowledged that post-issuance mitigation or other conditions could potentially support a minimal cumulative impact finding, but made it clear that such a finding required more than conclusory statements or lists of potential mitigation methods. *Id; see also Ohio Valley Env't Coalition v. Hurst,* 604 F.Supp.2d 860, 867 (S.D.W.Va. 2009) (deeming "conclusory" the Corps' "unsupported belief in the success of mitigation measures" and explaining that the Corps' "'mere listing' of mitigation measures and processes, without any analysis, cannot support a minimal cumulative impacts determination").

The same reasoning applies here. NWP 12 and the St. Paul District's Utility RGP cover a wide variety of "linear" projects, that might cross a wide variety of different geographies with very different potential risks to water quality. The facts here are that the 101-mile CHC transmission line that crosses through 114 wetlands and the Mississippi River does create very significant risks and damaging impacts to water quality. This huge transmission line would run through the unique topology of Wisconsin's Driftless Area, with its karst geology—a region with

many cracks and crevices in the bedrock, and intricate ground and surface water connections—

which allows pollutants to quickly and easily spread through groundwater. SPF at ¶ 144. If this

huge transmission line and tall towers impair a particularly fragile wetland complex, it is not at

all clear what conditions or mitigation measures might be available, might be effective, or might

be enforceable. Large projects like this simply are not "similar in nature" to smaller "linear"

projects with a limited geographic reach, for which effective mitigation measures might be easy

to select and to implement. Using the mere theoretical possibility that every problem that might

arise will have a mitigation solution as justification for a finding of "minimal cumulative impact"

is simply not supportable. The Corps' "one size fits all approach" does not fit well for the

massive CHC transmission line.

    **C.** **Because the Defendant Corps' General Permits for "Utility Lines" Do Have Significant Environmental Impacts, They Are Also Invalid Because They Were Not Preceded by an Environmental Impact Statement as NEPA Requires and by Programmatic Consultation with the USFWS as the Endangered Species Act Requires.**

    The same arguments that the Corps uses to contend that its "utility line" general permits

have no more than a minimal environmental impact under Section 404(e) of the Clean Water Act

are the ones it uses to justify why it has never issued an environmental impact statement or

engaged in a programmatic consultation with the USFWS before issuing or renewing those

general permits: Each river, stream, or wetland crossing should be treated as a separate "project,"

all analysis of impacts can be and should be deferred to the individual project stage, and, if all

else fails, compensatory mitigation will always be available to reduce environmental impacts

below any of the statutory thresholds.

    None of these arguments have merit under NEPA or the Endangered Species Act

("ESA"). NEPA provides that federal agencies must prepare environmental impact statements on

all "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). General permits that set the requirements for all crossing by transmission lines of waterways or wetlands of whatever size or location throughout the nation or throughout a region certainly meet the statutory test of "major federal actions significantly affecting the quality of the human environment," *id.,* as well as the Council on Environmental Quality definitions. 40 C.F.R. §§ 1508.18, 1508.27. A "programmatic EIS" should be prepared when actions are "connected," "cumulative," or sufficiently "similar" such that a broader review becomes "the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions." 40 C.F.R. § 1508.25(a); *see generally Kleppe v. Sierra Club,* 427 U.S. 390, 409 (1976) (discussing when a programmatic EIS may be necessary).

This case does not present the so-called "small handle" problem, which describes when there is a dispute about whether the Corps itself must prepare an EIS before determining whether a project comes within the scope of a general permit. *See, e.g. Sierra Club,* 803 F.3d 31 (no EIS required for pipeline project covered by NWP 12). There is no dispute here whether a project-specific EIS was required for the CHC transmission line—the Defendant RUS's environmental review rules required it, and an EIS was indeed completed. The question here is over the decision of the Defendant Corps not to complete an EIS on the general permits themselves, not on any specific project.

The Endangered Species Act requires review of broad agency decisions that may affect listed species or critical habitat. Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires each federal agency to ensure "that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered

80

species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [USFWS] … to be critical." The agency must review its actions "at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Then, if the agency finds its action "may affect" a listed species or critical habitat, it must initiate formal consultation with USFWS unless the agency has made a finding, with USFWS concurrence, that the action's effects are not likely to be adverse. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. A "programmatic" consultation is appropriate when an agency's proposed action "provid[es] a framework for future proposed actions." 50 C.F.R. § 402.02. That is precisely what a general permit is—a "framework for future proposed actions."

The Defendant Corps' "general" permits are therefore not valid unless the agency complies with its obligation under the Endangered Species Act to consult on the proposed permits' potential impacts on listed species and their critical habitat. U.S. Fish and Wildlife Service, *Interagency Cooperation—Endangered Species Act of 1973, as Amended; Incidental Take Statements*, 80 Fed. Reg. 26,832, 26,835 (May 11, 2015) (expressly listing the Corps' Nationwide Permit Program as an example of a program that would require programmatic consultation). The Corps renewed and readopted both NWP 12 and the Utility RGP in 2017 and 2018, respectively, without consulting with USFWS as required by Section 7 of the ESA. SPF at ¶¶ 190–191.

On April 15, 2020, the United States District Court for the District of Montana concluded that the Corps' failure to initiate formal programmatic consultation with USFWS under Section 7(a)(2) of the Endangered Species Act before renewing NWP 12 in 2017 was arbitrary and capricious. *Northern Plains Resource Council v. U.S. Army Corps of Engineers,* 454 F.Supp. 3d 985 (D. Mont. 2020), *amended* 460 F.Supp.3d 1030 (D. Mont. 2020), *appeal dismissed as moot*

No. 20-35412 (9th Cir., Aug. 11, 2021). In the decision document adopting NWP 12, the Corps itself acknowledged that the construction of utility lines "will fragment terrestrial and aquatic ecosystems," and that dredged and fill material can have temporary or permanent impacts, including losses of aquatic resource functions and services. SPF at ¶ 193. For those reasons, the district court found "resounding evidence" that the adoption of NWP 12 easily met the "may affect" threshold and required consultation. 454 F. Supp. 3d at 990–91.

The district court had little patience for the Corps' argument that programmatic consultation was not required, because each project that might involve listed species would get its own project-specific consultation. As the court reasoned:

> Programmatic consultation considers the effect of an agency's proposed activity as a whole. A biological opinion analyzes whether an agency action likely would jeopardize a listed species or adversely modify designated critical habitat. This type of analysis allows for a broad-scale examination of a nationwide program's potential impacts on listed species and critical habitat. A biological opinion may rely on qualitative analysis to determine whether a nationwide program and the program's set of measures intended to minimize impacts or conserve listed species adequately protect listed species and critical habitat. Programmatic-level biological opinions examine how the overall parameters of a nationwide program align with the survival and recovery of listed species. An agency should analyze those types of potential impacts in the context of the overall framework of a programmatic action. A broad examination may not be conducted as readily at a later date when the subsequent activity would occur.

454 F.Supp.3d at 990 (internal citations omitted). *See also Western Watersheds Project v. Kraayenbrink,* 632 F.3d 472 (9th Cir. 2011) (overturning Bureau of Land Management's nationwide grazing regulations for inadequate environmental review and lack of programmatic consultation with USFWS under the ESA). The same reasoning of the court in *Northern Plains,* a case about NWP 12 as applied to a pipeline, holds true in this case for NWP 12 (or the new NWP 57) as well as for the similar Utility RGP.

The Corps, of course, tries to have it both ways. It avoids considering whether the individual and cumulative impacts of its general permits will be significant by deferring the

assessment of impacts to the project stage, and then avoids considering impacts at the project stage by referring back to the general permits. The result is that serious consideration of alternatives—greater use of individual permit processes, caps (size, number of crossings) on availability of general permits, mitigation development, assessment, monitoring and enforcement—does not occur, even though that consideration of alternatives is precisely what the CWA, NEPA, and the ESA all require.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a summary judgment and vacate and remand the Defendant RUS's Record of Decision approving the EIS, and the Defendants USFWS and Corps' approvals of permits and other authorizations for the proposed CHC transmission line as explained above.

Respectfully submitted this 3rd day of September, 2021.

*/s/ Howard A. Learner*
Howard A. Learner
Scott Strand
Rachel L. Granneman
Ann Jaworski
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
SStrand@elpc.org
RGranneman@elpc.org
AJaworski@elpc.org

*Counsel for Plaintiffs National Wildlife
Refuge Association, Driftless Area Land
Conservancy, Wisconsin Wildlife
Federation, and Defenders of Wildlife*

*/s/ Lindsay Paige Dubin*
Lindsay Paige Dubin
*Admitted Pro Hac Vice*
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
T: (202) 772-3234
ldubin@defenders.org

*Counsel for Plaintiff Defenders of Wildlife*

*/s/ Robert M. Morgan*
Robert M. Morgan
*Admitted Pro Hac Vice*
National Wildlife Refuge Association
415 E. Cape Shores Dr.
Lewes, DE 19958-3109
T: (301) 466-8915
RMorgan@RefugeAssocation.org

*Counsel for Plaintiff National Wildlife
Refuge Association*