IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN
WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE

|  |  |
|---|---|
| Plaintiffs, | OPINION AND ORDER |
| v. | 21-cv-096-wmc    & 21-cv-306, |

RURAL UTITLITIES SERVICE,
CHRISTOPHER MCLEAN, Acting Administrator,
Rural Utilities Service,
UNITED STATES FISH AND WILDLIFE SERVICE,
CHARLES WOOLEY, Midwest Regional Director, and
SABRINA CHANDLER, Manager, Upper Mississippi River
National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL STEVEN SATTINGER, Commander
And District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL KARL JANSEN, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

Defendants,

and

AMERICAN TRANSMISSION COMPANY, LLC,
DAIRYLAND POWER COOPERATIVE, & ITC
MIDWEST LLC,

Intervenor-Defendants.

Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy,

Wisconsin Wildlife Federation, and Defenders of Wildlife seek a preliminary injunction

prohibiting Intervenor-Defendants American Transmission Company, LLC ("ATC"),

Dairyland Power Cooperative ("Dairyland") and ITC Midwest LLC ("ITC") from

beginning construction on the ninety-mile stretch of their proposed, preferred route for the Cardinal-Hickory Creek ("CHC") Transmission Line Project running from far Southwest Wisconsin near Cassville and the Mississippi River to Middleton in the center of Southern Wisconsin through what is known as the Driftless Area.[1]  Given the balance of harms implicated by the parties and the plaintiffs' likelihood of success on the merits, a narrowly tailored motion for preliminary injunction will be granted with respect to land on or near federal jurisdictional waters until issuance of this court's decision on the parties' cross-motions for summary judgment, which will be fully briefed within a day of the issuance of this order.

BACKGROUND[2]

## A. Project Permits

Since 2012, ATC, ITC, and Dairyland ("co-owners") have been working on approvals for and construction of the CHC project.  (Def.'s Resp. to Pl.'s PFOF (dkt. #119) ¶ 3-5.)  This project involves a 345-kilovolt, 101-mile transmission line that will carry electricity from Iowa to Wisconsin.  (*Id*. at ¶ 1.)  Among other things, defendants have proposed that the CHC Transmission Line cross a section of the Upper Mississippi River National Wildlife and Fish Refuge ("Refuge").  (*Id*.)  Dairyland has also indicated its intent

---

[1] The Driftless area is a region in Iowa, Wisconsin, and Minnesota.  This region was not flattened by glaciers like many other areas of the Upper Midwest, leading to a unique geographic region with hills, bluffs, and valleys.  Many species of plant and animal call this region home, such as the Timber Rattlesnake, the Northern Monkshood, and the Brook Trout. Defining the Driftless, October 28, 2021, https://driftlesswisconsin.com/defining-the-driftless/

[2] As cited below, the following facts are largely undisputed and taken from the parties' responses to each side's proposed findings of fact ("Resp. to PFF") or the administrative record, except where otherwise noted.

2

to pursue financial assistance from the Rural Utilities Service ("RUS") in the future. (*Id.* at ¶ 5). To that end, the RUS prepared an environmental impact statement ("EIS") regarding the project under the National Environmental Policy Act ("NEPA"), on which both the United States Fish and Wildlife Service ("Service") and the the U.S. Army Corps of Engineers ("Corps") expressly relied. (*Id.* at ¶ 6.) The Service determined that the project is compatible with the purposes of the Refuge, resulting in its issuance of a "right-of-way" permit for the line's construction through the Refuge. (*Id.* at ¶ 128.) Finally, the Corps is responsible for regulating the project to the extent that it impacts jurisdictional waters of the United States. (*Id.* at ¶ 192.) Since the proposed line covers territory under the district authority of two of the Corps branches, both the Rock Valley and St. Paul district branches have permitted sections of the proposed CHC transmission line. (*Id.* at ¶ 196-198.)

Specifically, the Corps-Rock Valley district issued Nationwide Permit 12 ("NWP 12"), under which intervenor-defendants had already started to clear cut the relatively smaller portion (approximately 15 miles) of the proposed CHC line running through Northeastern Iowa without objection by plaintiffs. (*Id.* at ¶ 197-198.) Because the Corps-St. Paul branch revoked NWP 12 within its district, no work had begun in the Upper Mississippi Refuge and the remainder of the proposed line through Wisconsin, although the St. Paul district did issue a more narrow Utility Regional General Permit ("URGP") some time ago (USACE000680).[3]

---

[3] Whether nationwide or regional, when a general permit is created, the issuing agency does an environmental review, but little, additional review is needed for each *specific* project subsequently. authorized, except for "Pre-Construction Notices" for certain larger projects having more than "minimal effects" on the environment.  . (*Id.* at 193-196.)

**B. Defendants' and Intervenor-Defendants' New Approach for Obtaining a CHC Line Permit Within the Refuge**

On July 29, 2021, intervenor-defendants also requested a "land exchange" with the Service in lieu of obtaining renewed right-of-way permits through the Refuge.  (Def.'s Resp. to Pl.'s PFOF (dkt. #119) ¶ 137.)  Under this requested land exchange, the proposed co-owners, ITC, ATC and Dairyland, would transfer to the Service another parcel adjacent to the Refuge of around 30 acres.  In exchange, the Service would grant the co-owners 19 acres of land within the refuge.  (dkt. #53-2.)  The Service is considering this proposal and expects its review to take up to nine months.  (Def.'s Mot. (dkt #50) 10.)

In the meantime, the Service has withdrawn the CHC Project's application for Compatibility Determination and Right of Way Permits through the Refuge, ostensibly because the Service "did not review the correct easement documents when evaluating the existing use."  (dkt. #69.)  Additionally, the Corps modified and reissued several, other nationwide permits under the Clean Water Act on January 13, 2021, which it noted rendered the NWP 12 permit invalid.  (*Id.*)

**C. Plaintiffs' Claims**

In this lawsuit, plaintiffs have asserted three, basic challenges to the federal approvals of the proposed preferred route of the CHC Transmission Line.  First, plaintiffs' claim that the EIS prepared for the CHC project does not comply with the National Environmental Policy Act ("NEPA").  (Def.'s Mot. (dkt #50) 2.)  Second, they claim that the right-of-way permit and compatibility determination by the Service violated the National Wildlife Refuge System Improvement Act, as the project is not compatible with the purposes of the Refuge.  (*Id.*)  Third, they claim that the Corps violated NEPA, the

4

Endangered Species Act, and the Clean Water Act by issuing general permits for the proposed project. (*Id.*)

On September 24, 2021, intervenor-defendants notified plaintiffs and this court of their intention to start construction in Wisconsin by clear cutting the proposed route within 30 days, a minimum notice period agreed upon by the parties early in this lawsuit. (dkt. #96.)  In response, plaintiffs moved for a preliminary injunction, arguing that (1) clearcutting and subsequent construction of the powerline itself would permanently harm the environment and (2) a temporary pause of clearcutting and construction while the court decides the merits of this case at summary judgment is warranted.  (Pl.'s Mot. (dkt. #98).)  Subsequently, in response to inquiry by this court, intervenor-defendants agreed to hold off all activities within federal jurisdictional waters until November 29, 2021. (Dkt. #152.)

### D. Jurisdictional Limits

Given that NWP 12 through Wisconsin and the Service's previous grant of a right of way through the Refuge are no longer valid, intervenor-defendants are unable to begin construction in the Refuge, including clearcutting.  Additionally, Dairyland has not yet asked for funding from RUS, making that EIS relevant only to the extent it impacts the validity of other, current permits issued or actions taken by the Corps and the Service. Because the Wisconsin section is currently the subject of clearcutting and possible construction is authorized under the URGP alone, that is the only place where irreparable harm is likely to occur for the purposes of the preliminary injunction.  As such, at most, the court can enjoin construction activities requiring permitting under that URGP.  Any

other construction activity is unavailable due to lapsed permits, is outside the jurisdiction of this court, or is not the subject of challenge in this lawsuit.

OPINION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). A party seeking preliminary injunctive relief must demonstrate as a threshold matter that it: (1) has a reasonable likelihood of success on the merits; (2) lacks an adequate remedy at law; and (3) will suffer irreparable harm if relief is not granted. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If these elements are met, the court must then balance, on a sliding scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing party. *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion*, Indiana, 889 F.3d 432 (7th Cir. 2018). In particular, when assessing whether a claim challenging the issuance of a government permit has a likelihood of success on the merits, the court must follow the Administrative Procedure Act ("APA"), only asking "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003) (citation omitted).

As with their briefing on cross-motions for summary judgment to date, the parties' equally lengthy submissions on plaintiffs' motion for preliminary injunction are like large ships passing in the night, largely failing to engage on the crucial legal issues, and for the most part, not even agreeing on what those issues are. Fortunately, by distillation of the material facts and legal issues during last week's nearly three hours of oral argument with

6

counsel, both the basic facts set forth above and key legal issues addressed below have emerged.  Accordingly, that argument frames this opinion on plaintiffs' recently-filed motion.[4]  In particular, the court's analysis begins by addressing those legal claims on which plaintiff is most likely to prevail, then moves on to the other factors that must be considered before issuance of a preliminary injunction.

## I.  Likelihood of Success on the Merits

### A. Utility Regional General Permit

Given that the URGP is the only permit whose validity is currently contested in this case *and* on which intervenor-defendants could proceed with construction in Wisconsin, at least as to federally protected jurisdictional waters, plaintiffs must show that they have some likelihood of success on the merits of their claim that the URGP is invalid.  General approval documents for the URGP state that the Corps-St. Paul branch will analyze the cumulative impact of all projects authorized under that permit to make sure that it does not exceed minimal impacts.  Specifically, the approval documents contemplate that "[i]n reviewing the [pre-construction notice] for the proposed activity . . . [t]he Corps will also consider the cumulative adverse environmental effects caused by activities authorized by

---

[4]  Like most matters in this case, the parties disagree about who is responsible for the sudden motion and need for a decision on an only recently filed motion for preliminary injunction in a case that has been pending for the better part of a year:  intervenor-defendants for providing only 30-days notice of its intent to adhere to its long set schedule to begin work in Wisconsin, despite having no currently valid permit to do so within the Refuge itself; or plaintiffs for not realizing that the intervenor-defendants would proceed as originally planned with just the minimum notice agreed upon, even if it inevitably meant the court having to make a preliminary assessment of the merits just before turning to the parties' cross-motions on summary judgment.  In the end, wherever the blame is most appropriately placed, this court's obligation to assessing the substance of plaintiffs' motion does not change.

the RGP and whether those cumulative adverse environmental effects are no more than minimal." (USACE 009060.) However, at least on the basis of the record cited by both sides to date, there is *no* evidence of even cursory analysis of the cumulative impact of the CHC Transmission Line in the Corps-St. Paul's project specific verifications under the RGP. (USACE 000679; USACE000686.)

Certainly, as both defendants and intervening-defendants take pains to point out repeatedly in their briefing and at oral argument, general permits need not engage in the same strenuous review necessary for an individual permit; indeed, the central tenet of general permits is that projects proceeding under them will not cause more than minimal harm, either individually or cumulatively. (USACE009046.) Even assuming that the Corps' limited review of the specific proposal for the CHC Line were adequate, without *any* apparent analysis of the projects proceeding under the general RGP, the Corps appears to have no basis on which it could have found harms are no more than minimal.

At this point, it remains to be seen whether there are in fact sufficient projects to raise such concerns, but the URGP is authorized for a period of five years and can be applied to any number of projects during that time, so it is only reasonable that the Corps comport with the text of its permit and take at least some look at the cumulative impacts over time with each subsequent project approved under that URGP.[5]

Moreover, there are also questions about the extent to which the CHC project itself

_____

[5] The URGP defines a single and complete project as "that portion of the overall linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all crossings of a single water of the US (i.e., a single waterbody) at a specific location. For linear projects crossing a single or multiple waterbodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of this general permit authorization." (USACE 009058.)

8

qualifies for the URGP at all, which is limited to projects that do not "cause the loss of greater than 0.5 acre of waters of the US." USACE009046. In its project-specific verification, for example, the Corps-St. Paul branch acknowledges around 2.64 acres of permanent loss of wooded wetlands, but provides little explanation as to why that loss does not preclude the CHC project's operating under the URGP. USACE 000680 ("Indirect effects also include a permanent conversion of 1.50 acre of wooded wetland that will be cleared and maintained for the utility corridor."); USACE000686 ("Indirect effects also include a permanent conversion of 1.14 acre of wooded wetland that will be cleared and maintained for the utility corridor."),)[6]

The Corps' short memorandum on the specific project verification also states that,

> While the overall 5.81 acres of temporary impacts from timber matting include 1.14 acre of wooded wetland conversion, the matting is considered a best management practice to protect and minimize ground disturbance during construction. Because all wooded wetland conversion areas are a result of the matting, the Corps will not require compensatory mitigation."

(USACE000688.) However, operations under a general permit does not provide for a "best practices" exemption for mitigation. "The measurements of loss and temporary impact to waters of the US are for determining whether a project may qualify for the RGP, and are not reduced by compensatory mitigation." (USACE009048.) Even if this loss is divided between separate areas of the transmission line under the Corp's definition of "project,"

---

[6] ATC and ITC, two of the intervenor-defendants, applied separately for use of the URGP on their respective portions of the line. Because of this, there are two project verifications authorizing use of the URGP for the proposed CHC transmission line. (USACE000680; USACE000687.) Even taken separately, however, as noted above, these verifications still acknowledge 1.5 and 1.14 acres of permanent conversion of wooded wetlands, respectively. (*Id.*)

there is still no indication that the Corps considered this in either URGP project verification. (USACE000680; USACE000687.) Indeed, that this court, even with the benefit of the full administrative record, is struggling to understand how the Corps-St. Paul's project verification worked[7] further supports a finding that plaintiffs have established at least some likelihood of success on the merits as to the intervening-defendants right to proceed with clear cutting, much less building the CHC Line on permanent wetlands under the URGP alone.

## B. Environmental Impact Statement

### 1. Corp's Reliance on the EIS

Defendants first argue that the EIS prepared for this project is wholly irrelevant to the court's analysis of plaintiffs' likelihood of success on the merits, as it was only created and relied upon for possible funding by one of the intervening-defendants' construction costs by the RUS. More specifically, since Dairyland has not even asked RUS for funding yet, defendants maintain any potential problems with the EIS are beyond this court's review. Defendants further maintain that because the Corps' verification of the project under the URGP permit occurred a few weeks before issuance of the final findings, it has no bearing on the Corps' issuance of that permit.

Even if either of these arguments were credited, the previous analysis under the URGP would still show some likelihood of success on the merits supporting an injunction and would at least be relevant to consideration of possible harms were this project to be

---

[7] On this second point about 3 acres, the Corps may be taking advantage of 33 USCA 1344(f)(1)(e), but if that is what they are relying on for the "best practices" point, there appears to be *no* mention of this in the administrative record.

allowed to proceed fully in Wisconsin. However, the court also does not credit either of defendants' arguments. Indeed, defendants' suggestion that the EIS is irrelevant to the URGP because the RUS financing has yet to be approved is just silly on its face. And while defendants' argument that the EIS should be ignored because the project-specific verification for the URGP was given before its final publication has some superficial appeal, it requires acceptance of a fiction that simply does not make sense and is contradicted by the record.

Certainly, the final EIS *was* published after the URGP verification, but the URGP verification and publication of the formal EIS occurred within *one* month of each other, making it unlikely that one occurred independently of each other at least factually, if not legally. (USACE000680; USACE000687; USACE00001.) Even more striking is the fact that Corps-St. Paul branch, which issued the URGP, had been a part of planning and development meetings for and preparation of the EIS nearly three *years* before the URGP project verification, dating back to at least to May of 2016. (USACE14753.) In that time, the Corps-St. Paul branch office was included in numerous meetings and calls about the NEPA analysis of the project, intervenor-defendants' plans for the line, *and* the drafting of the EIS. (USACE001238; USACE003685.)

Even more persuasive, the Corps' project verifications themselves cite heavily to actions RUS took under the EIS. (USACE000680 ("Other federal agencies involved include SERVICE, USEPA, and Corps Rock Island District. The Rural Utilities Service, USDA, is the lead federal agency and they published the Notice of Availability in the Federal Register for the Final EIS on October 23, 2019"); USACE000681 ("The action area was defined by the lead federal agency, the USDA Rural Utility Service (RUS), as the

entire project area");  USACE000682 ("RUS submitted a biological assessment (BA) to the Service on November 2, 2018 for all species identified throughout the entire Cardinal Hickory Creek project area . . . RUS made a 'no effect determination' for the whooping crane . . . The Corps has reviewed the documentation provided by the agency and determined it is sufficient to confirm Section 7 ESA compliance for this permit authorization.");  USACE000683 ("RUS used the NEPA process, which covers the entire Cardinal Hickory Creek project area from Dubuque County, Iowa to Dane County, Wisconsin, to satisfy the public involvement process for Section 106 of the NHPA . . .  the identification and evaluation process would be provided for in a Programmatic Agreement (PA) . . . RUS developed a PA that was fully executed on October 21, 2019 . . . The Corps has reviewed the PA provided by RUS and determined it is sufficient to confirm Section 106 compliance for this permit authorization.").)  Accordingly, the court will not just ignore:  nearly 3 years of collaboration, frequent citations to RUS findings made during the EIS process; and a temporal gap of less than a month before final publication of the EIS and issuance of the URGP verification.  Thus, to the extent the EIS undergirded the Corps' project-specific decision, any material errors in approval of that statement may impact the validity of the URGP, as well as the Corps' specific project approval.

## 2.  Narrow Purpose

Plaintiffs' main argument as to the EIS's defect goes to its purpose and need statement, which defines the scope of alternative analysis.  (Pl.'s Mot. (dkt. #70) 34.)  Specifically, plaintiffs object to EIS's adoption of the intervenor-defendants' proposed statement as to the purpose of the project:  "increase[ing] transfer capability between Iowa

and Wisconsin enabling additional generation." FEIS Vol. I, 1.4.1. This purpose arguably allows little else but a large, wired transmission line between the two states. For instance, as even defendants concede, alternatives such as reliance on solar energy, battery storage, upgrading existing transmission lines, or changing the grid management system could reduce the *need* for increased transfer capability, but would not *increase* transfer capability between the two states. (Pl.'s Mot. (dkt. #70) 39.)

The Seventh Circuit has observed that "[o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997). In *Simmons*, an EIS was prepared for a plan to supply two districts with water by creating a lake. *Id.* at 667. However, the Seventh Circuit found error in defining the purpose of the project as "supplying two users (Marion and the Water District) from a single source," because it effectively ruled out the consideration of any alternative that did not provide water from a single source, greatly reducing the scope of the EIS. *Id.* Similarly, plaintiffs argue here that RUS's adoption of a purpose narrowed to increasing transfer capacity unnecessarily constrained consideration of viable alternatives in the EIS. (Pl.'s Mot. (dkt. #70) 34.)

In response, defendants contend that "an EIS does not run afoul of [purpose] guidelines simply because its definition of a project's purpose precludes a particular interest group's preferred alternative." (Def.'s Mot. (dkt. #92) 56.) However, the stated purpose accepted in the EIS did not simply leave out plaintiffs' *preferred* option; it wholly adopted a purpose proposed by intervenor-defendants, which left little room for anything but the large CHC transmission line that intervenor-defendants had been planning all along.

13

"If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives." *Simmons*, 120 F.3d at 670. Perhaps defendants can ultimately demonstrate the adopted purpose is not *too* narrow, but in emphasizing the limiting options that the EIS allows by adoption of a very narrow purpose, plaintiffs have at least demonstrated *some* likelihood of success on the merits of their argument that the EIS failed to weigh fully reasonable alternatives to the proposed powerline project, and thereby failing the purpose of NEPA.

### 3. Cumulative Impacts Analysis

The EIS also defines the area in which it considers cumulative impacts for different categories is required to be considered, including cumulative impacts on vegetation. As for wetlands in particular, the EIS states that:

> The spatial boundary is the Savanna and Coulee Sections of the Driftless Area Ecoregion bounded to the north by where the Turkey and Wisconsin Rivers join the Mississippi River. **Rationale:** The direct and indirect impacts to vegetation would occur within and immediately adjacent to the proposed C-HC Project ROW. These moderate (short- and long-term) impacts could contribute to adverse cumulative vegetation and wetland impacts within these ecoregions.

FEIS Vol. III, Table 4.2-1. The same boundary and definition were used for the wildlife impacts section. *Id*. Even construed generously, therefore, the definition limits the vegetation and wildlife cumulative impacts analysis to the area south of where the Wisconsin River meets the Mississippi River.

Unfortunately, plaintiffs assert, and defendants do not dispute that, a fair portion of the proposed CHC route is north of that area. (Def.'s Resp. to Pl.'s PFOF (dkt. #119) ¶ 102-103.) While defendants argue that the agencies creating the EIS have discretion in

14

drawing such boundaries as long as a rationale is given, the stated rationale contradicts the chosen boundary. (Def.'s Opp. (dkt. #115) 20-21.) In particular, the given rationale is that "direct and indirect impacts to vegetation would occur within and immediately adjacent to the proposed [CHC] Project ROW," but the adopted boundary cuts out a swath of the CHC line's right of way. (FEIS Vol. III, Table 4.2-1.) Moreover, there is also no indication that vegetation or wildlife would *not* be impacted in the right of way north of the chosen boundary.

Regardless, "NEPA requires that an agency explain in the EIS how it chose the geographic area in which it conducted the cumulative impacts analysis and . . . demonstrate that in making such choice it considered the relevant factors." *Habitat Educ. Ctr., Inc. v. Bosworth*, 363 F. Supp. 2d 1090, 1097 (E.D. Wis. 2005). Because the EIS fails to do so, plaintiffs' claim that the EIS violates NEPA also has some likelihood of success on the merits.

## II. Likelihood of Irreparable Harm

The court next looks at whether the activities proposed, if not enjoined, will likely cause irreparable harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008). Plaintiffs have offered statements from several of their members that outline how the construction could impact their ability to live, work, and play in the Driftless Area. For instance, Dena Kurt "is concerned that clearing and maintenance of the ROW will lead to increased run-off of soil, nutrients, and pollutants into the Mississippi River, which resulting sedimentation and algal blooms that would harm the aquatic ecosystem and her enjoyment of the Mississippi River and its species." (Pl.'s PFOF (dkt. #119) ¶ 15.)

Additionally, Brian Durtschi, who owns property that will be crossed by the transmission line, is concerned that, "[g]round-clearing and ground-moving activities will likely cause significant erosion and sedimentation of the creek and its wetlands, especially due to the steep topography found on the property." (Id. at ¶ 23.)

While defendants assure the court that best construction practices and mitigation will be used, that does not change the fact that some harm will come to the environment. (Id. at ¶ 24.)  Specifically, even the first stage of construction will involve ground clearing, which in and of itself causes harms that are acknowledged in the Environmental Impact Statement, which the Corps signed.  (USACE000001.)  Even before actual construction starts, "[c]learing of vegetation as well as grading would disturb topsoil, which would result in newly exposed, disturbed soils that could be subject to accelerated soil erosion by wind and water." (FEIS Vol. II, Pg. 145.)  Additionally, "disturbance of vegetative cover could facilitate the introduction, spread and proliferation of invasive species, which in turn could alter plant community composition . . . several species of invasive plants were documented in the C-HC Project." (*Id.* at 170-171.)  And regarding animal species which live in the right of way, "[l]ong-term moderate impacts associated with clearing the ROW would include habitat loss, fragmentation, and degradation along with changes to species movement." (*Id.* at 201.)

All of the above represent real and irreparable impacts that will occur from clearing alone; actual groundbreaking will lead to even more severe consequences.  Given that the Corps signed the Record of Decision, which adopts the findings of the Environmental Impact Statement (USACE000001), defendants must acknowledge that soil, habitats, and vegetation would all be truly and concretely impacted by the intervenor-defendants

16

beginning work.

## III. Adequate Legal Remedy

Finally, the court looks to whether there exists an adequate legal remedy that would rectify such harms should they occur, such as "money damages and/or an injunction ordered at final judgment." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). According to the Seventh Circuit, "[a] harm is 'irreparable' if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Girl Scouts*, 549 F.3d at 1089 (citing Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380 (7th Cir. 1984).)

Here, the potential harm relates to the destruction of ecosystems, wetlands, and habitats, and simply awarding damages cannot repair fragile ecosystems that are harmed. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545, (1987) ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.") Accordingly, an injunction on the final merits is not likely to be sufficient to repair this kind of environmental damage once it occurs, as money cannot reverse soil erosion or reintegrate fragmented habitats. *Id*. Indeed, "[i]f [environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.* 480 U.S. 545. Courts have even found irreparable harm in less concrete situations; for instance, "courts have recognized that NEPA plaintiffs are likely to suffer irreparable harm when an agency is allowed to commit itself to a project before it has fully complied with NEPA," even if no actual construction would take place. *Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb*, 944 F. Supp. 2d 656 (E.D. Wis. 2013).

All of this suggests a strong presumption in favor of an injunction where environmental harm is likely.  As before, defendants signed off on the Environmental Impact Statement, which explicitly outlines the environmental harms that will occur from clearing activities.  (USACE000001.)  Given the presumption in favor of injunctions and the fact that defendants' own documents show a likelihood of environmental harm, this prong of the test is also satisfied.

## IV. Balancing Test

While there are several compelling interests at play in this case, the court agrees with plaintiffs that the balance of equities favors a preliminary injunction as well for at least two reasons:  (1) plaintiffs will be prejudiced without an injunction; (2) intervenor-defendants have voluntarily put the court in the position of having to decide this motion prematurely by not simply delaying plans to disturb federal jurisdictional waters a few months until the court can consider and decide the parties almost fully briefed, cross-motions on summary judgment;   and (3) intervenor-defendants demonstrated only minimal damages, if any, from the imposition of a short, preliminary injunction to disturbing jurisdictional waters.

First, plaintiffs have suggested that defendants may use this construction to tilt the scales at summary judgment.  (Pl.'s Mot. (dkt. #70) 68.)  Intervenor-defendants have been building the Iowa side of the transmission line since April of 2021, and allowing additional construction on the Wisconsin side would no doubt help the transmission companies build momentum, if not create an air of inevitability to completion of the line, even through the Upper Mississippi River National Fish and Wildlife Refuge.  (Def.'s Mot. (dkt #50) 10.)

18

Indeed, the Upper Mississippi River Refuge sits in the middle of the Iowa and Wisconsin branches that the intervenor-defendants are proceeding to clear cut and eventually construct towers and power lines despite a lack of permit for this crucial, environmentally sensitive section.  (Def.'s Resp. to Pl.'s PFOF (dkt. #119) ¶ 1.)  Moreover, plaintiffs' claims challenging construction within the Refuge remain, by far, their strongest in terms of likelihood of prevailing.

Thus, by permitting construction up to the edge of the Refuge on the Wisconsin side, just as they have already been doing on the Iowa side, the Refuge would represent only a relatively small strip of land, albeit likely the most environmentally sensitive, to complete the line.  Psychologically, if not legally, this would likely make it much harder for state or federal regulatory authorities *or* the courts to deny a right of way through the Refuge.

Second, this proposed preliminary injunction is a problem of intervenor-defendants' own making.  Early in the lawsuit, intervenor-defendants vowed to give plaintiffs at least a 30-day notice before beginning construction.  (Def.'s Mot. (dkt #50) 9.)  To their credit, this minimal notice was given, but by sticking to the very minimum notice necessary, defendants and intervenor-defendants surely were aware of what little time both plaintiffs and the court would have to take up this motion.  (Dkt. #96.)  Even more concerning is the fact that the proposed construction start date fell only 1 week before cross briefing on the parties' cross-motions for summary judgment would be completed.  Intervenor-defendants have offered little, in any, reason why they cannot wait 60 days to receive a final judgment on the merits, given that they decided to withhold notifying the court of their commitment to stick to original construction plans until the last possible moment.

This, combined with plaintiffs' likelihood of irreparable harm and success on the merits, warrants the issuance of a preliminary injunction against any steps toward construction at least on federal jurisdictional waters, including clearance activities.

Finally, while intervenor-defendants have represented that they will suffer monetary damages due to an injunction, these limited damages are unlikely to outweigh the permanent damage threatened. Notably, intervenor-defendants have voluntarily decided to refrain from any work in jurisdictional waters until November 29, 2021 as "a showing of cooperation and good faith." (Status Rep. (dkt. #152) 1.) Intervenor-defendants represent that even this limited voluntary cessation will cost $140,000 in extra construction costs. (*Id*. at 5.) Moreover, if construction were halted along the entire Wisconsin right of way, rather than just jurisdictional waters, intervenor-defendants purportedly expect that a 30-day injunction would cause $3.1 million in damages, and a 60-day injunction would cause $12.72 million in damages. (Justus Dec. (dkt. # 157) 6-7.)

While actual damages would likely be much less -- given that this court has no jurisdiction to enjoin construction outside of land on or near jurisdictional waters -- briefing on the parties cross-motions for summary judgment will be completed within one day of this opinion's issuance, and the court does not anticipate taking more than 30 to 60 days to issue a final judgment on the administrative record already before it.[8] With these facts, the damages that intervenor-defendants will incur are not so extreme that it outweighs

---

[8] Since intervenor-defendants have yet to provide any calculation of this far narrower injunction for this short period of time, the court will not require plaintiffs to post any monetary bond at this time without prejudice to intervenor-defendants supplementing the record as to that much smaller sum and renewing their request for a monetary bond.

their likelihood of success on the merits and irreparable harm, which plaintiffs have raised. Thus, the balance of equities here weighs in favor of the plaintiffs.

## ORDER

IT IS ORDERED that intervenor-defendants American Transmission Company, LLC, Dairyland Power Cooperative and ITC Midwest LLC are enjoined from any activities requiring permission under the Utility Regional General Permit until the issuance of an opinion and order on summary judgment. This includes any work impacting jurisdictional waters of the United States as defined under 33 C.F.R. § 328.3. Activities that fall under 33 C.F.R § 323.2(d)(2) are not restricted under the URGP and may proceed.

Entered this 1st day of November, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge