IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, WISCONSIN
WILDLIFE FEDERATION, and DEFENDERS OF WILDLIFE,

|                        |                     |
|------------------------|---------------------|
| Plaintiffs,            | OPINION AND ORDER   |
| v.                     | 21-cv-096-wmc   &   |
|                        | 21-cv-306,          |
|                        | Consolidated        |

RURAL UTITLITIES SERVICE,
CHRISTOPHER MCLEAN, Acting Administrator,
Rural Utilities Service,
UNITED STATES FISH AND WILDLIFE SERVICE,
CHARLES WOOLEY, Midwest Regional Director, and
SABRINA CHANDLER, Manager, Upper Mississippi River
National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL STEVEN SATTINGER, Commander
And District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL KARL JANSEN, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

Defendants,

and

AMERICAN TRANSMISSION COMPANY, LLC,
DAIRYLAND POWER COOPERATIVE, & ITC
MIDWEST LLC,

Intervenor-Defendants.

---

In this lawsuit, plaintiffs National Wildlife Refuge Association, Driftless Area Land

Conservancy, Wisconsin Wildlife Federation, and Defenders of Wildlife challenge the

actions of various federal agencies permitting the Cardinal-Hickory Creek ("CHC")

Transmission Line Project, which would run from the Hickory Creek substation west of

Dubuque, Iowa, through far Southwest Wisconsin near Cassville and the Mississippi River to Middleton in the center of Southern Wisconsin, all through what is known as "the Driftless Area."[1]  The utility companies charged with building and operating the CHC -- American Transmission Company, LLC ("ATC"), Dairyland Power Cooperative ("Dairyland") and ITC Midwest LLC ("ITC") (the "Utilities") -- later joined the suit as intervenor-defendants.  Now at the merits stage, the court finds that defendants fail to meet legal requirements for the Environmental Impact Statement, Compatibility Determination, and Land Transfer.

BACKGROUND[2]

As proposed, the CHC project would create a 345-kilovolt electricity transmission line between 100 and 125 miles long.  (ROD004933-34.)  As part of the project, a new electricity substation would also be constructed in Montfort, Wisconsin.  (*Id*.)  Intervenor-defendants Dairyland, ATC, and ITC intend to construct, own and operate the CHC line jointly.  (ROD004940.)  Several areas of the proposed CHC project cover existing rights-

---

[1] The Driftless area is a region in Iowa, Wisconsin, and Minnesota.  This region was not flattened by glaciers like many other areas of the Upper Midwest, leading to a unique geographic region with hills, bluffs and valleys.  Many species of plant and animal call this region home, such as the Timber Rattlesnake, the Northern Monkshood, and the Brook Trout.  "Defining the Driftless," https://driftlesswisconsin.com/defining-the-driftless/ (last visited December 30, 2021).

[2] Intervenor-defendants moved to strike plaintiffs' proposed findings of fact (dkt. #113) from consideration, as the parties agreed in their preliminary pretrial conference report that proposed findings would be unnecessary.  (Report (dkt. #40) 13.)  Because the court did not rely on any parties' proposed findings of fact for summary judgment, but instead relied directly on the administrative record, that motion will be denied as moot, along with plaintiffs' related motion for leave to reply (dkt. #165).

of-way owned by the Utilities and would also involve replacing or upgrading existing facilities.  (*Id.*)

Midcontinent Independent System Operator, Inc. ("MISO"), an independent not-for-profit group which manages the power grid in 15 states, worked with various state regulators and utility industry stakeholders from 2008 to 2011 to identify projects that would increase energy transmission and usage of renewable energy.  (ROD004981.)  One identified project was to connect Dubuque, Iowa, to southwest Wisconsin, which would provide cheaper wind power to Milwaukee and Chicago, as well as reduce overloaded power lines.  (ROD031340-41.)  This in turn developed into the proposed CHC transmission line project.  (ROD004981.)

Because Dairyland expressed an intent to request funding for its 9% stake in the CHC project from the U.S. Department of Agriculture Rural Utilities Service ("RUS"), that government entity led the effort to prepare an Environmental Impact Statement ("EIS") in cooperation with U.S. Fish and Wildlife Service ("Fish and Wildlife"), the U.S. Army Corps of Engineers ("Corps") and the U.S. Environmental Protection Agency ("EPA").  (ROD004941.)  The Utilities also asked (1) Fish and Wildlife for a right of way easement and special use permit to cross the Upper Mississippi River National Wildlife and Fish Refuge ("the Refuge"), and (2) the Corps for permits to build in navigable waters of the United States.  (ROD004942.)

Before granting a right of way through the Refuge, Fish and Wildlife must confirm that the proposed project comports with the purposes of the Refuge under 16 U.S.C.A. § 668dd.  Fish and Wildlife originally finalized its "Compatibility Determination for the

CHC" on December 20, 2019.  (ROD007584.)  Because the Utilities already had a prior right of way through the Refuge, where a 161 and 69kv transmission line had been previously installed (ROD17047) *and* the Utilities had agreed to transfer back that right of way (ROD007574), Fish and Wildlife found the proposed CHC line was compatible with the purposes of the Refuge as "a minor realignment of an existing right-of-way" and granted a permit to the Utilities.  (ROD007574.)

On March 1, 2021, however, the Utilities contacted Fish and Wildlife and asked for a slightly amended right of way through the Refuge, ostensibly to avoid Ho-Chunk burial grounds.  (Zoppo Decl., Ex. A (dkt. #53-1) 2-3.)  Then, before Fish and Wildlife could issue a decision on the proposed amendment, the Utilities again contacted Fish and Wildlife on July 29, 2021, this time asking for an expedited land exchange instead of an amended right of way, ostensibly because approval for a new right of way would take too long.  (Zoppo Decl. (dkt. #53-2) 1.)  Specifically, in exchange for a land exchange in the Refuge, the Utilities were now proposing to transfer a 30-acre parcel to Fish and Wildlife. (*Id.*)  On August 3, 2021, Fish and Wildlife confirmed receipt of the Utilities' latest proposal, indicating that its response to such a land exchange "may" be "favorable." (Zoppo Decl. (dkt. #53-3) 1.)

Then, on August 27, 2021, less than a month after Fish and Wildlife responded favorably to a proposed land transfer, and less than a week before summary judgment motions were due in this case, Fish and Wildlife "withdrew" its entire original Compatibility Determination, stating it "learned that an error had previously been made regarding the 2019 Compatibility Determination when identifying the existing rights-of-

way proposed for re-alignment." (Not. by Def. (dkt. #69-1) 1.)  As a result, any approved

right of way through the Refuge was rescinded, along with the compatibility determination.

(*Id.*)  However, in its letter of withdrawal to the Utilities, Fish and Wildlife did note that

the agency "is committed to working with you toward timely review of the land exchange

you have proposed in lieu of your March 2021 application for an amended right-of-way

permit . . . [and] concurs that a land exchange is a potentially favorable alternative to a

right-of-way permit." (*Id.*)

     As for the Corps' involvement, both its Rock Island and Saint Paul district offices

issued permits, as each office covers a different area of the CHC line.  (USACE000094;

USACE000679.)  Specifically, the Corps' Rock Island office is responsible for those

sections of the CHC project running through Iowa and authorized the project under

Nationwide Permit 12 ("NWP 12").  Generally, such nationwide permits ("NWPs") are

used as a means to expedite permissions to build without needing to go through the more

demanding, individual permitting process.  (USACE001200.)  Instead, proposed projects

permitted by an NWP only require that the Corps do a project-specific "verification" to

ensure that it meets the requirements of the nationwide permit.  (USACE001199.)  The

CHC was verified in November of 2019.  (USACE001199.)  However, NWP 12 was later

revoked by the Corps in part, and now only covers oil and gas pipelines, meaning that

companies building utility lines like the CHC project will need to be permitted under NWP

57.  To date, the Utilities have not yet reapplied for an NWP 57 permit.  *See* "Regulatory

Program   &   Permits,"   U.S.   Army   Corps   of   Engineers,

https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/

Nationwide-Permits/ (last visited Jan. 14, 2022).

In contrast, the Saint Paul district Corps never relied on NWP 12; instead, it issued a separate permit.  (USACE013001.)  Specifically, the Saint Paul office issued a Regional Utility General Permit ("RUGP"), which mirrors NWP 12 for the most part, while applying to operations in the Saint Paul District that includes the relevant portions of Southwest Wisconsin.  (USACE000730.)  The Corps verified the proposed CHC project under the RUGP in December of 2019 (USACE000679), which is active.  (USACE000679.)  Various other state permits have been issued for the CHC project as well, although none of those are challenged in this case.  (USACE000012.)

OPINION

## I.  Mootness

The Administrative Procedure Act ("APA") grants judicial review of agency action to persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702.  More specifically, APA § 704 provides that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  Finally, APA § 706 grants courts the power to set aside agency actions that are "arbitrary, capricious, or otherwise not in accordance with law," 5 U.S.C.§706(2)(A), while affording appropriate deference to administrative decisions.

Both governmental and intervenor-defendants argue that many of the challenged actions here are now moot.  Specifically, defendants point to the fact that the Fish and Wildlife's original Compatibility Determination and issuance of a right of way through the Refuge have been revoked, while the proposed land transfers have not yet been finalized. Yet none of these arguments hold up to scrutiny, as the specific facts of this case compel the court to rule on the challenged permits, as they are certain to have to be revisited by this court in similar form, except under even more pressing and difficult circumstances.

While this court's jurisdiction "is limited by Article III to live cases and controversies," the doctrine of mootness generally weighs against relinquishing jurisdiction. *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017).  This is particularly true when a party voluntarily ceases the disputed conduct, rather than face a lawsuit forcing the conduct to stop.  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Thus, the Supreme Court has adopted a "strict" standard in cases of voluntary cessation, as "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  *Friends of the Earth, Inc.* 528 U.S. at 189 (*citing City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  In such cases, the court may only find mootness if "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (citing *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).  This burden shifts slightly if:  (1) the party voluntarily ceasing an action is the government; *and* (2) "a government actor sincerely self-corrects the practice at issue." *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1051 (7th Cir.

2018).  In that case, "a court will give this effort weight in its mootness determination," although a case may still be "live" if it "cannot give definitive weight to the [government's] statements." *Id*.

Under the circumstances here, the court cannot help but conclude that any mootness determination would require a finding of absolute clarity that a return to a request for a right of way could not reasonably be expected, especially because the Utilities offer only 30 days' notice from its reissuance to begin building through the heart of the Refuge.  Even assuming a slightly lower standard applied because Fish and Wildlife is a governmental body -- albeit one seemingly working hand-in-glove with the Utilities up to and including suddenly withdrawing the right of way through the Refuge just weeks before plaintiffs' challenge was to become ripe for summary judgment consideration by this court -- the only other alternative is a nearly identical crossing through land transfers approved by Fish and Wildlife, which will be subject to the same or very similar challenges.  Indeed, there remains no reasonable doubt on this record that both the Utilities and Fish and Wildlife remain committed to a path through the Refuge (whether by land transfer or a reissued right of way).  Nevertheless, the court will address mootness and standing issues as to plaintiffs' principal claims in more detail before turning to the merits of those claims.

## A. Compatibility Determination

Plaintiffs' strongest claim is their challenge to the Fish and Wildlife's original Compatibility Determination, which granted the Utilities the original right of way through the Refuge.  However, defendants argue that the withdrawal of the right of way by Fish and Wildlife renders that claim moot, especially since the Utilities are now planning to

seek land transfers with Fish and Wildlife to run through the Refuge instead.  (Defs.' Mot. (dkt. #93) 45; Not. by Def. (dkt. #69-1) 1.)

As previously explained, the history of the Compatibility Determination and issuance of the original right of way is a convoluted one, with the Utilities later requesting an amended right of way and now a land transfer, then Fish and Wildlife withdrawing its determination altogether, and with it, the existing right of way.  Suspiciously, *all* of these actions took place in the months *after* this case was filed.  Moreover, in weighing the likelihood of reoccurrence against Fish and Wildlife's voluntary cessation, the court finds that a very similar compatibility determination is not only likely but nearly certain to reoccur.

In response, defendants contend that the *original* right of way permit issued in 2020 will never be reissued given the Utilities request for a planned land transfer instead of a permit.  (Defs.' Mot. (dkt. #93) 46.)  That response is thin porridge indeed.  While the Utilities have waffled between seeking another right of way or land transfers, *at no point* has Fish and Wildlife *or* the Utilities suggested that the CHC would *not* cross the Refuge, which mean the Utilities' request for another Compatibility Determination is a near certainty and its outcome is at least "potentially favorable" for the Utilities.  Indeed, the government's Final EIS itself acknowledges as much:  "[a]ll action alternatives would cross the Refuge," and the EIS did not even *consider* any routes not crossing the Refuge. (ROD004950.)   Instead, the government relied on "the Utilities' investigation and assessment of potential Mississippi River crossing locations for the proposed C-HC Project"

and accepted the Utilities' own analysis that the CHC must cross the Refuge. (ROD005006.)

Without even a cursory analysis of non-Refuge crossings beyond the Utilities' self-funded research, both defendants and intervenor-defendants have already made their choice and the CHC transmission line will, by right of way or land transfer, still cross the Refuge. In fact, the Utilities continue to clear land on both the Iowa and Wisconsin sides of the Refuge as though its crossing were inevitable. (11/1/21 Op. & Order (dkt. #16) 3.) Thus, the Utilities *must* gain access to the Refuge under either of two ways: receive a right of way through a renewed compatibility determination process or acquire a fee simple title through land transfers with Fish and Wildlife, which as discussed below raises all the same concerns as a compatibility study.

Moreover, the fact that Fish and Wildlife is now expecting to review a land transfer favorably does not mean that a renewed right of way request is in the offing, and as discussed above, a controversy is not moot unless "it is *absolutely clear* [that] the allegedly wrongful behavior could not reasonably be expected to recur," which the Supreme Court has interpreted as an extremely high bar. *Friends of the Earth, Inc.*, 528 U.S. at 189 (citing *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)) (emphasis added). For example, when the Governor of Missouri announced that the state was revoking a challenged policy about grants for religious organizations, the Supreme Court found that the State still had "not carried the 'heavy burden' of making 'absolutely clear' that it could not revert to its policy." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017). Similarly, while the Utilities may proceed by land transfer

10

through the Refuge, it is equally as likely that they will have to revert to seeking a right of way.  As such, defendants have not met the heavy burden required to moot plaintiffs' challenge to the Compatibility Determination.

If the land transfer were to fall through, the government defendants alternatively contend that the Utilities would be requesting an *amended* right of way permit, which will be different than the original request.  (Defs.' Mot. (dkt. #93) 46.)  However, an amended right of way request will not be so different as to moot plaintiffs' challenge.  Indeed, such a request would have to cover nearly the same acreage within the Refuge, something that the Utilities are all but assuring as they continue to clear the path for the CHC line up to the Refuge from both the Iowa and Wisconsin sides even as this lawsuit pends.  (Zoppo Decl., Ex. B (dkt. #53-2) 5.)

In a case involving preferential treatment for city contracts, the Supreme Court held that similar, minor changes to the repealed conduct cannot moot a case:

> There is no mere risk that [the city] will repeat its allegedly wrongful conduct; it has already done so. Nor does it matter that the new ordinance differs in certain respects from the old one. *City of Mesquite* does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect . . . The new ordinance may disadvantage [plaintiffs] to a lesser degree than the old one, but insofar as it accords preferential treatment . . . it disadvantages them in the same fundamental way.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993).  Thus, the fact that Fish and Wildlife may grant land transfers or issue a slightly amended right of way that require less acreage does not change plaintiffs' main

11

complaint that placement of the CHC line through the Refuge is not compatible with its purposes.

Finally, while intervenor-defendants assert they are acting in good faith, there is substantial, contrary evidence in this record.  As noted, the Utilities did not ask to amend their right-of-way permit until after this litigation commenced (Zoppo Decl., Ex. A (dkt. #53-1) (letter dated March 1, 2021)), and Fish and Wildlife suddenly "discovered" errors in the Compatibility Determination that warranted withdrawal, which defendants argue conveniently moots any pending challenges to a Refuge crossing, just a week before opening briefs on summary judgment were due in this case.  (Not. of Withdrawal (dkt. #69).) Shortly before this, the Utilities suggested a land transfer, which they maintain was only because it would allow construction to begin faster (Zoppo Decl., Ex. B (dkt. #53-3)), an option that Fish and Wildlife promptly indicated may be a good option (*id.*, Ex. C).

At the same time, the Utilities have continued construction on the Iowa side of the line and started construction on the Wisconsin side in October 2021, even as they maintained passage through the Refuge was uncertain, ignoring that the obvious connector between the two portions of the line under construction runs straight through the Refuge. (ROD005063.)  In particular, on August 11, 2021, the Utilities requested a stay from the court pending a possible land transfer, stating that they would not begin work in the Refuge until October 2022, while offering to give plaintiffs all of "30 days' notice" before starting actual construction in the Refuge.  (Intervenor-Defs.' Mot. (dkt. #50) 3.)   Then, on September 24, 2021, the Utilities notified the court that they would start construction in Wisconsin on October 25, 2021, leaving the Refuge and a few, federal wetlands as the only

portion of the line not under construction.  (Not. (dkt. #96) 1.)  This, despite the fact that the summary judgment motions in this case would have otherwise been due on November 1, 2021, and the Utilities still did not have a valid right of way *or* approved land transfer through the Refuge.  (Not. (dkt. #96) 1.)[3]

Given these facts, plaintiffs contend, and the court finds credible, that the Utilities are pushing forward with construction on either side of the Refuge, even without an approved path through the Refuge, in order to make any subsequent challenge to a Refuge crossing extremely prejudicial to their sunk investment, which will fall on their ratepayers regardless of completion of the CHC project, along with a guaranteed return on the Utilities' investment in the project.  Thus, if the court does not treat consideration of the essentially inevitable re-proposal for a Refuge crossing as ripe for consideration now, the Utilities will have built up to either side of the Refuge, making entry of a permanent injunction later all the more costly, not just to the Utilities and their ratepayers, but to the environment they are altering on an ongoing basis.

## B.  Land Transfer

Even if the original challenge to the Compatibility Determination were not ripe, a challenge to land transfer, as the *only* alternative for crossing the Refuge, would be.  Of course, the intervenor defendants similarly argue that the court cannot yet review the Fish

---

[3] Plaintiffs filed a preliminary injunction to halt construction, and the Utilities again emphasized at a court hearing, that they had *always* planned to begin Wisconsin construction in October 2021. (11/22/21 Hr'g Tr. (dkt. #173) 8-14.)  Construction is already underway in Iowa, with clearing occurring in Wisconsin subject to the court's preliminary injunction order protecting a few designated wetlands.  (*Id.* 9-12.)

and Wildlife's approval of land transfers, as there is no final decision or record to review. (Intervenor-Defs.' Opp'n (dkt. #112) 8.)  However, the defendants' argument is premised on the likely mistaken assumption that Fish and Wildlife may apply different decision criteria to the land transfer than the right of way, necessarily leading to the need for the creation of a new administrative record.  In fact, the proposed land exchange would very likely have to meet the same compatibility requirements of the Refuge Act, making any analysis done by Fish and Wildlife for the land exchange and the right of way practicably identical.

Thus, the possible, minor change to the proposed Refuge crossing does not constitute a sufficient change to moot the agency's original compatibility analysis, and the difference between the CHC's crossing the Refuge by right of way or fee simple title transfers are negligible where the underlying effect of allowing the crossing is the same.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993) (holding it does not "matter that the new ordinance differs in certain respects from the old one").  As such, the issue of compatibility -- whether by exchange or by right of way -- is not only ripe, but the only way to ensure an orderly review of the project under the National Environmental Protection Act ("NEPA").

Finally, the Supreme Court has held that the question of whether an agency decision is "final" depends upon "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Thus, "[t]he cases dealing with judicial review of administrative actions have interpreted the

'finality' element in a pragmatic way," with the Supreme Court finding a statement by the Federal Communications Commission as reviewable even though "the FCC regulation could properly be characterized as a statement only of its intentions." *Abbott*, 387 U.S. 136 at 149.

Even if Fish and Wildlife does not have to follow the Refuge Act's compatibility requirements for a land exchange, Fish and Wildlife's own, anticipated approval of a land exchange to proceed with a Refuge crossing *and* the hardship that a delay in consideration would cause plaintiffs compels the court to review the proposed crossing now.  Specifically, the letter from Fish and Wildlife stating its concurrence "that a land exchange is a potentially favorable alternative to a right-of-way permit," as well as its subsequent revocation of the original right of way to avoid orderly review, are statements of intent. (Notice (dkt. #69-1) 1.)  In fact, as previously discussed, Fish and Wildlife has created a situation where a land exchange or similar right of way are the only options left to defendants, making its statement of intent all but a guarantee, while they continue to attempt to evade judicial review until any route, other than through the Refuge, would be so prejudicial that a court would have little choice but to approve the crossing -- creating the very hardship that the Supreme Court warned against in *Abbot*.  If anything, both the government defendants and Utilities appear to be playing a shell game, cavalierly revoking applications for and grants of permits, all as a Refuge crossing becomes a near certainty, while telling this court that *nothing* is yet reviewable.

Defendants also fail on public policy grounds.  In *Abbott*, the Supreme Court was being asked to review a drug labeling regulation where the government similarly argued

that reviewing the regulation and halting its enforcement would be harmful to the public given the importance of proper pharmaceutical labeling. 387 U.S. 136 at 154. In rejecting this argument, the Supreme Court found that pre-enforcement review would actually speed up enforcement, as the regulation would either be fully upheld or struck down at once, despite recognizing that pharmaceutical labeling can have drastic negative effects on patient health. *Id*. Here, there is no similar, adverse public safety concern should the court act now; if anything, pre-enforcement review of the right of way or land transfer only affects the proposed crossing through the Refuge sought by the Utilities. As such, the government and Utilities have an even weaker argument for delay than in *Abbott*.

If this were simply a case of a land transfer, the court may be more inclined to wait for Fish and Wildlife's further review. Given the history of this litigation, however, common sense counsels in favor of proceeding. As previously noted, if the issuance of a right of way or land transfer is not reviewed at this stage, there is a strong possibility that the CHC line will be nearly completed in all areas except the Refuge despite its legality being in substantial question. Defendants tout the land transfer as the reason why reissuance of the right of way will not occur, but acknowledge that the contemplated land transfers are uncertain to shield a crossing through the Refuge from review.

Defendants cannot use a possible land exchange as both sword and shield in this litigation, while the public interest and plaintiffs may suffer substantial hardship by further delaying judgment day. Even without questioning the governmental defendants' or the Utilities' motives, their proposed "wait and see" method of proceeding amounts to little more than an orchestrated trainwreck at some later point in this lawsuit. *See City of Mesquite*

16

*v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 ("In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.") (citations omitted); *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 831 (7th Cir. 2017) (quoting *Friend of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.* 528 U.S. 167, 190) ("[A] case does not become moot merely because the defendants have stopped engaging in unlawful activity. '[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'"). Given all of the above factors, therefore, the court finds the Compatibility Determination ripe for review.[4]

## II. Standing

Defendants further contend that plaintiffs have no standing to bring this action. In order to establish standing, there are three requirements: "First, the plaintiff must have suffered an injury in fact . . . Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be [redressable]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted). Moreover, to

---

[4] Plaintiffs also seek to challenge the Corps' NWP 12 permit, which defendants note is no longer operational and has been replaced by NWP 57, although the Utilities have yet to submit that application. (Defs.' Mot. (dkt. #93) 35.) Here, the court must again look to likelihood of reoccurrence. The Utilities have chosen their route for the CHC line. With only slight route changes likely between NWP12 and 57, the line *will* cross navigable waters in the Refuge overseen by the Corps and any such crossing will still require the Corps' permit. Additionally, these nationwide permits are otherwise substantially similar: the biggest difference is that the NWP 12 was approved for oil, gas, and electricity lines split into 3 permits, while NWP 57 covers only electricity lines. (*Id.* at 36.) As previously discussed, defendants cannot prevent the court's review by "repealing the challenged [permit] and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662.

demonstrate associational standing to sue on behalf of its members, an organization must show: (1) its members would have standing to sue; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) its claims do not require participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). In this case, the federal defendants argue that there is no redressability or causation regarding the record of decision. (Defs.' Mot. (dkt. #93) 41.) The intervenor-defendants similarly argue that plaintiffs have failed to show an injury in fact. (Intervenor-Defs.' Opp'n (dkt. #112) 3.) For the reasons explained below, the court disagrees with both arguments.

Standing in environmental cases like this one has been thoroughly addressed in earlier cases, with the Supreme Court's opinion in *Lujan* being among the most instructive. "To survive the Secretary's summary judgment motion," in that case, "respondents had to submit affidavits or other evidence showing, through specific facts . . . that one or more of respondents' members would thereby be 'directly' affected apart from their ''special interest' in th[e] subject.'" *Lujan,* 504 U.S. at 563. For that reason, much of the analysis of standing in this case depends on the adequacy of the affidavits from plaintiffs' members. While the federal defendants do not challenge plaintiffs' injury in fact, the intervenor defendants argue that plaintiffs' purported injuries are neither "actual or imminent," nor concrete and particularized. Regarding the second and third factors, all defendants argue that plaintiffs have not met the bar because only the Rural Utility Services' ("RUS") actions could be impacted. The court addresses each factor individually.

As for the first factor of an "injury in fact," plaintiffs must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.''" *Id.* at 560. At the very least, intervenor-defendants argue that plaintiff Defenders of Wildlife ("Defenders") does not have standing. (Intervenor-Defs.' Opp'n (dkt. #112) 3.) Defenders offered affidavits from two members: Jean Luecke and Mariel Combs. In a two-page statement signed on January 20, 2021, Luecke says that she visited the Refuge twice in 2020 in lieu of her family's yearly cruise ship vacation. (Luecke Decl. (dkt. #77) ¶ 4.) Luecke also stated that she planned to go back in the summer of 2021 to do some boating. (*Id*. ¶ 7.) Meanwhile, Combs does not allege any personal interest in the Refuge specifically, instead noting that she "serve[s] as the organization's lead employee on refuge issues" and that Defenders "focus[es] on preserving biodiversity," such as that found in the Refuge. (Combs Decl. (dkt. #81) ¶¶ 2, 4.) Beyond her work on refuges nationwide, however, Combs offers nothing to suggest that she ever visited, studied, or had any interest in this specific Refuge at issue in this case.

Combs' general interest in biodiversity and refuges is insufficient to support standing with regard to the specific challenged actions in this case. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009) (plaintiff lacked standing when affiant only expressed a general desire to visit national parks, given that "[t]here may be a chance, but is hardly a likelihood, that [affiant]'s wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations"). Thus, Lueke's affidavit alone must be able to support standing for plaintiff Defenders, and while Luecke has not had extremely in-depth connections to the Refuge, she did at least discuss particular visits,

concrete plans to return to the area, and specific aesthetic concerns.  (Luecke (dkt. #77) ¶¶ 4, 7.)

In *Lujan*, the Supreme Court took issue with the fact that the two affiants for the plaintiff had only been to the relevant country once, and neither had concrete plans to return any time soon.  504 U.S. at 563.  In particular, the Supreme Court held that "past visits and 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."  *Id.* at 564 (internal citations omitted).  In *Summers,* the Supreme Court explained that "[a]ccepting an intention to visit the national forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact."  555 U.S. at 496.  As a result, the *Summers* Court found inadequate an affiant's simple statement that he had visited national forests and planned to do so again, without acknowledging that there are over 190 million acres of national forest, much of which would not be impacted by the challenged logging plan.  *Id*. at 495.  However, Luecke offers more specific interest and particularized injury in the Refuge at issue.  In particular, she described her plan to return to the Refuge "within a few months" of signing her affidavit, noticed how obtrusive the existing, smaller electrical lines crossing the Mississippi River are already, and averred that the planned expansion of those lines for the CHC project would further degrade her ability to enjoy boating in the refuge.  (Decl. of Luecke (dkt. #77) 1.)  Given that Luecke's statements would seem to substantially

assuage the concerns raised by the affidavits considered in *Lujan* and *Summers*, Defenders'

Lucke Affidavit has sufficiently shown injury in fact, if only just barely.

Moreover, even if Defenders has shaky grounds for standing, the same is not true

for the other plaintiffs.  In particular, the Supreme Court ruled in *Summers* that "[w]hile

generalized harm to the forest or the environment will not alone support standing, if that

harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that

will suffice."  555 U.S. at 494.  Plaintiffs Driftless Area Land Conservancy, Wisconsin

Wildlife Federation, and National Wildlife Refuge Association have more than met that

bar in their supporting affidavits.  For example, Kerry Beheler, a member of the Wisconsin

Wildlife Federation, worked on conservation for the Wisconsin Department of Natural

Resources and spends time birding at the Refuge.  (Beheler Decl. (dkt. # 79) 1-2.)

Members from Driftless Area Land Conservancy also own land (Anderson Decl. (dkt. #85)

2); Durtschi Decl. (dkt. #73) 2), care for sensitive habitats (Mittlestadt Decl. (dkt. # 83)

6,) and enjoy recreational activities (Morton Decl. (dkt. #75) 2) within the path of the

proposed CHC line.  And National Wildlife Refuge Association member Todd Paddington

spends a great deal of time exploring the Refuge, volunteers with organizations supporting

the Refuge, and even taught a class about the Refuge for four years.  (Paddington Decl.

(dkt. #86) 1-3.)  In fact, all three organizations have provided statements showing that

their members go above and beyond simply using the Driftless Area threatened by the

CHC line for recreational pursuits.  Given these affidavits, plaintiffs have shown a concrete,

particularized injury in fact to plaintiffs' members should the CHC transmission line be

allowed to proceed through the Driftless Area generally and the Refuge specifically.

Defendants next argue that plaintiffs fail to show causation.  (Defs.' Mot (dkt. #93) 41.)   For causation, plaintiffs must show an "injury that fairly can be traced to the challenged action of the defendant."  *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41 (1976).  Defendants' argument rests entirely on the assertion that only RUS's "Record of Decision" is ripe for review, and that decision only allows RUS to *consider* extending funding to one of the utilities.  (Defs.' Mot (dkt. #93) 41.)  Even if RUS does offer funding, which is not certain, defendants also point out that funding would only cover 9% of project costs.  (*Id*. at 42.)

Standing on its own, defendants' argument holds some weight, but it rests on a set of flawed assumptions about plaintiffs' challenges that this court has already rejected.  First, as mentioned above, Fish and Wildlife's Compatibility Determination and proposed land transfer are *not* moot, meaning much more than just the Record of Decision is at issue. Second, even if the court only reviewed the Record of Decision, that decision undergirds more than the RUS's funding decision.  Holding otherwise does not comport with a reasonable view of the administrative record.  To the contrary, in granting a preliminary injunction in this case, the court found "defendants' suggestion that the EIS is irrelevant to [other permits] because the RUS financing has yet to be approved is just silly on its face." (11/1/21 Op. & Order (dkt. #160) 11.)  In part, this conclusion relied on the heavy entanglement between the EIS and permits granted by cooperating agencies.  (*Id*.)

Regardless, looking at all of the challenged actions, including the Corps' existing issuance of permits for the Refuge crossing, plaintiffs' affidavits sufficiently show causation. Indeed, affiants amply addressed their specific, personal concerns for the Driftless Area,

Refuge, and Mississippi River, as well as the specific land and recreational opportunities threatened by the CHC project, and overturning the specific permits at issue would ameliorate at least some of plaintiffs' injuries.

Finally, as to "redressability," plaintiffs' supporting affidavits provide ample grounds to conclude that merely rerouting the CHC line outside of the Refuge will substantially address many of their concerns, as would an order requiring greater consideration by the government defendants' as to their other concerns with the proposed project.

### III. Merits

#### A.  Refuge Crossing

The Refuge crossing is at the crux of this case, as Congress has provided more protection for refuges than other areas of land.  With little in the factual record to support it, the court finds that defendants' decision to grant a right of way or land transfer to the Utilities through the Refuge would be arbitrary and capricious.

##### 1.  Compatibility Determination

Under the National Wildlife Refuge System Improvement Act of 1997 ("Refuge Act"), a "Refuge Manager will not initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife refuge, unless the Refuge Manager has determined that the use is a compatible use."  50 C.F.R. § 26.41.  Fish and Wildlife has defined a compatible use as "a wildlife-dependent recreational use, or any other use on a refuge that will not materially interfere with or detract from the fulfillment of the mission of the Service or the purposes of the refuge."  (ROD028302 (Upper

Mississippi River National Wildlife and Fish Refuge Comprehensive Conservation Plan).)

In cases involving only *maintenance* of an existing right of way, Fish and Wildlife applies a lower standard of scrutiny, basing its "analysis on the existing conditions with the use in place, not from a pre-use perspective."  50 C.F.R. § 25.21.  Fish and Wildlife regulations further state that "[m]aintenance of an existing right of way includes minor expansion or minor realignment to meet safety standards."  50 C.F.R. § 26.41(c).

With this standard in mind, intervenor-defendants make two arguments:  (1) the CHC transmission line project is a minor expansion deserving of lower scrutiny as an existing right of way; or (2) even if the CHC project were not a minor expansion, it is still compatible with the purposes of the Refuge.  (Intervenor-Defs.' Opp'n (dkt. #112) 36-37.) Neither argument is persuasive, as evidenced by the government defendants' unwillingness to join in those arguments.  *First*, the CHC project does not qualify as maintenance to an existing right of way under the National Wildlife Refuge System Improvement Act of 1997, as the project is neither "minor" nor being built "to meet safety standards."  50 C.F.R. § 26.41(c).  Intervenor-defendants contend that the CHC project is "minor" because it ultimately concerns "a relocated right-of-way that results in a disturbance of some 30 or so acres . . . in the context of a 240,000 acre Refuge."  (Intervenor-Defs.' Opp'n (dkt. #112) 37.)  However, when read in context, maintenance is defined as a "minor *realignment*."  50 C.F.R. § 26.41(c) (emphasis added).

While the CHC project may be "minor" in comparison with the entire Refuge, the CHC Transmission Line Project is hardly minor when it comes to realignment.  Instead, the new, proposed right of way or land acquisition alone would impact 39 acres of land,

with less than 9 acres overlapping with the Utilities' existing rights of way.  (ROD007577.)
Fish and Wildlife has itself stated, "[w]hen compared to the existing Stoneman right of
way, [the CHC] transmission line infrastructure within the Nelson Dewey realignment will
be significantly more visible to Refuge visitors."  (ROD007578.)  Fish and Wildlife now
also admits that it looked at the wrong easements for calculating a minor realignment,
leading to untrustworthy analysis.  (Notice (dkt. #69-1) 1.)  Tellingly, Fish and Wildlife
has also made *no* attempt to argue that the CHC project would be a minor realignment
since withdrawing its permit, making the Utilities' argument even less persuasive.  (Defs.'
Mot. (dkt. #93) 45-48.)

Finally, as noted, an explicit element of the maintenance exception to compatibility
determinations is that the minor expansion or realignment is done to "to meet safety
standards."  50 C.F.R. § 26.41(c).  There is no indication that the Utilities are building the
CHC *through the Refuge* to meet safety standards for their existing rights-of-way.  Instead,
the Utilities decided to cross the Refuge because other options were not deemed feasible.
(ROD005028.)  At this point, there is no indication that the preexisting utility lines in the
Refuge are unsafe, in need of repair, or non-functional.  This, too, shows that Fish and
Wildlife's original decision to classify the project as "maintenance" was arbitrary and
capricious.

*Second*, because the CHC project is not subject to the maintenance exception under
50 C.F.R. § 26.41(c), it must fully comply with the Refuge Act's compatibility
requirements.  Defendants' argument that the project is "fully compatible" is even weaker
than that for a maintenance exception.  Not only was the project only ever found

compatible under the maintenance exception in the first place, Fish and Wildlife later revoked even that decision.  (Notice (dkt. #69-1) 1.)  Indeed, "[i]f given a choice, the USFWS Refuge management would prefer a crossing not involving/affecting Refuge-managed lands."  (ROD005028.)  Still, for the sake of completeness, the court will briefly address the compatibility requirement outside of the maintenance exception.

A "use" is compatible if "in the sound professional judgment of the refuge manager, [it] will not materially interfere with or detract from the fulfillment of the National Wildlife Refuge System mission or the purposes of the national wildlife refuge."  (ROD028207.)  As Fish and Wildlife guidelines state, "the fact that a use will result in a tangible adverse effect, or a lingering or continuing adverse effect is not necessarily the overriding concern regarding 'materially interfere with or detract from.'"  603 FW 2.11(B)(2).  Still, "[a] determination that a use is compatible does not require the use to be allowed."  603 FW 2.15.  Most importantly, "[t]he burden of proof is on the proponent to show that they pass; not on the refuge manager to show that they surpass."  603 FW 2.11(B)(1).

The Utilities argue that the CHC project is a compatible use because it does not materially interfere with the Refuge's purposes.  Specifically, the Utilities point out that in cases about statutes with stricter wording, courts have found "the statutory term 'interfere with' . . . had to mean more than "any hindrance, delay, or obstruction."  (Intervenor-Defs.' Opp'n (dkt. #112) 35 (citing *Cascade Forest Conservancy v. Heppler*, No. 3:19-cv-00424, 2021 WL 641614 *5 (D. Or. Feb. 15, 2021)).)  However, this ignores the Utilities' burden of proof and draws the definition of compatibility too narrowly.  603 FW 2.11(B)(1).

Certainly, although a refuge manager has some deference in deciding which uses are compatible, the court is not compelled to take the agency's final word when all factual findings weigh against it.  In this way, "deference" does not become the unlimited, get-out-of-jail-free card that the Utilities seem to suggest; rather, "[i]n report language attached to the 1997 Amendments, Congress recognized the conservation groups' concern and expressed its intent not to preclude judicial review of compatibility determinations."  Cam Tredennick, *The National Wildlife System Improvement Act of 1997: Defining the National Wildlife Refuge System for the Twenty-First Century*, 12 Fordham Envtl. L.J. 41, 86 (2000).  Thus, the court will afford deference to the Refuge manager's determination here, while also reviewing the entirety of the administrative record.

Of course, the initial question is what the purpose of the Refuge is.  The intervening defendants suggest that the court look to 16 U.S.C. § 723, describing the purpose for the Upper Mississippi Refuge as providing a "refuge and breeding place for migratory birds," as well as fish, animals, and plants "to such extent as the Secretary of the Interior may by regulations prescribe."  (Intervenor-Defs.' Opp. (dkt. #112) 35.)  However, Congress also mandated that a more particular report of purpose be provided by each refuge every 15 years in a Comprehensive Conservation Plan ("CCP").  Specifically, the Refuge Act requires that "[u]pon completion of" a CCP, "the Secretary shall manage the refuge or planning unit in a manner consistent with the plan."  16 USC § 668dd(1)(E).  The CCP requirement also comports with the general purposes of the Refuge Act, which aimed to "to guide overall management and to supplement the purposes of individual refuges, responding to decades of calls for organic legislation to provide a unifying purpose for all

refuges in the system."  Tredenick, *supra*, at 77 (internal citations omitted).  Accordingly, a CCP's express "objectives are designed to help the Refuge achieve its purposes and contribute to the mission and policies of the National Wildlife Refuge System." (ROD028194.)

Given that the Refuge Act mandates a comprehensive, fully researched plan for the Refuge, looking at nothing but the enacting language for the Refuge would be unreasonably narrow.  Indeed, if the court only looked to § 723 to understand the Refuge's purposes, its manager could achieve that purpose simply by setting up an artificial lab for breeding trout and birds, which would clearly violate Congress's intent.  In addition, while a CCP provides specific guidance to the objectives of this particular Refuge, it is only prudent to also look at the overall purpose of the Refuge Act.

The National Wildlife Refuge System Improvement Act of 1997 was written by Congress to close regulatory holes that had been left by prior legislation.  Tredenick, supra, at 77.  "In 1989, wildlife refuge managers reported that ninety percent of the refuges had at least one secondary use, seventy percent of the refuges had at least seven different secondary uses, and more than thirty percent of the refuges had fourteen different uses." *Id*. at 68.  In response, Congress made several attempts to pass legislation that protected refuges and its primary and secondary uses, while also protecting hunting and fishing rights. *Id*. at 72.  After several failed attempts at legislation, "Executive Order 12,996, signed by President Clinton on March 25, 1996, provided the foundation for the 1997 Amendments.  Most importantly, it established a policy of wildlife conservation as the singular purpose of the NWRS." *Id*. at 76.  Thus, the twin policy aims of the Refuge Act were to reprioritize

wildlife conservation over secondary uses and elevate wildlife-related uses, such as hunting, fishing, photography, and birding. *Id*. For the purposes of the Refuge, therefore, the court looks to the Refuge's CCP and the overall meaning of the Refuge Act.

While plaintiffs offer many reasons why the CHC transmission line project is *incompatible* with the Refuge, the project's direct undercutting of the stated goals of the CCP is most glaring. Specifically, one of the 15-year goals in the Refuge's Comprehensive Plan was to acquire more land for the Refuge, but not land acquisition blind to all other considerations. (ROD028314.) Instead, the goal of the land acquisitions was to protect fish and wildlife by promoting habitat connectivity. (ROD028314 ("Land acquisition is a critical component of fish and wildlife conservation since it permanently protects their basic need of habitat. . . . On a narrow, linear refuge, *land acquisition is a critical component of restoring habitat connectivity* needed for the health of many species.") (emphasis added).) In earlier portions of the Plan, the Refuge Manager also discusses habitat fragmentation as a threat to the Eastern Mississauga Rattlesnake (ROD028252), various raptor species (ROD028267), and sturgeon (ROD028269).

In its compatibility analysis for the CHC, however, Fish and Wildlife acknowledges that "[n]atural forest successional processes would occur in areas adjacent to the proposed right-of-way over the next 30 to 50 years, resulting in habitat gaps and forest fragmentation." (ROD007579; ROD007580 ("Potential construction-related impacts from the project would include the loss, degradation, and/or fragmentation of breeding, rearing, foraging, and dispersal habitats").) As shown in the below map, all of the potential

CHC routes also cut directly through the *middle* of the Refuge, creating an even more serious threat of habitat fragmentation.



(ROD005063 Figure 2.3-14.)  Despite this direct contradiction, Fish and Wildlife found the CHC project would be compatible.

The CCP also notes that "there is constant pressure to the integrity of the Refuge from development that encroaches upon Refuge land via tree cutting, dumping, construction, and mowing."  (ROD028216.)  At the same time, the Compatibility Determination says that:

> The proposed Nelson Dewey realignment passes through the area where reforestation efforts have been conducted. Natural succession of trees planted by the Refuge in the proposed right-of-way would cease. Clearing and maintenance suppression of woody vegetation by the Applicants within the right-of-way

> footprint would alter the forest succession patterns permanently.

(ROD007579.)

Additionally, one of the explicit goals for the Refuge is to "maintain and improve the scenic qualities and wild character of the Upper Mississippi River Refuge." (ROD028215.)  Yet the Compatibility Determination notes, "[w]hen compared to the existing Stoneman right-of-way, transmission line infrastructure within the Nelson Dewey realignment will be significantly more visible to Refuge visitors.  Negative impacts to the visual qualities of the Refuge, when viewed from Oak Road would occur as a result of realigning the existing right-of-way."  (ROD007578.)  All of these examples undermine explicit goals set by the Refuge, and all are blatantly contradicted in the Compatibility Determination.

So how did Fish and Wildlife come to find the CHC transmission line project compatible despite these clear contradictions with the Refuge's purposes?  For all of its goals, Fish and Wildlife determined that the CHC project is still compatible because the Utilities will revegetate other areas of their previous easements in the Refuge. (ROD007581) ("The Applicants propose to mitigate adverse impacts to forest resources in the Refuge through restoration and enhancement of forest resources both within and off Refuge lands.").)  Even accepting the notion that efforts to reclaim the old transmission crossing might eventually mitigate some of the impact of now building a much larger, higher power line, and recognizing that compensatory mitigation is broadly used in environmental reviews, the Refuge Act specifically *prohibits* the use of compensatory mitigation to make a use compatible.   50 C.F.R. § 26.41(b) ("We will not allow

compensatory mitigation to make a proposed refuge use compatible . . . . If we cannot make the proposed use compatible with stipulations we cannot allow the use."). Indeed, as previously discussed, the only time compensatory mitigation can bolster compatibility by regulation is when the requested action consists of maintenance of an existing right of way. *Id*. Because Fish and Wildlife initially chose to categorize the CHC project as maintenance, its Compatibility Determination could cover many sins with compensatory mitigation. Now that Fish and Wildlife has acknowledged that the CHC project is not maintenance, however, compensatory mitigation is categorically disallowed as a reason for compatibility, taking away the one defense the Utilities had to the obvious *in*compatibility of the CHC project with the Refuge's express purposes. Given these direct contradictions, therefore, the CHC project's proposed crossing cannot be deemed compatible with the Refuge. Any Fish and Wildlife decision to the contrary would be arbitrary and capricious.

## B. Land Transfer

As discussed, the Utilities and federal defendants have recently agreed to pursue a land exchange crossing the Refuge as an alternative to a right of way. (Notice (dkt. #69-1) 1.) Implicit in this agreement is the belief that a land exchange, unlike a right of way, would not need to be compatible with the Refuge's purposes. Refuge managers are allowed to "[a]cquire lands or interests therein by exchange for acquired lands or public lands, or for interests in acquired or public lands, under [their] jurisdiction which [they] find[] to be suitable for disposition." 16 U.S.C.A. § 668dd. Defendants' position appears to be that, unlike the grant of a right of way, Fish and Wildlife's grant of a land exchange need not be compatible under the Refuge Act because that land would no longer be part of the

Refuge once deeded to the Utilities.  This argument defies both congressional intent and common sense.

To begin, Congress wrote the Refuge Act in order to curb incompatible, secondary uses within refuges.  To allow anyone to skirt that rule by simply doing a land exchange would obviously undermine the purposes of the Refuge Act.  Moreover, the specific facts of this case *strongly* suggest that the Utilities are pursuing a land exchange to evade judicial review.   As noted, the Utilities proposed their amended right of way on March 1, 2021, after plaintiff filed this case.  (Zoppo Decl., Ex. A (dkt. #53-1).)  Then, on July 29, 2021, the Utilities switched tactics and asked for a land transfer instead, writing that the right of way determination would "take too long."  (*Id.*, Ex. B (dkt. #53-2).)  Within a month of receiving that request, Fish and Wildlife next fully withdrew its Compatibility Determination, citing previously undiscovered "errors."  (Not. (dkt. #69-1) 1.)  Since that time, however, Fish and Wildlife has made no effort to argue that the CHC is, indeed, compatible with the Refuge.

This quick switch of tactics, along with Fish and Wildlife's abandonment of the compatibility argument, would certainly seem to suggest that the Utilities are pursuing the land exchange in order to avoid a compatibility analysis, which they would likely lose.  In *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,* 463 F. Supp. 3d 1011 (D. Alaska 2020), the United States District Court for the District of Alaska came to a similar conclusion with regard to an Alaskan refuge.  In that case, after finding that the proposed road was not a compatible use, the Fish and Wildlife Service instead attempted to push through a land exchange.  The Alaska court found that this switch from incompatible right of way to

land transfer was arbitrary and capricious.  *Id*. at 1022.  Here, too, an incompatible use cannot become compatible simply by converting it to a land transfer.  If the court allowed a comparable land exchange where there is no compatibility, the entire purpose of the Refuge Act would be entirely undermined, just as the Utilities appear to be attempting here, again with Fish and Wildlife's complicity.

Defendants in *Friends of Alaska* also tried to argue that they did not need to follow Title XI of the Alaska National Interest Lands Conservation Act ("ANICLA"), as the land would no longer be "federal conservation land" once transferred to the defendants.  *Friends of Alaska*, 463 F. Supp. 3d at 1025.  The court rejected this argument as well, noting that "Congress's intent was clear—it enacted Title XI as a 'single comprehensive statutory authority for the approval' . . . To make Title XI subordinate to the exchange provision in § 1302(h) would run counter to that intent."  *Id*. (citing 16 USC § 3161).  The Refuge Act mirrors much of ANICLA, and it makes sense that the policy goals of the Refuge Act should not be subordinate to an individual manager's general authority to exchange lands, however complicit he or she may be in thwarting its goals.  In *Friends of Alaska*, the court further found "under the 'well established canon of statutory interpretation,' the more specific procedural mandates of Title XI govern over the general authority provided in § 1302(h)."  *Id*. (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012)).  Thus, the holding in *Friends of Alaska* court has been characterized as "exchange agreements are not *exempt* from those procedures simply because the affected land would no longer be located within federal conservation lands."  *See* National wildlife refuge land exchanges, 2 Pub. Nat. Resources L. § 13:39 (2nd ed.) (analyzing *Friends of Alaska*).

Moreover, even if the Refuge manager only has to follow the lower bar of "suitable for disposition" suggested by defendants, they have not offered any evidence to suggest that the land is indeed suitable for disposition.  16 U.S.C.A. § 668dd.  Returning to the CCP, a goal of the Refuge is to acquire land to reintegrate habitats and bring areas of overlapping jurisdiction under the control of one agency.  (ROD028314.)  On its face, deeding a long strip of land to private utility companies that cuts through the *middle of the Refuge* for construction of a major power line would not comport with the goals of consolidating jurisdiction and reducing fragmentation.  Accordingly, a land exchange that is equally incompatible with the purposes of the Refuge as a right of way cannot be used as a method to evade Congress' mandate.

### C. Environmental Impact Statement

Plaintiffs have offered several reasons why the NEPA review in this case was insufficient.  Most compelling is the argument that RUS defined the purpose and need of the CHC project so narrowly as to define away reasonable alternatives.  As the Seventh Circuit has explained in *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997),

> When a federal agency prepares an Environmental Impact Statement (EIS), it must consider "all reasonable alternatives" in depth. 40 C.F.R. § 1502.14. No decision is more important than delimiting what these "reasonable alternatives" are. That choice, and the ensuing analysis, forms "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. To make that decision, the first thing an agency must define is the project's purpose.

*Id.* at 666.

In the final EIS here, RUS defined six, sub-purposes of the CHC project, which taken together constitute its stated purpose:

- Address reliability issues on the regional bulk transmission system and ensure a stable and continuous supply of electricity is available to be delivered where it is needed;
- Alleviate congestion that occurs in certain parts of the transmission system and thereby remove constraints that limit the delivery of power from where it is generated to where it is needed to satisfy end-user demand;
- Expand the access of the transmission system to additional resources, including lower-cost generation from a larger and more competitive market that would reduce the overall cost of delivering electricity, and renewable energy generation needed to meet state renewable portfolio standards and support the nation's changing electricity mix;
- Increase the transfer capability of the electrical system between Iowa and Wisconsin;
- Reduce the losses in transferring power and increase the efficiency of the transmission system and thereby allow electricity to be moved across the grid and delivered to end-users more cost-effectively;  and
- Respond to public policy objectives aimed at enhancing the nation's transmission system and to support the changing generation mix by gaining access to additional resources such as renewable energy or natural gas-fired generation facilities.

(ROD004984.)

"When evaluating alternatives to a proposed action, an agency must answer three questions in order. First, what is the purpose of the proposed project? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular alternative?" *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 603 F. Supp. 2d 1176, 1184 (E.D. Wis. 2009) (citing *Simmons*, 120 F.3d at 668).

While statements of purpose are meant to narrow reasonably the alternatives analyzed in the EIS to some manageable number, "[o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration." *Simmons*, 120 F.3d at 666.

Plaintiffs contend that the sub-purposes identified in the EIS, and *especially* the fourth sub-purpose, skew the results strongly in favor of a large, wired transmission line like the CHC.   (Pls.' Mot. (dkt. #71) 39.)   The court is not convinced that increasing transfer capacity between Iowa and Wisconsin alone is impermissibly narrow; however, when combined with five, other sub-purposes, the overall impact is incredibly specific, resulting in most reasonable alternatives being defined out of the EIS.

Beginning with the fourth sub-purpose in the EIS, plaintiffs argue that the requirement of increasing transfer capacity between Iowa and Wisconsin removes all non-wire alternatives, as non-wire alternatives cannot *increase* capacity.  (Pls.' Mot. (dkt. #71) 38.)   In so arguing, plaintiffs rely heavily on *Simmons*, in which the Seventh Circuit addressed a plan to provide water to two Illinois towns, with the stipulation that both towns be supplied from the same water source.  120 F.3d at 667.  The *Simmons* court found the stipulation of one water source problematic, since "supplying Marion and the Water District from two or more sources is not absurd-- which it must be to justify the Corps' failure to examine the idea at all." *Id.* at 669.  Since the EIS did not in fact consider any two-source alternatives in its analysis, the court found the one-source purpose statement unreasonable. *Id*.  Thus, while "[t]he 'purpose' of a project is a slippery concept, susceptible of no hard-and-fast definition," *Simmons* stands for the proposition that the purpose

statement should look at the general goal of an action, rather than a specific means to achieve that goal. *Id*. at 666 (*citing Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986)). Additionally, "[i]f NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives." *Id.* at 670.

Looking only at the sub-purpose of increasing the transfer capacity between Iowa and Wisconsin, it can reasonably be understood as a general goal, rather than a specific means. Although other than installation of a new power line, there would appear *no* such means unless the Utilities could increase the transfer capacity on existing lines, which the Utilities maintain is not feasible, *or* perhaps increasing transfer at off-hours and somehow economically storing it for use as needed, which seems to remain still a scientifically receding goal despite promises of breakthroughs, except for hydroelectric storage. "Energy & the Environment," EPA, https://www.epa.gov/energy/electricity-storage (last visited January 14, 2022). Further, neither of those other options appear to have been even considered by the EPA in light of the other five, narrow sub-purposes of the project. More importantly, it is hard to conceive of a goal much narrower than increasing transfer capacity between two states, since if that requirement were struck, all that would remain is a project to transfer "some amount" of energy between Iowa and Wisconsin. While this "broader purpose" would widen "the range of alternatives," *Simmons*, 120 F.3d at 666, the simple purpose of transferring energy would not meaningfully guide an alternatives analysis. Still, even considered in isolation, the fourth purpose is arguably as restrictive as the single-source requirement in *Simmons*.

Regardless, this still leaves the question of whether the requirement to meet all six, sub-purposes makes the CHC project a foregone conclusion. Although plaintiffs focus less on the other five, sub-purposes, they do also object to the entire purpose statement in the EIS as a whole. (Pls.' Mot. (dkt. #71) 39.) Having a purpose with several sub-parts is not necessarily a problem for an EIS, as long as the purpose does not become "so slender as to define competing 'reasonable alternatives' out of consideration." *Simmons*, 120 F.3d at 666; *see also Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1028 (E.D. Wis. 2009), *aff'd sub nom.* 609 F.3d 897 (7th Cir. 2010).

Taken as a whole here, in order to even be considered as an alternative in this EIS, each option would need to meet the following characteristics:

- Increase reliability in the transmission system
- Stabilize the supply of electricity
- Ensure electricity can be delivered even if power lines or generation facilities are down
- Alleviate congestion in the transmission system
- Remove limitations on delivery of power from generation facilities to locations in need of power
- Expand access to low-cost generation
- Reduce overall cost of delivering electricity
- Expand renewable energy access
- Meet state renewable portfolio standards
- Support the nation's changing electricity mix
- Carry electricity from Iowa to Wisconsin
- Increase the transfer capacity between Iowa and Wisconsin
- Reduce losses during transmission
- Increase efficiency of the transmission system
- Make energy delivery more cost-effective
- Respond to public policy objectives
- Gain access to natural gas-fired generation facilities

Any alternative which fails to achieve even one of the above goals would then be (and was) entirely written out of consideration, leaving the EIS to only consider alternatives so

substantially similar to the CHC project that any distinction would be meaningless, with the possible exception of running adjacent to the Refuge, and even that will soon be written out by the Utilities' ongoing construction of the rest of the line.

Thus, while any one sub-purpose might be sufficiently broad, having adopted so many as part of the overall purpose of the project serves to whittle away any alternatives down to the CHC project alone, especially as the Utilities sink more and more investment in preparing for a Refuge crossing from both the Iowa and Wisconsin sides, and buying or exchanging land with that same goal in mind.

The practical effect of such a specific set of sub-purpose can be seen in the EIS itself, which considered the CHC transmission line project with no other alternative outside of minor route changes.  Looking at several, non-wire alternatives favored by plaintiffs, the EIS explicitly noted that each alternative failed at least one sub-purpose of the project, which was used to justify removing the following alternatives from consideration: regional and local renewable electricity generation; energy storage; energy efficiency; demand response; and lower-voltage transmission lines.  (ROD005032.)[5]  Whether any of those potential alternatives would actually be better than the CHC project after full analysis is immaterial; the "error is in accepting [these narrowing] parameter[s] as a given." *Simmons*, 120 F.3d at 667.

Perhaps unsurprisingly, the EIS actually adopts one of the three utilities' (MISO's) stated purpose for the CHC project almost verbatim.  (ROD031341.)  The Seventh Circuit

---

[5] In addition, an underground transmission line alternative that the EIS concedes would meet the purpose was discarded before a full analysis because it would not be economically feasible, apparently even just in crossing the Refuge.  (ROD005032.)

has specifically cautioned against adopting a beneficiary's purpose, finding instead that agencies have "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons*, 120 F.3d at 669 (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 209 (D.C. Cir. 1991) (Buckley, J., dissenting)).  Specifically, after considering an agency's statement in *Simmons* that it "must accept [a city's] definition," "[s]ince [it] is the proposer and will construct the project," the Seventh Circuit bluntly stated that "[t]his is a losing position in the Seventh Circuit." *Id*.  MISO may have its own reasons for proposing the CHC project as it did, but "[t]he public interest in the environment cannot be limited by private agreements." *Id*. at 670.  Given the complexity and depth of the chosen purpose, it also seems unlikely that RUS would have independently come up with such a narrow set of sub-purposes without mirroring MISO's.  Because RUS adopted MISO's convoluted purpose statement, which then drastically narrowed the alternatives reviewed in the EIS, that purpose statement fails to comply with NEPA.[6]

### D. RUGP

Finally, plaintiffs challenge the Corps' verification of the project under the RUGP permit.[7]  Plaintiffs' main challenge to the RUGP is that it did not properly assess

---

[6] The obvious result of the EIS' failure is that Dairyland cannot seek funding from the RUS until the EIS is revisited.  However, plaintiffs have not explained to what, if any, relief they are entitled beyond this consequence.

[7] Plaintiffs also argue that nationwide permits as a whole are non-compliant with the Clean Water Act; however, plaintiffs themselves acknowledge that argument has been discredited by the Fourth, Tenth, and D.C. Circuits.  *See Ohio Valley Env't Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005); *Bostick*, 787 F.3d at 1060 (10th Cir. 2015); *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31,

cumulative impacts. (Pls.' Mot. (dkt. # 70) 69.) With virtually no briefing on the RUGP, the court found at preliminary injunction that, "without *any* apparent analysis of the projects proceeding under the general RUGP, the Corps appears to have no basis on which it could have found harms are no more than minimal." (11/1/21 Op. & Order (dkt. #160) 8.) Now, having the benefit of further briefing, it is evident that the Corps' project-specific verification need not contain much analysis to be considered adequate. In *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043 (10th Cir. 2015), the Tenth Circuit considered a similar challenge to an RUPG permit, but held:

> The record shows three facts:
> 1. District engineers prepared verification memoranda that describe the Corps' analysis of pipeline impacts, impose special conditions to ensure minimal impacts, and conclude that the pipeline (with proposed mitigation) would "result in no more than minimal individual and cumulative adverse environmental effects...."
> 2. The verification letters state that district engineers analyzed "[a]ll proposed crossings" of the pipeline "relative to the definition of single and complete project for linear projects."
> 3. Corps officials from separate districts communicated about the pipeline's verification to ensure that officials had necessary information and had fully considered the pipeline's collective impact.
> Based on the combination of these three facts, we can reasonably discern that the agency analyzed the cumulative impacts of the proposed crossings.

*Id.* at 1061. The Tenth Circuit further found that those factors alone were sufficient to uphold a cumulative impact analysis, even though the analysis in the project-specific

---

39 (D.C. Cir. 2015). Although the Seventh Circuit has not explicitly ruled on this issue, plaintiffs have offered no good grounds to go against the decisions of these other circuits, nor offered any persuasive counter authority.

verification letter was surface level, because "the engineers need not include a written analysis of cumulative impacts within the verification letters." *Id*. at 1060.

In the case at hand, those same, three facts are present in the record. The Corps prepared a verification memorandum that imposed conditions on the project and purported to assess the cumulative impact of proposed crossings after communicating with the separate districts about the proposed CHC transmission line. (USACE 000679); (USACE000686.) Plus, plaintiff offers no case law to suggest that anything more is needed at the project-specific, verification level. To the contrary, the Ninth Circuit held similarly that the project-specific verification does not need fulsome analysis. *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers*, 683 F.3d 1155 (9th Cir. 2012). Specifically, the court noted that, "a permittee is usually not required to notify the Corps in the first place that it is proceeding under a nationwide permit. . . . And even where pre-construction notification is required, a permittee is not required in most cases to supply the Corps with information about how the project will satisfy each general condition." *Id*. at 1163-64. Such lax notification requirements show that the Corps never intended to have project-specific verifications go through in-depth analysis. Rather, the court held that: "[t]he nationwide permit system is designed to streamline the permitting process. We decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have." *Id*. at 1164.

The Ninth Circuit also explained that "the Corps ordinarily confined its environmental assessments to impacts from the activities authorized under the nationwide permit (construction, maintenance, and repair of utility lines), rather than the eventual

operation of these utility lines," meaning that risks involved with the actual operation of the CHC "would not have alerted the Corps to an obvious deficiency in its environmental assessment. *Id*. at 1050. Thus, with limited scope, limited information, and limited requirements, the Corps did not need to flesh out its entire analysis for why the CHC project complies with the RUGP permit at issue, and the RUGP is, in fact, compliant with the requirements of NEPA.

## IV.  Next Steps

In light of these rulings, the court invites the parties to brief what additional relief, if any, may be appropriate, including suggested language to be included in a final judgment. Those submissions will be due on or before January 24, 2022.

ORDER

IT IS ORDERED that:

1) Intervenor-defendants' motions to strike plaintiffs' proposed findings of fact (dkt. #113), motion to stay (dkt. #49) and motion to strike or disregard the exhibits of Rachel Granneman (dkt. #117) are DENIED AS MOOT.

2) Plaintiffs' motion for leave to Reply (dkt. #165) is DENIED AS MOOT.

3) Plaintiffs' motion for summary judgment (dkt. #70), defendants' motion for summary judgment (dkt. #88), and intervenor-defendants' motion for summary judgment (dkt. #92) are GRANTED IN PART AND DENIED IN PART consistent with the above opinion.

4) The court DECLARES that the compatibility determination precludes the CCH transmission line from crossing the refuge by right of way or land transfer.

5) The parties' submissions on additional relief and proposed language for a final judgment are due on or before January 24, 2022.

Entered this 14th day of January, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge