# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

NATIONAL WILDLIFE REFUGE ASSOCIATION, et al.,

       Plaintiffs,

     v.

RURAL UTILITIES SERVICE, et al.,

       Federal Defendants,

AMERICAN TRANSMISSION COMPANY, LLC, et al.,

       Intervenor-Defendants.

_____

NATIONAL WILDLIFE REFUGE ASSOCIATION, et al.,

       Plaintiffs,

     v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

       Federal Defendants,

AMERICAN TRANSMISSION COMPANY, LLC, et al.,

       Intervenor-Defendants.

No. 3:21-cv-00096-wmc

Consolidated with No. 3:21-cv-000306-wmc

## CO-OWNERS' BRIEF ON REMEDY AND BRIEF IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

I.  THE COURT SHOULD (AT MOST) REMAND THE ROD, BUT SHOULD NOT
    VACATE THE ROD OR COMPATIBILITY DETERMINATION. ........................................4

II. THE COURT SHOULD NOT ENTER ANY INJUNCTIVE RELIEF. ....................................7

    A.  The Court cannot issue the injunctive relief requested in the Complaint. .....................9

        1.  The Court cannot grant any effectual injunctive relief concerning the
            withdrawn Compatibility Determination and ROW permit...............................9

        2.  With respect to RUS's financing decision and the proposed land
            exchange, there is no final agency action to enjoin. .........................................10

        3.  As this Court has previously acknowledged, the Court lacks jurisdiction
            to enjoin the Co-owners from building along the entire Project route.............11

    B.  Under the four-factor test set forth in *Monsanto*, Plaintiffs cannot show that
        they are entitled to injunctive relief that would prohibit Project construction
        either within the Refuge or along the entire Project route. ..........................................14

        1.  Plaintiffs cannot establish irreparable injury based on decisions
            authorizing work within the Refuge that have been withdrawn by the
            agencies and held invalid by the Court, or activity outside the Refuge
            pursuant to permits that the Court has upheld as lawful. ...................................15

        2.  The balance of hardships weighs against injunctive relief, since *any*
            injunction would likely delay the in-service date for the Project beyond
            December 2023, causing millions of dollars of additional construction
            costs and deny ATC a profit on its investment. ................................................19

        3.  Any injunction would severely harm the public interest by increasing
            energy costs, undermining grid reliability, and harming renewable
            generators in the upper Midwest that are conditioned on the Project. ..............23

    C.  The Court should dissolve the preliminary injunction..................................................29

III. THE COURT SHOULD STAY ITS JUDGMENT PENDING APPEAL. .............................29

    A.  The Co-owners have a high likelihood of success on appeal. ......................................33

        1.  The Court's decision to preemptively rule on a land exchange that has
            not even occurred is inconsistent with the APA's command that only
            final agency actions are subject to judicial review. .........................................33

        2.  Even if the Court had jurisdiction to preemptively review the land
            exchange, it wrongly concluded that such exchanges must be supported
            by a compatibility determination. .....................................................................37

        3.  The Court erred in concluding that the EIS's purpose and need statement
            does not satisfy NEPA. .....................................................................................38

4. The Court's analysis of whether FWS complied with the Refuge Act is inconsistent with the statute and fails to afford the Refuge Manager the deference to which she is entitled under the law. ..............................................42

    a. The Court erred in finding that FWS's conclusion that the Project was compatible with Refuge purposes is "arbitrary and capricious." ........................................................................................43

    b. The Court erred in concluding that the Project fails to qualify for a regulatory provision that controls minor realignment of an existing ROW..................................................................................48

    c. The Court erred when it looked to the Comprehensive Conservation Plan to determine "the major purpose for which the Refuge was established." ....................................................................50

B. A stay will not irreparably harm the Plaintiffs.................................................51

C. A stay will avoid irreparable harm to the Co-owners. ...................................52

D. A stay is in the public interest........................................................................53

E. In the alternative, the Court should grant an administrative stay of 21 days to allow the Co-owners to seek a stay from the Seventh Circuit. ....................................53

IV. THE COURT'S FINAL JUDGMENT SHOULD ENTER DECLARATORY JUDGMENT AND REMAND THE ROD WITHOUT VACATUR OR INJUNCTIVE RELIEF ..............................................................................................................54

# **TABLE OF AUTHORITIES**

**Page(s)**

<small>CASES</small>

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ...................................................................................................35

*Am. Wild Horse Preservation Campaign v. Salazar*,
  800 F. Supp. 2d 270 (D.D.C. 2011) ..............................................................................6

*Ameritech Corp. v. Int'l Broth. of Elec. Workers, Local 21*,
  543 F.3d 414 (7th Cir. 2008) .........................................................................................4

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987) ...........................................................................................14, 20

*Animal Lovers Volunteer Ass'n, v. Cheney*,
  795 F. Supp. 994 (C.D. Cal. 1992) ..............................................................................48

*Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*,
  599 F.2d 1333 (5th Cir. 1979) .....................................................................................12

*Audubon Soc'y of Portland v. Zinke*,
  No. 17-cv-00069, 2019 WL 8371180 (D. Or. Nov. 18, 2019), *appeals filed sub
  nom. Audubon Soc'y of Portland v. Bernhardt*, No. 20-35513 (9th Cir. June 8,
  2020) and *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, No. 20-35515
  (9th Cir. June 8, 2020) .................................................................................................47

*Backcountry Against Dumps v. Chu*,
  215 F. Supp. 3d 966 (S.D. Cal. 2015) ..........................................................................41

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................10, 33, 34

*Bouas v. Harley-Davidson Motor Co. Grp., LLC*,
  No. 3:19-CV-1367, 2020 WL 2334336 (S.D. Ill. May 11, 2020) ...............................54

*Califano v. Sanders*,
  430 U.S. 99 (1977) .......................................................................................................10

*Cascade Forest Conservancy v. Heppler*,
  No. 19-cv-00424, 2021 WL 641614 (D. Or. Feb. 15, 2021) .......................................45

*Chihuahuan Grasslands All. v. Kempthorne*,
  545 F.3d 884 (10th Cir. 2008) .......................................................................................6

*Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency*,
    259 F. Supp. 2d 9 (D.D.C. 2003), *aff'd*, 102 Fed. App'x 167 (D.C. Cir. 2004) ...................... 12, 13

*Citizens for Appropriate Rural Roads v. Foxx*,
    815 F.3d 1068 (7th Cir. 2016) ...................................................................................... 33

*Clinton v. Jones*,
    520 U.S. 681 (1997) ...................................................................................................... 53

*Colo. River Indian Tribes v. Dep't of the Interior*,
    No. CV14-02504, 2015 WL 12661945 (C.D. Cal. Jun. 11, 2015) ................................ 28

*Columbia Broadcasting System v. United States*,
    316 U.S. 407 (1942) ................................................................................................. 35, 36

*Comm. on the Judiciary v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ...................................................................................... 16

*Common Cause Ind. v. Lawson*,
    978 F.3d 1036 (7th Cir. 2020) ...................................................................................... 32

*Conservation L. Fund. v. U.S. Army Corps of Eng'rs*,
    457 F. Supp. 3d 33 (D. N.H. 2019) ............................................................................... 15

*Cronin v. U.S. Dep't of Agric.*,
    919 F.2d 439 (7th Cir. 1990) ......................................................................................... 31

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*,
    894 F.3d 1005 (9th Cir. 2018) ......................................................................................... 5

*Del. Audubon Soc. v. Salazar*,
    829 F. Supp. 2d 273 (D. Del. 2011) ............................................................................... 47

*Dhakal v. Sessions*,
    895 F.3d 532 (7th Cir. 2018) ......................................................................................... 34

*Driftless Area Land Conservancy v. Valcq*,
    16 F.4th 508 (7th Cir. 2021) ......................................................................................... 41

*E. Band of Cherokee Indians v. U.S. Dep't of the Interior*,
    No. CV 20-757, 2020 WL 2079443 (D.D.C. Apr. 30, 2020) ....................................... 15

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) .................................................................................... 15, 20

*Env't L. & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*,
    470 F.3d 676 (7th Cir. 2006) .................................................................................... 39, 40

*Env't Rts. Coal., Inc. v. Austin*,
    780 F. Supp. 584 (S.D. Ind. 1991) ............................................................................... 12

iv

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ........................................................................ 15

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ..................................................................................... 31

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..................................................................................... 36

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
463 F. Supp. 3d 1011 (D. Alaska 2020), *appeals filed*, Nos. 20-35721 (9th Cir.
Aug. 14, 2020), 20-35727, 20-35728 (9th Cir. Aug. 17, 2020) (oral argument held
August 4, 2021) ............................................................................................ 38

*Greene v. Teslik*,
No. 18-cv-116, 2021 WL 1820788 (W.D. Wis. May 6, 2021), *appeal filed* (7th Cir.
June 22, 2021) ................................................................................................ 9

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) ...................................................................... 22

*Hell's Canyon All. v. U.S. Forest Serv.*,
227 F.3d 1170 (9th Cir. 2000) .................................................................... 44

*Highway J. Citizens Grp. v. Mineta*,
349 F.3d 938 (7th Cir. 2003) ............................................................... 31, 47

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
722 F.3d 1053 (7th Cir. 2013) .................................................................... 41

*Ill. Com. Comm'n v. FERC*,
721 F.3d 764 (7th Cir. 2013) ................................................................ 32, 41

*In re A & F Enters., Inc. II*,
742 F.3d 763 (7th Cir. 2014) ...................................................................... 32

*In re Forty–Eight Insulations, Inc.*,
115 F.3d 1294 (7th Cir.1997) ..................................................................... 32

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
325 F.3d 851 (7th Cir. 2003) ...................................................................... 47

*Johnson v. U.S. Office of Personnel Mgmt.*,
783 F.3d 655 (7th Cir. 2015) ........................................................................ 4

*Kent v. Vilsack*,
No. 3:21-CV-540, 2021 WL 6139523 (S.D. Ill. Nov. 10, 2021) ................ 54

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*,
No. LA CV11-04466, 2011 WL 13130485 (C.D. Cal. Aug. 11, 2011).........................28

*LAJIM, LLC v. Gen. Elec. Co.*,
917 F.3d 933 (7th Cir. 2019) .................................................................................8, 14

*League of Wilderness Def./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ...........................................................................................23

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v. Smith*,
No. CV-04-1595, 2006 WL 3692535 (D. Or. Mar. 16, 2007).......................................6

*Lewis v. Casey*,
518 U.S. 343 (1996).........................................................................................................8

*Menominee Indian Tribe of Wis. v. Env't Prot. Agency*,
947 F.3d 1065 (7th Cir. 2020) .....................................................................................34

*Michigan v. U.S. Army Corps of Engineers*,
667 F.3d 765 (7th Cir. 2011) ...................................................................................14, 20

*Monsanto Co. v. Geerston Seed Farms*,
561 U.S. 139 (2010).................................................................................................passim

*Munson v. Butler*,
776 F. App'x 339 (7th Cir. 2019) ...............................................................................53

*N. Cheyenne Tribe v. Norton*,
503 F.3d 836 (9th Cir. 2007) .........................................................................................8

*Nat'l Parks Conservation Ass'n v. Jewell*,
965 F. Supp. 2d 67 (D.D.C. 2013) ...........................................................................44

*Nelson v. Miller*,
570 F.3d 868 (7th Cir. 2009), *abrogated on other grounds as recognized in Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019) ....................................................................9

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................................32

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)..........................................................................................................32

*Or. Wild v. U.S. Forest Serv.*,
193 F. Supp. 3d 1156 (D. Or. 2016) ........................................................................45, 48

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
845 F. Supp. 2d 1102 (S.D. Cal.), *aff'd*, 473 F. App'x 790 (9th Cir. 2012).................41

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
No. 11-cv-00093, 2011 WL 13356151 (S.D. Cal. Sept. 15, 2011) ................................... 28

*Protect Our Parks, Inc. v. Buttigieg*,
10 F.4th 758 (7th Cir. 2021) ............................................................................... 2, 39

*Reed v. Antwerp*,
No. 4:09CV3096, 2009 WL 2824771 (D. Ne. Aug. 28, 2009) .............................. 20, 25

*Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*,
627 F.2d 44 (7th Cir. 1980) ..................................................................................... 15

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) .............................................................................. 20, 23

*Sauk Prairie Conservation All. v. U.S. Dep't of the Interior*,
944 F.3d 664 (7th Cir. 2019), *cert. denied sub nom. Sauk Prairie Conservation All.*
*v. Dep't of the Interior*, 140 S. Ct. 2764 (2020) .................................................... 49

*Save the Bay, Inc. v. U.S. Army Corps of Eng'rs*,
610 F.2d 322 (5th Cir. 1980) .................................................................................. 12

*Sequoia Forestkeeper and Earth Island Inst. v. U.S. Forest Serv.*,
No. CV-F-07-1690, 2008 WL 5054100 (E.D. Cal. Nov. 19, 2008) ............................ 6

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
992 F.3d 1071 (D.C. Cir. 2021) ............................................................................... 4

*Sierra Club v. Hickel*,
467 F.2d 1048 (6th Cir. 1972) ............................................................................... 37

*Sierra Club v. Marita*,
46 F.3d 606 (7th Cir. 1995) .................................................................................. 47

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015) ................................................................................. 12

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ........................................................................... 13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
No. 2:20-cv-00396, 2020 WL 7389744 (D. Me. Dec. 16, 2020), *aff'd* 997 F.3d 395
(1st Cir. 2021) ....................................................................................................... 20

*Sierra Club v. U.S. Dep't of Agric.*,
841 F. Supp. 2d 349 (D.D.C. 2012) ....................................................................... 12

*Sierra Club v. U.S. Dep't of Energy*,
825 F. Supp. 2d 142 (D.D.C. 2011) ..................................................................... 8, 17

*Simmons v. U.S. Army Corps of Eng'rs*,
   120 F.3d 664 (7th Cir. 1997) ...........................................................2, 39, 40

*Smith v. Pollard*,
   No. 16-cv-10, 2016 WL 5922320 (W.D. Wis. Oct. 11, 2016)...................8, 17

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*,
   683 F.3d 1155 (9th Cir. 2012) ..............................................................49

*SPRAWLDEF v. Fed. Emergency Mgmt. Agency*,
   717 F. App'x 733 (9th Cir. 2018) ..........................................................17

*Stevens Cnty. v. U.S. Dep't of the Interior*,
   507 F. Supp. 2d 1127 (E.D. Wash. 2007) ...............................................48

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..............................................................................15

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
   913 F. Supp. 2d 1087 (D. Colo. 2012*), aff'd sub nom. WildEarth Guardians*, 784
   F.3d 677 (10th Cir. 2015) ......................................................................37

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016).............................................................................33

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
   513 U.S. 18 (1994)...................................................................................5

*United States v. Chemical Found.*,
   272 U.S. 1 (1926)...................................................................................16

*W. Watersheds Project v. Salazar*,
   692 F.3d 921 (9th Cir. 2012) .............................................................20, 27

*W. Watersheds Project v. Salazar*,
   No. CV 11-00492, 2011 WL 13124018 (C.D. Cal. Aug. 10, 2011)............23

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)...................................................................................8

*Weiss v. Kempthorne*,
   580 F. Supp. 2d 184 (D.D.C. 2008) .......................................................12

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
   784 F.3d 677 (10th Cir. 2015) ...............................................................37

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................................7, 15, 23

*Woida v. United States,*
446 F. Supp. 1377 (D. Minn. 1978) .................................................. 25

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
165 F.3d 43 (D.C. Cir. 1999) ............................................................ 7

**STATUTES**

5 U.S.C. § 551 *et seq.* .......................................................... passim

5 U.S.C. § 702 ............................................................................ 5

5 U.S.C. § 704 .......................................................................... 10

5 U.S.C. § 706 ..................................................................... 36, 42

16 U.S.C. § 668dd(b) ........................................................... 36, 37

16 U.S.C. § 668dd(d)(1) ....................................................... passim

16 U.S.C. § 668dd(d)(3)(A)(i) .................................................. 43

16 U.S.C. § 668dd *et seq.* ..................................................... passim

16 U.S.C. § 668ee(1) ............................................................ passim

16 U.S.C. § 668ee(10) ..................................................... 43, 50, 51

16 U.S.C. § 723 ........................................................................ 50

16 U.S.C. § 724(b)(1) ............................................................... 51

16 U.S.C. § 731 ........................................................................ 51

16 U.S.C. § 3192 ...................................................................... 38

28 U.S.C. § 1331 ...................................................................... 10

42 U.S.C. § 4321 *et seq.* ...................................................... passim

**REGULATIONS**

50 C.F.R. § 25.21(h) ................................................................ 49

50 C.F.R. § 26.41(c) ........................................................... 44, 48

50 C.F.R. § 29.21.1–8 .............................................................. 44

U.S. Department of Energy Notice of Intent, "Building a Better Grid Initiative to
   Upgrade and Expand the Nation's Electric Transmission Grid to Support
   Resilience, Reliability, and Decarbonization" (Jan. 11, 2022),
   https://www.energy.gov/sites/default/files/2022-
   01/Transmission%20NOI%20final%20for%20web_1.pdf.................................................24, 25, 27

**OTHER AUTHORITIES**

120 Cong. Rec. 36355 (1974) .............................................................................................37

H.R. Rep. No. 94-1656, 94th Cong., 2d Sess. 1976, 1976 U.S.C.C.A.N. 6121 ....................................5

U.S. Fish & Wildlife Service, 342 FW 5, Non-Purchase Acquisition (Jun. 21, 1994)
   (as amended Apr. 14, 2008), https://www.fws.gov/policy/342fw5.html.......................................36

Pursuant to the Opinion and Order this Court issued on January 14, 2022 (ECF No. 175) ("Order"), American Transmission Company LLC by its corporate manager ATC Management Inc., ITC Midwest LLC, and Dairyland Power Cooperative (collectively, the "Co-owners") submit this brief to address "what additional relief, if any, may be appropriate, including suggested language to be included in a final judgment." Order at 44.

In the Order, the Court granted summary judgment in favor of the Plaintiffs on their claims against the U.S. Fish and Wildlife Service ("FWS") and the Rural Utilities Service ("RUS"), but in favor of the Federal Defendants and the Co-owners on Plaintiffs' claims against the U.S. Army Corps of Engineers ("Corps"). Specifically, the Court found that:

1. It was arbitrary and capricious for FWS to issue a Compatibility Determination and right-of-way permit ("ROW") authorizing the Cardinal-Hickory Creek 345-kilovolt Transmission Line Project ("Project") to cross the Upper Mississippi National Wildlife and Fish Refuge ("the Refuge"), Order at 23–32;

2. FWS cannot authorize the Project's crossing through the Refuge through a land exchange—even though FWS has not acted on the Co-owners' application for a land exchange, Order at 32–35;

3. The "purpose and need" statement in the final environmental impact statement ("EIS") that RUS prepared for the Project does not comply with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), Order, at 35–41; and

4. The Corps' Utility Regional General Permit ("URGP") and Nationwide Permit 12 ("NWP 12"), and the verifications issued thereunder, comply with NEPA, Order at 41–44.

While the Co-owners agree with the Court's holding on Plaintiffs' claims against the Corps, the Co-owners strongly disagree with the Court's ruling on Plaintiffs' claims against FWS and RUS. The Court acted in excess of its jurisdiction by passing judgment on a land exchange that FWS *has not even authorized*, violating the black letter, well-established principle of the Administrative Procedure Act that federal courts only have authority to review *final* agency actions. In deciding that FWS's decision to issue the Compatibility Determination was arbitrary and capricious, the Court also unlawfully substituted its own judgment for that of FWS and fundamentally misapplied the National Wildlife

1

Refuge System Act, 16 U.S.C. § 668dd *et seq*. ("Refuge Act"). Finally, the Court's holding that the EIS's "purpose and need" statement was too narrow lacks support in fact and law: it relies on a single, 25-year old decision, *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997), that is inapposite here; ignores decades of subsequent precedent from the Seventh Circuit and elsewhere—including *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021)—holding that federal agencies *can* accord substantial weight to the applicant's preferences and goals; ignores the important role and expertise that the Midcontinent Independent System Operator, Inc. ("MISO") brought to bear when MISO designed the Project as a critical component of the regional transmission system, and that the Public Service Commission of Wisconsin ("PSCW") and the Iowa Utilities Board exercised when they approved it; and ignores the EIS's well-supported conclusion that there simply are *no other feasible alternatives* that can achieve the important economic, reliability, and public policy objectives that this Project was designed to achieve.

Given the flaws in the Order, this brief should not be construed as a concession that Plaintiffs are entitled to *any* relief. The Co-owners reserve their right to appeal the Order and whatever final judgment the Court issues, as the Co-owners disagree with most of the Court's rulings on the merits of Plaintiffs' claims and dispute that Plaintiffs are entitled to any relief. With that caveat, the Co-owners' position on the appropriate remedy is as follows:

*First*, the Court should at most remand the Record of Decision ("ROD"), but should not vacate the ROD or the Compatibility Determination. The ROD does not authorize the construction or operation of the Project, but rather, reflects the conclusion of the NEPA process for the Project and enables the Federal Defendants to authorize other, future actions, including the Project's crossing of the Refuge and RUS's potential grant of financial assistance to Dairyland. However, FWS has revoked the Compatibility Determination and ROW permit for the Project, mooting the Plaintiffs' claims against

those authorizations and leaving the Court with no agency action to vacate.[1] Similarly, FWS has not yet acted on the Co-owners' application for a land exchange and Dairyland will not apply for financial assistance from RUS (if it does at all) until 2023. With respect to the land exchange and application for financial assistance from RUS, there simply is no final agency action for the Court to vacate.

*Second*, the Court should not grant any injunctive relief against the Federal Defendants. The Court rejected Plaintiffs' claims against the Corps (concerning NWP 12 and the URGP), which means they could only possibly obtain injunctive relief on their claims against FWS (related to the Refuge crossing) and RUS (related to the EIS's compliance with NEPA). But again, an injunction is unnecessary for the rescinded Compatibility Determination and ROW, FWS has not yet acted on the proposed land exchange, and Dairyland has not yet applied for funding from RUS. The Court has no jurisdiction to entertain challenges to, let alone enjoin, agency actions that have not yet occurred.

*Third*, the Court should not issue any injunction prohibiting construction of the Project, either within the Refuge or along the remainder of the Project route outside the Refuge. Plaintiffs did not request an injunction halting Project construction in its entirety and, as the Court previously acknowledged, it lacks jurisdiction to enjoin construction along most of the line. *See* ECF No. 160, at 5–6. Indeed, the limited federal approvals the Co-owners obtained to construct the Project are insufficient to federalize the entire Project. Moreover, Plaintiffs have failed to show that they are entitled to such broad injunctive relief under *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139 (2010): they have no record upon which they can demonstrate irreparable harm, the balance of hardships weigh in favor of the Co-owners, and any injunction will likely delay the Project's in-service date and manifold economic, environmental, and reliability benefits, which is contrary to the public interest.

---

1 Although the Co-owners filed an administrative appeal of FWS's decision to revoke the Compatibility Determination and ROW authorization, they have since withdrawn that appeal.

*Fourth*, the Court should dissolve the preliminary injunction it issued in November 2021. *See* ECF No. 160. The Court issued that injunction based on the Plaintiffs' claims against the Corps related to the URGP and the verifications issued thereunder. Now that the Court has ruled in the Federal Defendants' and Co-owners' favor on those claims, it should dissolve the preliminary injunction (to the extent it remains in place).

*Finally*, whatever remedy the Court orders, the Co-owners move the Court to stay its final judgment pending appeal or, at a minimum, issue an administrative stay for a defined period of time following entry of the judgment (e.g., 21 days) so that the Co-owners may seek relief pending appeal with the Seventh Circuit. The Co-owners have a high likelihood of success on appeal and will suffer irreparable injury without a stay, while Plaintiffs will not suffer substantial injury if a stay issues. Moreover, staying the Court's final judgment will clearly benefit the public interest, which favors the delivery of low-cost, reliable, and renewable energy to consumers in Wisconsin and neighboring states.

## I.    THE COURT SHOULD (AT MOST) REMAND THE ROD, BUT SHOULD NOT VACATE THE ROD OR COMPATIBILITY DETERMINATION.

This Court should, at most, remand the ROD to the agency for further analysis consistent with its opinion, but should not vacate the ROD. *Johnson v. U.S. Office of Personnel Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015) ("Although vacatur is the presumptive remedy for a violation of the Administrative Procedure Act, courts have discretion to craft other remedies."); *see also Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021) (remanding without vacatur FWS's incidental take statement and FERC order because agencies might reach the same result after redressing deficiencies, and vacatur would lead to disruptive consequences). Indeed, since vacatur is fundamentally an equitable remedy, *Ameritech Corp. v. Int'l Broth. of Elec. Workers, Local 21*, 543

F.3d 414, 419 (7th Cir. 2008), a weighing of the equities is proper. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994).[2]

Here, the Court need not vacate the ROD because there simply is no extant agency action related to Plaintiffs' claims for the Court to vacate.[3] The ROD does not itself authorize construction or operation of the Project. Rather, it represents the conclusion of a NEPA process enabling other, future actions. ROD007607. But those future actions cannot occur while the Court's declaratory judgment remains in place, making vacatur superfluous. With respect to RUS, the ROD only authorizes RUS's potential future grant of financial assistance to Dairyland to fund Dairyland's nine percent ownership interest in the Project. ROD007606–08. However, Dairyland will not even apply for funding from RUS until 2023, at which time Project construction would be complete under the longstanding construction schedule. Decl. of Jesse Beckendorf ¶¶ 9–10, ECF No. 90.[4]

Likewise, the Court need not vacate the Compatibility Determination and ROW permit for the Project to cross the Refuge because FWS has revoked those authorizations, rendering them moot.[5] In December 2019 and September 2020, FWS issued a Compatibility Determination and ROW authorization for the Project to cross through the Refuge. ROD007568, ROD 007569. On March 1, 2021, the Co-owners applied for an amended ROW through the Refuge to accommodate concerns that a Native American Tribe raised about the Project's impacts to a burial mound near the Refuge during

---

[2] The APA provides that "[n]othing herein . . . affects . . . the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. According to the legislative history for this provision, "[t]hese grounds include, but are not limited to, the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or the public ('*balancing of the equities*')." H.R. Rep. No. 94-1656, at *12, 94th Cong., 2d Sess. 1976, 1976 U.S.C.C.A.N. 6121, 6132 (emphasis added).

[3] The ROD does reflect the Corps' decision to issue an easement for the Project's crossing of lands that the Corps manages or owns within the Refuge, *see* ROD007609–11, but Plaintiffs have not challenged that action in this case.

[4] As the Co-owners argued in their summary judgment brief, ECF No. 89, at 46–51, Plaintiffs lack standing to assert this claim based on the Co-owners' ability to complete the Project before the financing is extended and at the risk that financing might not be so extended. *Cf. Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1014 (9th Cir. 2018) (no standing where "both Projects were already underway by the time funding from the Ex-Im Bank was authorized— nearly halfway complete" and "the Projects' joint venture partners possessed considerable financial resources, as did other lenders in the capital markets . . . that would have supported the Projects.").

[5] *See* ECF No. 93, at 45–48; ECF No. 115, at 5–11.

5

consultation with the Tribe under Section 106 of the National Historic Preservation Act.[6] *See* ECF No. 53-1, ECF No. 91-2. However, in July 2021, the Co-owners applied for a land exchange in lieu of the ROW, ECF No. 53-2, and several weeks later, FWS revoked the Compatibility Determination and ROW it initially issued in 2019 and 2020. ECF No. 69-1. Since FWS has revoked the Compatibility Determination and ROW authorization for the Project, there is no longer any agency action for the Court to vacate. *See, e.g.*, *Am. Wild Horse Preservation Campaign v. Salazar*, 800 F. Supp. 2d 270, 275–76 (D.D.C. 2011) (dismissing as moot challenge to Bureau of Land Management decision for managing wild horse population in Wyoming, where the agency rescinded the decision after complaint was filed); *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884 (10th Cir. 2008) (dismissing as moot appeal involving Bureau of Reclamation sale of oil and gas leases on public land because all leases in dispute were either never acquired or terminated, meaning there was "no continuing, present, adverse effect for the purpose of granting injunctive relief and no substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Sequoia Forestkeeper and Earth Island Inst. v. U.S. Forest Serv.*, No. CV-F-07-1690, 2008 WL 5054100, at *8-11 (E.D. Cal. Nov. 19, 2008) (declining to terminate timber sale contracts where U.S. Forest Service had formally suspended the contract pending supplemental review); *League of Wilderness Defenders-Blue*

---

[6] Plaintiffs filed their complaint challenging the January 2020 ROD on February 10, 2021—19 days before the Co-owners applied for the amended ROW. The Court found that the timing of the application after Plaintiffs' complaint was filed was "suspicious[]" and cited it as a fact "strongly support[ing]" an inference that the Co-owners are attempting "to evade judicial review." Order at 9, 23. As the cover letter to the application explains, however, the application (which would have reduced the impacted Refuge acreage by about 10 acres) came about after a meeting in July 2020—more than six months *before* Plaintiffs filed their complaint—during which the Tribe expressed concerns about the Project's original route passing over a burial mound. ECF No. 53-1, at 2–3. As a result of this meeting and a follow-up site visit, the Co-owners and the Tribe negotiated with two parties (a private landowner and the Iowa Natural Heritage Foundation) to obtain the necessary rights to an alternative route that would alleviate the Tribe's concerns about the line passing over a burial mound. *Id.* Securing those property rights—a necessary predicate to the application for an amended right-of-way—took several months. As this example illustrates, major infrastructure projects—particularly where the applicants diligently endeavor to reduce the environmental impacts and footprints of those projects as designs are refined and implemented—often result in changes and amendments throughout the design and implementation process. To assign nefarious motives based on these types of changes creates perverse incentives for project applicants to view a permit not as one of many steps in their environmental compliance, but rather, as the end of it. Moreover, the Co-owners always expected their application to culminate in a decision by the agency that would be subject to review, belying the unsupported insinuation that they were somehow attempting to evade review. *See* ECF No. 40, at 7 (May 2021 joint preliminary pretrial conference statement noting that expected decision on amended ROW would allow Refuge-related claims to be litigated before work in Refuge began).

*Mountains Biodiversity Project v. Smith*, No. CV-04-1595, 2006 WL 3692535 (D. Or. Mar. 16, 2007) (plaintiffs' claims concerning post-fire logging salvage project in national forest were moot where FWS withdrew its approval of the project and authorization for a new project in the same area would involve new data, decisions, and public notice and comment and could subsequently be challenged in court); ECF Nos. 89 at 52–55, 93 at 65–66 (citing cases recognizing that the repeal or expiration of agency actions or permits generally moots challenges to those actions).

Finally, regardless of the remedy the Court orders with respect to the Compatibility Determination and ROW permit, it cannot vacate the land exchange. While the Co-owners have *applied* for a land exchange, FWS has not taken final action with respect to that application. The mere fact that FWS indicated a land exchange "is a potentially favorable alternative to the right-of-way permit" does not mean FWS preordained its decision or has otherwise taken final action that the Court has the ability to vacate. *See infra* Sections II(A)(2), III(A)(1). In short, since FWS has not taken final action on the proposed land exchange, not only is that issue unripe for review, but there is also no agency action for the court to vacate. *Id.*; *cf. Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49–51 (D.C. Cir. 1999) (plaintiffs' NEPA challenge to oil and gas leases on public lands was not ripe where Bureau of Land Management had not actually issued any such leases).

## II.     THE COURT SHOULD NOT ENTER ANY INJUNCTIVE RELIEF.

An injunction is an extraordinary remedy that is not granted as a matter of right. *See Monsanto*, 561 U.S. at 165–66; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain an injunction, a plaintiff must demonstrate that (1) it has suffered an irreparable injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) a remedy in equity is warranted, considering the balance of hardships between the plaintiff and defendant; and (4) an injunction would not disserve the public interest. *Monsanto Co.*, 561 U.S. at 156–57. This test applies equally when a plaintiff seeks a permanent injunction, or an injunction to remedy a NEPA violation. *Id.* at 157 (citing

*Winter*, 555 U.S. at 31–33); *see also LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 943 (7th Cir. 2019) (courts should apply "traditional equitable principles" when evaluating requests for injunctive relief under environmental statutes). The burden is on the Plaintiffs to demonstrate that they are entitled to injunctive relief: "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above." *Monsanto*, 561 U.S. at 158; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law.") (citations omitted).

If the Court believes Plaintiffs are entitled to injunctive relief, it has discretion to fashion a remedy, but there are limitations: an injunction must be narrowly tailored to the specific harm alleged and must provide only the relief to which Plaintiffs are entitled. *See Smith v. Pollard*, No. 16-cv-10, 2016 WL 5922320, at *2 (W.D. Wis. Oct. 11, 2016) ("Injunctive relief must be specific and narrowly tailored to address only the specific risk of harm faced by the plaintiff."); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) ("[T]he irreparable harm considered by the court must be caused by the conduct in dispute and remedied by the relief sought."). As mentioned, there is no rule requiring a blanket injunction in cases involving a NEPA violation. *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) (Instead, at times "the equities demand a partial injunction.").

For the reasons discussed below, injunctive relief is not appropriate in the present case. First, this Court cannot enjoin the Compatibility Determination and ROW permit because those actions are moot (and, as explained below, Section II.B.1, declaratory relief affords Plaintiffs all the relief they need).

Second, the Court lacks jurisdiction to enjoin the Compatibility Determination and ROW permit, land exchange, or RUS financing decision because those actions are either moot or non-final. Third, this Court lacks jurisdiction to issue an injunction against Co-owners halting construction along the entire length/route of the Project. Finally, under the four-factor test for injunctive relief, Plaintiffs cannot meet their burden of showing that they are entitled to injunctive relief either within the Refuge itself (even if there were any agency action authorizing construction work there) or along the entire Project route. *Monsanto*, 561 U.S. at 157.

> **A.** **The Court cannot issue the injunctive relief requested in the Complaint.**

> **1.** **The Court cannot grant any effectual injunctive relief concerning the withdrawn Compatibility Determination and ROW permit.**

A "court's power to grant injunctive relief only survives if such relief is actually needed." *Greene v. Teslik*, No. 18-cv-116, 2021 WL 1820788, at *6 (W.D. Wis. May 6, 2021) (quoting *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds as recognized in Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019)), *appeal filed* (7th Cir. June 22, 2021). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility." *Nelson*, 570 F.3d at 882 (internal quotations and citations omitted)). Here, the Court determined that Plaintiffs' claims concerning the Compatibility Determination and ROW permit that FWS issued—and subsequently revoked—are not moot because "a very similar compatibility determination is not only likely but nearly certain to occur" given the Co-owners' pending application for a land exchange. Order at 9–13. As a matter of fact and law, this is simply incorrect: there is no reasonable probability that FWS will issue a new Compatibility Determination because a Compatibility Determination is not a prerequisite to entering into the proposed land exchange. *See infra* Section III(A)(2). FWS specifically noted that "if approved, th[e] proposed land exchange would make any further decision on [the Co-owners'] pending [amended ROW] application unnecessary and would obviate the need for the 2020 right-of-way permit." ECF No. 53-3. Indeed, FWS has affirmatively *revoked* the Compatibility

Determination and ROW permit for the Project's crossing of the Refuge—it no longer exists. ECF No. 69-1. Therefore, injunctive relief as to the Compatibility Determination and ROW permit is unnecessary and those claims are moot. *See supra* Section I. Even if these actions had not been revoked by the agency, the Court's declaratory judgment would be sufficient to prevent the parties from using them.

> **2.** **With respect to RUS's financing decision and the proposed land exchange, there is no final agency action to enjoin.**

This Court lacks jurisdiction to review—let alone enjoin—agency actions that are not yet final. The federal question statute, 28 U.S.C. § 1331, provides courts with jurisdiction over civil actions arising under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). *See Califano v. Sanders*, 430 U.S. 99, 104–07 (1977). However, courts may only review *final actions* of federal agencies for which there is no other adequate remedy in court. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("The APA, by its terms, only provides a right to judicial review of final agency action[.]"). In contrast, "a preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. As a general matter, two conditions must be satisfied for agency action to be considered final. *Id.* at 177–78. First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. *Id.* Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *Id.*

In this case, there is no final agency action for the Court to enjoin. Plaintiffs seek relief as to two (as yet unrealized) agency actions that rely on the ROD: (1) potential future financial assistance from RUS to fund Dairyland's nine percent ownership interest in the Project; and (2) FWS's "permitting or granting any easement or other authority" to allow the Project to cross the Refuge. Compl. ¶ 20, Requested Relief ¶¶ 5–6, ECF No. 1; *see also* ROD007606–08. But the Federal Defendants have not taken final action on either of these matters. Dairyland has not yet applied for any funding from RUS,

so RUS necessarily has not determined whether it will award such funding. *See supra* Section I; ROD007606–08; Beckendorf Decl. ¶¶ 9–10. Likewise, FWS has not made any decision, much less consummated one, on the Co-owners' proposal for a land exchange, or otherwise granted the Co-owners any right to construct the Project through a new ROW in the Refuge. *See* ECF No. 53-3; *see also supra* Section I; *infra* Section III(A). The Court lacks jurisdiction to review—let alone enjoin—such non-final agency actions.

### 3. As this Court has previously acknowledged, the Court lacks jurisdiction to enjoin the Co-owners from building along the entire Project route.

For the reasons discussed below, this Court cannot enjoin construction along the entire Project, the vast majority of which is occurring along the Co-owners' preexisting or independent rights-of-way on private land and required no approval from the federal government. *See* ROD005040, ROD005061, 005110 (noting that Project will be constructed "primarily on private land in Wisconsin and Iowa," with a less than 1.5-mile segment running through the Refuge); ROD007624 (97 of line's 101 miles are collocated with existing ROWs for transmission lines, railroads, and roadways). In fact, this was the very reason the Court limited the scope of its preliminary injunction to jurisdictional waters subject to the URGP.[7] ECF No. 160 at 5–6 (acknowledging that no other construction activities may be enjoined "due to lapsed permits, [because the activity] is outside the jurisdiction if this court, or [because the activity] is not the subject of challenge in this lawsuit."). Moreover, Plaintiffs' request for injunctive relief is itself limited to Project activities within the Refuge. *See* Compl., Requested Relief ¶ 5 (requesting that the Court "Enjoin the USFWS Defendants from permitting or granting any easement or other authority to allow the proposed CHC transmission line and towers to run across or cut through the Upper Mississippi River National Wildlife and Fish Refuge").

---

[7] As discussed below, to the extent the preliminary injunction is still in effect, the Court should now dissolve it, since the Court ruled in the Federal Defendants' and Co-owners' favor on Plaintiffs' claims against the Corps, finding the URGP and verifications thereunder were lawful. *See* Order at 44.

In any event, the Court lacks jurisdiction to enjoin construction of the entire Project. An APA challenge to a federal agency action authorizing only a portion of larger private undertaking provides no basis to enjoin an entire project. *Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349, 361 (D.D.C. 2012) (while an injunction may issue against an action that "cannot lawfully begin or continue without the prior approval of a federal agency," a "proposed injunction is flawed" to the extent that it seeks to stop portions of a project not subject to federal agency control); *Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 185 (D.D.C. 2008) (holding that consent by the National Park Service to lease 22 acres of public parkland as part of a 500-acre development project did not subject the nonfederal portions of the development to federal control, and that an injunction against the development project was not warranted). "Even if there was a violation of NEPA . . ., that does not mean that there is a remedy available to [plaintiff]. It is quite clear that, absent extenuating circumstances, NEPA does not constrain the actions of non-federal entities." *Env't Rts. Coal., Inc. v. Austin*, 780 F. Supp. 584, 588, 596 (S.D. Ind. 1991) ("[NEPA's] reach is limited by its express application only to agencies of the federal government."); *see also Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1344 (5th Cir. 1979) ("Congress did not intend NEPA to apply to state, local, or private actions.").

Here, the Project is a private venture and the federal approvals required for its construction are insufficient to "federalize" the entire line. While receipt of federal funds may federalize a project for purposes of NEPA, it will not do so if the funding is "but an expectancy that has not yet materialized." *Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency*, 259 F. Supp. 2d 9, 19–20 (D.D.C. 2003) (citing *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994)), *aff'd*, 102 Fed. App'x 167 (D.C. Cir. 2004). The mere fact that a non-federal project requires some federal approval or incidental federal involvement does not mean the entire project becomes federalized. *Save the Bay, Inc. v. U.S. Army Corps of Eng'rs*, 610 F.2d 322, 326–27 (5th Cir. 1980); *Sierra Club v. U.S. Army Corps*

*of Eng'rs*, 803 F.3d 31, 48 (D.C. Cir. 2015) (rejecting argument that NWP verifications extended geographic scope of the federal action to entire pipeline).

In this case, the Project is a private venture with limited federal involvement outside the Refuge, making it improper for the Court to enjoin construction of the entire line. Although Dairyland anticipates requesting a loan from RUS to finance its participation in the Project, its "mere expectancy" or anticipation of federal funding is insufficient to federalize the 91 percent of the Project that requires no federal funding. *Citizens Alert Regarding the Env't*, 259 F. Supp. 2d at 19–20 (citing cases).

The other required federal approvals are equally insufficient to federalize the Project for purposes of awarding injunctive relief. Almost all of this approximately 101-mile Project is being constructed on private land. ROD005110; *see also* Decl. of Dan Belin ¶ 13, ECF No. 133; Oct. 19, 2021 Decl. of Shawn Mathis ¶ 4, ECF No. 132; Decl. of Sarah Justus ¶ 9, ECF No. 129. The only segment of the Project that will be constructed on federal land is a less than 1.5-mile segment that will run through the Refuge and across the Mississippi River. *See* FWS00629. This river crossing is the only portion of the Project requiring authorization from the FWS. ROD007608–09.[8] The Co-owners have obtained regional general permits under section 404 of the Clean Water Act to permanently fill or temporarily disturb jurisdictional wetlands along portions of the Project route outside of the Refuge. However, these permits are required only for 0.02 acres of permanent wetland fill and 13.6 acres of temporary wetland fill outside the Refuge. USACE000679; USACE000686; USACE004232; USACE004828. Given the *de minimis* impacts associated with these activities, the general permits that the Corps have issued are insufficient to federalize the entire Project. *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 32–37 (D.D.C. 2013) (denying motion for preliminary injunctive relief on plaintiffs' claim

---

8 Even for that portion, the Co-owners have existing rights-of-way over the land that give them the ability to build the line even without federal approval. As explained in Co-owners' opening summary judgment brief, the 150-foot right-of-way currently used for the 161 kV line could be used to construct the 345 kV Cardinal-Hickory Creek line through the Refuge, but the towers would be much taller. *See* ECF No. 89 at 14–15; ECF Nos. 91-2 & 91-3. Because Co-owners have not begun planning for this option, it could not occur in time to meet the December 2023 in-service date.

that Army Corps was required to prepare an EIS for the entire 589-mile pipeline project, where 560 miles of the project cross privately owned land and only 1.6 miles of the project would cross lands within the Corps' jurisdiction).

In short, the vast majority of this Project is being constructed on privately owned land. No federal funding has been awarded for the Project, nor have the Co-owners even applied for it at this time. The only federal approvals required for the Project are for the less than 1.5-mile segment that crosses the Refuge and the Mississippi River—which have either been revoked (the Compatibility Determination and ROW permit) or not yet issued (the land exchange)—and a *de minimis* amount of permanent wetland fill outside the Refuge. Given these facts, the required federal approvals do not "federalize" the rest of the line, meaning the Court simply cannot enjoin construction of the entire Project.

> **B.** **Under the four-factor test set forth in *Monsanto*, Plaintiffs cannot show that they are entitled to injunctive relief that would prohibit Project construction either within the Refuge or along the entire Project route.**

As noted earlier, the Court applies the four-factor test from *Monsanto* when determining whether to grant Plaintiffs' request for injunctive relief. *Monsanto*, 561 U.S. at 157 (citing *Winter*, 555 U.S. at 31–33); *see also LAJIM, LLC*, 917 F.3d at 943 (courts should apply "traditional equitable principles" when evaluating requests for injunctive relief under environmental statutes).[9] Applying these factors to the current case, and given that the Court has already declared the Compatibility Determination and ROW to be invalid, Plaintiffs have failed to carry their burden of showing that the Court should enjoin construction of the Project within the Refuge itself or, to the extent Plaintiff's argue such relief would be appropriate, along the entire line.

---

[9] The standard for permanent injunctive relief is essentially the same as the standard for a preliminary injunction, except in the former case, the movant must show actual success on the merits, rather than a likelihood of success. *See Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 (1987); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011).

1. **Plaintiffs cannot establish irreparable injury based on decisions authorizing work within the Refuge that have been withdrawn by the agencies and held invalid by the Court, or activity outside the Refuge pursuant to permits that the Court has upheld as lawful.**

A showing of irreparable harm is a prerequisite for the issuance of an injunction. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see also Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 52–53 (7th Cir. 1980). To obtain injunctive relief, Plaintiffs must demonstrate not just the mere possibility of irreparable harm, but rather, a likelihood of irreparable harm. *Winter*, 55 U.S. at 24. The mere potential for environmental injury, without more, will not suffice. *See, e.g., Earth Island Inst.*, 626 F.3d at 474 (declining to adopt a rule that any potential environmental injury automatically merits an injunction); *Conservation L. Fund. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 66 (D. N.H. 2019).

Here, Plaintiffs cannot show that, absent injunctive relief, they would likely suffer irreparable harm. To begin with, procedural injury alone is insufficient to demonstrate the irreparable injury required to justify injunctive relief. *E. Band of Cherokee Indians v. U.S. Dep't of the Interior*, No. CV 20-757, 2020 WL 2079443, at *4 (D.D.C. Apr. 30, 2020) ("A chorus of federal courts . . . has found that procedural injury, standing alone, cannot constitute irreparable harm."); *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[A] deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Instead, Plaintiffs must show that "the procedural harm is accompanied by a concrete injury." *E. Band of Cherokee Indians*, 2020 WL 2079443, at *4 (internal quotation marks and citations omitted). Thus, a procedural violation with the EIS—its (allegedly) unduly narrow purpose and need statement—is insufficient, standing alone, to satisfy the irreparable injury required to justify injunctive relief.

Moreover, as a factual matter, Plaintiffs cannot make the required showing of irreparable harm to justify an award of injunctive relief, either within the Refuge (where any construction along the PSCW-

approved route will have to await further FWS approvals, if they are issued) or along the entire Project route (where any "injury" to Plaintiffs attributable to federally authorized activity is not a proper basis for an injunction now that the Court has rejected Plaintiffs' claims against the URGP).

With respect to the Refuge, Plaintiffs cannot demonstrate injury from the withdrawn Compatibility Determination or ROW permit. As discussed earlier, the revoked authorizations have no continuing effect (and for the same reason, Plaintiffs' challenges to those actions are moot). Second, the Court must presume that the Federal Defendants will comply with this Court's order declaring those actions unlawful. *See, e.g.*, *United States v. Chemical Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Comm. on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) ("[W]e have long presumed that officials of the Executive Branch will adhere to the law as declared by the court. As a result, [a] declaratory judgment is the functional equivalent of an injunction."). Plaintiffs can establish no injury associated with these authorizations, which FWS has rescinded and the Court has declared are invalid.

With respect to a future financing decision from RUS or land exchange that might or might not occur (and which *would not* be subject to a compatibility determination, *see infra* Section III(A)(2)), Plaintiffs also cannot establish injury because they can point to no authorized construction activity that would harm them. In *Monsanto*, the Supreme Court held that no irreparable injury existed as to an agency action (partial deregulation of genetically modified crops) that had not yet occurred. It reasoned, "[w]hen the District Court entered its permanent injunction, [the Animal and Plant and Health Inspection Service] had not yet exercised its authority to partially deregulate [roundup ready alfalfa]. Until APHIS actually seeks to effect a partial deregulation, any judicial review of such a decision is premature." *Monsanto*, 561 U.S. at 160. The same logic applies here and bars enjoining either a land exchange decision by FWS or a funding decision by RUS until they have exercised their authority on

those matters subject to an administrative record developed in connection with those decisions. *See also SPRAWLDEF v. Fed. Emergency Mgmt. Agency*, 717 F. App'x 733, 734 (9th Cir. 2018) (action moot where FEMA withdrew funding, and would have to "conduct additional NEPA review prior to issuing any future grants," which plaintiffs could then challenge).To the extent Plaintiffs seek to enjoin construction along the entire Project, Plaintiffs cannot show that they will suffer irreparable harm—or indeed any harm—that is attributable to the *de minimis* federally-authorized activities outside the Refuge, which this Court *upheld*. Order at 41–44. As noted, any injunctive relief must be narrowly tailored to address the allegedly unlawful conduct that caused the plaintiffs' injury. *See Pollard*, 2016 WL 5922320, at *1–2; *Sierra Club*, 825 F. Supp. 2d at 153. Neither factor is satisfied here. The only activity the Federal Defendants authorized on the vast majority of the Project that will be constructed outside the Refuge relates to temporary and permanent wetland impacts under the (now revoked) NWP 12 and the URGP. *See* USACE000094; USACE000100; USACE000166. But as noted, the Court granted summary judgment *in favor* of the Federal Defendants and Co-owners on these claims, Order at 41–44, so there is no unlawful conduct to enjoin outside the Refuge. In any event, permanently affected wetlands from anticipated construction comprise only .02 acres outside the Refuge, and even temporary (and thus reparable) work amounts to less than 14 acres in Wisconsin under the Corps permits verified for the Project. USACE00693–758; USACE00759–809. Plaintiffs have never attempted to connect their alleged injuries with the temporary and permanent fill authorized under these permits from the Corps. *See* ECF No. 121, at 42–43. Absent this showing of irreparable harm, Plaintiffs are not entitled to an injunction halting Project construction outside the Refuge.

Of course, Plaintiffs are likely to argue that *any* construction of the Project will result in irreparable aesthetic and environmental harm to the Driftless Area, as they have previously. *See, e.g.*, ECF No. 98, at 68–78. Setting aside the fact that Plaintiffs have failed to demonstrate how Project construction would specifically harm *them* or *their members*, *see* ECF No. 121, at 34–46, Plaintiffs incorrectly

assume that the existence of *any* impact on the environment constitutes a *per se* finding of irreparable harm. This is incorrect. The Driftless Area is "marked by active agricultural and other human uses, including utility infrastructure." Belin Decl. ¶ 15. Expanding access to energy from renewable projects to the west of the Mississippi River requires transmission infrastructure, just like infrastructure is needed for crop development, forestry, or other uses of the land. *Id*. In fact, until 2015, there was a 220 megawatt coal plant right across the Refuge, which had been operating for more than 50 years. *Id*. ¶ 16. As such, the Driftless Area it is not inherently incompatible with energy infrastructure development, given the infrastructure that already exists in the area. *Id*. The mere presence of the Project will *not* irreparably harm the Plaintiffs.

Moreover, the harms Plaintiffs cite from building the line are not irreparable. Cleared vegetation will grow back except in the immediate right-of-way; soils will stabilize; best management practices will mitigate erosion; and wildlife species will adapt to the new environment. *See, e.g*., ROD005182 (permanent displacement of wildlife species is not anticipated); ROD005113 ("In areas that were previously forested, disturbed areas would be revegetated consistent with non-invasive herbaceous vegetation that occurs in the area."). Again, permanently affected wetlands from anticipated construction comprise only .02 acres, and even temporary (and thus reparable) work amounts to less than 14 acres in Wisconsin under the Corps permits verified for the Project. USACE00693–758, USACE00759–809.

Along the entire Project route, the Co-owners will implement avoidance and minimization measures that will limit harm to the environment. The most significant of these measures—the Co-owners' routing and siting process—has *already* been implemented and mitigates the Project's impacts to the environment by siting it primarily along *existing* rights-of-way. Belin Decl. ¶¶ 10–11, 13 (fact that "the Project parallels existing rights-of-way for more than 95 percent of its length" helps "to significantly avoid or reduce impacts to interior forest, undisturbed grasslands, endangered species, and

other valuable resources, and limit habitat fragmentation."); ROD007624 (97 of line's 101 miles are collocated with existing ROWs for transmission lines, railroads, and roadways).

In addition, impacts from the preconstruction and construction process will be minimized through mitigation measures and best management practices ("BMPs"). *See, e.g.,* ROD005182 (permanent displacement of wildlife species is not anticipated); ROD005113 ("In areas that were previously forested, disturbed areas would be revegetated consistent with non-invasive herbaceous vegetation that occurs in the area."); ROD005077 ("all erosion control measures (e.g. silt fences, slope breakers) needed to maintain stable site conditions would be installed"). The Co-owners will implement BMPs to minimize the potential for the introduction and spread of invasive species. ROD005114 (listing measures to prevent spread of invasive species, including surveys and site revegetation); ROD005619 (same). The Project also includes environmental commitments and BMPs that are intended to stabilize disturbed ground and control erosion. ROD005209; *see also* ROD005077 (Final EIS, stating that "all erosion control measures (e.g. silt fences, slope breakers) needed to maintain stable site conditions would be installed"). Any adverse impacts to sensitive and agricultural soils will be repaired immediately following construction. ROD005134–5135. *See also* Belin Decl. ¶ 23 (noting that the Co-owners will conduct monitoring until 70 percent revegetation is established).

In sum, Plaintiffs' allegations of irreparable harm—whether due to construction of the Project generally or within the Refuge—are vastly overstated. Given that most of the Project will be sited along existing rights-of-way and will be constructed using best management practices and other mitigation measures, Plaintiffs cannot establish that they will be irreparably harmed absent an injunction.

> **2.** **The balance of hardships weighs against injunctive relief, since *any* injunction would likely delay the in-service date for the Project beyond December 2023, causing millions of dollars of additional construction costs and deny ATC a profit on its investment.**

In considering a request for injunctive relief, the Court must balance the harm the plaintiff will suffer if the injunction is denied against the harm the defendant will suffer if the relief is granted.

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Economic harm is an appropriate factor to consider when balancing the parties' equitable interests. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). Indeed, when balancing the equities of an injunction, an intervenor-defendant's economic interests are "legitimate considerations." *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 2:20-cv-00396, 2020 WL 7389744, at *23 (D. Me. Dec. 16, 2020), *aff'd* 997 F.3d 395 (1st Cir. 2021); *see also Gambell*, 480 U.S. at 545 (considering oil company petitioners' $70 million investment in oil and gas exploration activities when balancing harms of preliminary injunction against oil and gas leasing activities on outer continental shelf); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (district court properly weighed environmental harm of utility scale solar project against, among other things, project funding and jobs when denying motion for preliminary injunction). "[A]n injunction should not necessarily issue if the harm to the defendant would substantially outweigh the benefit to the plaintiff." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789 (7th Cir. 2011).

Should Plaintiffs seek to enjoin work along the entire Project route, the balance of hardships would definitely weigh against such relief. First, the Co-owners have already devoted significant capital—approximately $159 million through the end of August 2021—to procure the equipment and labor necessary to construct the Project and place it in-service by December 2023. Justus Decl. ¶ 13. If this Court were to enjoin Project construction in its entirety, the Co-owners would be unable to proceed with building the Project. The significant capital the Co-owners have dedicated to the Project already weighs against awarding injunctive relief. *See Sierra Club*, 2020 WL 7389744, at *23 (utility's commitment of "considerable human and economic resources" to construct high-voltage transmission line connecting hydropower generation resource to the New England electric grid undermined plaintiffs' motion for preliminary injunction); *Reed v. Antwerp*, No. 4:09CV3096, 2009 WL 2824771, at *8 (D. Ne. Aug. 28, 2009) (denying motion for preliminary injunctive relief to halt construction on

segment of new transmission line, in part due to the "considerable investment" public power district had already committed to the project).

Second, an injunction halting construction work along the Project would almost certainly delay the Project's in-service date. Presumably, any injunction that is issued based on errors in the agencies' environmental analysis would be lifted if and when the agencies address those errors by conducting supplemental analyses. However, given that the Federal Defendants spent several years preparing the EIS, Biological Opinion, and Compatibility Determination for the Project, it would in all likelihood take the Federal Defendants at least six months to prepare and finalize the supplemental analyses. ROD000003; ROD007652. And, an injunction of construction along the entire Project route that lasts more than six months would jeopardize the December 2023 in-service date for the Project. Oct. 19, 2021 Decl. of Shawn Mathis, ¶ 21, ECF No. 132. In other words, it will likely take the Federal Defendants longer than six months to prepare a supplemental environmental analysis to address the alleged flaws described in the Order, and if all Project construction is enjoined during this timeframe, the Project will almost certainly miss its December 2023 in-service date.

Halting Project construction in its entirety (i.e., even in non-federal areas) would result in tens of millions of dollars of additional construction costs. Workers are building the Project on a full-time basis. Mathis Decl. ¶ 18; Justus Decl. ¶ 24. If an injunction issues, the Co-owners will not be able to deploy carefully sequenced construction work and will need to demobilize—and, after the injunction is lifted, remobilize—the resources they have marshalled for construction. Justus Decl. ¶¶ 23–24; Mathis Decl. ¶ 18. Once the injunction is lifted, the Co-owners would need to adjust the work schedule by adding construction crews, increasing work hours, and conducting work on multiple segments of the Project. Justus Decl. ¶¶ 24–25; Mathis Decl. ¶ 22. They may also need to pay a premium for the additional labor needed to timely complete Project construction. Mathis Decl. ¶ 22; Justus. Decl. ¶ 25.

Given these costs, a six-month injunction is expected to increase the cost of building the Project by approximately $23 million for ATC and $7 million for ITC. Mathis Decl. ¶ 25; Justus. Decl. ¶ 27.

In addition, an injunction halting all Project construction would cause ATC to suffer significant lost profits, which generally fall into two categories. *See generally* Decl. of Michael Degenhardt on behalf of ATC, ECF No. 135. ATC will both fail to earn on the money it has spent to date. *Id*. at 11, and continue to incur costs that it cannot add to rate base (i.e., cannot earn a return or interest on) while the injunction remains in effect. *Id*. ¶ 12. Taken together, these two categories of losses would amount to approximately $2 million if an injunction lasted six months and approximately $6 million if an injunction lasted a year. *Id*. ¶ 13. These are financing costs that ATC would never recover, from ratepayers or otherwise. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) ("Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money," and there is "no procedural vehicle to enable [non-moving party] to recover the loss of the time value of its money" in such circumstances.).

Even if the injunction is limited to construction work within the Refuge, the balance of hardships would still tilt in favor of the Co-owners. The Co-owners are currently scheduled to start construction within the Refuge in October 2022. Jan. 31, 2022 Decl. of Shawn Mathis ¶ 8 (filed concurrently herewith). That schedule would be obtainable if Federal Defendants are allowed to act on the Co-owners' land exchange application after they conduct any supplemental analysis necessary to address purported NEPA concerns identified by the Court and [FWS] decides to approve the land exchange. But if the Co-owners are unable to begin work within the Refuge by October 2022, they would have to push back the construction start date until October 2023, making it unlikely that the Project could be placed in-service by the currently scheduled in-service date of December 2023. *Id.* ¶ 9.

For the foregoing reasons, the balance of hardships weighs in favor of the Co-owners, meaning the Court should decline to issue any form of injunctive relief.

**3.** **Any injunction would severely harm the public interest by increasing energy costs, undermining grid reliability, and harming renewable generators in the upper Midwest that are conditioned on the Project.**

The Court must examine the impact that granting or denying an injunction would have on the public interest. *Monsanto*, 561 U.S. at 157; *Roland Mach.*, 749 F.2d at 388. If a plaintiff cannot demonstrate that an injunction is in the public interest, that alone is a sufficient basis to deny a plaintiff's motion. *Winter*, 555 U.S. at 26. This factor should primarily focus on the impact to non-parties (such as, in this case, retail electric ratepayers, or families and businesses who pay monthly electric bills), rather than parties. *See League of Wilderness Def./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). NEPA cases are no exception to this requirement. *W. Watersheds Project v. Salazar*, No. CV 11-00492, 2011 WL 13124018, at *20 (C.D. Cal. Aug. 10, 2011) ("In considering a motion for an injunction under NEPA, however, where the ultimate claim is that the defendants must adequately prepare an EIS, an injunction should not be granted when there is a strong public interest weighing against the injunction.") (citing *Winter*, 555 U.S. at 32). Here, enjoining construction either within the Refuge or along the entire route would thwart the public interest. This is because enjoining any Project construction would likely delay the Project's in-service date, *see supra* Section III.D, and likewise, the public's ability to realize the Project's significant economic, reliability, and environmental benefits.

First, the Project is expected to relieve transmission congestion on the existing system, which, in turn, reduces market prices for electricity in Wisconsin, resulting in energy cost savings for utilities and consumers alike. Decl. of Tom Dagenais ¶¶ 27–36, ECF No. 137. The benefits from this reduced congestion to Wisconsin are significant, constituting the lion's share of the $23 million to $350 million in net economic benefits the Project is expected to deliver to the state over the next 40 years. *Id*. (describing the Co-owners' calculation of the Project's economic benefits to Wisconsin). If the Project is not placed into service by the currently scheduled in-service date (December 2023), Wisconsin

ratepayers would be forced to wait to receive the millions of dollars in economic benefits the Project is expected to deliver over its 40-year assumed life. The existing transmission congestion the Project is designed to relieve would continue unabated, adversely impacting utilities and consumers alike, since wholesale power prices will be higher than they otherwise would be with the Project in-service. *Id*. ¶ 70. This Court should not use its equitable powers to prevent implementation of a Project that MISO, Wisconsin, and Iowa have determined is *necessary* to save money for Wisconsin ratepayers.

Second, the Project provides a critical connection between the 345-kV electric transmission systems in Wisconsin and Iowa and, as a result, will improve the flexibility and reliability of the grid. Dagenais Decl. ¶ 51 & Ex. A at 58, 90, ECF No. 137-1. Until the Project is placed in-service, "the transmission system will be less secure, with additional voltage and transient stability limitations." Decl. of MISO Senior Manager of Economic Planning Neil Shah ¶ 19, ECF No. 128. The Project also increases the availability of periods during which generators or transmission lines can be taken out of service for maintenance, relieves congestion on a critical transformer in southwestern Wisconsin (especially during periods of long-term plant outages), and provides insurance value against extreme weather events that can lead to outages on the transmission system, reducing the cost of electricity during outages by making the grid more resilient to potential outages in the first instance. Dagenais Decl. ¶¶ 43, 49–51; Shah Decl. ¶ 23.

An injunction that delays the Project's in-service date would defer the Project's critical reliability improvements to the electric transmission system. *See* Decl. of Christopher McLean, Acting Administrator for RUS ¶ 9, ECF No. 139 ("[U]nexpected and unnecessary delays in needed transmission construction can contribute to grid fragility, consumer harm, and ultimately power outages. If this Project is enjoined, risks to grid reliability could be compounded."). [10] If the Project is

---

[10] *See generally* U.S. Department of Energy Notice of Intent, "Building a Better Grid Initiative to Upgrade and Expand the Nation's Electric Transmission Grid to Support Resilience, Reliability, and Decarbonization" (Jan. 11, 2022) ("DOE NOI")

delayed, emergencies such as extreme weather are more likely to lead to outages. Shah Decl. ¶ 23 ("The CHC Project . . . make[s] the transmission system in the MISO footprint more resilient to severe weather disruptions."). Given the adverse impacts that injunctive relief could have on the reliability of the transmission system, such relief would be contrary to the public interest. *Antwerp*, 2009 WL 2824771, at *8 (denying motion for preliminary injunction on plaintiffs' claim under NEPA regarding 80-mile transmission project designed to reliably move power to load centers in Nebraska and meet North American Electric Reliability Corporation reliability standards, in part because "the public's interest lies in completion of the project and the provision of reliable electric service"); *Woida v. United States*, 446 F. Supp. 1377, 1390 (D. Minn. 1978) (denying motion for preliminary injunction on plaintiffs' NEPA claim regarding construction of high-voltage transmission line that would connect 1000-MW coal plant to nearby substation; injunctive relief was not in the public interest since "delay might cause a decline in the reliability of electric service for the approximately one million rural consumers" served by utilities constructing the line).

Third, the Project is critical to supporting the massive amount of renewable energy currently being developed in western Wisconsin, Iowa, and the Dakotas. Approximately 7,500 MW of renewable generation—enough to power millions of homes per year—is currently conditioned on the Project, with another approximately 10,000 MW in advanced stages of the interconnection process that will also be conditioned on the Project. Dagenais Decl. ¶ 60. Until the Project is placed in-service, these generators could be subject to quarterly operating studies, which could curtail their output—that is, limit their ability to inject their full output onto the grid. Shah Decl. ¶ 20 (existing and new renewable generators "could be unable to deliver their full output to the transmission system if the CHC Project is not

_____

at 1 ("Modernizing, hardening, and expanding the grid will enhance the resilience of our entire electric system, and ensure that electricity is available to customers when it is needed most. . . .The increasing frequency of extreme weather events is leading to energy supply disruptions that threaten the economy, put public health and safety at risk, and can devastate affected communities all over the country"), https://www.energy.gov/sites/default/files/2022-01/Transmission%20NOI%20final%20for%20web_1.pdf.

constructed as planned"). MISO estimates that, for every megawatt of wind output that is limited due to these quarterly studies, system production costs increase by approximately $100,000 per year. ROD016920–21.

The adverse repercussions of a delay in the Project's in-service date would ripple throughout the upper Midwest. As stated by an officer of the American Clean Power Association, "[m]any renewable resources that would support Wisconsin's clean energy goals are dependent on the development of the Cardinal-Hickory Creek 345 kilovolt transmission line to successfully interconnect to the grid." Decl. of Gene Grace ¶ 10, ECF No. 134. For example, four proposed wind projects, totaling almost 900 MW of capacity, plan to interconnect to the transmission system through that portion of the Project located between the Hill Valley and Cardinal substations. *Id.* In addition, three of Wisconsin's largest electric utilities—who provide retail electric service to approximately 1.75 million customers in Wisconsin— have invested $390 million into the Badger Hollow solar farm, a 300 MW solar project located in Grant County, Wisconsin that is conditioned on the Project. Decl. of Scott Smith and Daniel Krueger ¶¶ 7–8, 26, ECF No. 130. A delay of even *two months* in the Project's in-service date would cause these utilities to lose approximately $15 to $20 million in 2024 alone. *Id.* ¶ 32. Other renewable generators in the region would similarly be faced with increased risks, lost revenues, and potential abandonment of their projects. *See* Decl. of Arash Ghodsian, EDF Renewables, Inc. ¶¶ 5-7, ECF No. 123; Decl. of Phillip Ross, Pattern Energy ¶¶ 8–9, ECF No. 136; Decl. of Wells McGiffert, ALLETE Clean Energy ¶¶ 7–9, ECF No. 125. These renewable energy developers stand ready to harness the wind and solar energy MISO predicted would become available (and more), but until the line is built, these generators may be subject to limits or curtailment that prevent them from achieving their full potential. Collectively, these generators represent 7,500 MW of green energy that is primed and ready to flow into the system; the Court should decline Plaintiffs' invitation to staunch it with a tourniquet by enjoining the Project.

Finally, maintaining the current construction schedule is also critical to meet the region's and the nation's ambitious carbon-free goals.[11] The Project is expected to reduce regional carbon dioxide ($CO_2$) emissions by approximately 150,000 to 1.2 million tons per year. Smith Decl. ¶¶ 13–14, 31 ("[E]very single [data run] indicates that the Cardinal-Hickory Creek transmission line will result in a net decrease in $CO_2$ emissions in those regions."). On a global scale, the monetary benefit of these emissions reductions could be substantial—ranging from $154 million to $1.4 billion. Smith Decl. ¶¶ 23–31. By contrast, an injunction that delays the Project's in-service date would hinder the region's ability to achieve these emission reductions. Smith Decl. ¶¶ 15–22 (explaining how Project delays would increase $CO_2$ emissions from the regional generating fleet); *see also* Dagenais Decl. ¶ 75 (if the Project is not constructed by its scheduled in-service date, "less renewable generation will be sold into the market, resulting in an increase in generation and greenhouse gas emissions from fossil fuel generators"). Specifically, for every gigawatt (1,000 MWs) of wind capacity that is delayed for a 12-month period, carbon dioxide emissions would increase by somewhere between 1.5 to 3.9 million tons. Smith Decl. ¶ 21; Dagenais Decl. ¶ 76. Building the Project as soon as possible is critical to alleviate transmission congestion, ensure that utilities can obtain the cost-effective renewable resources they need to serve their customers, and help states in the region achieve their carbon reduction goals. Decl. of Heather Allen ¶¶ 9, 12, ECF No. 122; Decl. of Thomas Hanrahan ¶¶ 4–6, ECF No. 124; Smith/Krueger Decl. ¶¶ 44–48; Decl. of Amelia Vohs ¶¶ 7, 9, ECF No. 126; Grace Decl. ¶ 11.

Courts have repeatedly acknowledged that injunctive relief undermines the public interest if it inhibits renewable energy development and greenhouse gas reduction objectives. *See, e.g., W. Watersheds Project*, 692 F.3d at 923 (affirming district court decision to deny preliminary injunction

---

[11] *See generally* DOE NOI at 3 ("Multiple pathways exist for the United States to meet [Biden Administration's] clean energy goals, but all require upgrading and expanding the Nation's transmission infrastructure. In particular, they require deploying interstate high-voltage lines connecting areas with significant renewable energy resources to demand centers and linking together independently operated grid regions.").

of Ivanapah solar project based on plaintiffs' claims under NEPA and other environmental statutes because "the district court properly took into account the federal government's stated goal of increasing the supply of renewable energy and addressing the threat posed by climate change, as well as California's argument the [] project is critical to the state's goal of reducing fossil fuel use, thereby reducing pollution and improving health and energy security in the state"); *Colo. River Indian Tribes v. Dep't of the Interior*, No. CV14-02504, 2015 WL 12661945, at \*34–35 (C.D. Cal. Jun. 11, 2015) (denying motion for preliminary injunctive relief on plaintiffs' NHPA, NEPA, and FLPMA claims regarding Blythe solar project where competing public interests were in equipoise: while plaintiffs had interest in preserving cultural resources, there was a competing public interest in developing renewable energy on public lands); *Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, No. 11-cv-00093, 2011 WL 13356151, at \*11–12 (S.D. Cal. Sept. 15, 2011) (denying motion for preliminary injunctive relief against 117-mile transmission line; injunctive relief was not in the public interest since the project would facilitate development of renewable resources by "unlock[ing] the potential of one of the richest renewable energy regions in California" and advance state and federal policies to reduce GHG emissions); *La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, No. LA CV11-04466, 2011 WL 13130485, at \*11 (C.D. Cal. Aug. 11, 2011) (denying motion for preliminary injunctive relief on plaintiffs' claims under NEPA and FLPMA against Blythe solar project because "[t]he public also has a significant interest in obtaining new sources of renewable energy").

In short, the Project is expected to "reduce and prevent regional transmission congestion, improve system reliability from outages, lower transmission costs, . . . meet renewable energy policies set by states, move renewable power from where it is generated to where it is needed, and address system needs due to coal and biomass powerplant closures." McLean Decl.¶ 7. "Unnecessary delays may cause ripple effects triggering additional delays in interconnection investments to generation sources as well as increases or shifts in transmission congestion and related cost allocations which would adversely

affect rural consumers and grid reliability." *Id*. Given the significant economic, reliability, and environmental benefits the Project will generate for the upper Midwest, an injunction would be antithetical to the public interest.

### C. The Court should dissolve the preliminary injunction.

Given that the Court issued an order on summary judgment, the preliminary injunction appears to have expired by its own terms, as it only enjoined activities under the URGP "until issuance of an opinion and order on summary judgment." ECF No. 164, at 2. Plaintiffs' challenge to the URGP formed the entire basis for the Court's decision to preliminarily enjoin construction activities in jurisdictional waters. Since the Court has now rejected that challenge, it should dissolve the preliminary injunction, to the extent it still remains in effect, or clarify that it has indeed expired.

## III. THE COURT SHOULD STAY ITS JUDGMENT PENDING APPEAL.

The Order, which resolves Plaintiffs' claims and reverses the Court's findings on Plaintiffs' preliminary injunction motion (ECF No. 164), declares that it "would be" unlawful for the federal government to take any future action to authorize the Co-owners to build the Project through the Refuge, where the Co-owners currently own and operate two existing transmission lines. *See* Order at 23. The Project—which will span approximately 100 miles and will have 99 percent of its right-of-way located on existing rights-of-way between Dubuque County, Iowa and Madison, Wisconsin—would cross little more than a mile of the Refuge, which (with limited exceptions for jurisdictional gaps) spans 261 miles of the river in the states of Minnesota, Wisconsin, Iowa and Illinois.



Map of Refuge, ROD028205, Fig. 1

Both the Refuge segment and the remaining 100 miles of the Project—again, collocated with existing rights-of-way that already figure in the landscape—would pass through the Driftless Area, a historically unique geological landscape spanning four states that is today noteworthy for scenic values but also for heavy agricultural land use. Federal permitting for the portion of the Project in Wisconsin consists solely of Clean Water Act permits for the 0.02 acres of permanent and 13.6 acres of temporary and temporary fill that will implicate federal jurisdictional waters. The Court has now upheld that permitting and construction of that portion of the line, and rejected Plaintiffs' claims against the Corps.

The Project has been planned for more than a decade by MISO, FERC's surrogate; endorsed by two expert state agencies after years of independent study and public input (including public hearings); and studied in a four-volume Environmental Impact Statement, Biological Opinion, and other permitting documents (with extensive public notice and comment) by three federal agencies, including one (a potential source of future funding) whose mission is to improve transmission in rural America. MISO (the regional planning entity), the PSCW, and the Iowa Utilities Board each approved the project because of its economic, reliability, and public policy benefits. The Project fulfills the longstanding goals of multiple Midwestern states to efficiently harness and distribute renewable energy in the region

to meet policy goals to reduce their reliance on fossil fuels and alleviate existing limitations on the grid that affect energy cost, safety and reliability.

Plaintiffs, having previously sought to stop the Project in two different forums and four different lawsuits,[12] have found some relief in this Court—at least for now. But for the reasons set forth below, that relief must be fleeting. In its desire to stop the Project, the Court ignores the statutory limitations on APA review, which the Seventh Circuit has repeatedly recognized when exhorting courts not to substitute their judgment for that of politically accountable officials. *Highway J. Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003). By enjoining decisions that have not yet been made (and were not included in the complaint, which Plaintiffs never amended), the Court ignored express statutory limits of APA review, which must be based on an administrative record unique to each decision. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). "Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider . . . evidence bearing on those questions unless the evidence has first been presented to and considered by the agency." *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990). And yet, by purporting to block a land exchange that has not even been approved, the Court did exactly that.

To issue relief against the Project, the Court had to disregard more than the APA's deferential standard of review; it also had to ignore the Article III limits on its jurisdiction. Other than the Clean Water Act claims the Court rejected, Plaintiffs' claims were either moot (their challenge to FWS's Compatibility Determination and ROW permit) or unripe (their challenge to RUS's future funding decision). The Court's review of a land exchange decision that has not occurred (and was never pleaded) runs roughshod over the APA's requirement of "final agency action"; as the Supreme Court

---

[12]In addition to these two consolidated actions, there one (stayed) federal and one state court lawsuit. *Driftless Area Land Conservancy, et al. v. Huebsch*, et al., No. 3:19-cv-01007; *County of Dane, et al. v. PSCW et al.*, No. 2019-CV-3418. Although the parties and claims vary, they all seek an injunction against the Project.

has observed, ignoring this requirement presents the unappealing prospect of "injecting the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 66–67 (2004). And, if this unauthorized supervision of Executive branch agencies by a federal court were not sufficiently disconcerting, the Court's grasp to invalidate a Project approved by two democratically selected public utility commissions presents uncomfortable concerns about federalism as well. *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 773 (7th Cir. 2013) ("[U]nlike the regulation of natural gas, a field in which FERC has jurisdiction both over pricing and over the siting of interstate lines . . . the states retain authority over the location and construction of electrical transmission lines.").

Because these errors of law warrant reversal, and because the other *Nken* factors are satisfied as well, the Co-owners move for a stay pending appeal. The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014); *see also In re Forty–Eight Insulations, Inc.,* 115 F.3d 1294, 1300 (7th Cir.1997). The court considers: "(1) the likelihood the applicant will succeed on the merits of the appeal; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties; and (4) the public interest." *Common Cause Ind. v. Lawson,* 978 F.3d 1036, 1039 (7th Cir. 2020) (citing *Nken*, 556 U.S. at 426). As with a motion for a preliminary injunction, "a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters.*, 742 F.3d at 766. Here, all four factors weigh in favor of a stay pending appeal.

**A.     The Co-owners have a high likelihood of success on appeal.**

**1.     The Court's decision to preemptively rule on a land exchange that has not even occurred is inconsistent with the APA's command that only final agency actions are subject to judicial review.**

As explained *supra* Section II.A, the Court lacks jurisdiction to review agency actions that are not final and which were not identified in Plaintiffs' Complaint, which Plaintiffs never amended. The Court therefore lacked jurisdiction to address the merits of the Co-owners' proposal for a land exchange that would enable the Project to cross the Refuge, as FWS has yet to act on that proposal. *See* ECF No. 53-3. For the reasons discussed below, the Co-owners have a high likelihood of reversing on appeal this Court's conclusion that the land exchange was sufficiently ripe and final for adjudication in this case. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) (affirming dismissal of claim where plaintiffs' lawsuit "predated the final agency action[,] and is therefore unripe").

In concluding that the nascent land exchange was sufficiently "final" and ripe for judicial review, the Court relies heavily on FWS's statement that such an exchange could be a "potentially favorable alternative to a right-of-way-permit." *See* Order at 15. It asserts that FWS's letter to the Co-owners reflects the agency's final action on the proposed land exchange because it "all but guarantee[s]" the agency's approval. *Id*. This was clear error. Final agency action must reflect the consummation of the agency's decisionmaking process and constitute action that creates legal rights or obligations. *Bennett*, 520 U.S. at 177–78. FWS's letter far from consummates its decisionmaking process on the land exchange. The letter is *at most* a preliminary assessment—one which is advisory in nature and which simply indicates a "potentially favorable alternative" to the (now revoked) Compatibility Determination and ROW permit. Courts have previously distinguished between these type of preliminary assessments and final agency determinations, and have declined to review agency actions that are simply "informational in nature." *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590,

597 (2016) (distinguishing between preliminary jurisdictional determinations "which are 'advisory in nature'" from approved jurisdictional determinations which "clearly mark[] the consummation of the Corps' decisionmaking process on that question") (internal quotation marks omitted); *Menominee Indian Tribe of Wis. v. Env't Prot. Agency*, 947 F.3d 1065, 1070 (7th Cir. 2020) ("A letter 'purely informational in nature' is not a final agency action because it 'impose[s] no obligations and denie[s] no relief.' Letters restating earlier interpretations likewise do not carry legal consequences for purposes of the 'final agency action' requirement.") (internal citations omitted).

Moreover, and contrary to the Court's reasoning, an agency's "anticipated approval" is insufficient to constitute final agency action for purposes of judicial review. Finality requires a formal determination that determines rights or obligations, or "from which legal consequences flow." *Bennett* 520 U.S. at 177. Courts have long recognized that "[a]n agency action is not final if it is only . . . 'tentative.' The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Dhakal v. Sessions,* 895 F.3d 532, 539 (7th Cir. 2018) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)). Despite any indications in FWS's letter of a potentially favorable outcome for the Co-owners, FWS's action is far from final. As discussed below, the agency must still undergo an entirely different administrative review process before making an ultimate and final decision on whether to accept the Co-owners' proposal for a land exchange. Because FWS has yet to complete its decisionmaking process regarding the land exchange, this Court cannot reasonably conclude that FWS's actions constituted final agency action subject to judicial review. And because it has not done so, there is nothing "from which [any] legal consequences flow."

The Court's reliance on *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) and the line of cases cited therein, Order at 14–16, to support its finality determination is simply flawed because in those cases, regulated entities sought pre-enforcement review of regulations that they feared would be aimed

at them. Here, in contrast, Plaintiffs are not the objects of any future land exchange decision. In *Abbott*, the Supreme Court reviewed a challenge to a Food and Drug Administration regulation that imposed labeling and advertisement requirements on prescription drug manufacturers. *Abbott*, 387 U.S. at 137–38. Noting that "finality" has been interpreted in a "pragmatic way," the Court concluded that the regulation at issue was "quite clearly definitive," reasoning that it had been "promulgated in a formal manner . . . made effective upon publication" and had the "status of law." *Id*. at 151–52. The Court further reasoned the impact of the regulations upon the petitioners "is sufficiently direct and immediate as to render the issue appropriate for judicial review." *Id*. at 149, 151–52. This is a far cry from the one-page letter FWS issued here, where the agency merely indicated its commitment to *review* the proposed land exchange and nothing more. *See* ECF No. 53-3.

The Court's reliance on *Abbott* for the proposition that a "statement of interest" is sufficient to constitute final agency action, Order at 14–15, is likewise erroneous. In fact, the portion of *Abbott* the Court discusses references a different case—*Columbia Broadcasting System v. United States*, 316 U.S. 407 (1942)—that also has no application here. *Columbia Broadcasting* involved pre-enforcement review of an FCC regulation where the FCC asserted it would not license local stations that maintained contracts with certain broadcasters. *Abbott*, 387 U.S. at 150 (citing *Columbia Broadcasting System*, 316 U.S. 418–19). While the Court did characterize that regulation as "a statement only of [the agency's] intentions," it did so in the context of justifying pre-enforcement review of the promulgated rule, and did not stop at the proposition that a statement of intent *on its own* constitutes final agency action. Rather, the Court reasoned:

> The FCC did not have direct authority to regulate these contracts, and its rule asserted only that it would not license stations which maintained such contracts with the networks. Although no license had in fact been denied or revoked, and the FCC regulation could properly be characterized as a statement only of its intentions, the Court held that '*Such regulations have the force of law before their sanctions are invoked as well as after*. When as here they are *promulgated by order* of the Commission and the *expected conformity to them causes injury cognizable by a court of equity*, they are appropriately the subject of attack.

*Id.* (emphasis added).

Like *Abbott*, *Columbia Broadcasting* is simply inapposite. It involved an agency that issued a formal regulation (which had the force of law) after an extensive investigation, public hearings, briefing, and oral argument. *Columbia Broadcasting*, 316 U.S. at 409. In this case, FWS has done nothing more than issue a one-page letter indicating that a land exchange is a "potentially favorable alternative" to the (now revoked) Compatibility Determination and ROW permit. Even assuming this reflects a statement of FWS's intentions, the process for FWS's final decision on the land exchange is nowhere near complete. There are a variety of procedures that apply to land exchanges, including an appraisal, environmental review, title review, and (depending on the value of the exchange) potential review by the House and Senate Committees on Appropriations.[13] The agency has not completed this process, let alone made a decision on or otherwise consummated the land exchange. It is impossible for the Court to conduct "pre-enforcement review" (as was the case in *Abbott* and *Columbia Broadcasting*) when no decision has been made and nothing is being enforced—against Plaintiffs or anyone else. *See Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decision making process, *and whether the result of that process is one that will directly affect the parties*.") (emphasis added).

The Court's criticism of FWS for failing to offer "any evidence to suggest that the land is indeed suitable for disposition [under 16 U.S.C. § 668dd(b)(3)]," Order at 35, illustrates this point. The agency necessarily could not offer any such evidence because it *has not taken action* on the proposed land exchange. That is precisely why the Court's jurisdiction is limited to *final* agency actions: so that there is an administrative record that the Court can review to determine whether the action in question is arbitrary, capricious, or otherwise not in accordance with the law. 5 U.S.C. § 706. It is impossible for

---

[13] *See* U.S. Fish & Wildlife Service, 342 FW 5, Non-Purchase Acquisition (Jun. 21, 1994) (as amended Apr. 14, 2008), https://www.fws.gov/policy/342fw5.html.

the Court to conduct that inquiry without such a record, let alone a final determination from the agency in question.

### 2. Even if the Court had jurisdiction to preemptively review the land exchange, it wrongly concluded that such exchanges must be supported by a compatibility determination.

The Court's holding that the proposed land exchange must be supported by a compatibility determination, Order at 32–35, is clearly erroneous. Contrary to the reasoning in the Order, land exchanges simply do not present the same legal issues as ROW authorizations because *no compatibility determination is required*. The plain language of the Refuge Act provides that *proposed uses* must be "compatible" with Refuge purposes, *see* 16 U.S.C. § 668dd(d)(1)(B), but contains no similar requirement for land exchanges, *id.* § 668dd(b)(3). The only requirement is that the Refuge land be "suitable for disposition" and "approximately equal" in value (or equalized by cash payment) to the land for which it is being exchanged. *Id.* For that reason, courts have uniformly recognized that the Secretary has discretion over land exchanges. *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 687 (10th Cir. 2015) ("[T]he fact that the Service enjoys the power to enter into land exchanges like this one as a general matter bolsters the reasonableness of the Service's view that it had the power to preside over the exchange here.") (interpreting 16 U.S.C. § 668dd(b)(3)); *Sierra Club v. Hickel*, 467 F.2d 1048, 1051 (6th Cir. 1972) ("No conditions relating to the environment were imposed in the statute."); *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1111 (D. Colo. 2012*), aff'd sub nom. WildEarth Guardians*, 784 F.3d 677 (10th Cir. 2015) ("The plain language of the Refuge Act supports the conclusion that a compatibility determination is not required for the acquisition of land."). Indeed, Congress expressly contemplated the agency's use of its exchange authority for the purposes of the Co-owners' proposal; the bill that became 16 U.S.C. § 668dd(b)(2) was intended "to provide for the replacement of lands within the National Wildlife Refuge System that are permitted to be used for such purposes as road, canals, and pipelines." 120 Cong. Rec. 36355 (1974).

37

The Alaska district court's decision in *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1022 (D. Alaska 2020) (*FANWAR*), *appeals filed*, Nos. 20-35721 (9th Cir. Aug. 14, 2020), 20-35727, 20-35728 (9th Cir. Aug. 17, 2020) (oral argument held August 4, 2021), does not change this analysis. For one thing, the court in that case was applying a *completely different* statute— the Alaska National Interest Land Conservation Act ("ANILCA"), *see* 16 U.S.C. § 3192, which is not at issue here. *FANWAR*, 463 F. Supp. 3d at 1022–24. In fact, the district court explicitly acknowledged that the requirements for land exchanges under ANILCA differ from those that apply under the Refuge Act. It noted that Congress included certain language in ANILCA "to exempt land exchanges from the requirement of equal value or complex public interest exchanges that were required by other statutes in place when ANILCA was enacted." *FANWR*, 463 F. Supp. 3d at 1026 & n.96 (comparing the language in ANILCA to language in the Federal Land Policy and Management Act and the Refuge Act). Moreover, in that case, the government agreed to a land exchange that it had previously rejected. *Id.* at 1018. The court applied a more onerous standard of review to the agency's change in position and concluded that the agency "failed to provide adequate reasoning to support the change in policy in favor of a land exchange." *Id.* at 1022. That is not the case here, as approval of a proposed land exchange would be consistent with FWS's previous decision to *approve* permits that allowed the Project to cross the Refuge.

In short, the Court's conclusions regarding FWS's authority to enter into land exchanges contradict the plain language of the Refuge Act. The Co-owners have a high likelihood of reversing the Court's determination on this issue on appeal to the Seventh Circuit.

### 3. The Court erred in concluding that the EIS's purpose and need statement does not satisfy NEPA.

The Court held that the EIS's purpose and need statement was impermissibly narrow because it effectively resulted in the Federal Defendants' dismissing from detailed consideration alternatives to the Project, including non-wires alternatives, "with the possible exception of running adjacent to the

Refuge." Order at 40. The Court did not find that any other alternative was reasonable, dismissing that consideration as "immaterial" given the parameters of the purpose and need statement. *Id.* In reaching this result, the Court failed to address how the MISO planning process informed the statement of purpose and need and the EIS's alternatives analysis, and seems to have fundamentally misunderstood MISO's role in that process. Indeed, citing *Simmons*, 120 F.3d 664, the Court faulted the EIS as "actually adopt[ing] one of the three utilities' (MISO's) [*sic*] stated purpose for the CHC project."[14] Order at 40. The Court concluded "MISO may have its own reasons for proposing the CHC project as it did, but '[t]he public interest in the environment cannot be limited by private agreements.'" *Id.* at 41 (quoting *Simmons*).

The Seventh Circuit's post-*Simmons* case law, however, approves of the common-sense proposition that "a reviewing agency can take an applicant's goals for a project into account." *Env't L. & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 683 (7th Cir. 2006) (collecting cases)*; see also Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 764 (7th Cir. 2021) ("the agencies must take the objectives they are given and consider alternatives means of achieving those objectives, not alternative objectives.") (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (Thomas, J.)). In *Protect Our Parks*, the Seventh Circuit agreed that two federal agencies did not need to consider alternative locations for a Presidential Center proposed by the City of Chicago and a non-profit foundation that would occupy 20 acres in a city park; "[t]he City's objective was to build the Center in Jackson Park, so from the Park Service's perspective, building elsewhere was not an alternative, feasible or otherwise." *Id*.

Similarly here, the agencies did not need to reformulate the purpose and need to allow greater consideration of alternatives that did not increase transfer capability of the transmission system, or that

---

[14] This statement is factually incorrect. As the Co-owners explained previously, MISO is not a "utility" that will own the Project, but rather, a not-for-profit regional transmission organization charged by FERC with planning and operating the high-voltage transmission system across the Midwest in a manner that promotes the public interest. ECF No. 89 at 19.

did not connect the endpoints (Dubuque County, Iowa and Madison, Wisconsin) MISO specified for the Project. Any such alternatives would have been beyond the capabilities of the Co-owners to build, and beyond the authority of the federal agencies to require. *Env't L. & Pol'y Ctr.*, 470 F.3d at 684 ("[I]t was reasonable for the Board to conclude that NEPA did not require consideration of energy efficiency alternatives when [applicant for license] was in no position to implement such measures.").

The Seventh Circuit's holding in *Environmental Law and Policy Center* that "where a federal agency is not the sponsor of a project, the 'consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project'" is dispositive. *Id.* (citation omitted). In addition, this case is a far cry from *Simmons*, in which the agency formulated a purpose so narrow that even a reasonable, "concrete" alternative proposed by the plaintiffs was not considered. *Simmons*, 120 F.3d at 669. In contrast, the purpose and need articulated in the EIS resulted in the robust consideration of a wide range of alternatives, with the agency dismissing from in-depth study only those alternatives that failed to satisfy more than one of the six purpose and need criteria. ROD005030–039; 5032 (identifying the specific goals that each rejected alternative failed to meet). Significantly, there was no alternative that failed only the increased transfer capacity criterion. ROD005032. The purpose and need statement appropriately considered the Co-owners' purpose and regional and state planning needs, and it allowed consideration of a sufficient range of alternatives. It was not arbitrary and capricious.

In addition, the administrative record demonstrates that, far from being based solely on the Co-owners' interests, the agencies' purpose and need statement was based on years of planning by the regional grid planning entity, MISO, and two state regulatory commissions. ROD014714–720; ROD021257; ROD004981. The expert grid operator and state agencies determined, in proceedings conducted publicly and with participation from multiple stakeholders, that the Project is needed in order to bring renewable energy generated in Iowa, Minnesota, and the Dakotas to population centers in

Wisconsin and elsewhere. ROD014715; ROD014725. The administrative record shows that the agencies considered both system (i.e., transmission or non-transmission) and routing alternatives and explained, consistent with NEPA's requirements, why these alternatives were not carried forward for in-depth analysis. ROD007624.

MISO began the regional planning exercise that identified the Multi-Value Project portfolio to address the needs identified by states seeking grid improvements that would enable utilities to comply with renewable portfolio standards. ROD013648; ROD014269; ROD014747; ROD014835. *See also Ill. Com. Comm'n*, 721 F.3d at 771–72. In doing so, it brought to bear considerable expertise. *Id.* at 776 (acknowledging "the highly technical character of the data and analysis required to match costs and benefits of transmission projects"). The PSCW then carefully vetted the need for the Project for a year, in a proceeding in which two of the Plaintiffs (DALC and WWF) actively participated. The Seventh Circuit recently recognized the expertise involved in Wisconsin's permitting process, under which "[t]he Commission must consider a multitude of factors such as the reliability of the power supply, alternative sources of supply, economic factors, engineering obstacles, safety, and environmental impact." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 516 (7th Cir. 2021). It was reasonable for RUS to take into account the Commission's final determination on whether this Project is needed. *Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1110 (S.D. Cal.), *aff'd*, 473 F. App'x 790 (9th Cir. 2012). NEPA does not require the Service to "reinvent the wheel." *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013).

Finally, the Court erred by dismissing as "immaterial" whether any reasonable alternative was in fact ignored. The Court's analysis was thus not complete because it did not consider whether the ostensibly too-narrow purpose and need actually resulted in a too-narrow range of alternatives. *See Backcountry Against Dumps v. Chu*, 215 F. Supp. 3d 966, 978 (S.D. Cal. 2015) ("However, a purpose and need that is too narrow would not be dispositive in and of itself. If the statement were narrowly

41

drawn, but every alternative were still considered, then the purpose and need could hardly have caused a defect in the EIS. Thus, the ultimate question is whether the purpose and need statement improperly foreclosed consideration of alternatives.") (citing *Westlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 867 (9th Cir. 2004)). In this respect, the Court's analysis is flawed because it fails to account for the well-established rule of harmless error that applies to judicial review under the APA: if the (alleged) flaws in the agencies' NEPA analysis were not prejudicial, then reversal is not required. 5 U.S.C. § 706 (in APA review of agency action, "due account shall be taken of the rule of prejudicial error").

### 4. The Court's analysis of whether FWS complied with the Refuge Act is inconsistent with the statute and fails to afford the Refuge Manager the deference to which she is entitled under the law.

The Court rejected the Federal Defendants' argument that Plaintiffs' claims are moot because FWS withdrew the Compatibility Determination and ROW. The Court erred because these claims are moot now that the agency has revoked these two decisions. Even if the Court had jurisdiction over these claims, its decision is nonetheless erroneous because the Compatibility Determination and ROW comply fully with the Refuge Act.

The Court found that the Compatibility Determination and ROW violate the Refuge Act for two reasons. *First*, the Court held that the Project does not qualify as a minor realignment of an existing ROW under FWS regulations interpreting the Refuge Act because "the project is neither 'minor' nor being built 'to meet safety standards.'" Order at 24. *Second,* the Court held that the Project is incompatible with the Refuge's purposes because it found that the Project undercut goals in the Refuge's Comprehensive Conservation Plan ("CCP") to promote habitat connectivity and scenic values, *id.* at 29–31, and could not rely on compensatory mitigation under a regulatory exception to a regulatory prohibition on compensatory mitigation. *id.* at 31–32. The Court's analysis, however, is inconsistent with the Refuge Act, and fails to afford deference to the Refuge Manager's determinations

42

that the Project (1) would not materially interfere with the purposes of the Refuge, and (2) qualifies as a minor expansion or realignment to meet safety standards, regardless of compensatory mitigation. The Court finding that the "purposes for which the [Refuge is] established"—a term that the statute defines to require evidence of Congressional intent at the time a Refuge is established—can instead be defined to incorporate land management plans adopted decades later by individual Refuges. 16 U.S.C. § 668(ee)(10).

### a. The Court erred in finding that FWS's conclusion that the Project was compatible with Refuge purposes is "arbitrary and capricious."

Under the Refuge Act), the Secretary of the Interior, acting through FWS, may authorize private uses of within a refuge. As part of her broad grant of authority from Congress, the Secretary may "permit the use of any area within the System for any purpose . . . whenever [s]he determines that such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(A); *see also id*. § 668dd(d)(1)(B).[15] The Refuge Act specifically allows a refuge manager to approve the "construction" of "powerlines," provided they are "compatible with the purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(B); *see also id*. § 668dd(d)(1)(A). Compatible uses are those that "*in the sound professional judgment* of the [Regional] Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1) (emphasis added). The regulations define the "purposes of the refuge" to consist of "the purposes specified in or derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit." *Id*. § 668ee(10). Here, the Refuge manager, Sabrina Chandler, appropriately found that the requested right-of-way would "not materially

---

[15] A decision to "initiate or permit a new use of a refuge or expand, renew, or extend an existing use" also requires a compatibility determination. 16 U.S.C. § 668dd(d)(3)(A)(i).

interfere or detract from fulfillment of" the purposes of the Refuge or Refuge system. ROD007584. That finding was not arbitrary and capricious and therefore must be upheld.

The Court's analysis fails to acknowledge that even new ROWs for the construction of powerlines—not just the realignments for maintenance purposes governed by FWS regulations—are authorized under the Refuge Act upon a finding that they do not materially interfere with Refuge purposes. The Refuge manager may "permit the use of, or grant easements in, over, across, upon, through, or under any areas within the System for purposes such as but not necessarily limited to, *powerlines*, telephone lines, canals, ditches, pipelines, and roads, including the construction, operation, and maintenance thereof, whenever he determines that such uses are compatible with the purposes for which these areas are established." 16 U.S.C. § 668dd(d)(1)(B) (emphasis added). Because this provision mentions "construction," it obviously contemplates more than simply the renewal of existing uses.[16] To implement this statutory authority, FWS has created rules that identify requirements for approving powerlines in refuges. *See* 50 C.F.R. § 29.21.1–8. The plain statutory and regulatory language thus demonstrate that transmission line rights-of-way can be compatible uses of a Refuge.

Congress' acknowledgement of the many appropriate uses of refuges provides context for its decision to set the threshold for approval relatively low, by prohibiting only those uses that "*materially interfere*" with the purposes of the particular Refuge in which their use is proposed. 16 U.S.C. § 668ee(1) (emphasis added). This deliberately flexible standard is consistent with other conservation statutes that recognize that public lands must be administered for multiple uses. *Cf. Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 89 (D.D.C. 2013) (agency's assessment, under Wild and Scenic Rivers Act, of whether expansion of powerlines within a National Park "substantially interferes with public use and enjoyment of the river's values" is entitled to deference); *Hell's Canyon*

---

[16] The Co-owners do not read FWS's regulations governing "maintenance," *see* 50 C.F.R. § 26.41(c), to prohibit the grant of powerlines through the Refuge. However, to the extent those regulations can be interpreted to strip the agency of authority Congress explicitly located in the agency, those regulations would be arbitrary and capricious.

*All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1178 (9th Cir. 2000) ("the mere existence of some decline in scenic value does not establish that motorized use substantially interferes with this value" under the Wild and Scenic Rivers Act); *Or. Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1173 (D. Or. 2016) (where the Wild and Scenic Rivers Act prohibits uses that "substantially interfere" with river's values, "'[t]he Court defers to the Forest Service's reasoned judgment on the proper balance of competing uses for the river corridor") (citing *S. Utah Wilderness All.*, 542 U.S. at 58); *see also Cascade Forest Conservancy v. Heppler*, No. 19-cv-00424, 2021 WL 641614, at *5 (D. Or. Feb. 15, 2021) ("interfere with" under Reorganization Plan "means something more than *any* hindrance, delay, or obstruction").

The authorized officials properly found that the Project does not materially interfere with the purposes of the Refuge. The Refuge Act undeniably vests the Refuge Manager with the authority to find that the Project—a "powerline" expressly contemplated as a potentially valid use within the Refuge under the statute, 16 U.S.C. § 668dd(d)(1)(B)—is "compatible with" (i.e., does not "materially" interfere with, *id.* § 668ee(1)), the Refuge's purpose as a breeding ground for certain wildlife species. The NEPA documents and biological opinion confirm that any impacts on the Refuge do not amount to material interference, and the Refuge Manager expressly stated in the Compatibility Determination that the Project would not materially interfere with Refuge purposes based on a thorough examination of impacts to resident wildlife, vegetation and other resources. ROD007584; ROD007370. FWS reasonably found that the impacts of a relocated, little more than a mile crossing with a right-of-way that is 110' wider than the existing lines occupy—collocated with other rights-of-way, and with 17 fewer towers than the existing lines require—on the 240,000-acre Refuge would not "materially interfere with" the Refuge's purposes of establishing a breeding ground and habitat for certain bird and

other wildlife species. ROD007584.[17] That determination stands on its own irrespective of the compensatory mitigation.

In reaching the conclusion that the relocated right-of-way would not "materially interfere with" Refuge purposes, based on the EIS, biological opinion, and 17-page analysis in the Compatibility Determination, FWS officials appropriately exercised "sound professional judgment" based on statutorily-prescribed factors. ROD007609, 7650. These factors include how habitat fragmentation would be reduced under the proposed realignment as compared to the status quo; how the noise from the transmission line would, in its new location, be indistinguishable from "the ambient noise associated with the railroad and Oak Road"; how "permanent displacement of [wildlife] species is not anticipated"; and that any forest-obligate species displaced by permanently cleared areas would have habitat "in other areas near or adjacent to the right-of-way." ROD007579–582. Those analyses also showed:

- that granting the right-of-way along the Nelson Dewey route, subject to enforceable mitigation measures, was compatible with Refuge purposes. ROD007577 (incorporating analysis in EIS); ROD007584 (finding proposed use compatible);

- that given the disturbed condition of the new right-of-way for much of its length (i.e., because the Project would be aligned along an existing road and railroad within the Refuge), the proposed route would be much more protective of Refuge resources than an alternative built in the existing location. ROD007581–82 ("A more contiguous array of habitats would exist on the floodplain" after realignment); and

---

[17] The Court found that the Co-owners' commitment to revegetate the existing right of way was "compensatory mitigation" that is prohibited under FWS regulations. Order at 31-32. This is incorrect because the Co-owners' commitment to revegetate the rights-of-way after the lines are removed is a consequence of the relocation, not an attempt to compensate for the new right-of-way. Moreover, to the extent FWS considered off-site compensatory mitigation as part of its analysis, that consideration was appropriate, *see infra* Section III(A)(4)(b).

46

- that the route is less damaging than an alternative under which the Co-owners might exercise their easement rights to build out the new line *within their existing rights-of-way*. ROD007584.

The Refuge Manager's judgment, concurred in by the Regional Director and informed by substantial analysis, is entitled to deference. *Audubon Soc'y of Portland v. Zinke*, No. 17-cv-00069, 2019 WL 8371180, at *26 (D. Or. Nov. 18, 2019) ("The Court is not to substitute its scientific judgment for that of the Service, especially with 'respect to scientific matters within the purview of the agency'"), *appeals filed sub nom. Audubon Soc'y of Portland v. Bernhardt*, No. 20-35513 (9th Cir. June 8, 2020) and *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, No. 20-35515 (9th Cir. June 8, 2020) (citations omitted); *see also Del. Audubon Soc. v. Salazar*, 829 F. Supp. 2d 273, 289 (D. Del. 2011) (plaintiffs failed to show that compatibility determination was not product of "sound professional judgment" where NEPA analysis was adequate and plaintiffs offered no other basis for challenging that judgment).

To the extent that Plaintiffs' Refuge Act claim is not constitutionally moot, Plaintiffs failed to meet their burden on that claim. The Court improperly substituted its own policy judgment for that of FWS', rather than according the Refuge Manager the deference to which she is owed not only under the APA, but also under the Refuge Act, which allows land managers to take action based on "sound professional judgment." Here, the Refuge Manager relied on that judgment in finding that the Project "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1). *See Highway J Citizens Grp.*, 349 F.3d at 953; *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003) ("If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference."); *Sierra Club v. Marita*, 46 F.3d 606, 621 (7th Cir. 1995) (agency "is entitled to use its own methodology, unless it is irrational"). The

Refuge Manager's determination should be upheld unless "arbitrary and capricious." *Animal Lovers Volunteer Ass'n, v. Cheney*, 795 F. Supp. 994, 1000 (C.D. Cal. 1992) ("The [Administrative Procedure Act] and [National Wildlife Refuge System Administration Act] do not give the Court the authority to evaluate whether the agency's decision was the wisest decision."). In fact, the "very use of the term sound professional judgment constitutes a grant of authority by Congress to the FWS." *Stevens Cnty. v. U.S. Dep't of the Interior,* 507 F. Supp. 2d 1127, 1132 (E.D. Wash. 2007); *see also Or. Wild,* 193 F. Supp. 3d at 1173 (where Wild and Scenic Rivers Act prohibits uses that "substantially interfere" with river's values, "[t]he Court defers to the Forest Services' [sic] reasoned judgment on the proper balance of competing uses for the river corridor.") (citing *S. Utah Wilderness All.,* 542 U.S. at 58).

> **b.     The Court erred in concluding that the Project fails to qualify for a regulatory provision that controls minor realignment of an existing ROW.**

Under a regulation FWS has promulgated interpreting its Refuge Act authority, the Refuge Manager may approve any use that constitutes "maintenance of an existing right of way," including a "minor expansion or minor realignment [of the right of way] to meet safety standards," when certain specified conditions are met.[18] Here, the Compatibility Determination, which explains at length how the proposed line will increase habitat connectivity in comparison to existing rights-of-way, ROD007581–82 (which also afford the Co-owners the ability to build the line, ROD007569, 7582, 7584),

---

[18] 50 C.F.R. § 26.41(c) reads as follows:

> *Existing right-of-ways.* We will not make a compatibility determination and will deny any request for maintenance of an existing right-of-way which will affect a unit of the National Wildlife Refuge System, unless: the design adopts appropriate measures to avoid resource impacts and includes provisions to ensure no net loss of habitat quantity and quality; restored or replacement areas identified in the design are afforded permanent protection as part of the national wildlife refuge or wetland management district affected by the maintenance; and all restoration work is completed by the applicant prior to any title transfer or recording of the easement, if applicable. Maintenance of an existing right-of-way includes minor expansion or minor realignment to meet safety standards.

The exception allows FWS to accept compensatory mitigation, which the agency otherwise views as an impermissible basis for deeming a use compatible under the Refuge Act, under certain specified circumstances. 50 C.F.R. § 26.41(c); ROD007584.

demonstrates that the Project meets the statutory criteria for compatible uses without the need to qualify for this regulatory maintenance exception. *See supra* Section III.A.4. The Compatibility Determination also establishes, however, that the proposed use fell within that exception. Neither determination was "arbitrary and capricious," and therefore the Court's decision is erroneous. *Sauk Prairie Conservation All. v. U.S. Dep't of the Interior,* 944 F.3d 664, 678 (7th Cir. 2019), *cert. denied sub nom. Sauk Prairie Conservation All. v. Dep't of the Interior*, 140 S. Ct. 2764 (2020) (finding National Park Service's "application of expertise" entitled to deference).

The regulations do not define the term "minor," and it was reasonable for the Refuge Manager to find that, for a Refuge that extends 261 miles, a realignment that moves the right-of-way only 1800 feet at one end and 6000 feet at the other, and adds a net total of only 2.5 acres of disturbance as compared to the existing right-of-way, qualifies as "minor."[19] In addition, any requirement that the realignment's purpose is "to meet safety standards" is satisfied here because the new configuration reduces safety concerns in the town of Cassville by avoiding the need to route transmission line infrastructure "near schools, churches and other public gathering places." ROD007581. FWS explained that the Project is a minor realignment to meet safety standards "due to the relatively short distance the transmission lines would be moved . . . and the ability to co-locate adjacent to existing disturbed areas" and because it would "significantly reduce safety concerns in the town of Cassville" by avoiding "transmission line infrastructure running into and through Cassville." *Id*. *See Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1162 (9th Cir. 2012) (project to replace dam qualified for nationwide permit for replacement of structures to meet safety standards where "excessive flooding rationally

---

[19] FWS regulations require it to look at this smaller, net difference instead of the absolute acreage affected by the new line because the existing lines in the Refuge are a pre-existing use. 50 C.F.R. § 25.21(h) ("When we prepare a compatibility determination for re-authorization of an existing right-of-way, we will base our analysis on the existing conditions with the use in place, not from a pre-use perspective.").

qualifies as a 'public safety' concern"). The Court erred in second-guessing the FWS's sound professional judgment.

The FWS buttressed its decision by describing the Co-owners' commitment to donate a parcel of land within the Refuge boundaries that had been identified by the agency as a high priority for acquisition purposes due to its habitat value. But Plaintiffs have not demonstrated that the Refuge Manager relied on the donation parcel in order to find the proposed use compatible. Moreover, as the Refuge Act does not support FWS's ban on the use of compensatory mitigation. Indeed, to the extent that the ban attempts to alter the statutory standard for compatibility Congress prescribed for powerlines and other uses prioritized in the statute, that interpretation is itself suspect.

    **c.**    **The Court erred when it looked to the Comprehensive Conservation Plan to determine "the major purpose for which the Refuge was established."**

A proposed powerline right-of-way must be compatible with "the purposes for which these areas are established." 16 U.S.C. § 668dd (d)(1)(B); *see also* § 668ee(1) (defining "compatible use" as one that will not "in the sound professional judgment of the Director, . . . materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."). The phrase "purposes of the refuge" is defined to include "the purposes specified in or derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit." 16 U.S.C. § 668ee(10). Thus, Congress has prescribed the universe of documents to which a court may properly look to determine a refuge's purposes. A CCP is not one of them.

Here, the purposes of the Refuge would include, first (and as the Court duly recognized, Order at 27), the purpose specified in the statute that created the Refuge in 1924: to provide "a refuge and breeding place for migratory birds, as well as fish, animals, and plants." 16 U.S.C. § 723; *see also* ROD 007568 (Compatibility Determination, listing Refuge purposes). Because of extensive navigation

operations at the river by the Corps, the legislation was explicit that nothing in it should be construed to "authoriz[e] any interference with the operations of the Department of the Army in carrying out any project now or hereafter adopted for the improvement of said river. 16 U.S.C. § 731. Arguably, the statutory definition of "purpose" would also incorporate the deed restrictions in lands acquired by FWS in the process of expanding the Refuge (i.e., the "agreement" pursuant to which those lands were acquired).[20] In contrast, nothing in the Refuge Act or anything interpreting it suggests that the Refuge's purposes should include objectives in a CCP published by only one unit of the National Wildlife Refuge System 82 years after Congress has established the Refuge. That is not a "law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing authorizing, or expanding a refuge, refuge unit, or refuge subunit." 16 U.S.C. § 668ee(10). It was arbitrary, for example, for the Court to determine that one of the Refuge's purposes is to "maintain and improve the scenic qualities" of the area based on the CCP.[21]

The Court's interpretation of the Refuge Act suffers from multiple infirmities and should be stayed pending appeal.

### B.    A stay will not irreparably harm the Plaintiffs.

As discussed *supra* Section II.B.1, a stay will not result in irreparable or imminent harm to Plaintiffs. At this time, the Project cannot cross the Refuge through a new or realigned right-of-way because FWS has revoked the Compatibility Determination and ROW permit that it previously issued

---

[20] Because FWS purchased this land in 2000 subject to the Co-owners' existing rights-of-way, those are incorporated into the Refuge purposes. FWS00028 (warranty deed dated March 15, 1999, listing reservations); ECF Nos. 91-2 & 91-3 (rights-of-way listed in deed). FWS, aware of these rights-of-way when it acquired the lands, must be deemed to have determined that they do not interfere with the Refuge's purposes. 16 U.S.C. § 724(b)(1) (allowing Secretary to add lands to the Refuge that are burdened by easements provided he or she "determines that any such reservation or exception will in no manner interfere with the use of the area for the purposes of this chapter").

[21] The Court's discernment of "purposes" from the CCP is also selective; the first "major objective" listed in its 2006 Upper Mississippi River National Wildlife and Fish Refuge CCP is to "acquire from willing sellers 15,000 acres of land within the approved boundary." ROD028194. In addition, the CCP for the Refuge, adopted in 2006, lists conservation-oriented objectives, but acknowledges that there may be times when these resource priorities must be subordinated to other priorities, including "health, safety, and societal needs which must be addressed." ROD028363. It then provides as an example "a right-of-way expansion for a utility or highway project." *Id.*

51

and has not acted on the Co-owners' application for a land exchange. Accordingly, even if the Court stays whatever declaratory and injunctive relief it issues as part of its final judgment, there will be no irreparable harm to the Plaintiffs within the Refuge, because the Co-owners do not currently have federal authorization to construct the Project through a new or realigned right-of-way in the Refuge.

Likewise, if the Court enjoins construction of the Project outside the Refuge (notwithstanding the fact that it lacks jurisdiction to do so, *see supra* Section II.A), a stay of that relief will not harm the Plaintiffs. As noted, the only permits the Federal Defendants issued for the Project outside the Refuge are from the Corps, which authorize a *de minimis* amount of permanent fill (0.02 acres) and temporary fill (13.6 acres) in jurisdictional wetlands. *See supra* Section II.B.3. But the Court ruled in the Federal Defendants' and the Co-owners' favor on Plaintiffs' claims against the Corps, so it cannot use this *de minimis* impact to jurisdictional wetlands as a basis for enjoining the entire Project. In any event, the Plaintiffs simply cannot demonstrate that, absent an injunction, these *de minimis* impacts to wetlands or construction of the Project generally will cause them to suffer irreparable injury. *Id.*

### C.     A stay will avoid irreparable harm to the Co-owners.

As discussed *supra* Section II.B, there is a significant likelihood of irreparable harm to the Co-owners if the Court's judgment remains in effect pending appeal. Any relief, declaratory or injunctive, that prevents the Project from crossing the Refuge while an appeal is pending would likely force the Co-owners to defer construction work within the Refuge until October 2023 at the earliest, making it unlikely that the Project will meet its December 2023 in-service date. Jan. 31, 2022 Decl. of Shawn Mathis ¶¶ 8–9. Similarly, an injunction halting construction across the entire Project while the Federal Defendants correct the (alleged) deficiencies in their environmental assessment will almost certainly last longer than six months, which would significantly increase construction costs, prevent ATC from recovering a profit on the capital it has invested in the Project, and likely lead to the Project missing its December 2023 in-service date.

### D.    A stay is in the public interest.

As discussed *supra* Section II.B.3, allowing whatever relief the Court orders to remain in effect pending appeal will severely harm the public interest. The Court has already issued a declaration that the Project cannot cross the Refuge by ROW permit or land exchange. Allowing this relief to remain in effect pending appeal would delay the start date for construction within the Refuge by at least year, likely leading to a delay in the Project's in-service date. And if the Court enjoins construction along the entire Project route, this will almost certainly lead to a construction delay of longer than six months, further jeopardizing the Project's in-service date. This will, in turn, harm the public interest by preventing the public from realizing the Project's significant economic, reliability, and environmental benefits. Energy costs will remain higher than they otherwise would, harming utilities and ratepayers alike. The grid will be less reliable and secure, creating the potential for exceedances of reliability standards on the existing system and potential outages. And perhaps most importantly, thousands of megawatts of new and existing renewable generators will be at risk of having their output curtailed or cancelling their projects altogether, hindering regional efforts to promote access to low-cost, renewable energy and reduce regional greenhouse gas emissions.

### E.    In the alternative, the Court should grant an administrative stay of 21 days to allow the Co-owners to seek a stay from the Seventh Circuit.

If the Court is unwilling to stay its judgment pending appeal, the Co-owners request that the Court grant an administrative stay for a period of 21 days, which will provide them with the time needed to seek further relief with the Seventh Circuit. The Court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see also Munson v. Butler*, 776 F. App'x 339, 342 (7th Cir. 2019). That power applies "especially in cases of extraordinary public moment," when a party "may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." *Clinton*, 520 U.S. at 707 (modifications omitted). To determine whether a stay is warranted

courts consider, among other things, whether a stay would "unduly prejudice or tactically disadvantage the non-moving plaintiffs" and "reduce the burden of litigation on the parties and on the court." *Bouas v. Harley-Davidson Motor Co. Grp., LLC*, No. 3:19-CV-1367, 2020 WL 2334336, at *1 (S.D. Ill. May 11, 2020) (quoting *Nicholson v. Nationstar Mortg. LLC of Del.*, No. 17-cv-1373, 2018 WL 3344408 at *9 (N.D. Ill. July 6, 2018)); *see also Kent v. Vilsack*, No. 3:21-CV-540, 2021 WL 6139523, at *2 (S.D. Ill. Nov. 10, 2021). As discussed above, the balance of harms and the public interest weigh strongly in favor of a stay. An administrative stay of 21 days to allow the Co-owners to seek a stay from the Seventh Circuit would also reduce the burden of litigation on the parties and on the Court.

## IV.    THE COURT'S FINAL JUDGMENT SHOULD ENTER DECLARATORY JUDGMENT AND REMAND THE ROD WITHOUT VACATUR OR INJUNCTIVE RELIEF

For the foregoing reasons, the Court should enter declaratory judgment consistent with the Court's opinion and order on summary judgment and remand the ROD without vacatur or injunctive relief. In addition, the Court should dissolve the preliminary injunction and should grant either a stay pending appeal or an administrative stay of 21 days to allow the Co-owners to request such a stay from the Seventh Circuit.

The Co-owners' proposed language for a final judgment is attached to this submission.


DATED:  January 31, 2022                           Respectfully submitted,

                                                   *s/ Thomas C. Jensen*
                                                   Thomas C. Jensen
                                                   Edward A. Boling
                                                   Stacey Bosshardt
                                                   **PERKINS COIE LLP**
                                                   700 Thirteenth St. NW Suite 800
                                                   Washington, D.C. 20005-3960
                                                   Tel: (202) 654-6200
                                                   Fax: (202) 654-6210
                                                   TJensen@perkinscoie.com
                                                   TedBoling@perkinscoie.com
                                                   SBosshardt@perkinscoie.com

David Zoppo
**PERKINS COIE LLP**
33 E. Main Street, Suite 201
Madisom, WI 53703
Tel: (608) 663-7460
Fax: (608) 663-7499
DZoppo@perkinscoie.com

*Attorneys for Intervenor-Defendants*
*American Transmission Company LLC by its*
*corporate manager, ATC Management Inc.,*
*ITC Midwest LLC and Dairyland Power*
*Cooperative.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2022, I electronically filed the forgoing document with the Clerk of Court using the Court's ECF system, which will serve the document on all counsel of record registered for electronic filing in the above-captioned proceeding.


Dated: January 31, 2022

*/s/ Thomas C. Jensen*
Thomas C. Jensen